Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| JIMMY HENDRICH, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>MEDTRONIC, INC., et al.<br><br>*Defendants.* | ) | No. 1422-CC01224 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR TRANSFER OF CERTAIN CLAIMS TO OTHER VENUES OR FOR A MORE DEFINITE STATEMENT**

Eric D. Holland *(Mo. Bar # 39935)*
R. Seth Crompton *(Mo. Bar # 57448)*
**HOLLAND, GROVES, SCHNELLER & STOLZE, LLC**
300 N Tucker, Suite 801
St. Louis, Missouri 63101
TEL: (314) 241-8111
FAX: (314) 241-5554
EHolland@allfela.com
scrompton@allfela.com

Nicholas J. Drakulich, Esq. *(Pro Hac Vice)*
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108
TEL: (858) 755-5887
FAX: (858) 755-6456
njd@draklaw.com

Richard J. Arsenault, Esq. *(Pro Hac Vice)*
**NEBLETT, BEARD & ARSENAULT**
2220 Bonaventure Court
Alexandria, Louisiana 71309
TEL: (800) 256-1050
FAX: (318) 561-2592
rarsenault@nbalawfirm.com

Jerrold S. Parker, Esq. *(Pro Hac Vice)*
**PARKER WAICHMAN LLP**
3301 Bonita Beach Road
Bonita Springs, Florida 34134
TEL: (239) 390-8610
FAX: (239) 390-0055
jerry@yourlawyer.com

W. Mark Lanier *(Pro Hac Vice)*
**LANIER LAW FIRM**
6810 FM 1960 West
Houston, Texas
TEL: (713) 659-5200
FAX: (713) 659-2204
wml@lanierlawfirm.com
*Attorneys for Plaintiffs*

DATED: August 22, 2014

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES....v

PREFACE....1

INTRODUCTION....4

BACKGROUND....8

I. SUMMARY OF RELEVANT ALLEGATIONS....8

II. SUMMARY OF RELEVANT FEDERAL LAW AND REGULATIONS....16

III. LEGAL STANDARD....24

ARGUMENT....24

I. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS AS TO ALL PLAINTIFFS....24

II. VENUE IS PROPER IN THE CITY OF ST. LOUIS UNDER MISSOURI REVISED STATUTE § 508.010....38

A. Joinder and Venue are Intertwined in the Law....39

B. Missouri Law Recognizes That More Than One Venue May Be Proper in a Given Case....40

C. A Plaintiff's Choice of a Proper Venue Cannot Be Disturbed....43

III. PLAINTIFFS' CLAIMS ARE PROPERLY JOINED....44

A. Rulings Finding Joinder Proper....44

1. Judge Joan L. Moriarty's Orders....44

2. Judge Mark H. Neill's Orders....46

3. Judge Bryan L. Hettenbach's Order....47

4. Judge Phillip D. Heagney's Orders....48

5. Judge John F. Garvey, Jr.'s Order....49

6. The Missouri Court of Appeals for the Eastern District's Orders Denying Prohibition and/or Mandamus....49

7. The Supreme Court of Missouri's Orders Denying Prohibition and/or Mandamus....50

8. Federal Court Rulings Finding Proper Joinder....51

B. Independently, Plaintiffs' Claims Are Properly Joined....52

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM


IV. DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENTS ARE WITHOUT MERIT....57

V. PLAINTIFFS' CLAIMS ARE NOT PREEMPTED....62

A. Requirements Imposed By The PMA Approval For Infuse®....62

B. Federal Prohibition Against "Off-Label" Promotion....65

C. There Is A Presumption Against Preemption....67

D. Preemption Does Not Apply When Medtronic Violates The Laws....67

E. Plaintiffs' Claims Are Not Preempted By Riegel's Two-Step Test....69

1. No Specific FDA Requirement Applies Only to the rhBMP-2 Component (as Implanted in Plaintiffs) Because Medtronic Promoted a Different Design and Use than Approved by the FDA....71

a. The Infuse® FDA Approval Letter invalided all PMA requirements applicable to unapproved uses promoted contrary to the CONDITIONS OF APPROVAL....71

b. PMA requirements do not attach to the singular components of the Infuse® device....74

c. Cases Applying PMA Protection to rhBMP-2 Alone are Based Upon a Flawed Analysis....76

d. The rhBMP-2 device implanted in Plaintiff is a new "biologic" or combination device, with no applicable PMA requirements....78

e. The approval of Infuse® remains in effect, but only within the boundaries intended by the FDA. FDA never intended its PMA to apply separately to the parts of the Infuse® device....79

2. Plaintiffs' State-Law Claims Are Based On Requirements That Merely Parallel Federal Requirements....81

a. The FDCA and FDA Regulations prohibit off-label solicitation....82

b. Plaintiffs' State Law Claims Parallel Federal Law....83

c. Plaintiffs' Claims Against Defendants are Not Impliedly Preempted....89

d. Plaintiffs' Warranty Claims Are Not Preempted....92

F. The Solicitor General's Amicus Brief on Preemption Sheds Light on the Position of the Supreme Court....93

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

1. Despite the Guidance Provided in the Solicitor General's Amicus Brief, Some Courts Continue to Take an Incorrect Approach with Respect to Preemption ..........97

G. Medtronic Cannot Escape Responsibility For its Own Violation and Actions ..........102

CONCLUSION ..........105

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Action on Smoking and Health v. Harris*,
655 F.2d 236 (D.C. Cir. 1980) ..........22-23

*Adair v. Norfolk S. Ry. Co.*,
Cause No. 052CC1224 (Mo. 22nd Cir. Ct. May 15, 2006) ..........61

*Adams v. Union Pacific R.R. Co.*,
Cause No. 012-01286 (Mo. 22nd Cir. Ct. Aug. 30, 2001)..........61

*Adams v. Union Pacific R. R. Co.*,
Cause No. 13SL-CC00115 (Mo. 21st Cir. Ct. July 16, 2013). ..........62

*Aday v. Medtronic Med. Care N. Am., Inc.*,
No. 4:13-CV-2462, 2014 U.S. Dist. LEXIS 5066 (E.D. Mo. Jan. 15, 2014)..........53

*Affordable Healthcare, LLC v Protus IP Solutions, Inc.*,
2009 WL 749536 (E.D. Mo. 2009)..........37-38

*Agnew v. Medtronic Med. Care N. Am., Inc.*,
No. 4:13cv2468 TCM, 2014 U.S. Dist. LEXIS 2536 (E.D. Mo. Jan. 9, 2014)..........50

*Alton v. Medtronic Sofamor Danek USA, Inc.*,
No. 3:13-CV-409-PK, 2013 U.S. Dist. LEXIS 127190 (D. Ore. Sep. 6, 2013)....68, 91-2

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008)..........66

*Anglim v. Missouri Pacific R.R. Co.*,
832 S.W.2d 298 (Mo. banc 1992)..........56

*Apperson v. E.I. du Pont de Nemours & Co.*,
41 F.3d 1103 (7th Cir.1994). ..........83

*Ard v. Jensen*,
996 S.W.2d 594 (Mo. App. W.D. 1999)..........66

*Aurillo v. GlaxoSmithKline, LLC*,
2010 U.S. Dist. LEXIS 68348, 2010 WL 2735663 (E.D. Mo. July 9, 2010)..........51

*Austin v. Bayer Corp.*,
Cause No. 0922-CC09567 (Mo. 22nd Cir. Ct. June 30, 2011) ..........43

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Ayers v BNSF Ry. Co.*,
Cause No. 06CC-1810 (Mo. 21st Cir. Ct. June 27, 2007) ....................................... 59

*Barrett v. Missouri Pacific R.R. Co.*,
688 S.W.2d 397 (Mo. App. E.D. 1985) ........................................................... 60

*Barron v. Abbott Labs., Inc.*,
Cause No. 1222-CC02479-01 (Mo. 22nd Cir. Ct. Aug. 27, 2013) ......................... 47

*Bass v. Stryker Corp.*,
669 F.3d 501 (5th Cir. 2012). ..................................................................... 76

*Bates v. Dow Agrosciences, LLC*,
544 U.S. 431 (2005) ................................................................................ 66

*Bausch v. Stryker Corp.*,
30 F.3d 546 (7th Cir. Ill. 2010) ............................................... 83, 87-8, 90

*Bentley v BNSF Ry. Co.*,
Cause No. 06CC-5100 (Mo. 21st Cir. Ct. May 4, 2007) ................................ 59

*Besse v. Missouri Pacific R.R. Co.*,
721 S.W.2d 740 (Mo. banc 1986) ................................................... 57-8

*Bhagvandoss v. Beiersdorf, Inc.*,
723 S.W.2d 392 (Mo. banc. 1987) ............................................... 44, 52

*Blankenship v. Medtronic, Inc.*,
Case No. 4:13-CV-1087 (CEJ), 2014 WL 1226491 (E.D. Mo. March 25, 2014)..82, 96

*Boschert v. Pfizer, Inc.*,
2009 WL 1383183 (E.D. Mo. May 14, 2009) ........................................... 53

*Bristol-Myers Squibb Co. v. Superior Court of San Francisco County*,
2014 WL 3747250 (Cal. Ct. App. July 30, 2014) ........................................ 34

*Bruesewitz v. Wyeth Inc.*,
561 F.3d 233 (3d Cir. 2009) ....................................................................... 66

*Bryan v. Peppers*,
175 S.W.3d 714 (Mo. App. S D. 2005) .......................................... 44, 52

*Bryant v. Medtronic, Inc.*,
623 F.3d 1200 (8th Cir. 2010) .................................................................. 79

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Bryant v. Smith Interior Design Group, Inc.*,
310 S.W.3d 227 (Mo. banc 2010)........................................................24-5

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001)..........................................................................88-9

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)............................................................................30

*Campbell v. Francis*,
258 S.W.3d 94 (Mo. App. W.D. 2008)....................................................56

*Caplinger v. Medtronic, Inc.*,
921 F. Supp. 2d 1206 (W.D. Okla. 2013)................................................78

*Chambers (Brandt) v. Medtronic, Inc.*,
No. 12-2-07422-4 SEA (Wash. Super. Ct. Sept. 18, 2013)............................68

*Chandler v. Union Pacific R.R. Co.*,
Cause No. 042-00663 (Mo. 22nd Cir. Ct. Jan. 7, 2005)................................59

*Chromalloy American Corp. v. Elyria Foundry Co.*,
955 S.W.2d 1 (Mo. banc 1997)..............................................................26

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992)...........................................................................91

*Cline v. Advanced Neuromodulation Sys.*,
914 F. Supp. 2d 1290 (N.D. Ga. 2012)...................................................91

*Coleman v. Bayer Corp.*,
No.4:10CV01639, 2010 U.S. Dist. LEXIS 143673 (E.D. Mo. Dec. 9, 2010) ......... 51

*Coleman v. Medtronic, Inc.*,
No. SC112290 (Cal. Super. Ct. June 22, 2012)...........................................78

*Connelly v. Iolab Corp.*,
927 S.W.2d 848 (Mo. banc 1996)...........................................................24

*Cornett v. Johnson & Johnson*,
48 A.3d 1041 (N.J. 2012)....................................................................84

*Daimler AG v. Bauman*,
134 S.Ct. 746 (2014)...................................................27-28, 30, 35

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Dawson v. Medtronic, Inc.*,
No. 3:13-cv-663-JFA, 2013 U.S. Dist. LEXIS 112877 (D.S.C. Aug. 9, 2013).........78

*Dickerson v. GlaxoSmithKline, LLC*,
2010 U.S. Dist. LEXIS 69070, 2010 WL 2757339 (E.D. Mo. July 12, 2010)..........51

*Donahue v. Phillips Petroleum*,
866 F.2d 1008 (8th Cir. 1984) ....................................................................86

*Douglas v. GlaxoSmithKline, LLC*,
2010 U.S. Dist. LEXIS 66234, 2010 WL 2680308 (E.D. Mo. July 1, 2010)............50

*Duggan v. Medtronic, Inc.*,
840 F. Supp. 2d 466 (D. Mass. 2012) ..........................................................73

*Duvall* v. *Bristol Myers-Squibb Co.*,
103 F.3d 324 (4th Cir. 1996).......................................................................91

*Eidson v. Medtronic, Inc.*,
Nos. 3:13-CV-02049-LHK; 3:13-CV-01502-LHK, 2013 U.S. Dist. LEXIS 144179 (N.D. Cal. Oct. 3, 2013).................................................................68

*Elmore v. Smith*,
2013 WL 1707956 (N.D. IL 2013)..............................................83, 90

*Euton v. Norfolk and Western Ry. Co.*,
936 S.W.2d. 146 (Mo. App. E.D. 1996)..........................................56, 58

*Fenner v. Wyeth*,
912 F. Supp. 2d 795 (E.D. Mo. 2012)..........................................................50

*Ferre v. Norfolk Southern Ry. Co.*,
Cause No. 052-08304 (Mo. 22nd Cir. Ct. Jan. 23, 2006) ..................................58

*Fry v Norfolk Southern Ry. Co.*,
Cause No. 07-CC-2329 (Mo. 21st Cir. Ct. Jan. 17, 2008)..................................59

*Galloway v. Norfolk Southern Ry. Co.*,
Cause No. 052-07983 (Mo. 22nd Cir. Ct. Feb. 27, 2006) ..................................59

*Gavin v. Medtronic Inc.*,
2013 WL 3791612 (E.D. La. 2013)..................................................74-6

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. ----, 131 S.Ct. 2846 (2011) ..........................................................28

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Gross v. Stryker Corp.*
858 F. Supp. 2d 466 (W.D. Pa. 2012)....73

*Ground v. Abbott Labs., Inc.*,
Cause No. 1122-CC08690 (Mo. 22nd Cir. Ct. Dec. 1, 2011)....45

*Hall v. GlaxoSmithKline, LLC*,
Cause No. 1022-CC01740-01 (Mo. 22nd Cir. Ct. Sept. 23, 2010)....50

*Hall v. GlaxoSmithKline, LLC*,
706 F. Supp. 2d 947 (E.D. Mo. 2010)....46-50

*Hanson v. Denckla*,
357 U.S. 235 (1958)....30

*Hawkins v. Medtronic, Inc.*,
2014 WL 346622 (E.D. Cal. 2014)....74, 76

*Hess v. Chase Manhattan Bank*,
220 S.W.3d 758 (Mo. banc 2007)....24

*Hill v. Air Shields Inc.*,
721 S.W.2d 112 (Mo. App. E.D. 1986)....84

*Hinesman v. Norfolk Southern Ry. Co.*,
Cause No. 22052-08107 (Mo. 22nd Cir. Ct. July 24, 2006)....58

*Hopson v. Union Pacific R.R. Co.*,
Cause No. 042-07544, (Mo. 22nd Cir. Ct. Apr. 21, 2005)....59

*Donna Hornbeck, et. al v. Medtronic, Inc., et al.*,
13 C7816 (U.S. Dis. Ct. Dist. of Il., East Dist. 2014)....68

*Houston v. Medtronic, Inc.*,
957 F. Supp. 2d 1166 (C.D. Cal. 2013)....74-76

*Hudson v. GlaxoSmithKline, LLC*,
2010 U.S. Dist. LEXIS 72650, 2010 WL 2926535 (E.D. Mo. July 20, 2010)....51

*Hughes v. Boston Scientific Corp.*,
631 F.3d 762 (5th Cir. 2011)....83

*Hyatt v. Organon USA, Inc.*,
2012 WL 4809163 (E.D. Mo. Oct. 10, 2012)....53

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Ingle v. Illinois Cent. Gulf R.R. Co.*,
608 S.W.2d 76 (Mo. App. E.D. 1980) ....................58

*In re Medtronic, Inc., Implantable Defibrillators Litig.*,
465 F. Supp. 2d 886 (D. Minn. 2006) ....................90

*In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*,
592 F.Supp. 2d 1147 (D.Minn. 2009) ....................79

*In re Prempro Prods. Liab. Litig.*,
591 F.3d 613 (8th Cir. 2010) ....................52

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ....................29

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) ....................30, 36

*Kelley v. Nat'l Lead Co.*,
210 S.W.2d 728 (Mo. App. 1948) ....................44-50, 52

*King v. Collagen Corp.*,
983 F.2d 1130 (1st Cir. 1993) ....................96

*Knipe v. SmithKline Beecham*,
583 F.Supp. 2d 553 (E.D. Pa. 2008) ....................90

*Koz v. Norfolk Southern Ry. Co.*,
Cause No. 22052-07691 (Mo. 22nd Cir. Ct. July 24, 2006) ....................58

*Kulko v. Superior Court of California*,
436 U.S. 84 (1978) ....................30

*Lacy v. The Burlington Northern & Santa Fe Ry. Co.*,
Cause No. 052-00055 (Mo. 22nd Cir. Ct. Aug. 31, 2005) ....................59

*Laser Vision Centers, Inc. v. LVCI*,
930 S.W.2d 29 (Mo. App. E.D. 1996) ....................25-26

*Ledet v. Medtronic, Inc.*,
2013 WL 6858858 (S.D. Miss. 2013) ....................74

*Level 3 Commc'ns LLC v. Illinois Bell Tel. Co.*,
2014 WL 50856 (E.D. Mo. 2014) ....................35

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Levey v. Roosevelt Fed. Savings & Loan Ass'n of St. Louis*,
504 S.W.2d 241 (Mo. App. 1973) ....53

*Lowrey v. Horvath*,
689 S.W.2d 625 (Mo. banc 1985) ....24

*M.B. v. Abbott Labs.*,
No. 4:12-CV-1250, 2012 U.S. Dist. LEXIS 152588 (E.D. Mo. Oct. 24, 2012) ....51

*Madderra v. Merck Sharpe & Dohme Corp.*,
No. 4:11CV1673, 2012 U.S. Dist. LEXIS 22862 (E.D. Mo. Feb. 23, 2012) ....51

*Madderra v. Merck, Sharp & Dohme Corp.*,
Cause No. 1122-CC-09316 (Mo. 22nd Cir. Ct. Dec. 13, 2012) ....46-47

*Maretta Worrix v. Medtronic, Inc.*,
No. 13-CI-01016 (Ky. Pike Cir. March 6, 2014) ....68

*McCormick v. Medtronic, Inc.*,
No. 368532-V (Md. Cir. Ct. Apr. 19, 2013) ....78

*McDonald-Lerner v. Neurocare Assocs., P.A.*,
No. 373859-V, 2013 Md. Cir. Ct. LEXIS 6 (Md. Cir. Ct. Aug. 29, 2013) ....68

*McDonald-Lerner v. Neurocare Assocs*., P.A.,
NO. RWT 14-cv-094, 2014 WL 1356602 (D. Md. Apr. 4, 2014) ....79

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ....66, 80-82, 89

*Medtronic, Inc. v. Stengel*,
-- S. Ct. --, 2014 WL 2807193 (June 23, 2014) ....83

*Minix v Norfolk Southern Ry. Co.*,
Cause No. 07-CC-02328 (Mo. 21st Cir. Ct. Oct. 2, 2007) ....59

*Minneapolis Firefighters' Relief Assoc. v. Medtronic, Inc*.,
Civ. No. 08-6324, 2009 WL 1458234 (D. Minn. 2009) ....2, 13

*Mitchell v. Collagen Corp.*,
126 F. 3d 902 (7th Cir. 1997) ....96

*Monroy v. BNSF Ry. Co.*,
Cause No. DV 13-0799 (Mont. 13th Jud. Dist. Ct. July 30, 2014) ....34

*Moore v. Christian Fidelity Life Ins. Co.*,

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

687 S.W.2d 210 (Mo. App. W.D. 1984)....24

*Morris v. Shell Oil Co.*,
467 S.W.2d 39 (Mo. 1971)....86

*Morrison v. Union Pacific R.R. Co.*,
Cause No. 052-01267 (Mo. 22nd Cir. Ct. Mar. 24, 2006)....59

*Morrison v. Union Pacific R. Co.*,
Cause No. 052-08466 (Mo. 22nd Cir. Ct. Apr. 4, 2006)....59

*Mosley v. General Motors Corp.*,
97 F.2d 1330 (8th Cir. 1974)....53

*Moynihan v. Gunn*,
204 S.W.3d 230 (Mo. App. E.D. 2006)....24

*Noble v. Shawnee Gun Shop, Inc.*,
316 S.W.3d 364 (Mo. App. W.D. 2010)....24

*Orrantia v. Union Pacific R.R. Co.*,
Cause No. 09SL-CCO3964 (Mo. 21st Cir. Cit. Apr. 23, 2010)....58

*Osborn v Arkansas RR Co.*,
Cause No. 05CC005987 (Mo. 21st Cir. Ct. July 18, 2006)....59

*Otis-Wisher v. Fletcher Allen Health Care, Inc.*,
2013 U.S. Dist. LEXIS 88813, 951 F.Supp. 2d 592 (D.Vt. 2013)....78

*Pennoyer v. Neff*,
95 U.S. 714 (1878)....28

*Peterson v. BNSF Ry. Co.*,
Cause No. 052-7686 (Mo. 22nd Cir. Ct. Oct. 26, 2005)....59

*Phillips v. Stryker Corp.*,
2010 WL 2270683 (E.D. Tenn. June 3, 2010)....90

*Platonov v. The Barn, L.P.*,
226 S.W.3d 238 (Mo. App. E.D. 2007)....63-64, 67

*Purchase v. Advanced Bionics, LLC*,
896 F. Supp. 2d 694 (W.D. Tenn. 2011)....72

*Ramirez v. Medtronic, Inc.*,

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

No. CV-13-00512-PHX-GMS, 2013 U.S. Dist. LEXIS 118822 (D. Ariz. Aug. 21, 2013) ............ 68, 79

*Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008) ............ 63, 69

*Riley v. Cordis Corp.*, 625 F. Supp. 2d 769 (D. Minn. 2012) ............ 76

*Rimpler v Norfolk Southern Ry. Co.*, Cause No. 06CC-03756 (Mo. 21st Cir. Ct. Apr. 26, 2007) ............ 59

*S.L. v. Pfizer, Inc.*, No. 4:12-cv-00420-CEJ, 2012 U.S. Dist. LEXIS 103134 (E.D. Mo. April 4, 2012) ............ 51

*Saeger v. Lakeland Dev. Co.*, 350 S.W.2d 820 (Mo. App. 1961) ............ 44-50, 52

*Sanda v. Medtronic, Inc.*, No. 13L000305 (Ill. Cir. Ct. Jul. 18, 2013) ............ 68, 78

*Schafer v. Norfolk Southern Ry. Co.*, Case No. 08SL-CC00781 (Mo. 21st Cir. Ct. July 28, 2008) ............ 59

*Schouest v. Medtronic, Inc.*, 2014 WL 1213243 (S.D. Tex. 2014) ............ 74, 76

*Shapiro v. Columbia Union Nat'l Bank & Trust Co.*, 576 S.W.2d 310 (Mo. banc 1978) ............ 24

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) ............ 89

*Slaughter House Cases*, 16 Wall 36 (1873) ............ 66

*Smith v. Depuy Orthopaedics Inc.*, 552 F. App'x 192 (3d Cir. 2014) ............ 73

*Smyth v. BNSF Ry. Co.*, Cause No. 052-01686 (Mo. 22nd Cir. Ct. Oct. 26, 2005) ............ 59

*Sondergard v. Miles, Inc.*, 985 F.2d 1389 (8th Cir. 1993) ............ 30

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Spears v. Fresenius Med. Care N. America, Inc.*,
Cause No. 1322-CC00825-01 (22nd Cir. Ct. June 16, 2014) ....................................48, 54

*Spiller v. Medtronic USA, Inc.*,
No. 4:13- CV-2538, 2014 U.S. Dist. LEXIS 9727 (E.D. Mo. Jan. 27, 2014) .......... 50

*Stallworth v. BNSF Ry. Co.*,
Cause No. 042-09571 (Mo. 22nd Cir. Ct. Aug. 4, 2005)..........................................59

*Stansberry v. The Burlington Northern & Santa Fe Ry. Co.*,
Cause No. 042-08811 (Mo. 22nd Cir. Ct. Aug. 1, 2005)..........................................59

*State ex rel. Abbott Labs., Inc. v. The Honorable Philip D. Heagney*,
No. ED100679 (Mo. Ct. App. Dec. 11, 2013) .........................................................48, 50

*State ex rel. Allen v. Barker*,
581 S.W.2d 818 (Mo. banc 1979)..............................................6, 38, 41, 53

*State ex. rel. Birdsboro Corp. v. Kimberlin*,
461 S.W.2d 292 (Mo. App. 1970) ...............................................................................30

*State ex rel. Clark v. Gallagher*,
801 S.W.2d 341 (Mo. banc 1990)................................................................................42

*State ex rel. Farmers Ins. Co. v. Murphy*,
518 S.W.2d 655 (Mo. banc 1975) ...............................................................52, 55

*State ex. rel. Ford Motor Co. v. Westbrooke*,
12 S.W.3d 386 (Mo. App. S.D. 2000) .........................................................................56

*State ex rel. GlaxoSmithKline v. The Honorable Mark H. Neill*,
No. ED95780 (Mo. App. E.D. Nov. 23, 2010) ...........................................................49

*State ex rel. GlaxoSmithKline v. The Honorable Mark Neill*,
No. SC91374 (Mo. 2011)..............................................................................................49

*State ex. rel. Jinkerson v. Koehr*,
826 S.W.2d 346 (Mo. banc. 1992)................................................................................38

*State ex rel. K–Mart Corp. v. Holliger*,
986 S.W.2d 165 (Mo. banc 1999)..................................................................................25

*State ex rel. Kansas City S. Ry. Co. v. Mauer*,
998 S.W.2d 185 (Mo. App. W.D. 1999)...........................................................58, 60

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*State ex rel. Kansas City S. Ry. Co. v. Nixon*,
282 S.W.3d 363 (Mo. banc 2009)......6, 39-40

*State ex rel. Kinsey v. Wilkins*,
394 S.W.3d 446 (Mo. App. E.D. 2013)......38

*State ex rel. Nixon v. Beer Nuts, Ltd.*
29 S.W.3d 828 (Mo. App. E.D. 2000)......25

*State ex rel. Nixon v. Dally*,
248 S.W.3d 615 (Mo. banc 2008)......54

*State ex rel. Palmer v. Goeke*,
8 S.W.3d 193 (Mo. App. E.D. 1999)......42

*State ex rel. Selimanovic v. Dierker*,
246 S.W.3d 931 (Mo. banc 2008)......39-40, 42

*State ex. rel. Turnbough v. Gaetner*,
589 S.W.2d 290 (Mo. banc. 1979)......38

*State ex rel. Wyeth v. Grady*,
262 S.W.3d 216 (Mo. banc 2008)......39, 60

*Stengel v. Medtronic, Inc.*,
704 F.3d 1224 (9th Cir. 2013)......82-83, 85-86, 92

*T.F. v. Pfizer, Inc.*,
No. 4:12-cv-01221-CDP, 2012 U.S. Dist. LEXIS 101859
(E.D. Mo. July 23, 2012)......50

*Taylor v. Danek Med., Inc.*,
1998 U.S. Dist. LEXIS 20265 (E.D. Pa. December 29, 1998)......22, 65

*Townsend v. Hoffmann-La Roche, Inc.*,
Case No. 4:11-cv-01420 (E.D. Mo. Sept. 1, 2011)......51

*Townsend v. Hoffmann-La Roche, Inc.*,
Cause No. 1122-CC08391 (Mo. 22nd Cir. Ct. Sept. 26, 2012)......44

*United Mine Workers of America v. Gibbs*,
383 U.S. 715, 86 S. Ct. 1130, 16 L.Ed.2d 218 (1966)......53

*United States v. Articles of Drug*,
625 F.2d 665 (5th Cir. 1980)......20

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*United States v. Caronia*,
703 F.3d 149 (2d Cir. 2012)....................81-82

*United States v. Stryker Biotech, LLC*,
Criminal No. 09-10330-GAO, 2010 WL 2132743 (D. Mass. May 25, 2010)..........84

*United States v. Two Units, More or Less, of an Article or Device*,
49 F.3d 479 (9th Cir. 1994)....................22

*Vance v BNSF Ry. Co.*,
Cause No. 07CC-2083 (Mo. 21st Cir. Ct. Nov. 26, 2007)....................59

*Vogt v. Emmons*,
158 S.W.3d 243 (Mo. App. E.D. 2005)....................63

*Walden v. Fiore*,
134 S.Ct. 1115, 1122 (2014)....................30

*Walker v. BNSF Ry. Co.*,
Cause No. 052-00724 (Mo. 22nd Cir. Ct. Sept. 27, 2005)....................59

*Walker v. Medtronic, Inc.*,
670 F3d 569 (4th Cir. 2012)....................83

*Washington Legal Found. v. Henney*,
56 F. Supp. 2d 81 (D.D.C 1999)....................20

*Washington Legal Found. v. Henney*,
202 F.3d 331 (D.C. Cir. 2001)....................20

*Wendt v. Bernstein*,
No. 12 L 11479 (Ill. Cir. Ct. Jun. 24, 2013)....................78

*Whitman v. BNSF Ry. Co.*,
Cause No. 042-09267 (Mo. 22nd Cir. Ct. Aug. 4, 2005)....................59

*Willman v. McMillen*,
779 S.W.2d 583 (Mo. 1989)....................56

*Winston Dillion, Jr., et ux. v. Medtronic, Inc. et al.*,
No. 13-CI-00922 (Ky. Pike. Cir. Ct. May 26, 2014)....................68

*Wolicki-Gables v. Arrow Intern., Inc.*,
634 F.3d 1296 (11th Cir. 2011)....................78, 83

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Wood v. v. Norfolk Southern Ry. Co.*,
Cause No. 042-01171 (Mo. 22nd Cir. Ct. Jan. 27, 2005) ....................................58

*World–Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ....................................30

*Zaccarello v. Medtronic, Inc.*,
3:13-CV-01161-BCW, 2014 WL 3866607 (W.D. Mo. August 6, 2014) ..................96-99

**Statutes, Rules and Regulations**

21 C.F.R. § 3.2(b) ....................................77, 79

21 C.F.R. § 202.1(l)(2)....................................*passim*

21 C.F.R. § 201.100 ....................................65

21 C.F.R. § 201.128 ....................................20, 65

21 C.F.R. § 314.70(c)(6)(iii)....................................95, 98, 100

21 C.F.R. § 314.70(c)(6)(iii)(A)....................................95, 98, 100

21 C.F.R. § 314.70(c)(6)(iii)(C)....................................95, 98, 100

21 C.F.R. § 801.4....................................18, 22, 23, 99

21 C.F.R. § 801.5 ....................................18, 23

21 C.F.R. § 801.109 ....................................22

21 C.F.R. § 801.119 ....................................18

21 C.F.R. § 801.122 ....................................18

21 C.F.R. § 803.50 ....................................23, 85

21 C.F.R. § 803.50(a)....................................85

21 C.F.R. § 807.87(g) ....................................71

21 C.F.R. § 808.1(d) ....................................87, 96

21 C.F.R. § 808.1(d)(1)....................................91

21 C.F.R. § 814....................................17

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

21 C.F.R. § 814.3(e)....17

21 C.F.R. § 814.20(b)(3)(i)....72

21 C.F.R. § 814.39....21

21 C.F.R. § 814.39(d)(2)....21

21 C.F.R. § 814.39(d)(2)(i)

21 C.F.R. § 814.39(d)(2)(ii)....21, 95

21 C.F.R. § 814.39(e)....21

21 C.F.R. § 814.39(f)....21

21 C.F.R. § 814.80....23

21 C.F.R. § 814.84(b)(2)....85

21 C.F.R. § 820.198(a)....23, 85

21 C.F.R. § 860.7(b)(2)....72

21 C.F.R. § 888.3080....77, 79

65 Fed. Reg. 14286....20, 65

21 U.S.C. § 321(h)....18

21 U.S.C. § 321(m)....20, 71

21 U.S.C. § 321(n)....23, 99

21 U.S.C. § 331(a)....22, 81, 99

21 U.S.C. § 331(b)....23

21 U.S.C. § 331(d)....20, 21

21 U.S.C. § 331(k)....21

21 U.S.C. § 332....21

21 U.S.C. § 333....99

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

21 U.S.C. § 334 ... 21

21 U.S.C. § 337(a) ... 90, 92

21 U.S.C. § 351(f) ... 21, 65

21 U.S.C. § 352 ... 89

21 U.S.C. § 352(a) ... 22

21 U.S.C. § 352(f)(1) ... 23, 65

21 U.S.C. § 353 ... 89

21 U.S.C. § 355(a) ... 20

21 U.S.C. § 355(b) ... 20

21 U.S.C. § 355(d) ... 20

21 U.S.C. § 355(j) ... 20

21 U.S.C. § 360c(a)(1)(A) ... 16

21 U.S.C. § 360c(a)(1)(B) ... 17

21 U.S.C. § 360c(a)(1)(C) ... 17

21 U.S.C. § 360c(a)(1)(C)(ii)(II) ... 17

21 U.S.C. § 360c(a)(2) ... 61, 77, 84

21 U.S.C. § 360e(a) ... 17

21 U.S.C. § 360e(a)(1) ... 17

21 U.S.C. § 360e(c) ... *passim*

21 U.S.C. § 360e(c)(1) ... 61, 84

21 U.S.C. § 360e(d) ... *passim*

21 U.S.C. § 360e(d)(1)(B)(iii)(II) ... 17-18

21 U.S.C. § 360e(d)(2) ... 77

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

21 U.S.C. § 360e(d)(2)(A) ....................18

21 U.S.C. § 360e(d)(2)(B) ....................18

21 U.S.C. § 360i(a) ....................11-12

21 U.S.C. § 360(k) ....................96

21 U.S.C. § 360k(a) ....................82, 88

21 U.S.C. § 396 ....................22, 71

21 U.S.C. § 397 ....................71

21 U.S.C. § 510(k) ....................23, 73, 75, 95

Fed. R. Civ. P. 13 ....................53

Fed. R. Civ. P. 20 ....................53

Mo. Rev. Stat. § 196.015 ....................84, 90

Mo. Rev. Stat. § 400.2-313 ....................91

Mo. Rev. Stat. § 400.2-314 ....................91

Mo. Rev. Stat. § 400.2-315 ....................91

Mo. Rev. Stat. § 506.500 ....................26

Mo. Rev. Stat. § 507.040.1 ....................6, 38, 51, 54, 56

Mo. Rev. Stat. § 508.010 ....................6, 37-40, 57

Mo. R. Civ. P. 51.045 ....................42

Mo. R. Civ. P. 52.05 ....................6

Mo. R. Civ. P. 55.27(a)(2) ....................63

Mo. R. Civ. P. 55.27(a)(6) ....................63

**Other Sources**

1A-8B Drug Product Liability § 8B.06 ....................71

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Brilmayer et al., *A General Look at General Jurisdiction*, 66 TEXAS L.REV. 721 (1988).....28

Restatement (Second) of Torts § 388 cmt. n.....86

S. Comm. on Finance, 112th Cong., 2d Sess., *Staff Report on Medtronic's Influence on Infuse Clinical Studies* (Oct. 2012).....3, 14, 33

U.S. Amicus Br., *Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. 2013).....92-95

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

# PREFACE

## THE MEDTRONIC INFUSE® SCANDAL

- "[I]t's ultimately disappointing that after 15 years of largely self-congratulatory research, we have only indirectly discovered BMP-2's many potential complications. . .The suggested gap in our understanding. . .is simply appalling: these complications were systematically, 'misrepresented,' 'underreported' or just 'missing' from the first decade" of Infuse sales. –Dr. Eugene Carragee, MD, Stanford University, Editor-in-Chief of the *Spine Journal* (Am. Pet. ¶ 963).

- "Evidence suggests that some data are not missing at random." – Yale's YODA Project Leader, Dr. Harland Krumholz, MD, SM (Am. Pet. ¶ 962).

- "Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting." – *Annals of Internal Medicine* (Am. Pet. ¶ 961-962).
- "This sounds eerily familiar to many of the transgressions we've read about from the pharmaceutical industry…It paints a picture of a company very heavily involved in the science; marketing contaminating the science; and the medical profession and researchers being complicit." Yale's YODA Project Leader, Dr. Harland Krumholz, MD, SM (Am. Pet. ¶ 933).

- "The actual rates of adverse events were much higher than reported." Oregon Health and Science University, Executive Summary of Study Findings (Am. Pet. ¶ 936).

- "[*N]one* of the original estimates of safety for any of the rhBMP-2 applications proved accurate" and the risk of adverse events associated with rhBMP-2 are actually "10 to 50 times the original estimates" reported by Medtronic." – 2011 Study in *The Spine Journal* (Am. Pet. ¶ 782).

- "A physician's use of a device in a manner not specifically approved by the FDA is not illegal. It is illegal, however, for a manufacturer to promote devices' off-label use. . . information provided by confidential witnesses either established or implies that Medtronic actively promoted off-label uses for Infuse, by among others things, hosting physician meetings at which a Medtronic-paid consulting physician would give a presentation on off-label uses, instructing its sales force in off-label use of Infuse (Am. Compl. ¶ 94), giving physicians literature about off-label uses for Infuse *(Id.* ¶ 96) or directing physicians to other surgeons who used Infuse for off-label procedures (*Id.* ¶ 102), and advising physicians regarding the appropriated dosage of Infuse for off-label uses (*Id.* ¶ 105). Plaintiffs also claim that Medtronic set high sales targets for Infuse and

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

knew or should have known that such high targets could be reached only through illegal promotion of off-label uses of Infuse. (e.g., *Id.* ¶ 107).” – Judge Paul A. Magnuson, Memorandum and Order at 2-3, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (2/3/2010). (Am. Pet. ¶ 667).

- “[K]ickbacks to physicians are incompatible with a properly functioning healthcare system . . . They corrupt physicians' medical judgment and they cause overutilization and misallocation of vital health resources.” – Peter Keisler, Assistant Attorney General, Civil Division, Department of Justice. (Am. Pet. ¶ 599).

- “[W]e found a lot of reporting bias in [Medtronic's] published papers that tends to overstate the benefits and played down the risks. . .it was difficult to identify ‘clear indications’ for using the product, as Infuse® offered no additional benefits beyond the normal benefits of the spine surgery. . .[s]uch underreporting and practice could affect the spine surgeons' ability to evaluate the balance between the benefits and harms of using rhBMP-2 and prevent informed consent.” – Dr. Rongwei Fu, Oregon Health and Science University, study co-author (Am. Pet. ¶ 941-43).

- “[I]n a triumph of understatement, the YODA group informs us that ten years after its development ‘it is difficult to identify a clear indication for BMP-2 use in spinal fusion.’” – *The Spine Journal* editorial on YODA study (Am. Pet. ¶ 961).

- “[I]t is hard to find a clear advantage for using it. . .When you add in the potential harms, it tips the scale further toward not using it.” – Mark Helfand, MD, Oregon Health and Science University, study co-author (Am. Pet. ¶ 949).

- “[A]n extraordinary merry-go-round of comprehensively conflicted faces are found where independent checks should have provided critical review.” – Dr. Eugene Carragee, Stanford University, Editor-in-Chief *The Spine Journal* (Am. Pet. ¶ 962).

- “If surgeons had known that the lead authors of the 13 original studies on Infuse had received payments ranging from $1.7 million to $64 million from Medtronic and that its marketing employees were co-authors and co-editors, would they have been so eager to use Infuse on their patients?” – Michael Heggeness and Charles Mick, President and Vice President of the North American Spine Society (Am. Pet. ¶ 872).

- The BMP-2 issue is just the most recent example (eg Vioxx, Tamiflu, Paxil, Avandia) to show that questionable behavior has been going on in the medical research for years, resulting in publication/reporting bias, biased systematic reviews, and public health and patient harm.” - The September 2013 *The* Spine *Journal* editorial entitled “Moving forward after YODA”, written by Eugene J. Carragee, M.D., Bradley K. Weiner, M.D., Eric L. Hurwitz, DC, Ph.D., and Mark L. Schoene, (Am. Pet. ¶ 971).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

- "Last week, the Wall Street Journal (WSJ) reported allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to Alaska and patent royalties on inventions they played no part in…[O]ne of the incentives Medtronic provided physicians was to include them on patents for medical devices and reward them with royalties, even though the physicians may not have contributed to the development of the product…It was reported that Medtronic gave payments to physicians, in the form of consulting agreements, as a means of increasing sales of Infuse®. The allegations that Medtronic has been disguising these consulting agreements as inducements or kickbacks for physicians to use Infuse® are equally troubling. . ." - United States Senator Chuck Grassley (Am. Pet. ¶ 856).

- "Earlier this year, your company's outside counsel provided the Committee with a written account of Medtronic's efforts to comply with the settlement agreement it reached with the United States Department of Justice (DOJ) concerning allegations that Medtronic and its subsidiary improperly compensated surgeons and physicians. . . .Consequently, it was with concern that I read recent articles, in the Wall Street Journal and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by Medtronic to surgeons and physicians." – United States Senator Herbert Kohl (Am. Pet. ¶ 853).

- "It is painful to consider how early prudent reporting of even the most obvious and suspicious adverse events might well have prevented a decade of serious complications related to the use of rhBMP-2. In retrospect, we can see how false confidence in a reportedly perfect safety profile promoted a period of BMP-2 application in areas of greater and greater potential danger. . ." – *The Spine Journal*, October 2012 Editorial (Am. Pet. ¶ 931).

- "[T]he core of our professional faith . . . is to first do no harm. It harms patients to have biased and corrupted research published. It harms patients to have unaccountable special interests permeate medical research. It harms patients when poor publication practices become business as usual. Yet harm has been done." – Dr. Dan Spengler, former Editor-in-Chief, *Journal of Spine Disorders*. (Am. Pet. ¶ 789).

- "Medtronic was heavily involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. . .Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements." – U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies* (Am. Pet. ¶ 868).

- "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has . . . Patients everywhere will be better served by a more open, honest

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

system without this kind of collusion." – United States Senator Max Baucus (Am. Pet. ¶ 869).

## INTRODUCTION

For the serious injuries caused by Medtronic's wrongful conduct, Plaintiffs have brought suit against Defendants Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., and Medtronic Sofamor Danek, Inc. (collectively referred to herein as "Medtronic" and/or "Defendants"), alleging state law claims for:

- negligence
- negligence per se
- negligent misrepresentation
- strict products liability (failure to warn, design defect, and manufacturing defect)
- fraud, (common law, constructive fraud, and fraudulent concealment)
- breach of implied and express warranties
- violations of consumer protection statutes
- violations of the Missouri Merchandising Practices Act
- loss of consortium and
- punitive damages

Medtronic has moved to dismiss all of Plaintiffs' claims, or in the alternative, transfer certain Plaintiffs' claims to other venues.[1]

[1]Defendants moved to dismiss for: (1) lack of personal jurisdiction, (2) transfer of Venue, (3) joinder of Claims (4) *forum non conveniens*, (5) federal preemption, (6) lack of particularity and (7) a series of independent state law grounds. Your Honor's Order dated August 18, 2014, clarified that the parties will defer the "Independent Grounds" portion of Defendants' Motion to Dismiss (Section VII) and the lack of particularity of Defendants' Motion to Dismiss (Section VIII) without prejudice to either party. As a result, Plaintiffs have fully briefed an opposition to Defendants' Motion to Dismiss or in the Alternative Transfer of Certain Claims to Other Venues as to personal jurisdiction, venue, joinder, *forum non conveniens*, and preemption. Plaintiffs have deferred responding to Defendants' arguments relating to "Independent Grounds" (Section VII) and "lack of particularity" (Section VIII) of Defendants' Motion.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Regarding Medtronic's motion to dismiss for lack of personal jurisdiction, Medtronic by its own admission is "the world's largest medical technology company." Medtronic makes billions of dollars from its sales in the U.S. alone. And it conducts a plethora of activity in Missouri including:

- Medtronic solicits business through its advertising campaigns in Missouri.
- Medtronic has sales consultants and representatives in the state of Missouri, including in St. Louis.
- Medtronic has regional offices in Clayton, Missouri.
- Medtronic makes significant sales, distributing its products throughout the state of Missouri.
- Medtronic has paid millions of dollars to its secret agents located in Missouri to illegally promote Infuse® for off-label uses, as alleged in the Amended Petition.
- In fact, Medtronic has been recognized by the Secretary of State for the State of Missouri, as a foreign corporation qualified to do business in the State of Missouri.
- Twenty one plaintiffs, including, Jimmy Hendrich, Loretta Ann Hendrich, Floyd Barnett, Steven Crenshaw, Mayann Deves, David Deves, Douglas Kiffmeyer, Charles Lee, Lisa Ann Lee, John Ockleston, James Oliver, Edward Salsman, Melanie Shaw, Charles Shaw, Heather Smith, Tammy Thomas, Mark Thomas, Teralandur Parthasarathy and Gita Malur, Keith Schremp, and Carlos Webster have claims based on injuries that were incurred in and wrongful conduct committed by Medtronic in the state of Missouri.

Notwithstanding this plethora of ties to Missouri, which individually and collectively exponentially exceed minimum contacts required by state law, Medtronic nonetheless moves to be dismissed for lack of personal jurisdiction.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Regarding Medtronic's motion to dismiss or transfer for venue, it is well established in the state of Missouri that venue is proper in the county where the plaintiff was first injured by the wrongful acts of the defendants. Mo. R.S. § 508.010. Venue and joinder are intertwined under Missouri law. *See e.g., State ex re. Allen v. Barker*, 581 S.W.2d 818, 824 (Mo. banc 1979). Therefore, venue can be proper in multiple locations. *See e.g. State ex rel. Kansas City S. Ry. Co. v. Nixon*, 282 S.W.3d 363, 367 (Mo. banc 2009). Venue is proper for all plaintiffs so long as venue is proper for one plaintiff. Mo. Rev. Stat. § 507.040.1; Mo. R. Civ. P. 52.05(a). Here, Plaintiffs Jimmy Hendrich, Keith Schremp, and Carlos Webster were all injured by the wrongful acts of the defendants within the city of St. Louis. These four plaintiffs were injured in the city of St. Louis, Missouri as they were exposed to spinal fusion surgeries involving an unreasonably dangerous and unsafe product, the off-label use of Infuse® and/or an "New, Unapproved Class III Medical Device" consisting of only select parts of Infuse® (i.e. the rhBMP-2 and collagen sponge without the PMA mandated, LT-CAGE™)[2].

Further, joinder is permitted for the other named plaintiffs who allege injury caused by the same wrongful conduct by the same defendants. Here, there are numerous underlying facts regarding the conduct of Medtronic that are common to all plaintiffs. This common factual predicate, includes, but is not limited to, how Medtronic obtained from the Food and Drug Administration (FDA) a very limited PMA approval for the use of the Infuse® medical device (consisting of two components made up of three parts) in spinal fusion surgeries, and then following that narrow and restricted approval, Medtronic consciously and illegally over-promoted and marketed off-label uses of Infuse® and/or an unapproved class III medical device

[2] Medtronic subsequently had two additional cage types approved by the FDA (the InterFix™ and InterFix™ RP cages) for the same limited use in ALIF procedures with the Infuse® device, but for purposes of this motion they will all be referred to as "LT-Cage™."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

consisting of only select parts of Infuse® (i.e. the rhBMP-2 biologic and the absorbable collagen sponge without the LT-Cage™). Plaintiffs have alleged throughout the Amended Petition that Medtronic illegally and in violation of federal law (as well as parallel state laws) marketed an unapproved class III medical device for uses never approved by the FDA, while concealing and failing to report the serious dangers, risks, and associated adverse events.

Regarding Defendants' motion to dismiss for *Forum Non Conveniens*, there clearly are no "weighty reasons" strongly in favor of the defendants to dismiss this action. The Plaintiffs brought their actions in a proper venue. There is more than an adequate nexus between the city of St. Louis and the underlying facts of this case. Just as Venue is proper is St. Louis, so is the forum proper.

Regarding Medtronic's motion to dismiss for preemption, Plaintiffs have alleged that they suffered serious injuries as a result of Medtronic's illegal and misleading promotion and distribution of a medical device for uses never approved by the federal Food and Drug Administration (FDA). This wrongful conduct was in violation of federal law amounts to "parallel claims" under the controlling precedents such that their product liability causes of action are not preempted.

In addition, for the vast majority of the Plaintiffs, this Court can deny Medtronic's preemption motion without determining whether plaintiffs have alleged parallel claims. The vast majority of Plaintiffs were not implanted with Infuse®. The FDA approved the class III medical device Infuse® as a "system", consisting of two components, made up of three parts. To be Infuse® it must contain the rhBMP-2, the absorbable collagen sponge, and the LT-Cage™. The FDA never approved a medical device for spinal surgeries that consisted of only the rhBMP-2 and the absorbable collagen sponge (without the LT-Cage™) or with any surgical spinal cages

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

(other than the LT-Cage™). Only two of the plaintiffs had the LT-Cage™. Therefore, the vast majority of Plaintiffs received a new unapproved medical device. Without FDA approval, there is no preemption.

Defendants are clearly not entitled to the protection they seek. Their violations and wrongful conduct are not only alleged and well documented with particularity throughout the extensive allegations of the Amended Petition, but have been confirmed and sharply rebuked by independent authorities, including the Spine Journal editors, Yale's unprecedented YODA study, as well as the United States Senate. A manufacturer that fails to abide by the federal requirements, is not protected by them. Medtronic's motion should therefore be denied.

## BACKGROUND

### I. SUMMARY OF RELEVANT ALLEGATIONS

Plaintiffs brought an action for product liability and fraud against Medtronic Inc., and its wholly owned subsidiary, Medtronic Sofamor Danek, USA, Inc. The Amended Petition alleges in extraordinary detail and particularity, Medtronic's wrongful conduct, upon which Plaintiffs' actions are predicated. *See generally* Amended Petition for Damages. In 2002, Medtronic applied for, and received, a very narrow and limited Food and Drug Administration (FDA) approval for permission to sell Medtronic Infuse® Bone Graft LT-Cage™ Lumbar Tapered Fusion Device System ("Infuse®") for a specific, intended use.

The Infuse® "device" is a "system" that combines two components, consisting of three parts. The three parts are: (1) the bone protein biologic (rhBMP-2); (2) the absorbable collagen sponge (ACS); and (3) a metallic spinal fusion cage, called an "LT-CAGE™". The bone protein biologic (rhBMP-2) is soaked into the absorbable collagen sponge (ACS) to create the first component. This first component is then placed into the second component, the "LT-CAGE™,"

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

which is specifically, designed, tested and approved to be used with the biologic, rhBMP-2.




If the product used does not contain all three parts (the bone protein biologic (rhBMP-2), the collagen sponge (ACS), and the LT-CAGE™, then it is not Infuse®, (i.e., not an approved Class III Medical Device). If the product used is not Infuse®, but is rather a new, unapproved device that uses only selective parts taken from Infuse®, such as using the rhBMP-2 and the absorbable collagen sponge component, either on its own, without the LT-CAGE, or with another unapproved surgical cage, then it will be referred herein as an "Unapproved Device."

Infuse® was approved by the FDA to be used for only a single level of fusion, meaning it could only be placed once in the space in between two vertebrae. Further, its approval was limited to the space between specific vertebrae in the lumbar region (in 2002, it was limited to the L4-S1 and in 2004, it was slightly expanded to the L2-S1 region). Finally, the approval of Infuse® was limited to use in a specific type of surgical approach, an Anterior Lumber Interbody Fusion (ALIF).[3] If the product is used to fuse more than a single level of vertebrae, outside of the L4-S1 region of the lumbar spine, or performed with a surgical technique other than an ALIF,

[3] *See* Am. Pet. at ¶ 107, fn 2, "The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach." Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf ; *see also* Infuse® Label, "These components must be used as a system. The Infuse® Bone Graft component must not be used without the LT-Cage Lumbar Tapered Fusion Device component." *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

then it is outside of FDA approval and described as "off-label".

Recognizing these strict limitations greatly reduced the potential market and ultimate sales of Infuse®, and instead of seeking an expanded FDA approval through a supplemental Pre-Market Approval (PMA) as is required by the Federal Food, Drug, and Cosmetic Act (FDCA), and the Infuse® PMA, Medtronic following the very limited approval for Infuse® embarked on an illegal, false and deceptive marketing scheme to promote the sale of Infuse® for unapproved "off-label" uses and/or the use of an "Unapproved Device".[4]

Plaintiffs underwent spinal fusion surgeries in which Infuse® or an "Unapproved Device" consisting of only parts of Infuse® (i.e. the rhBMP-2 and collagen sponge component without an LT-Cage™) was implanted in an off-label manner. The FDA has never approved Infuse® for any lumbar surgery performed through the back or side of the body (posterior approaches. Nor has the FDA approved the use of either the liquid bone protein (rhBMP-2) part of the Infuse® device, or the Infuse® device itself, in any back surgeries that do not use the LT-Cage™.

In 2002, in furtherance of this illegal promotional campaign, Medtronic published a "Fact Sheet" that summarized and promoted the results of scientific studies it sponsored, many of which were performed after the limited FDA approval of Infuse®.[5] However, it was only recently revealed, that in the "Fact Sheet" as well as in the scientific studies themselves, Medtronic intentionally concealed important and material safety information in violation of federal law, the Infuse® PMA, and parallel state law.[6]

---

[4] *See* Am. Pet. at ¶¶ 484-519, "Medtronic Engaged in Active, Systemic "Off-Label" Over-Promotion Through Its Employees and Agents Without Seeking Prior Approval From the FDA or in Furtherance of the Safe Harbor Provisions."

[5] Medtronic, Fact Sheet (2002), *see* Am. Pet. at ¶ 2.

[6] *See* Am. Pet. at ¶¶ 728-769, "The Yale Study, Published in June 2013, Funded with Millions of Dollars From Medtronic, Confirms the Lack of Scientific Integrity of Previous Company Sponsored 'Studies' of Medtronic's Infuse®."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic knew that the off-label uses of Infuse®, or the use of an "Unapproved Device", were unreasonably dangerous and exposed patients to serious risks of increased injury and harm. Medtronic's false and deceptive marketing scheme was so effective, however, that 85-90% of all Infuse® sales were from off-label uses,[7] and/or the use of an "Unapproved Device". An "off-label" use rate of 85-90% can never be realized without significant "off-label" promotion, all in violation of federal law, the PMA, and parallel state laws. Medtronic received several billions of dollars of ill-gotten gains stemming from its false, deceptive, and illegal marketing scheme.[8]

As a result of Medtronic's fraudulent and wrongful actions, non-Medtronic paid physicians were deprived of material information known by Medtronic, Medtronic's clinic trial physicians, Medtronic's paid authors, and Medtronic's Key Opinion Leaders (KOLs), concerning not only the lack of efficacy, but the truth concerning the significant and serious adverse events posed by the off-label use of Infuse® or the use of an "Unapproved Device."[9] This deception precluded the non-Medtronic paid physicians from being learned or informed of the lack of efficacy, or the significant dangerous risks and propensities, stemming from the "off-label" use of Infuse® and/or the use of an "Unapproved Device." Medtronic concealed and failed to warn of the increased risks of using Infuse® off-label and/or the use of an "Unapproved Device" through a false and deceptive marketing scheme, including by funding biased studies and articles by Key Opinion Leaders, published in key medical journals.[10]

---

[7] *See* Am. Pet. at ¶¶ 420-424

[8] *See* Am. Pet. at ¶¶ 482-519, "Medtronic Pays $85 Million to Settle a Lawsuit Brought by its Shareholders Regarding Allegations of Aggressive Marketing and Promotion of the "Off-Label" Use of Infuse®."

[9] *See* Am. Pet. at ¶¶ 9, 1332(l), 1409(l), 1431(c), 1437(l), "Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events."

[10] *See* Am. Pet. at ¶¶ 592-605, "*The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agents Who Acted Ostensibly As "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"; "Medtronic, In Their Sponsored Studies, Engaged in Various

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic concealed critical safety information, including adverse events and serious increased risks (estimated by the authors of a peer reviewed article published in The Spine Journal to be as high as 50 times more than Medtronic reported), from the use of Infuse®. [11] Medtronic, via its illegal actions, clearly prevented the non-Medtronic paid Plaintiffs' physicians, from being adequately warned and informed about the serious dangers of off-label use of Infuse® and/or the use of an "Unapproved Device." Plaintiffs and Plaintiffs' physicians detrimentally relied on Medtronic for truthful and accurate information, which Medtronic failed to provide.

Medtronic's fraudulent scheme was undertaken in conscious disregard of the health and safety of Infuse® patients, and in violation of federal law, the PMA, and parallel state law. Thousands of vulnerable and unsuspecting patients, including the Plaintiffs herein, have been seriously and permanently injured as a result of Medtronic's wrongful, illegal and immoral actions.

Nevertheless, in violation of federal law, Medtronic actively promoted the use of Infuse® for the "off-label" procedures,[12] which are detailed throughout the Petition.[13] In addition, Medtronic failed to report certain adverse events, contrary to federal law.[14] Medtronic, through

---

Activities That Resulted in the Published Studies Failing to Disclose the Actual Serious, Sometimes Life-Threatening Or Life-Altering Side-Effects Actually Observed in Those Medtronic-Funded "Studies."

[11] *See* Am. Pet. at ¶¶ 606-651, "Medtronic Failed to Adequately Warn of the Serious Adverse Events, Dangers and Increased Risks, Associated with "Off-Label" Use of Infuse®."

[12] *See* Am. Pet. at ¶¶ 534-538, "Despite the Lack of Safety and Effectiveness and the Unreasonably Dangerousness of "Off-Label" use of Infuse®, Medtronic Promoted and Marketed "Off-Label" Use of Infuse® to Physicians, Including Through Key Opinion Leaders, Without Obtaining FDA Approval to Do So."

[13] *See* Am. Pet. at ¶¶ 539-574, "Medtronic Directly "Off-Label" Marketed, Warranted, and Misrepresented the Safety and Efficacy of "Off-Label" Use of Infuse® on Medtronic.com and Infusebonegraft.com, Which Was a Violation of Federal Law and the PMA Received for Infuse®"; "Medtronic Directly Marketed the "Off-Label" Use of Infuse® On Back.com, Which Was a Violation of Federal Law and the PMA Received for Infuse®; "Medtronic Directly Marketed and Misrepresented the Safety Of "Off-Label" use of Infuse® on Necksurgery.com, Another Medtronic-Owned Website, Which Was a Violation of Federal Law and the PMA Received for Infuse®."

[14] *See* Am. Pet. at ¶¶ 9, 1332(l), 1409(l), 1431(c), 1437(l), "Medtronic violated federal regulations 21 C.F.R. § 814.80, 21 C.F.R. § 803.50(a), and 21 U.S.C. § 360i(a), because it failed to timely report adverse events."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

its paid consultants, engaged in a long-standing campaign of improper off-label promotion of more dangerous, non-approved uses of Infuse®, while hiding the extent of adverse events reported in connection with the product.[15]

On June 1, 2011, The Spine Journal, a leading medical journal in the United States and the official journal of the North American Spine Society ("NASS"), published a special edition dedicated to addressing serious patient safety and ethical concerns related to the use of Infuse® in the spine. This special edition reviewed the thirteen original industry-sponsored peer-reviewed articles about Infuse® and revealed that many of Medtronic's paid consultant "opinion leaders" had inaccurately reported the safety of Infuse®, in particular when it is used in an off-label manner.[16]

The Amended Petition describes shocking facts learned from two whistle-blower actions brought by the Department of Justice against Medtronic concerning the off-label promotion of Infuse® (resulting in Medtronic paying of $40 million dollar penalty for illegal kickbacks to spine surgeons and entering into a Corporate Integrity Agreement with the Department of Justice),[17] Minneapolis Firefighters' Relief Assoc. v. Medtronic, Inc., Civ. No. 08-6324 (D.

---

[15] *See* Am. Pet. at ¶¶ 597-605, "Leading Spine Experts Repudiate Medtronic Studies"; "Medtronic-Sponsored Studies Exaggerated The Morbidity of Traditional Auto-Graft Harvesting Fusion, Thereby Exaggerating the Relative Benefits of Infuse®."; "A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)"; "Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption And Loss Of Alignment Related To The Use Of Infuse®; "Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®"; "Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®"; "Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG"; "Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify", A Higher Dosed rhBMP-2 (Infuse®) Product."

[16] *See* Am. Pet. at ¶¶ 592-605, "*The Spine Journal* Identifies Financial Inducements Paid To Medtronic's Secret Agents Who Acted Ostensibly As "Research Physicians" But Collectively Received Hundreds Of Millions Of Dollars From Medtronic For Their "Opinions"

[17] *See* Am. Pet. at ¶¶ 425-481, "Medtronic Pays the United States Government $40 million to Settle Whistleblower Suits Regarding Illegal Kickbacks to Doctors to Induce the "Off-Label" Use of Infuse®"; "Despite Medtronic's Settlement with DOJ, Medtronic's Secret Agent Colonel Timothy Kuklo, M.D. Was Found to Have Published a

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Minn. 2009)[18](following adverse findings from the Federal Court, Medtronic paid an $85 million settlement), and an extensive United States Senate investigation ("Senate Report")[19].

The Amended Petition explains the Committee on Finance for the United States Senate's investigation into Medtronic's off-label promotion of Infuse®. On October 25, 2012, the Committee released its "Staff Report on Medtronic's Influence on Infuse Clinical Studies" detailing Medtronic's manipulation of the Infuse® adverse events and published studies, as well as its massive financial entanglements with its consultants who published the early Medtronic-funded studies on Infuse®. The Committee found, among other things, that Medtronic was heavily involved in drafting and editing medical journal articles on Infuse® authored by its physician consultants and that Medtronic paid $210 million to the physician authors of

---

Falsified Study on the Experimental Use of Infuse® on War Veterans Without Their Knowledge or Consent Nor the Knowledge of the United States Army Regarding Infuse®, While Secretly Consulting for Medtronic."

[18] *See* Am. Pet. at ¶¶ 482-519, "Medtronic Engaged In Active, Systematic "Off-Label" Over-Promotion Through Its Employees And Agents Without Seeking Prior Approval From The FDA Or In Furtherance Of The Safe Harbor Provisions"; "Medtronic sponsored physician meetings and corporate visits focused on "off-label" training."; Medtronic instructed its sales representatives on particular dosage requirements for various "off-label" uses of Infuse®"; "Medtronic sales representatives would cite data from Medtronic sponsored published literature promoting "off-label" use and provide techniques for "off-label" procedures"; "Medtronic sales representatives routinely directed doctors inquiring about the "off-label" use of Infuse® to surgeons who had previously used Infuse® "off-label""; "Medtronic routinely informed surgeons regarding the dosage of Infuse® for "off-label" procedures in the cervical spine"; "Medtronic representatives showed doctors how to roll the absorbable collagen sponge (ACS) "like a burrito" or "like a taco" to be placed in the spine for "off-label" procedures"; "The vast majority of Infuse® sales (over 85-90%) were from "off-label" uses"; "Medtronic packaged, sold, and distributed Infuse® and the LT-Cage separately, therefore knowing that Infuse® far out-sold the FDA required LT-Cage"; "Medtronic set Infuse® sales quotas for its representatives that could not have been achieved without an aggressive, illegal "off-label" promotional campaign"; "Medtronic trained its sales representatives to provide step-by-step instructions to doctors conducting "off-label" surgeries using Infuse® and in fact encouraged its representatives to attend "off-label" Infuse® surgeries in operating rooms across the country"; Medtronic secret agents Defendant Lawrence G. Lenke, M.D. and Defendant Keith H. Bridwell, M.D. from Washington University St. Louis would train surgeons on the use of Infuse®, 85-90% of which was "off-label" uses."; "U.S. District Judge Paul Magnuson Determined That Statements Made by Confidential Witnesses Supported Allegations of Medtronic's "Off-Label" Promotion."

[19] Am. Pet. at ¶¶ 652-727, "United States Senators Question Medtronic About Unreported Side Effects, Financial Ties to Clinical Investigators, And "Off-Label" Promotion and Marketing of Infuse®; "Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse® "Off-Label" Sales Prompts Individual Inquiries From United States Senators"; "The U.S. Senate Committee On Finance Launches An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events"; "The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic-sponsored studies on Infuse® from November 1996 through December 2010. A Medtronic employee also recommended against publishing a complete list of adverse events, or side effects, possibly associated with Infuse® in a 2005 Journal of Bone and Joint Surgery article. These alarming findings are documented in the Senate Report, which is attached hereto as exhibit A to the Opposition. [20]

Plaintiffs' Amended Petition contains numerous references to the Senate Report and the Senate Letters in order to show that Medtronic's actions and practices were so blatantly fraudulent that the U.S. Senate was prompted to conduct a 16-month investigation into the company's conduct. Plaintiffs further reference the Senate Report and Senate Letters throughout their Amended Petition in order to support their allegations that Medtronic manipulated medical literature in order to conceal the serious side effects and health risks related to the off-label use of Infuse®[21] and entered into consulting and royalty agreements with physicians, including Dr. Kuklo and Dr. Gornet, for the purpose of perpetrating fraud on the medical community. Thus, the Senate Report and Senate Letters, which do not contradict plaintiffs' allegations, but rather support and are embraced by the Amended Petition. Furthermore, the Senate Report and Senate Letters are relevant in supporting plaintiff's allegations and providing the requisite particularity required to show that Medtronic was engaged in a fraudulent scheme, which included the

[20] *See* Am. Pet. at ¶¶ 668-727, "United States Senators Question Medtronic About Unreported Side Effects, Financial Ties to Clinical Investigators, And "Off-Label" Promotion and Marketing of Infuse®"; "High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious Adverse Events From Medtronic-Funded Published "Studies""; "Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies""; "Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies," attached hereto as Ex. A.

[21] *See* Am. Pet. at ¶¶ 770-803, "Recent Studies Released September 04, 2013, Recognized rhBMP-2 Exposure Leads to a Five-Fold Increase in Cancer"; "Articles from the Recent September 2013 Issue of the Spine Journal Discusses the Lack of Efficacy, Increased Risks, Safety Concerns, and the Corrupted Infuse® Studies"; "Medtronic's Participation in the Covering Up of and Failure to Adequately Warn of the Serious Adverse Events and Increased Risks and Complications Associated with "Off-Label" Use of Infuse® Caused Plaintiffs' Injuries."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

involvement of Dr. Timothy Kuklo, Dr. Matthew Gornet and others.

Finally, Plaintiffs claim that Medtronic's activities promoting dangerous off-label uses of Infuse® induced their surgeons to use Infuse® in an off-label manner in their surgeries, thereby causing their injuries.[22] As the editor of the Spine Journal concluded regarding Medtronic's Infuse® scandal, "Harm has been done." Plaintiffs, the victims, seek redress for the great harm that they have been caused to suffer.

In doing the wrongful acts, which are extensively alleged and well-documented in the Amended Petition, the Medtronic (a) did not act reasonably with regard to the foreseeable harm to patients, including the Plaintiffs; (b) did not act as a responsible manufacturer of a Class III medical device; (c) acted unlawfully and without the permission or approval of the FDA; and (d) violated state common law duties which parallel FDA requirements.

Medtronic simply and clearly did not play by the rules. Medtronic broke and evaded the rules and federal regulations and caused life-altering and serious injuries to tens of thousands of vulnerable and unsuspecting patients, including the Plaintiffs. They now come before this court seeking immunity for their wrongful and wanton conduct under the guise of preemption. Medtronic is not entitled to preemption and they should not be allowed to escape responsibility for their actions, which have caused such great harm to the Plaintiffs.

## II. SUMMARY OF RELEVANT FEDERAL LAW AND REGULATIONS

Congress established three classes of devices, based on the regulatory requirements needed to provide reasonable assurance of their safety and effectiveness. The three classes of devices are class I, class II, and class III. Class I devices present no unreasonable risk of illness or injury and are subject to regulation through "general controls."[23] Class II devices are

[22] *See* Am. Pet. at ¶¶ 788-803, 829-838.
[23] 21 U.S.C. § 360c(a)(1)(A).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

potentially more harmful and are subject to general controls, but FDA in addition has authority to require that such devices comply with other "special controls."[24] Class III devices present "a potential unreasonable risk of illness or injury."[25]

Before a Class III device may be introduced into the market, a manufacturer must obtain a "Premarket Approval" ("PMA" may refer to either Premarket Approval or Premarket Application) from the FDA.[26] To obtain a PMA, the manufacturer must submit information to FDA in a Premarket Approval application that provides reasonable assurance that the device is safe and effective for its "intended use."[27] A PMA is the most detailed type of device marketing application and review required by the FDA. The applicant must receive FDA approval of its PMA application prior to marketing and/or distributing the device.

A device by itself is not what receives approval or clearance. It is a device for a specific intended condition of use. A screw used in a car is not a medical device. A screw in a wheelchair is a Class I device. A screw implanted in the human spine is a Class III device.

The Federal Food, Drug, and Cosmetic Act incorporates the concept of "intended use" into the definition of a device. The Act defines a medical device as:

> [A]n instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory which is-
>
> 1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
> 2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

---

[24] 21 U.S.C. § 360c(a)(1)(B).
[25] 21 U.S.C. § 360c(a)(1)(C)(ii)(II).
[26] 21 U.S.C. § 360c(a)(1)(C); 21 U.S.C. 360e(a)(1); *see also*, 21 C.F.R. § 814.3(e) for the definition of premarket approval.
[27] 21 U.S.C. § 360c(a)(1)(C); 21 U.S.C. § 360e(d)(1)(B)(iii)(II); *see, generally*, 21 U.S.C. § 360e(a), (c), & (d) (1994 & Supp. IV 1998); 21 C.F.R. § 814.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

3) intended to affect the structure or any function of the body of man or other animals,

and which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes."[28]

For Class III devices requiring Premarket Approval, the Act requires that the FDA evaluate safety and efficacy of the device that is "relevant to the design and intended use of the device for which the application is pending."[29]

The FDA may deny approval of the PMA if there is "a lack of showing of reasonable assurance that such device is safe under the conditions of use prescribed, recommended, or suggested in the proposed label thereof."[30]

FDA may deny an approval of the PMA if there is "a lack of a showing of reasonable assurance that the device is effective under the conditions of use prescribed, recommended, or suggested in the proposed label thereof."[31]

As the FDA has stated, "PMA Approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s). [32][33]

Determination of a device's "intended use" is based on all the evidence concerning the product. According to FDA regulation, 21 C.F.R. § 801.4, titled "Meaning of intended use":

---

[28] 21 U.S.C. § 321(h)(emphasis added).
[29] 21 U.S.C. § 360e(d)(1)(B)(iii)(II)(emphasis added).
[30] 21 U.S.C. § 360e(d)(2)(A).
[31] 21 U.S.C. § 360e(d)(2)(B).
[32]http://www.fda.gov/Medicaldevices/Deviceregulationandguidance/Howtomarketyourdevice/Premarketsubmissions/Premarketapprovalpma/Default.Htm; *see also*, http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmissions/PremarketApprovalPMA/ucm050289.htm
[33] An additional term "indications for use" is referred to in 21 CFR § 814.20(b)(3)(i), "A general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

> The words *intended uses* or words of similar import in 801.5, 801.119 and 801.122 refer to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the devices, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put.[34]

In determining a product's "intended use", the FDA is not limited to examining the product label. Instead, "it is well established that the 'intended use' of a product, within the meaning of the Act, is determined from its label, accompanying labeling, promotional claims, advertising, and any other relevant source."[35]

Thus, under FDA's regulations, evidence of intent is not limited to expressions in labeling or advertising, but must be based on the totality of the relevant evidence showing the seller's awareness of how its product is actually used.

Intent may be determined by what a reasonable person would understand in the circumstances presented, or whether a reasonable person would believe that the defendant's conduct would lead to certain events. The language and purposes of the Act support a standard that allows consideration of information about the foreseeable uses of the product for medical purposes, as well as any statements or actions by the vendor that might show the vendor's actual

---

[34] 21 C.F.R. § 801.4 (emphasis added).
[35] *Action on Smoking and Health*, 655 F.2d at 239 (citations omitted).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

purpose in marketing and/or distributing a product, or refute the vendor's claims regarding "intended use."

The fact that a manufacturer knew that its products were being used for purposes beyond what the manufacturer listed in labels makes that additional use an "intended use." Evidence that a manufacturer actually knows that its product is being widely used for medical purposes, and/or has taken steps to facilitate that use, provides compelling evidence of "intended use." Federal Regulations state that "[i]f a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put."[36]

If a device is marketed and/or distributed in interstate commerce for an "intended use" other than the one that has received FDA approval, that is a violation of the Food, Drug, and Cosmetic Act.[37]

---

[36] 21 C.F.R. § 801.4.

[37] On March 16, 2000, the FDA, in 65 Fed. Reg. page 14286 in a notice concerning *Decision in Washington Legal Foundation v. Henney*, stated "[t]he Federal Food, Drug, and Cosmetic Act of 1938 (FDCA), as amended, generally prohibits the manufacturer of a new drug or medical device from distributing a product in interstate commerce for any intended use that FDA has not approved as safe and effective. The intended use or uses of a drug or device may be set forth in, among other things, its label or 'labeling,' which includes written, printed, or graphic matter affixed to or 'accompanying' the product. *See* 21 U.S.C. § 321(m); 21 CFR 202.1(l)(2); *see also* 21 CFR §§ 201.128, 801.4. The intended use or uses of a drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source. *Action on Smoking and Health*, 655 F.2d at 239; *see also* 21 CFR §§ 201.128 and 801.4.

When FDA approves a drug or medical device, the agency approves the product for each use set out in the product's approved labeling. A use that FDA approves is thus sometimes referred to as an 'approved' or 'labeled' use. A use that does not appear in the labeling is not approved as safe and effective by FDA and is known as an 'unapproved' or 'off-label' use. In this notice, such a use is referred to as a 'new use.'

A central feature of the FDCA is that it generally prohibits interstate commerce in new drugs and devices for 'new uses.' In particular, the statute provides that '[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [21 U.S.C. § 355(b) or (j)] is effective with respect to such drug.' 21 U.S.C. § 355(a); *see* 21 U.S.C. § 331(d). Such an application must identify the particular use or uses to which the new drug will be put, and an approval of such an application for interstate distribution can become effective only with respect to such uses(s). *See* 21 U.S.C. § 355(b),(d),(j). Thus, an approved new drug that is marketed for a 'new use' becomes an unapproved new drug with respect to that use.

An approved new drug that is marketed for 'new use' is also 'misbranded' under the FDCA, because the labeling of such a drug would not include 'adequate directions for use.' 21 U.S.C. § 352(f); see *United States v. Articles of Drug*, 625 F.2d 665, 673 (5th Cir. 1980). Similarly, a medical device that is distributed for a 'new use' is

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

If the device's "intended use" requires a PMA, and the FDA has not approved the PMA, then the product is adulterated under the Act.[38]

If an approved or cleared device for certain "intended use" is marketed and/or distributed for "non-approved" or "off-label" uses, then the device is misbranded under the Act.[39]

If an approved or cleared device fails to contain adequate directions or information for use, it is misbranded under the Act.[40]

A medical device manufacturer may place into effect "[l]abeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction…" and/or "…that add or strengthen an instruction that is intended to enhance the safe use of the device."[41] After making such changes, the medical device manufacturer must submit such

---

'adulterated,' see 21 U.S.C. § 351(f), and 'misbranded,' see 21 U.S.C. § 352(f). An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. § 331(a), (k)), as is a drug that is marketed for a 'new use' (21 U.S.C. § 331(d)).

An approved new drug that is marketed for a 'new use' may be seized (because it is an unapproved new drug with respect to that use), as may an adulterated or misbranded new drug or device (21 U.S.C. 334), and the government may seek an injunction against, or criminal prosecution of, those responsible for introducing such a product into commerce (21 U.S.C. 332, 333)."

[38] 21 U.S.C. § 351(f).
[39] 21 U.S.C. § 352.
[40] 21 U.S.C. § 352.
[41] 21 C.F.R. § 814.39(d)(2)(i) & (ii).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

changes for the FDA's review and approval.[42][43] These "changes being effected (CBE)" to a device's labeling is similar to the changes being effected provisions applicable to new drugs.[44]

The FDA has affirmed that a medical device manufacturer is not prevented from placing safety information regarding "off-label" uses on a label.[45]

While an individual physician may, in his or her judgment, decide to use an approved medical device in an "off-label" use, a medical device manufacturer may not influence physicians or the medical community to use it in such a manner.[46]

The FDCA prohibits the "adulteration" or "misbranding" of a medical device introduced into interstate commerce. 21 U.S.C. § 331(a)-(c). Pursuant to the statute, "'a device shall be deemed to be adulterated' with respect to an intended use if it is a Class III device which has not received premarket approval or § 510(k) clearance with respect to that intended use." *Taylor v. Danek Med., Inc.*, 1998 U.S. Dist. LEXIS 20265, *27-28 (E.D. Pa. December 29, 1998) (citing

---

[42] The July 2, 2002 PMA letter for the Infuse Bone Graft/LT-Cage Lumbar Tapered Fusion Device expressly provided in part, "You may begin commercial distribution of the device in accordance with the conditions described below and in the 'Conditions of Approval' (enclosed)…Failure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act."

[43] The July 2, 2002 PMA letter also states under "Conditions of Approval" in the section entitled "PREMARKET APPROVAL APPLICATION (PMA) SUPPLEMENT" that "[b]efore making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by FDA unless the change is of a type for which a 'Special PMA Supplement-Changes Being Effected' is permitted under 21 CFR § 814.39(d) or an alternate submission is permitted in accordance with 21 CFR § 814.39(e) or (f). A PMA supplement or alternate submission shall comply with applicable requirements under 21 CFR § 814.39 of the final rule for Premarket Approval of Medical Devices…A PMA supplement must be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification…A 'Special PMA Supplement – Changes Being Effected' is limited to the labeling, quality control and manufacturing process changes specified under 21 CFR § 814.39(d)(2)…These changes may be implemented before FDA approval upon acknowledgment by FDA that the submission is being processed as a 'Special PMA Supplement – Changes Being Effected.'"

[44] 21 CFR § 314.70(c)(6)(iii)(A)and(C)

[45] Declaration of Robert Temple, M.D., *Allergan v. U.S.*, Case No. 1:09-cv-01879, Dkt. 18-2.

[46] 21 U.S.C. § 396 states, "Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship. **This section shall not limit any existing authority of the Secretary to establish and enforce restrictions on the *sale or distribution***, or in the labeling, of a device that are part of a determination of substantial equivalence, established as a condition of approval, or promulgated through regulations. **Further, this section shall not change any existing prohibition on the *promotion* of unapproved uses of legally marketed devices."** (Emphasis added).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

21 U.S.C. § 351(f)) (alterations omitted). False or misleading labeling is considered "misbranding." 21 U.S.C. § 352(a). "The FDCA provides that 'a device shall be deemed to be misbranded' unless its labeling bears' adequate directions' for the intended use of the device including indications, effects, relevant hazards . . . and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purposes for which it is intended. *Id.* (citing 21 U.S.C. § 352(f) and 21 C.F.R. §§ 801.4, 801.109) (alterations omitted). *See also United States v. Two Units, More or Less, of an Article or Device*, 49 F.3d 479, 482 (9th Cir. 1994) ("A medical device is misbranded if it does not bear adequate directions to enable a layperson to use it safely.") (citing 21 U.S.C. § 352(f)(1) and 21 C.F.R. § 801.5).

Thus, a product is "misbranded" when the directions and indications for the unapproved uses that the manufacturer "intends" the product to be used for have not been included on the label. Further, a device's intended uses are evidenced by the manufacturers' conduct, and not by reference to what the FDA has approved. 21 C.F.R. § 801.4 ("intended uses" may be "shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives").

Medical device manufacturers are required to disclose all material facts in advertising and labeling. 21 U.S.C. § 321(n), 21 U.S.C. § 331(b). "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 C.F.R. § 814.80.

Finally, the FDCA mandates that device manufacturers establish internal procedures to review complaints and adverse event reports, and to maintain and submit information as required by regulation, including adverse event reports. 21 U.S.C. § 360i; 21 C.F.R. § 820.198(a), § 803.50.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

## III. LEGAL STANDARD

A petition for damages must contain a short and plain statement of the claim showing that the plaintiff is entitled to relief. Dismissal for failure to state a claim is appropriate only when the petition does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. In reviewing a trial court's dismissal of a petition for failure to state a claim upon which relief can be granted, "the sole issue to be decided is whether, after allowing the pleading its broadest intendment, treating all facts alleged as true and construing all allegations favorably to plaintiffs, the averments invoke principles of substantive law entitling plaintiffs to relief." *Lowrey v. Horvath*, 689 S.W.2d 625, 626 (Mo. banc 1985) (citing *Shapiro v. Columbia Union Nat'l Bank & Trust Co.*, 576 S.W.2d 310, 312 (Mo. banc 1978)). An appellate court reviews de novo whether the petition at issue invoked such principles. *Hess v. Chase Manhattan Bank*, 220 S.W.3d 758, 768 (Mo. banc 2007); *Moynihan v. Gunn*, 204 S.W.3d 230, 232–33 (Mo. App. E.D. 2006).

In reviewing the dismissal of a petition for failure to state a claim, the facts in the petition are treated as true and all reasonable inferences are construed in the plaintiff's favor. *Connelly v. Iolab Corp.*, 927 S.W.2d 848, 850 (Mo. banc 1996); *Moynihan,* 204 S.W.3d at 233. In considering whether the petition is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *Id.*

## ARGUMENT

### I. THIS COURT HAS PERSONAL JURISDICTION OVER ALL DEFENDANTS AS TO ALL PLAINTIFFS

When a defendant files a motion to dismiss claiming lack of personal jurisdiction, the burden shifts to the plaintiff to make a prima facie showing that personal jurisdiction exists. *Noble v. Shawnee Gun Shop, Inc.*, 316 S.W.3d 364, 369-370 (Mo. App. W.D. 2010). A court

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

must consider whether the allegations, if taken as true, establish adequate facts to support personal jurisdiction. *See Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 230–31 (Mo. banc 2010). The allegations of the petition must be given an intendment most favorable to the existence of the jurisdictional fact. *Id.* at 231; *Moore v. Christian Fidelity Life Ins. Co.*, 687 S.W.2d 210, 211 (Mo. App. W.D. 1984).

A foreign corporation is subject to the long-arm jurisdiction of Missouri when it does any of the acts enumerated in Missouri's long-arm statute and when it has sufficient minimum contacts with Missouri to satisfy due process. *See Laser Vision Centers, Inc. v. LVCI,* 930 S.W.2d 29, 32 (Mo. App. E.D. 1996). Missouri courts utilize a two-step analysis when evaluating personal jurisdiction. *Bryant*, 310 S.W.3d at 231. First, courts determine whether the defendant's conduct satisfies Missouri's long-arm statute. *Id.* If so, the next step is to evaluate whether the defendant has sufficient minimum contacts with Missouri such that asserting personal jurisdiction over the defendant satisfies the due process requirements of the Fourteenth Amendment. *Id.*

Missouri's long-arm statute was designed to allow the exercise of personal jurisdiction over a foreign corporation to the fullest extent permissible under the due process clause. *State ex rel. Nixon v. Beer Nuts, Ltd.* 29 S.W.3d 828, 833 (Mo. App. E.D. 2000) (citations omitted). As the Missouri Supreme Court duly noted, "long-arm statutes, as the name implies, are intended to expand the reach of the law of the state to authorize jurisdiction over foreign corporations that are not necessarily authorized to do business in the state but whose activities justify personal jurisdiction." *State ex rel. K–Mart Corp. v. Holliger,* 986 S.W.2d 165, 168 (Mo. banc 1999). Thus, the fact that the defendant in this case is not incorporated in Missouri has no significance for purposes of determining whether its activities fall within the reach of the long-arm statute.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

What is of significance is that Medtronic as a foreign corporation was "authorized to do business in the state" of Missouri by the Secretary of State for the State of Missouri. By seeking approval from the State of Missouri to do business in the state, Medtronic availed themselves to personal jurisdiction for their conduct and actions relating to that business.

Further, Missouri's long-arm statute confers personal jurisdiction over "foreign corporations that are not necessarily authorized to do business in the state" when they commit any one of a number of enumerated activities, including, among others: "(1) the transaction of **any** business within this state; (2) the making of any contract within this state; (3) the commission of a tortious act within this state; (4) the ownership, use, or possession of any real estate situated in this state…." Mo. R.S. § 506.500 (emphasis added). Thus, pursuant to Section 506.500, a foreign corporation subjects itself to legal action in the State of Missouri if it transacts any business within the State or enters into a contract within the State or commits a tort within the State.

For purposes of the long-arm statute, the "transaction of business" is construed broadly, so that even a single transaction may confer jurisdiction, if that is the transaction that gives rise to the suit. *Chromalloy American Corp. v. Elyria Foundry Co.*, 955 S.W.2d 1, 4 (Mo. banc 1997) (citations omitted). In this case, however, there is more than just a single transaction. This case is not one in which Defendants made a single, isolated sale to a Missouri customer. Still, even without this lengthy course of dealings, the Missouri Supreme Court has recognized that "[a] single business proposal to a Missouri corporation has been found sufficient to constitute the transaction of business." *Chromalloy American Corp.*, 955 S.W.2d at 4-5 (citing *Laser Vision Centers, Inc. v. LVCI,* 930 S.W.2d 29, 32 (Mo. App. E.D. 1996)).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Additionally, torts were committed in Missouri. Plaintiff has alleged various causes of action against Defendants, including negligence and strict products liability. These claims arise from the injuries to Plaintiffs, including: Jimmy Hendrich, a Missouri resident whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1053-1054); Floyd Barnett, a resident of Whitesville, West Virgina whose Infuse® surgery was performed in Cape Girardeau, Missouri (Am. Pet. at ¶¶ 1095-1096); Steven Crenshaw, a resident of Ferguson, Missouri whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1166-1167); Maryann Deves, a resident of Ellisville, Missouri whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1184-1185); Douglas Kiffmeyer, a resident of Madison, Illinois whose Infuse® surgery was performed in Bridgeton, Missouri (Am. Pet. at ¶¶ 1268-1269); Charles Lee, a resident of Nixa, Missouri whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1276-1277); John Ockleston, a resident of New Lynn, New Zealand whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1358-1359); James Oliver, a resident of Florissant, Missouri whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1365-1366); Edward Salsman, a resident of Farmington, Missouri whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1371-1372); Melanie Shaw, a resident of Berkeley, Missouri whose Infuse® surgery was performed in Bridgeton, Missouri (Am. Pet. at ¶¶ 1408-1409); Heather Smith, a resident of De Soto, Missouri whose Infuse® surgery was performed in Fenton, Missouri (Am. Pet. at ¶¶ 1418-1419); Tammy Thomas, a resident of Granada, Missouri whose Infuse® surgery was performed in Blue Earth, Minnesota (Am. Pet. at ¶¶ 1439-1440); Teralandur Parthasarathy, a resident of Glen Carbon, Illinois whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶¶ 1553-1554); Keith Schremp, a resident of St. Louis, Missouri whose Infuse® surgery was performed in St. Louis,

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Missouri (Am. Pet. at ¶¶ 1560-1564); and Carlos Webster whose Infuse® surgery was performed in St. Louis, Missouri (Am. Pet. at ¶ 1581-1582). Each plaintiff eventually sustained injuries as a result of implantation of Defendants' Infuse® device. Thus, as to Plaintiff's negligence and product liability claims, the causation and damages elements of each claim occurred in Missouri and therefore torts were committed in Missouri.

Notwithstanding the fact that torts were committed in Missouri, for purposes of the long-arm statute, it is well-recognized that a tortious act may occur outside of Missouri, so long as it produces "actionable consequences" in Missouri. *Noble*, 316 S.W.3d at 371 (citations omitted) (finding personal jurisdiction over a Kansas gun store that sold a firearm magazine to a Missouri resident in Kansas which was used to shoot people in Missouri). Thus, even if Defendants could argue that the tortious act was committed outside of Missouri, it would still fall under the jurisdiction of the long-arm statute as it undoubtedly produced "actionable consequences" in this state when plaintiff was seriously injured in Missouri.

Therefore, ample evidence exists for this Court to find that Defendant's activities fall within the Missouri long-arm statute. Defendants have transacted business in Missouri and committed torts in Missouri. While either of these activities is sufficient to satisfy the Missouri long-arm statute, here, Defendants have satisfied the Missouri Long-Arm Statute in at least two ways. Thus, with the long-arm statute satisfied, the next step is to determine whether Defendants have sufficient minimum contacts with Missouri to satisfy due process.

First, Defendants reliance on the United States Supreme Court's recent opinion in *Daimler AG v. Bauman*, 134 S.Ct. 746 (2014) is misplaced as the facts of that case are readily distinguishable. In *Daimler*, none of the plaintiffs or defendants was from the United States and none of the events that gave rise to the litigation took place in the United States. *Id*. at 750-751

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

(plaintiffs were citizens of Argentina who claimed that Daimler AG, a German corporation, conspired with Argentinian security forces to kidnap, detain, torture and kill certain plaintiffs or plaintiffs' relatives in the late 1970s and early 1980s)[47]. As such, in *Daimler*, there were no grounds for general jurisdiction in California.[48] Although neither defendant is incorporated or has its principal place of business in Missouri, those are not the only inquires in determining general jurisdiction. *Id.* at 761. While the "continuous and systematic" language in *International Shoe* is generally applied to a specific jurisdiction analysis, the inquiry for general jurisdiction is whether a corporation's "'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum state." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ----, 131 S.Ct. 2846, 2851 (2011)). Plaintiffs are not simply espousing a stream of commerce theory, but rather that the Defendants knowingly, intentionally, and continuously engaged in torts in Missouri. Though Defendants[49] claim that only a small percentage of its Infuse® sales and marketing took place in Missouri compared to other states, the "amount of activity elsewhere seems virtually irrelevant to…the imposition of general jurisdiction over a defendant." *Id.* at 769 (Sotomayor, J., concurring) (quoting Brilmayer et al., A

---

[47] The Supreme Court in *Daimler* also noted that the Ninth Circuit "paid little heed to the risks of internationality comity its expansive view of general jurisdiction posed" and the fact that other countries might not have as broad of a personal jurisdiction doctrine as is found in the United States. *Id.* at 763. Again, the plaintiffs were from Argentina, the defendant Germany, and the alleged torts took place in Argentina. Those international concerns are not present here. In her Concurrence, Justice Sotomayor also noted the "unique circumstances" of the case. *Id.*

[48] The differences between *Daimler* and the present case abound. Aside from the exclusively extraterritorial location of the torts alleged, the Plaintiffs in *Daimler* named only the German corporation as a defendant and Plaintiffs never attempted to make a specific jurisdiction argument, which as the Court in *Daimler* noted "has been cut loose from *Pennoyer*'s sway," expanding specific jurisdiction considerably from the original rigid territorial limits of *Pennoyer v. Neff*, 95 U.S. 714 (1878). *Id.* at 757.

[49] Defendants claim that Infuse is produced and sold by Medtronic Sofamor Danek USA, Inc. (MSD USA, Inc.), which is a wholly owned subsidiary of Medtronic Sofamor Danek, which itself is a wholly-owned subsidiary of Medtronic, Inc. (Skeffington Dec. at ¶ 8). The parties have not yet had formal discovery as to the role of Medtronic Sofamor Danek or Medtronic, Inc. over MSD USA, Inc. or the parent companies' respective involvement with Infuse®. Further, unlike the plaintiffs in *Goodyear* who only "belatedly" asserted a single enterprise theory between the various defendants, 131 S.Ct. at 2857, Plaintiffs here have alleged that each Defendant is the alter ego of the other, as well as "co-conspirator and/or joint venturer." Am. Pet. at ¶¶81-82. As such, Defendants are referred to collectively.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

General Look at General Jurisdiction, 66 TEXAS L.REV. 721, 742 (1988)). That Defendants might have more sales or a larger presence in other states is not the inquiry. Rather, it is the contacts Defendants have with Missouri that matter and those pervasive contacts essentially render them home in Missouri. *Goodyear*, 131 S.Ct. at 2851.

Notwithstanding the self-serving declarations attached to the Motion to Dismiss (that focus largely on Defendants having a bigger presence and higher sales in other states), at least one Defendant (MSD USA) admittedly has physical presence in Missouri, Defendants employed at least two separate secret agents who worked in Missouri to educate physicians about Infuse and for more than a decade they knowingly marketed their products (Infuse® and other products) that were ultimately implanted into patients in Missouri and other states. Unlike the facts in *Goodyear*, where the specific tire manufactured in Turkey was never distributed to the forum state of North Carolina, Infuse® was unquestionably repeatedly and purposefully marketed in Missouri and implanted in patients in Missouri for more than a decade. As such, factual disputes exist as to whether the "instances in which the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Id*. at 2853 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). In other words, just how much business Defendants do in Missouri (and whether that is enough to render the Defendants "home") is the inquiry, not the fact that Defendants might also have homes in other states.

Assuming no *general* jurisdiction over Defendants, here there is clearly *specific* personal jurisdiction over all Defendants, which did more than put Infuse® in the "stream of commerce." For personal jurisdiction to exist, due process requires a defendant to have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. This minimum contacts test is not susceptible to mechanical application; rather, "the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present." *Kulko v. Superior Court of California,* 436 U.S. 84, 92 (1978) (citing *Hanson v. Denckla,* 357 U.S. 235, 246 (1958)); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 485–86 (1985). The defendant's contacts with the forum state also must be purposeful and such that the defendant "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

In determining the existence of sufficient minimum contacts, consideration may be given to the nature, quality, and quantity of contacts with Missouri; the relationship of the cause of action to those contacts; the interest of Missouri in providing a forum for its residents; and the convenience and inconvenience to the parties. *Bryant,* 310 S.W.3d at 233. "As a general proposition, if a corporation elects to sell its products for ultimate use in another State, it is not unjust to hold it answerable there for any damage caused by defects in those products." *State ex. rel. Birdsboro Corp. v. Kimberlin*, 461 S.W.2d 292, 297 (Mo. App. 1970) (citations omitted) (finding due process satisfied where Pennsylvania defendant manufactured product and then sold to an Illinois company with knowledge that product would ultimately be used in Missouri); *see also Sondergard v. Miles, Inc.*, 985 F.2d 1389, 1391 (8th Cir. 1993) (upholding personal jurisdiction where the defendant sold the product in the forum state). Even post-*Daimler*, the United States Supreme Court has continued to recognize that courts have personal jurisdiction over a defendant that "'deliberately exploit[s]' a market in the forum State. *Walden v. Fiore*, 134 S.Ct. 1115, 1122 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

In addition to having a physical presence in Missouri, Defendants knowingly marketed and sold the Infuse® bone graft to doctors and hospitals in Missouri and patients were implanted with Infuse® in Missouri. Defendants had sales representatives detail surgeons in Missouri. Further, Defendants employed two secret agents from Washington University in St. Louis to train surgeons on the use of Infuse®. As detailed in Plaintiffs' Amended Petition:

> Medtronic secret agents, Defendant Lawrence "Larry" G. Lenke, M.D. and Defendant Keith H. Bridwell, M.D., two surgeons from Washington University in St. Louis, where Dr. Kuklo worked as an associate professor, similarly acted as "Opinion Leaders" or "guest surgeons" during "corporate visits" in which Medtronic would invite targeted surgeons to attend training sessions in Memphis, Tennessee. While in Memphis, the visiting surgeons met with Medtronic corporate officers, product managers, and guest surgeons, such as Lawrence "Larry" G. Lenke, M.D. and Keith H. Bridwell, M.D. The visiting surgeons also received "hands-on training" on Infuse®, including instruction in cadaver labs. The visiting surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest surgeons] would show them how to do it." Medtronic chose which surgeons to invite to these corporate visits based, in part, upon the volume of Infuse® procedures they performed.

(Am. Pet. ¶ 716.)

Further, Dr. Keith Birdwell co-authored, along with a Medtronic secret agent Dr. Scott Boden, a July 2007 article that "discussed, among other things, a study that examined the use of Infuse® in an 'off-label' Posterolateral Fusion procedure." (Am. Pet. ¶ 479.) That article further claimed "that Infuse® improved fusion rates when used in combination with iliac crest bone graft in an unapproved procedure in which the rhBMP-2 was wrapped around local bone as a bulking agent." *Id.* Again, the posterolateral approach is an unapproved use of Infuse® and Defendants were paying this Washington University professor to encourage this unapproved use.

As for Dr. Timothy Kuklo, an adjunct professor at Washington University Medical School and Medtronic secret agent, Plaintiffs' Am. dedicates at least 40 paragraphs to his

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Infuse® activities. *See* (Am. Pet. ¶¶ 611-648, 715.) A small sampling of those allegations includes:

- Medtronic's secret agent Timothy Kuklo, M.D. worked closely with Medtronic as an active promoter of the 'off-label' use of Infuse®. (Am. Pet. ¶ 617.)

- Medtronic's secret agent Timothy Kuklo, M.D. reported that those receiving autogenous bone grafts had successful fusion in 76% of procedures, while the union rate for the Infuse® group was significantly better at 92%; he claimed that this was a 'striking finding.' (Am. Pet. ¶ 623.)

- Not only were Medtronic secret agent Timothy Kuklo, M.D.'s reported union rates claimed better with Infuse® than with autograft, but, according to this falsified stud, patients who received Infuse® also reportedly experienced favorable outcomes in other clinical measures. (Am. Pet. ¶ 625.)

- Medtronic's secret agent Timothy Kuklo, M.D. appeared as a "distinguished guest surgeon" at Medtronic's Spine Division Business Overview Conference Call on September 28, 2006, alongside another Medtronic consultant, Dr. Rick Sasso—who received $150,000 in consulting fees in 2006—as well as Gary L. Ellis, Medtronic Vice President, Corporate Controller and Treasure and Peter Wehrly ("Wehrly"), Medtronic Spinal Division Senior Vice President. (Am. Pet. ¶ 637.)

- Medtronic's secret agent Timothy Kuklo, M.D.'s and Dr. Sasso's rendition of the medical literature was not accurate. (Am. Pet. ¶ 640.)

- Drs. Kuklo and Sasso intentionally and with the full knowledge of Medtronic misrepresented the seriousness of the adverse events that Medtronic knew were occurring in the cervical spine – their misrepresentations only hinted at the significant influence of Medtronic's payments had on its consultants' medical judgment. (Am. Pet. ¶ 641.)

- On June 18, 2009, Medtronic disclosed to *The Wall Street Journal* that Medtronic's secret agent Timothy Kuklo, M.D. had received almost $850,000 in payments from Medtronic over the past ten (10) years, the majority of which – nearly - $800,000 – were made in the preceding three (3) years when Dr. Kuklo was shopping his study to medical journals. (Am. Pet. ¶ 644.)

- Medtronic paid their secret agent Timothy Kuklo, M.D. $356,242 in 2007, the year their secret agent Timothy Kuklo, M.D. sought publication of the study in two medical journals. (Am. Pet. ¶ 645.)

- Medtronic paid Dr. Kuklo $249,772 in 2008, the year the study was published. (Am. Pet. ¶ 646.)

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

- Medtronic made both of these payments after it announced its settlement with the DOJ in July of 2006. (Am. Pet. ¶ 647.)
- Medtronic only placed their secret agent Timothy Kuklo, M.D. on "inactive status" ***after*** reports that he falsified the study's data were published in *The New York Times*. (Am. Pet. ¶ 648.)

Thus, Defendants knowingly and purposefully reached out to physicians in Missouri who played integral and active parts of the campaign to market Infuse® to surgeons, including for unapproved uses and to hide knowledge of the risks of using Infuse® for unapproved uses.

The Senate Staff Report on Medtronic's Influence on Infuse Clinical Studies ("the "Senate Report") determined that "Medtronic Employees Were Substantially Involved in Producing Journal Articles Authored by the Company's Physician Consultants." Several of these questionable studies were purportedly "authored" Dr. Matthew Gornet. See footnote 313 of the Amended Petition referencing the Senate Report and attaching a copy as Exhibit "P". For the Court's convenience the Senate Report is attached hereto as exhibit A, and references to Dr. Gornet are highlighted.

The Senate Report revealed previously undisclosed financial relationships that Medtronic had with physician authors of rhBMP-2 studies, including Dr. Gornet. It was determined that Medtronic had paid Matthew Gornet, M.D. $3,985,776.22.

Matthew Gornet, M.D. resides and practices medicine in Missouri, including in the City of St. Louis. He has performed Infuse surgeries at Barnes Jewish Hospital-West in St. Louis.

As United States Senator Baucus remarked upon the release of the Senate Report findings: "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has,"

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Senator Baucus said**.** "Patients everywhere will be better served by a more open, honest system without this kind of collusion."

Clearly, Missouri has significant contacts and an important and substantial nexus to this matter.

In no small part due to the efforts of Missouri secret agents Drs. Bridwell and Lenke and Washington University Adjunct Professor Dr. Timothy Kuklo, multiple Plaintiffs had their Infuse® surgery performed in Missouri. *See supra* at p. 4. Thus, Defendants purposely directed their activities towards (and from) Missouri and as a result, patients in Missouri suffered harm. The declarations attached to the Motion to Dismiss on Defendants' allegedly limited physical presence in Missouri do not change that fact. Defendants have purposely availed themselves of the benefits of the laws of Missouri by repeatedly conducting business with Missouri customers and, as a result, due process is satisfied.

Because Defendants can reasonably be haled into Missouri courts for the claims of several of the Plaintiffs (a fact Defendants do not dispute), Defendants have no due process complaint for Missouri courts to address the remaining plaintiffs.[50] As explained below, Missouri allows for joinder of Missouri and non-Missouri claims. The claims here all arise from the same series of transactions or occurrences, namely the development and illegal marketing of "off-label" or unapproved uses of Infuse® that caused harm to all plaintiffs. As the Supreme Court held in *International Shoe*:

> to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The

[50] *See also Bristol-Myers Squibb Co. v. Superior Court of San Francisco County*, 2014 WL 3747250 (Cal. Ct. App. July 30, 2014). There the California Court of Appeals declined to find general jurisdiction, but found specific jurisdiction under facts similar to those present here. The case similarly rejected venue and *forum non conveniens* arguments much like those made by Defendants here. *See id*. at 38. California is not an outlier in distinguishing Daimer. *See Monroy v. BNSF Ry. Co.*, Cause No. DV 13-0799, at pp. 7-12 (Mont. 13th Jud. Dist. Ct. July 30, 2014) (finding general jurisdiction over Defendant, that like Medtronic had only a small percentage of its business in Montana).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

> exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.
>
> 326 U.S. at 319.

Defendants unquestionably enjoyed the benefits of doing business in Missouri, and as a result, several of the Plaintiffs suffered harms in Missouri. Defendants can hardly be surprised they are being sued in Missouri.

Finally, Defendants claim that each plaintiff must assert personal jurisdiction over the defendant, relying on *Level 3 Commc'ns LLC v. Illinois Bell Tel. Co.*, 2014 WL 50856 (E.D. Mo. 2014) and *Affordable Healthcare, LLC v Protus IP Solutions, Inc.*, 2009 WL 749536 (E.D. Mo. 2009). That argument is incorrect and the facts of *Level 3* and *Affordable Healthcare* are readily distinguishable. First, in *Level 3*, the court declined to find that one telecommunication company's claims against the defendant created jurisdiction as to a separate plaintiff telecommunications company. *Id.* at 1. The difference between *Level 3* and this case is that the court there declined to find "the same nucleus of operative facts" between the claims of one plaintiff company and the other. *Id.* at *2. Additionally, the *Level 3* court found personal jurisdiction over the defendant as to one plaintiff as the defendant (which lacked any contacts to Missouri) had consented to being sued in Missouri as part of a contractual agreement with the first plaintiff. *Id.* at *1. The court declined to find "pendent" personal jurisdiction on behalf of the second plaintiff as the defendant had had no contacts with Missouri and it had not contractually consented to jurisdiction in Missouri as it had with the first plaintiff. *Id.* at *2-3.

Next, the facts are similarly distinguishable with *Affordable Healthcare*. There, the court declined to find personal jurisdiction for claims brought by non-Missouri plaintiff over a

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Canadian[51] company that sent unsolicited faxes to plaintiffs in various states (including Missouri). 2009 WL 749536, at *1. The defendant in *Affordable Healthcare* had no physical presence in Missouri and conducted no business in Missouri and, indeed, had no contact with Missouri other than sending some faxes to some Missouri residents. *Id.* at *2. Still, the court in *Affordable Healthcare* did not hold that there could not be personal jurisdiction over that foreign defendant, but rather, the "*de minimis* contact" in that particular case did not "tip the scale" sufficiently to create personal jurisdiction in Missouri over the defendants. *Id.* at *3.

Here, Plaintiffs, have alleged that the Defendants did much, much more than sent faxes to Plaintiffs, including: a physical presence in Missouri by at least one of the defendants (acting in concert with the other defendants), more than a decade of Infuse® sales and marketing in Missouri, implantation of the Infuse® device in multiple plaintiffs (and untold others) in Missouri, and employment of at least two Washington University physicians to educate other surgeons on Infuse®. *See* (Am. Pet. ¶ 715.) Sending unsolicited faxes pales in comparison to more than a decade of illegal "off-label" marketing of a medical product implanted into patients in Missouri—residents and non-residents—that caused and continues to cause severe personal injury. Defendants unquestionably knew that Infuse® would be implanted in persons in Missouri, that the device might cause injury, and as a result, those persons injured in Missouri would seek relief from the courts of Missouri. Defendants clearly have more than minimal contacts with Missouri, creating personal jurisdiction over all defendants. And to be clear, despite what Defendants here assert, it is a *defendant's* connection to the forum that matters; there is no federal constitutional requirement that a *plaintiff* have minimum contacts with the forum state for personal jurisdiction. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 (1984)

[51] *See* Justice Sotomayor's Concurrence in *Daimler*, n. 2, supra, regarding the special considerations sometimes paid to foreign (non-U.S.) defendants. Again, the defendant in *Affordable Healthcare* was a Canadian company.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

(holding "we have not to date required a plaintiff to have "minimum contacts" with the forum State before permitting that State to assert personal jurisdiction over a nonresident defendant. On the contrary, we have upheld the assertion of jurisdiction where such contacts were entirely lacking."). Thus, Defendants' claim that a personal jurisdiction analysis must be conducted for each plaintiff is simply incorrect, especially as all the Plaintiffs allege the same common nucleus of facts: Defendants' development and illegal marketing of Infuse® for unapproved uses. Because each Defendant has sufficient contacts with Missouri, this Court has personal jurisdiction over all Defendants as to each and every Plaintiff.

Therefore, personal jurisdiction is proper in this case and Defendants' motion should be denied.

## II. VENUE IS PROPER IN THE CITY OF ST. LOUIS UNDER MISSOURI REVISED STATUTE § 508.010.

Subsection (4) of Missouri Revised Statute Section 508.010 provides:

> Notwithstanding any other provision of law, in all actions in which there is any count alleging a tort and in which the plaintiff was first injured in the State of Missouri, venue shall be in the county where the plaintiff was first injured by the wrongful acts or negligent conduct alleged in the action.

Section 508.010(14) provides that: "A plaintiff is considered first injured where the trauma or exposure occurred rather than where symptoms are first manifested." As Plaintiffs have pled, multiple Plaintiffs had their Infuse® surgery in St. Louis, Missouri, including: Jimmy Hendrich (Am. Pet. ¶ 1053-1054), Keith Schremp (Am. Pet. ¶ 1560-1564), Carlos Webster (Am. Pet. ¶ 1581-1582). Venue is clearly proper in the City of St. Louis pursuant to Section 508.010.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Defendants do not actually deny this fact. Therefore, Defendants' venue/joinder motion is based on a series of distractions and erroneous legal theories, which are addressed in turn below.

**A. Joinder and Venue Are Intertwined in the Law.**

Contrary to Defendants' suggestion[52], the proper joinder of plaintiffs is relevant to the determination of venue under Section 508.010. In *State ex rel. Allen v. Barker*, 581 S.W.2d 818, 824 (Mo. 1979), the Supreme Court stated unequivocally that, "[c]ertain principles in this proceeding are clear. … (6) **The issues of proper venue are contingent upon whether there is proper joinder of parties.**" (emphasis supplied). This is black letter law in Missouri. As discussed above, these Plaintiffs' claims are properly joined under Section 507.040.1 and Rule 52.05(a). Venue is proper as to all Plaintiffs because Plaintiffs' claims are properly joined and venue for Plaintiffs Jimmy Hendrich, Keith Schremp, and Carlos Webster lie in this Circuit as their surgeries took place in the City of St. Louis.

The interrelation between joinder and venue is most recently underscored in *State ex rel. Kinsey v. Wilkins*, 394 S.W.3d 446 (Mo. Ct. App. 2013). The *Kinsey* plaintiff was in two automobile collisions with two different drivers. The first occurred on February 15, 2010, in Greene County, with April Bledsoe as the defendant. *Id.* at 447. The second accident occurred on January 27, 2011, in Jefferson County, with Tricia Bieser as the defendant. *Id.* Kinsey filed

[52] Defendants cite *State ex. rel. Turnbough v. Gaetner*, 589. S.W.2d 290 (Mo. Banc. 1979) for the proposition that joinder cannot cure improper venue, but the facts of that case are different. There the plaintiff, a resident of Cape Girardeau County, was injured by the Defendant Turnbough, also a resident of Cape Girardeau County in an accident occurring in Cape Girardeau County. Plaintiff attempted to join Turnbough in a suit involving a different injury suffered on the job (apparently in Cape Girardeau County) against Plaintiff's employer Frisco that had its headquarters in the City of St. Louis. Venue was not proper as to Turnbough in the City of St. Louis because Turnbough was not based there nor was Plaintiff injured in St. Louis. *Id.* at 291. Here, there are Plaintiffs who were injured in the City of St. Louis and therefore St. Louis is a proper venue as to all defendants as venue is based on the situs of the injury under Section 508.010. Medtronic similarly cites *State ex. rel. Jinkerson v. Koehr*, 826 S.W.2d 346 (Mo. Banc. 1992). The *Jinkerson* court noted on its facts resembled those in *Turnbough*: neither the defendant nor the plaintiff were from the City of St. Louis and the tort did not occur in the City of St. Louis. *Id.* at 347-348.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

suit against both Bledsoe and Bieser in Greene County. *Id.* at 448. The *Kinsey* decision finds that, under §508.010 as amended in 2005, a plaintiff could join such claims where the two harms caused by defendants were part of the same series of transactions or occurrences. *Kinsey*, 394 S.W.3d at 453.

Kinsey was hit by two people: One in Greene County (Bledsoe), one in Jefferson County (Bieser). Yet venue lay in Greene County. Because the two separate accidents nevertheless formed part of "the same series of transactions or occurrences," the court determined that Greene County was the proper venue for both accidents. Thus, principles of joinder and venue can be and often are often inextricably intertwined. In the instant case, Plaintiffs' claims are all properly joined under Missouri law, and therefore venue in the City of St. Louis is proper.

**B. Missouri Law Recognizes That More Than One Venue May Be Proper in a Given Case.**

Medtronic cites no authority for the proposition that §§508.010 (4) and (5) require the Court to analyze venue as to each **plaintiff** where a tort is alleged against the same defendants by multiple plaintiffs who have been properly joined. Contrary to Defendants' misconstruction of the law on venue, **Missouri law recognizes the possibility of more than one proper venue**. *See State ex rel. Selimanovic v. Dierker*, 246 S.W.3d 931, 932-933 (Mo. 2008); *State ex rel. Kansas City S. Ry. Co. v. Nixon*, 282 S.W.3d 363, 367 (Mo. 2009). Construed together, the two provisions of §508.010 give properly joined Plaintiffs multiple options for venue and the plaintiff's choice of forum is not to be disturbed except for "weighty reasons." *See State ex rel. Wyeth v. Grady*, 262 S.W.3d 216, 220 (Mo. 2008) (internal quotations and citations omitted). Defendants' misinterpretation of §§508.010(4) and (5) would require that in **every case** where multiple plaintiffs were first injured in different venues, their claims would be

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

automatically severed as a result of the general venue statue, regardless of whether joinder was proper, and regardless of how intertwined or logically related those claims are. The language of §§508.010(4) or (5) does not require this result, and it is inconsistent with the controlling precedent interpreting these venue provisions.

The Supreme Court of Missouri has determined that the "first injured" language now found in §§508.010(4) and (5) allows for more than one proper venue. In *State ex rel. Selimanovic v. Dierker*, *supra*, an attorney was sued for legal malpractice in the City of St. Louis Circuit Court by the heirs of a decedent killed in St. Louis County. 246 S.W.3d at 932-933. In determining where the plaintiffs were "first injured" under the language of §508.010, the Court ruled that:

> [T]he injury sought to be redressed by the malpractice action is the financial loss from the lack of an enforceable judgment. **That judgment could have been rendered in either the circuit court of the City of St. Louis or in the circuit court of St. Louis County. Under the facts of this case and the plain language of the venue statutes, Plaintiffs were "first injured" in those venues in which the wrongful death action could have been filed.**

246 S.W.3d at 933 (emphasis added). The Court held that the Circuit Court had abused its discretion in ordering the transfer of plaintiffs' case from the Circuit Court of the City of St. Louis, which was one of two proper venues for plaintiffs' legal malpractice action. *Id.* Thus, the Supreme Court clearly found the Selimanovic plaintiffs had two proper venues.

Similarly, in *State ex rel. Kansas City S. Ry. Co. v. Nixon*, *supra*, the Supreme Court of Missouri held that there can be more than one proper venue for a case under revised §508.010. 282 S.W.3d at 367. The defendants moved to transfer an action from Jackson County to St. Louis County based on improper venue. The plaintiffs moved to amend the pleadings to add a defendant who resided in Jackson County. *Id.* The Court held:

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

> The resulting amendment to the pleading-i.e., the addition of McIntosh as a defendant-rendered venue in Jackson County proper. **This means that there are two correct venues in this case-Jackson County and St. Louis County.** The trial court did not err in overruling the railway's motion to transfer.

*Id.* (emphasis added).

*State ex rel. Allen v. Barker*, 581 S.W.2d 818, 823-827 (Mo. 1979), further demonstrates the error in Defendants' logic. *Barker* involved a defamation action against multiple defendants relating to statements made in different counties at different times. The Supreme Court explained that under the venue statute, "in any action for defamation or for invasion of privacy the cause of action shall be deemed to have accrued in the county in which the defamation or invasion was first published." *See Id.* at 826 (cite & quot. om.). The Court found that the cause of action accrued as to Defendant Salina in Greene County, where that defendant's alleged defamation was first published. *Id.* However, the case had been filed in Dallas County, where venue was proper as to two other defendants who had made defamatory statements there. *See Id.*

Defendant Salina contended that venue was proper only in Greene County, where its purportedly defamatory statements had been made. *Id.* at 823. In rejecting that contention, the Court held that "if Salina is properly joined in the action with the [Defendants] School District and Lemons of Dallas County, then venue is proper as to Salina," demonstrating that proper venue as to one defendant is good venue for all defendants. *Id.* at 826 (emphasis added). Defendant Salina argued that plaintiff's claims were based on "independent and separate" acts of different defendants, that damages would have to be determined separately, and that there was no contention of joint liability among defendants. *Id.* at 823. Nevertheless, the Court found that the plaintiff's claims were logically related and properly joined, and therefore venue as to Salina was proper. *See id.* at 827. By Defendants' logic, the *Barker* court would have severed the

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

claims so that venue would be appropriate as to each defendant. The Supreme Court's analysis and holding compel the conclusion that Defendants' logic is not supported by Missouri law.

### C. A Plaintiff's Choice of a Proper Venue Cannot Be Disturbed.

Medtronic moves for a venue transfer under Rule of Civil Procedure 51.045, which requires that movants demonstrate "improper venue." Defendants' arguments on other possible venues fail to carry the motion because the existence of other venues does not make the Plaintiffs' choice improper. A trial court is without discretion to disturb the plaintiff's choice of a proper venue. It is well established that the plaintiff is allowed to select among the proper venues within which to file an action. For example, in *State ex rel. Selimanovic v. Dierker*, *supra*, where venue was proper in two different Circuits, the Missouri Supreme Court held that it was an abuse of discretion to order transfer from one proper circuit to another one. 246 S.W.3d at 933 ("the circuit court abused its discretion in ordering the transfer of Plaintiffs' case from the circuit court of the City of St. Louis, which was proper venue for Plaintiffs' legal malpractice action."); *see also State ex rel. Clark v. Gallagher*, 801 S.W.2d 341, 342 (Mo. 1990) (a plaintiff is generally permitted some latitude in choice of forum, both at common law and under various statutes).

Similarly, in *State ex rel. Palmer v. Goeke*, 8 S.W.3d 193, 195 (Mo. Ct. App. 1999), the Eastern District of Missouri held that if venue was proper in St. Louis County, and exclusive jurisdiction over the subject matter vested in that circuit court when Relator filed his action there, then the Respondent had acted in excess of his jurisdiction by transferring Relator's case to Jefferson County.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Here Defendants' arguments are unsupported and fail to defeat the numerous decisions upholding plaintiffs' venue choices in substantively indistinguishable circumstances. Because Plaintiffs are allowed to choose among the proper venues, and venue in the City of St. Louis is proper, Defendants' claims are unavailing.

## III. PLAINTIFFS' CLAIMS ARE PROPERLY JOINED

### A. Rulings Finding Joinder Proper

Judge after judge in this Circuit has held that joinder is permitted for unrelated plaintiffs who allege injury caused by the same wrongful conduct of the same defendants and those decisions have not been disturbed by the Court of Appeals or the Supreme Court. The results have been the same with federal courts applying Missouri law. Some examples include:

#### 1. Judge Joan L. Moriarty's Orders.

On June 30, 2011, the Honorable Joan L. Moriarty addressed and rejected improper joinder arguments in *Austin v. Bayer Corporation,* Cause No. 0922-CC09567 (Mo. 22nd Cir. Ct. June 30, 2011). Exhibit B. Judge Moriarty ruled under substantively indistinguishable procedural and factual circumstances that (a) plaintiffs' claims were properly joined, (b) venue was proper in the Circuit Court of the City of St. Louis, (c) severance was not warranted, and (d) dismissal was inappropriate.

In *Austin*, 72 plaintiffs brought suit in the Circuit Court of the City of St. Louis against three defendants for the injuries suffered from the use of Trasylol. Exhibit B at p. 1. The plaintiffs resided in thirty-one states, including Missouri, and one was injured in the City of St. Louis. *Id.* The defendants argued that the claims of the non-Missouri plaintiffs should have been severed and then dismissed, and the remaining Missouri plaintiffs' claims should have been transferred to other Missouri counties.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Judge Moriarty denied defendants' motion, stating as an initial matter that, "[t]he policy of the law is to try all issues arising from the same occurrence or series of occurrences together." Exhibit B, at p. 2 (citing *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 395 (Mo. banc. 1987); *Bryan v. Peppers*, 175 S.W.3d 714, 719 (Mo. Ct. App. 2005)). The Court further explained that:

> Missouri law clearly allows for the joinder of unrelated plaintiffs who allege injury from the same conduct of the same defendant. *See Kelley v. National Lead Co.*, 210 S.W.2d 728, 729 (Mo. App. 1948); *Saeger v. Lakeland Development Co.*, 350 S.W.2d 820, 821 (Mo. App. 1961).
>
> Plaintiffs each allege injuries from the drug Trasylol. Plaintiffs allege that Defendants are the only manufacturers of Trasylol. Plaintiffs each make the same allegations regarding product defect, failure to warn, negligence and breach of warranty regarding Trasylol against the same Defendants. Here, Plaintiffs have asserted rights to relief against Defendants jointly, and have alleged facts which give rise to common questions of law or fact for all Defendants.
>
> . . .
>
> [T]he Court finds that neither convenience, the avoidance of prejudice, or judicial economy would be served by severance of the "Missouri" Plaintiffs' claims against Defendants from the claims of the "non-Missouri" Plaintiffs. Defendants' motion to sever is denied.

Exhibit B, at pp.3- 4.

On September 26, 2012, Judge Moriarty again rejected these same improper joinder and venue arguments in *Townsend v. Hoffmann-La Roche, Inc.*, Cause No. 1122-CC08391 (Mo. 22nd Cir. Ct. Sept. 26, 2012). Exhibit C. In *Townsend*, twelve plaintiffs from seven states each alleged gastrointestinal injuries resulting from their use of the nationally marketed drug Accutane. Judge Moriarty found that "Missouri law allows for the joinder of unrelated plaintiffs who allege injury from the same conduct of the same defendant." (*Id.* at p. 2), and further found that, even if the claims were severed, the doctrine of *forum non conveniens* would not apply. *Id.* at p. 5. Finally, Judge Moriarty rejected the assertion that venue was improper as to the claims of the non-residents of the City of St. Louis, because the court found that the

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

claims of all plaintiffs were properly joined under Rule 52.05. *Id.* at pp. 5-6. Judge Moriarty's Orders in *Austin* and *Townsend* are directly on point on the issues of joinder and venue Medtronic seeks to litigate here.

**2. Judge Mark H. Neill's Orders.**

Other Judges in this Circuit have reached the same conclusion in cases where multiple plaintiffs have joined their claims pursuant to Rule 52.05 against the manufacturer of a **nationally marketed** drug that injured them. In *Ground v. Abbott Labs., Inc.*, Cause No. 1122-CC08690 (Mo. 22nd Cir. Ct. Dec. 1, 2011) (Exhibit D ), plaintiffs from Missouri and Illinois joined their claims that the plaintiffs' minor children suffered serious birth defects as a result of their mother's ingestion of the nationally marketed drug Depakote, due to the manufacturer's failure to adequately warn of Depakote's dangers to an *in utero* fetus.

Here, Medtronic levies the same argument that Abbot unsuccessfully advanced in *Ground*. Abbott contended that the claims of the non-Missouri plaintiffs were improperly joined with those of the Missouri plaintiffs and that venue in the City of St. Louis was improper for plaintiffs who were non-residents of the City of St. Louis. On December 1, 2011, the Honorable Mark H. Neill entered his Order rejecting Abbott's arguments and denying Abbott's motions. Exhibit D**.** As had Judge Moriarty (*see* Exhibit B , at p. 3), Judge Neill concluded that, "Missouri law **clearly allows** for the joinder of two unrelated plaintiffs who allege injury from the same conduct of the same defendant." Exhibit D**,** at p. 3 (citing *Kelley v. Nat'l Lead Co.*, 210 S.W.2d 728, 729 (Mo. Ct. App. 1948); *Saeger v. Lakeland Dev. Co.*, 350 S.W.2d 820, 821 (Mo. Ct. App. 1961)) (emphasis added). The court accordingly held that "where the claims are properly joined, venue as to both Plaintiffs is proper in the City of St. Louis if venue is proper as to either one." *Id.*

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

On September 23, 2010, Judge Mark H. Neill also ruled under indistinguishable circumstances that the claims of plaintiffs injured by the nationally marketed drug Avandia, with the same basis for liability, against the same drug manufacturer, were properly joined in that they involved the same series of transactions or occurrences under Rule 52.05. Exhibit E, *Hall v. GlaxoSmithKline, LLC*, Cause No. 1022-CC01740-01 (Mo. 22nd Cir. Ct. Sept. 23, 2010). Again citing *Kelley* and *Saeger*, Judge Neill stated that, "Missouri law **clearly allows**" for the joinder of unrelated plaintiffs who "allege injury from the same conduct of the same defendant." Exhibit E**,** at p.2 (emphasis added).

**3. Judge Bryan L. Hettenbach's Order.**

On December 13, 2012, the Honorable Bryan L. Hettenbach rejected the same defense arguments in *Madderra v. Merck, Sharp & Dohme Corp*., Cause No. 1122-CC-09316 (Mo. 22nd Cir. Ct. Dec. 13, 2012), Exhibit F. Plaintiffs from four different states joined in suing Merck, the manufacturer of the **nationally marketed** drug Fosamax. Upholding this permissive joinder, Judge Hettenbach reasoned that "Plaintiffs here allege similar personal and economic injuries caused by the use of Fosamax, which is manufactured by Defendant, and the failure of Defendant to warn of Fosamax's dangers. The Court finds that the Plaintiffs' claims are properly joined." Exhibit F, at p. 2. Consistent with Judge Moriarty and Judge Mark H. Neill's analysis of the jurisprudence, Judge Hettenbach cited *Kelley* and *Saeger* in support of the legal conclusion that, "Missouri law **clearly allows**" for the joinder of "unrelated plaintiffs who allege injury from the same conduct of the same defendant." Exhibit F**,** at p. 2 (emphasis added). Judge Hettenbach further found that, "because their claims are properly joined, venue as to all four Plaintiffs is proper in the City of St. Louis." *Id.* at p. 3.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

**4. Judge Philip D. Heagney's Orders.**

In *Madderra*, Merck filed a Motion to Reconsider Judge Hettenbach's Order finding that plaintiffs' claims were properly joined. In its motion, Merck contended that Judge Hettenbach had misinterpreted Rule 52.05. On January 31, 2013, Merck's Motion to Reconsider was heard by the Honorable Philip D. Heagney, who rejected Merck's arguments and found that Judge Hettenbach did not misinterpret Rule 52.05(a). *Madderra v. Merck Sharp & Dohme Corp.*, No. 1122-CC09316 (Mo. 22nd Cir. Ct. Feb. 19, 2013), Exhibit G, at p. 8. Judge Heagney also found that plaintiffs' claims were properly joined: "for the sake of clarity, the Court will state here its finding that Plaintiffs' claims arise out of the same series of transactions or occurrences and have questions of law or fact in common." *Id.* The Order explains that "Claims arise out of the same series of transactions or occurrences and justify joinder when they share a common scheme or design, or if the acts or conduct complained of are directed toward or connected with some common core, common purpose, or common event." *Id.* Finally, Judge Heagney turned to *Kelley* and *Saeger*, which had been cited in support of the frequently stated proposition that joinder of unrelated plaintiffs against the same defendant for the same conduct is proper. Judge Heagney explained that, "[t]his Court has reviewed the cases and finds that they support the rule for which they are cited." *Id.* Plaintiffs' claims here are properly joined for precisely the same reasons.

More recently, on August 27, 2013, Judge Heagney rejected Abbott's motion to sever and dismiss, or in the alternative to transfer for improper venue in *Barron v. Abbott Labs., Inc.*, Cause No. 1222-CC02479-01 (Mo. 22nd Cir. Ct. Aug. 27, 2013), Exhibit H. As had Judge Moriarty, Judge Heagney initially explained that, "[t]he policy of the law is to try all issues arising from the same occurrence or series of occurrences together." *Id.* at p. 3 (citing

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Bhagvandoss*, *supra*, 723 S.W.2d at 395; *Bryan*, *supra*, 175 S.W.3d at 719). The Court again found that, "Missouri law **clearly allows** for the joinder of unrelated plaintiffs who allege injury from the same conduct of the same defendant." Exhibit H, at p. 3 (citing *Saeger*, *supra*, 350 S.W.2d at 821; *Kelley*, *supra*, 210 S.W.2d at 729) (emphasis added).

**5. Judge John F. Garvey, Jr.'s Order.**

In denying a similar motion to dismiss, the honorable John F. Garvey, Jr. recently held that joinder may be permitted when there are numerous questions of law and fact in common, finding:

> "In the present case, Plaintiffs claim that they were each damaged by the same wrongful conduct of Defendants in the design, development, manufacture, testing, packaging, promoting, marketing, distributing, labeling, and sale of GranuFlo. The alleged events for which Plaintiffs seek damage arise out of the same common scheme or design, and are connected with a common core, common purpose, or common event. In addition, numerous questions of law and fact are common to Plaintiffs' claims herein, including what information Defendants possessed concerning the harmful effects of GranuFlo, what information they disclosed to physicians and patients about these harmful effects, and whether Defendants failed to conduct adequate safety efficacy studies."

*Spears v. Fresenius Med. Care N. America, Inc.*, Cause No. 1322-CC00825-01 (22nd Cir. Ct. June 16, 2014), *see also* Exhibit I.

**6. The Missouri Court of Appeals for the Eastern District's Orders Denying Prohibition and/or Mandamus.**

Notwithstanding that it was based on the widely accepted interpretation of the appeals' courts' decisions, Abbott attempted to challenge Judge Heagney's *Barron* order by taking a writ to the Missouri Court of Appeals. On December 11, 2013, the Eastern District denied the

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

writ. Exhibit J, *State ex rel. Abbott Labs., Inc. v. The Honorable Philip D. Heagney*, No. ED100679 (Mo. Ct. App. Dec. 11, 2013).

The *Barron* case was not the first time in which the Court of Appeals refused to disturb a Court decision interpreting *Kelley* and *Saeger* as support for the legal conclusion that, "Missouri law clearly allows for the joinder of unrelated plaintiffs who allege injury from the same conduct of the same defendant." *E.g.*, Exhibit H, p. 3; Exhibit E**,** at p. 2; *see also* Exhibit D**,** at p. 3; Exhibit F, at p. 2; Exhibit G, at p. 8. As previously indicated above, the Honorable Mark H. Neill ruled on September 23, 2010 that the claims of plaintiffs injured by Avandia, with the same basis for liability, against the same drug manufacturer, were properly joined in that they involved the same series of transactions or occurrences under Rule 52.05. Exhibit E, *Hall v. GlaxoSmithKline, LLC,* Cause No. 1022-CC01740-01 (Mo. Cir. Ct. Sept. 23, 2010). On November 9, 2010, GlaxoSmithKline filed a Petition for Writ of Prohibition and/or Mandamus in the Missouri Court of Appeals for the Eastern District, *State ex rel. GlaxoSmithKline v. The Honorable Mark H. Neill*, No. ED95780. The Court of Appeals denied that Petition on November 23, 2010. Exhibit K.

**6. The Supreme Court of Missouri's Orders Denying Prohibition and/or Mandamus.**

The Supreme Court of Missouri likewise has twice refused to disturb opinions of the Twenty-Second Judicial Circuit Courts allowing joinder of unrelated plaintiffs against the same defendants for the same conduct. On December 13, 2010, after the denial of the Petition for Writ of Prohibition and/or Mandamus by the Court of Appeals for the Eastern District, Defendant GlaxoSmithKline filed a Petition for Writ of Prohibition and/or Mandamus of Judge Neill's Order in the Supreme Court, *State ex rel. GlaxoSmithKline v. The Honorable Mark Neill*,

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

No. SC91374. On March 1, 2011, the Supreme Court of Missouri issued its Order denying GlaxoSmithKline's Petition for Writ of Prohibition/Mandamus. Exhibit C.

Notwithstanding defendants' repeated inability to convince the appeals courts to disturb the Twenty-Second Circuit's correct interpretation of *Kelley* and *Saeger*, Abbott also petitioned the Missouri Supreme Court in *State ex rel. Abbott Laboratories, Inc. v. The Honorable Philip D. Heagney*, No. SC93929. On February 25, 2014, that court denied Abbott's petition, again refusing to disturb a joinder decision that follows *Kelley* and *Saeger*. *See* Exhibit M**.** In so doing, the Supreme Court also rejected the same arguments that Medtronic makes here.

Thus, Medtronic is repeating misconstructions of joinder and venue that numerous other defendants have previously lost in pharmaceutical litigation in this Circuit and at all levels of appeal.

### 7. Federal Court Rulings Finding Proper Joinder

Additionally, proper joinder has been litigated intensely in the United States District Court for the Eastern District of Missouri. The following judges in the Eastern District have rejected the same "fraudulent misjoinder" arguments in the following mass tort pharmaceutical cases where, as here, plaintiffs allege injury from the same prescription product:

1. The Honorable Catherine Perry in *Fenner v. Wyeth*, 912 F. Supp. 2d 795 (E.D. Mo. 2012); *T.F. v. Pfizer, Inc.*, No. 4:12-cv-01221-CDP, 2012 U.S. Dist. LEXIS 101859 (E.D. Mo. July 23, 2012); and *Douglas v. GlaxoSmithKline, LLC*, No. 4:10CV971 CDP, 2010 U.S. Dist. LEXIS 66234, 2010 WL 2680308 (E.D. Mo. July 1, 2010);

2. The Honorable Henry Edward Autrey in *Spiller v. Medtronic USA, Inc.*, No. 4:13-CV-2538, 2014 U.S. Dist. LEXIS 9727 (E.D. Mo. Jan. 27, 2014);

3. The Honorable Thomas C. Mummert, III, *Agnew v. Medtronic Med. Care N. Am., Inc.*, No. 4:13cv2468 TCM, 2014 U.S. Dist. LEXIS 2536 (E.D. Mo. Jan. 9, 2014);

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

4. The Honorable Mary Ann Medler in *Hall v. GlaxoSmithKline, LLC*, 706 F. Supp. 2d 947 (E.D. Mo. 2010);

5. The Honorable Terry I. Adelman in *Hudson v. GlaxoSmithKline, LLC*, No. 4:10cv970, 2010 U.S. Dist. LEXIS 72650, 2010, WL 2926535 (E.D. Mo. July 20, 2010);

6. The Honorable Audrey G. Fleissig in *Dickerson v. GlaxoSmithKline, LLC*, no. 4:10CV00972, 2010 U.S. Dist. LEXIS 69070, 2010 WL 2757339 (E.D. Mo. July 12, 2010);

7. The Honorable Stephen N. Limbaugh Jr. in *Aurillo v. GlaxoSmithKline, LLC*, No. 4:10CV968 SNLJ, 2010 U.S. Dist. LEXIS 68348, 2010 WL 2735663 (E.D. Mo. July 9, 2010); and *Coleman v. Bayer Corporation*, No.4:10CV01639 SNLJ, 2010 U.S. Dist. LEXIS 143673 (E.D. Mo. Dec. 9, 2010);

8. The Honorable Audrey G. Fleissig *Townsend v. Hoffmann-La Roche, Inc.*, Case No. 4:11-cv-01420 (E.D. Mo. Sept. 1, 2011);

9. The Honorable Jean C. Hamilton in *Madderra v. Merck Sharpe & Dohme Corp.*, No. 4:11CV1673, 2012 U.S. Dist. LEXIS 22862 (E.D. Mo. Feb. 23, 2012);

10. The Honorable Charles A. Shaw in *M.B. v. Abbott Laboratories*, No. 4:12-CV-1250, 2012 U.S. Dist. LEXIS 152588 (E.D. Mo. Oct. 24, 2012); and,

11. The Honorable Carol E. Jackson in *Spears*, *supra*, and in *Aday v. Medtronic Med. Care N. Am., Inc.*, No. 4:13-CV-2462, 2014 U.S. Dist. LEXIS 5066 (E.D. Mo. Jan. 15, 2014); and *S.L. v. Pfizer, Inc.*, No. 4:12-cv-00420-CEJ, 2012 U.S. Dist. LEXIS 103134 (E.D. Mo. April 4, 2012).

In more than ten instances, federal judges in this district have found joinder proper under similar circumstances before this Court. As such, Medtronic cannot possibly justify re-litigating this issue.

**B. Independently, Plaintiffs' Claims Are Properly Joined.**

Both Missouri Revised Statute 507.040.1 and Missouri Rule of Civil Procedure 52.05(a) allow persons to "join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence or series of transactions or occurrences and if any question of law or fact common to all of them

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

will arise in the action." Mo. Rev. Stat. § 507.040.1; Mo. Sup. Ct. R. 52.05(a). This Rule is consistent with the important policy "to try all issues arising out of the same occurrence or series of occurrences together." *Bryan v. Peppers*, 175 S.W.3d 714, 719 (Mo. Ct. App. 2005) (finding severance of uninsured motorist claim for separate trial to be an abuse of discretion; quoting *Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 395 (Mo. banc. 1987)(further cit. om.).

For decades, Missouri law has clearly dictated that multiple plaintiffs may join together to sue a single tortfeasor. As far back as *Kelley v. Nat'l Lead Co.*, 210 S.W.2d 728, 729 (Mo. Ct. App. 1948), multiple plaintiffs with personal injuries were permitted (under the statue upon which Rule 52.05 is based, and which contained identical language) to join each other in suing one defendant, National Lead Company, for its negligence in causing toxic gases, fumes, and chemical particles to be emitted from its chemical plant and discharged over the plaintiffs' neighborhood. *Id.*

Similarly, in *Saeger v. Lakeland Development Co.*, the trial court had dismissed based on alleged improper joinder of separate claims for money had and received, where plaintiffs paid different amounts of money on different dates to the same developer; however, the appeals court reversed and found that "it appears that there are questions of law and fact common to all of the plaintiffs, and that the claims of all plaintiffs arose out of the same transactions or occurrences, or series of transactions or occurrences." 350 S.W.2d 820, 822 (Mo. Ct. App. 1961); *see also State ex rel. Farmers Ins. Co. v. Murphy*[53], 518 S.W.2d 655, 664 (Mo. 1975) (contract and tort claims may be joined in the same petition); *In re Prempro Prods. Liab.*

[53] In their Motion, Defendants cite *Murphy*, but there the Missouri Supreme Court referenced the "liberal policy regarding joinder of claims in the pleadings [that] extends to cases with multiple parties." 518 S.W. 2d at 658. The *Murphy* Court spent several pages defining just how broad the terms "transaction" and "occurrence" are under Missouri law. *Id.* at 658-662.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Litig.*, 591 F.3d 613, 623 (8th Cir. 2010) (rejecting argument that unrelated plaintiffs' claims for injuries from same drug[54] were fraudulently joined; finding a "palpable connection between the plaintiffs' claims against the manufacturers," as they all related to similar drugs and injuries and the manufacturers' knowledge of the risks of HRT drugs); *Mosley v. General Motors Corp.*, 497 F.2d 1330, 1334 (8th Cir. 1974) (joinder of plaintiffs was proper and arose from same series of transactions or occurrences where Plaintiffs' claims arose out of defendant's company-wide policy of racial discrimination.).

In *State ex rel. Allen v. Barker*, 581 S.W.2d 818 (Mo. 1979), a case the Defendants cite, the Supreme Court explained the framework for the liberal interpretation to be given permissive joinder under Missouri law:

> Our joinder rule, 52.05 was adopted from the federal rule governing joinder, Fed.R.Civ.P. 20. Under these rules the federal courts, and Missouri, have broadened the range of claims which may be permissibly joined.... The Eighth Circuit has adopted the "logical relationship" test, drawn from cases interpreting Fed.R.Civ.P. 13(a)'s requirement that compulsory counterclaims be made where claims arise out of the same series of transactions or occurrences. Adopting this test to Fed.R.Civ.P. 20 permits "**reasonably related claims for relief by or against different parties to be tried in a single proceeding. Absolute identity of all events is unnecessary**." [Citations omitted].... Such is in keeping with the Supreme Court's admonition in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724, 86 S. Ct. 1130, 1138, 16 L.Ed.2d 218 (1966): "Under the [federal] Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."
>
> ... It follows that in keeping with the broad policy favoring permissive joinder, we should follow the lead of the Eighth Circuit in applying that test to permissive joinder under rule 52.05(a)..... We thus have the "[cement] or unity justifying joinder . . . [found in] . . . the fact that **all acts or conduct are more or less consciously directed toward or connected with some common core, common**

[54] Defendants cite *Hyatt v. Organon USA, Inc.*, 2012 WL 4809163 (E.D. Mo. Oct. 10, 2012) and a case it cites, *Boschert v. Pfizer, Inc.*, 2009 WL 1383183 (E.D. Mo. May 14, 2009) as cases where the federal court declined to allow joinder in a pharmaceutical case. Respectfully, those cases are outliers compared to the bevy of state and federal cases—including pharmaceutical cases—cited *supra*. Regardless, neither cases held that pharmaceutical cases could not be joined. Even *Boschert* noted that such a determination was made via a "case-by-case approach...." *Id.* at *2.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

> **purpose, or common event**," required by *Levey v. Roosevelt Fed. Savings & Loan Ass'n of St. Louis*, 504 S.W.2d 241, 247 (Mo. App. 1973)..... If the requisite "logical relationship" is present, it seems inconsistent to establish a different rule for defamation than for other actions. As a result, joinder should be permitted.

581 S.W.2d at 826-827 (emphasis & note added).

More recently in *State ex rel. Nixon v. Dally*, 248 S.W.3d 615 (Mo. banc 2008), the Missouri Supreme Court defined the meaning of "series" under Rule 52.05(a), stating:

> The common meaning of series is a **"group of ... events ... succeeding in order and having a like relationship to each other," which can include events that are in "temporal succession." … The definition of "series" does not require that the events be related to a common cause.** Rule 52.05(a) requires that the series of occurrences be related by a common question of law or fact, a requirement that is readily apparent here because of the common factual question as to the origin of [the plaintiffs'] injuries. *Id.*

248 S.W.3d at 617 (emphasis added).

Additionally, as this Court recently noted, joinder may be permitted when there are "numerous questions of law and fact…common to Plaintiffs' claims herein, including what information Defendants possessed concerning the harmful effects of GranuFlo, what information they disclosed to physicians and patients about those harmful effects…." *Spears v. Fresenius Med. Care N. America, Inc.*, Cause No. 1322-CC00825-01 (22nd Cir. Ct. June 16, 2014).

Under the Supreme Court's interpretation of permissive joinder, Plaintiffs may join if they plead a series of occurrences that are related by a common question of law or fact. Plaintiffs' claims here arise from some of the same occurrences, and from a series of occurrences that are related by common questions of law and fact - namely each of their claims concerns the same nationally-marketed Infuse®, the same theories of liability, and the same conduct by the same defendants.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

The Statute and Rule only require "**any** question of law or fact common to all" plaintiffs that "will arise in the action." Mo. Rev. Stat. § 507.040.1; Mo. Sup. Ct. R. 52.05(a) (emphasis added); *see also Levey*, 504 S.W.2d at 247 ("The Rule does not require that all questions presented by each plaintiff be common; it is enough if there is any common question, and the wrongful quality of either defendant's act is a question common to both claims."). Here, there are numerous common questions of fact concerning the conduct of Defendants common to all Plaintiffs, including, but not limited to the development of Infuse®, marketing for unapproved uses, ghostwriting of expert articles, and illegal payments to doctors to promote the product while hiding adverse events it causes.

Quixotically, Defendants assert that joinder of Plaintiffs' claims is less efficient, and in doing so, cite *State ex rel. Farmers Ins. Co. v. Murphy*, 518 S.W.2d at 662 and the alleged need for individualized determinations based on the various states laws applicable to Plaintiffs. Mot. at 34. First, in *Murphy*, the Missouri Supreme Court affirmed the trial court's decision to permit joinder of tort and contract claims, even going as far as to overrule earlier cases that might have held that tort and contract claims could not be joined. 518 S.W.2d at 664. Thus, the idea that a court will have to examine different types of claims joined together is nothing new; trial courts can handle multiple legal standards. Secondly, Plaintiffs are at a loss to understand how severing these Plaintiffs into dozens of other cases will make the litigation more efficient. Plaintiffs' Petition is replete with common facts alleging improper and illegal behavior that harmed all the Plaintiffs. Defendants have presented no justification for disregarding the Statute, the Rule, the appellate cases, and the long line of decisions in this Circuit Court. Defendants' solution, i.e. severance of Plaintiffs' claims, would needlessly multiply the number of causes of action and the number of judges and juries needed to address the same issue: Medtronic's

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

liability for its wrongful and improper sale, marketing, and distribution of a dangerous product. Medtronic is seeking to make this case more complicated than it is to support its claim that joinder is inappropriate, without regard for the controlling legal standard set forth in Section 507.040.1 and Rule 52.05(a).

## IV. DEFENDANTS' *FORUM NON CONVENIENS* ARGUMENTS ARE WITHOUT MERIT

Contrary to Defendants' assertions, the City of St. Louis has a more than adequate nexus to this litigation. The Missouri Supreme Court has recognized that in the context of a *forum non conveniens* motion, a plaintiff's choice of forum should not be disturbed except for "weighty reasons" and a case should be dismissed "only if the balance is strongly in favor" of the Defendant." *Anglim v. Missouri Pacific R.R. Co.*, 832 S.W.2d 298, 305 (Mo. 1992) (internal citations omitted). *See also*, *Campbell v. Francis*, 258 S.W.3d 94, 97 (Mo. App. W.D. 2008). Under a *forum non conveniens* evaluation, the defendant bears "the burden of establishing all factors supporting a claim that a Missouri Court is an inconvenient forum." 832 S.W.2d at 305.[55] Moreover, the defendant must establish "a clear showing of inconvenience and that the ends of justice require the change of venue." *State ex. rel. Ford Motor Co. v. Westbrooke,* 12 S.W.3d 386, 394 (Mo. App. S.D. 2000)(finding no facts establish that "location of witnesses weighs heavily in favor of applying the doctrine…or that a trial in Missouri would be oppressive" where incident occurred in Nebraska, plaintiffs were from Nebraska, and all witnesses and medical providers were located in Nebraska). Also, the mere fact that more witnesses are located in a state other than Missouri is not conclusive. *See Anglim*, 832 S.W.2d at 304.

[55] Mere speculation that a plaintiff chose a forum based upon a perception that the venue has a favorable jury pool is irrelevant to the Court's consideration of the doctrine. *Euton v. Norfolk and Western Ry. Co.*, 936 S.W.2d. 146, 154 (Mo. App. E.D. 1996).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Despite Defendants' claim of a burden on the local judiciary and "trial by strangers," (Mot. at 37), in *Willman v. McMillen*, 779 S.W.2d 583, 586 (Mo. 1989), the Supreme Court explained that, "[w]here the legislature has provided that venue is proper in a particular county, it is not the court's role to frustrate it as suggested" by the defendants, who had complained that the process was allegedly being abused. Therefore, the Supreme Court has repeatedly rejected defense attempts to exalt their policy preferences over the law.

As such, the central issue in the case at bar is not whether Plaintiffs could have filed their Petition elsewhere, but rather, whether they are required by law to do so. As is clear, there is a strong presumption in favor of a plaintiff's choice of forum and the burden is on the defendant to prove that *forum non conveniens* is applicable. Thus, given this presumption and the fact that Defendant has failed to meet its burden, Plaintiffs should not be denied their right to bring suit in the City of St. Louis.

This Court's review of Defendants' motion should be made in the context of the relevant venue statute. The venue statute embodies the legislature=s intent as to which forums would be sufficiently convenient for the parties to try the lawsuit. The standard for dismissal under the doctrine of *forum non conveniens* is whether the present forum is so "manifestly inconvenient" that it would be unjust to require the Defendant to defend itself here. *Besse v. Missouri Pacific R.R. Co.*, 721 S.W.2d 740, 742 (Mo. 1986) (finding St. Louis City was not an inconvenient forum where the incident occurred in Kansas, eyewitnesses were in Kansas, and medical treatment was in Kansas).

As, the Missouri venue statute, §508.010(5), provides in pertinent part:

> Notwithstanding any other provision of law, in all actions where there is any count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

> (1) If the defendant is a corporation, then venue shall be in any county where a Defendant=s corporation=s registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured…

This is a clear statement that the Missouri legislature expected cases to be filed in Missouri when the plaintiff was a non-resident and was first injured outside the State of Missouri and legislatively mandated the correct venue in this instance. Of course, in the present situation, venue is proper in the City of St. Louis because multiple plaintiffs had their Infuse® surgeries performed in the City of St. Louis and those claims are properly joined with those who surgeries were performed outside of St. Louis.

But putting aside venue of Plaintiffs the Defendants do not challenge, other Missouri courts have consistently denied *forum* motions, even where the action accrues far outside the boundaries of the State and even when the plaintiff received initial medical treatment in that location. *See Besse v. Missouri Pacific R.R. Co.*, 721 S.W.2d 740, 742 (Mo. banc 1986)(the injury occurred in Kansas 446 miles from the forum and the witnesses and medical providers were in Kansas); *Ingle v. Illinois Cent. Gulf R.R. Co.,* 608 S.W.2d 76 (Mo. App. E.D. 1980) (589 miles from forum); *Euton v. Norfolk and Western Ry. Co.*, 936 S.W.2d 146, 154 (Mo. App. E.D. 1996)(457 miles from forum); and *State ex rel. Kansas City S. Ry. v. Mauer,* 998 S.W.2d 185, 185 (Mo. App. W.D. 1999) (453 miles from forum).

In fact, the Circuit Courts of St. Louis County and St. Louis City have repeatedly denied *forum* motions for cases involving out-of-state injuries and out-of-state initial medical treatment. See Exhibit N, attached hereto, collecting Orders denying similar motions: *Orrantia v. Union Pacific R.R. Co.*, Cause No. 09SL-CCO3964 (Judge Seigel; injury in San Antonio, Texas); *Adair v. Norfolk S. Ry. Co.,* Cause No. 052CC1224 (Judge Grady; South Whitley, Indiana); *Wood v. Norfolk S. Ry. Co.*, Cause No. 042-01171 (Judge Grady; Toledo, Ohio); *Koz v. Norfolk*

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*S. Ry. Co.*, Cause No. 22052-07691 (Judge Grady; Elkhart, Indiana); *Hinesman v. Norfolk S. Ry. Co.*, Cause No. 22052-08107 (Judge Grady; Marion, Indiana); *Ferre v. Norfolk S. Ry. Co.*, Cause No. 052-08304 (Judge Grady; Decatur, Illinois). *Schaefer v. Norfolk S. Ry.*, Case No. 08SL-CC00781, Order of Hon. John Ross; *Adams v. Union Pacific R.R. Co.*, Cause No. 012-01286, August 30, 2001, Order of Hon. Margaret M. Neill; *Chandler v. Union Pacific R.R. Co.*, Cause No. 042-00663, January 7, 2005, Order of Hon. John J. Riley; *Hopson v. Union Pacific R.R. Co.*, Cause No. 042-07544, April 21, 2005, Order of Hon. Steven R. Ohmer; *Morrison v. Union Pacific R.R. Co.*, Cause No. 052-08466, April 4, 2006, Order of Hon. Thomas C. Grady; *Vance v BNSF Ry. Co.*, Cause No. 07CC-2083, November 26, 2007, Order of Hon. Richard C. Bresnahan; *Rimpler v Norfolk S. Ry. Co.*, Cause No. 06CC-03756, April 26, 2007, Order of Hon. David Lee Vincent, III; *Ayers v BNSF Ry. Co.*, Cause No. 06CC-1810, June 27, 2007, Order of Hon. Richard C. Bresnahan; *Bentley v BNSF Ry. Co.*, Cause No. 06CC-5100, May 4, 2007, Hon. Emmett M. O=Brien; *Fry v Norfolk S. Ry. Co., et al.*, Cause No. 07-CC-2329, January 17, 2008; *Minix v Norfolk S. Ry. Co.*, Cause No. 07-CC-02328, October 2, 2007, Hon. David Lee Vincent, III; and *Osborn v Arkansas R.R. Co.*, Cause No. 05CC005987, July 18, 2006; *James L. Morrison v. Union Pacific R.R. Co.,* Cause No. 052-01267, March 24, 2006, Hon. Thomas C. Grady; *Steve Walker v. BNSF Ry. Co.*, Cause No. 052-00724, September 27, 2005, Hon. Steven R. Ohmer; *Steven Mark Lacy v. The Burlington Northern & Santa Fe Railway Co.*, Cause No. 052-00055, August 31, 2005, Hon. Steven R. Ohmer; *James Whitman v. BNSF Ry. Co.*, Cause No. 042-09267, August 4, 2005, Hon. Steven R. Ohmer; *Loyd Stansberry, Jr. v. The Burlington Northern & Santa Fe Ry. Co.*, Cause No. 042-08811, August 1, 2005, Hon. Steven R. Ohmer; *Michael A. Stallworth v. BNSF Ry. Co.*, Cause No. 042-09571, August 4, 2005, Hon. Steven R. Ohmer; *Anthony Galloway v. Norfolk S. Ry. Co.*, Cause No.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

052-07983, February 27, 2006, Hon. Thomas C. Grady; *Stephen Smyth v. BNSF Ry. Co.*, Cause No. 052-01686, October 26, 2005, Hon. Steven R. Ohmer; *John Peterson v. BNSF Ry. Co.*, Cause No. 052-7686, October 26, 2005, Hon. Steven R. Ohmer; *Adams v Union Pacific R.R. Co.*, 13SL-CC00115, July 16, 2013, Hon. Colleen Dolan, all of which are contained within Exhibit N.

Importantly, the appellate courts in Missouri have **never** reversed a circuit court's denial of a *forum non conveniens* motion. *See e.g.*, *State ex rel. Wyeth v. Grady,* 262 S.W.3d 216, 230 (Mo. 2008) (Clark, J., concurring) ("the fact remains that no Missouri appellate court has ever issued a writ directing a trial court to dismiss a case on grounds of forum non conveniens"); *Mauer*, 998 S.W.2d at 185 (same). Conversely, the courts have reversed the granting of a *forum* motion in at least one instance. *See, e.g.*, *Barrett v. Missouri Pacific R.R. Co.*, 688 S.W.2d 397 (Mo. App. E.D. 1985) (finding no manifest inconvenience because the defendant had offices and agents in St. Louis and some of the plaintiff's doctors were located close to St. Louis).

Further, the same determinative facts in *Barrett*, which was the basis for reversing a dismissal on *forum non conveniens* exist in this present action. Medtronic sought approval and has been approved by the Secretary of State for the State of Missouri to do business in this Missouri. Further, on their Secretary of State Business Filing, Medtronic lists an in state office in Clayton, Missouri. Medtronic has sales consultants, representatives, key opinion leaders, and secret agents, who promoted Infuse® and/or an unapproved device made of only select parts of Infuse® (i.e. only the rhBMP-2 biologic and the absorbable collagen sponge without the LT-Cage™) for unapproved uses.

As the overwhelming body of case law shows, *forum non conveniens* is a rarely invoked doctrine. Here, as venue is proper to some Plaintiffs and all of Plaintiffs' claims are properly

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

joined, Defendants cannot establish that it is manifestly inconvenient to have a trial in the City St. Louis. Therefore, their motion should be denied.

## V. PLAINTIFFS CLAIMS ARE NOT PREEMPTED

### A. Requirements Imposed By The PMA Approval For Infuse®

On January 12, 2001, Medtronic applied for approval of Infuse® pursuant to the FDA's premarket approval ("PMA") process. The PMA process applies only to "Class III" devices, which have a higher risk profile than Class I or II devices. The FDA defined Infuse® as a Class III "device" consisting of "two components containing three parts…"[56]: (1), the bone graft substitute which consists of liquid rhBMP-2, also known as Bone Morphogenetic Protein ("BMP"); (2), a sponge-like carrier or scaffold for the BMP (manufactured from bovine collagen) which is soaked with and contains the "BMP"; and, (3) the "LT-CAGE™," which is a hollow metal cylinder that is used to insert the collagen scaffold into the spine. (Am. Pet. ¶ 160)

Medtronic applied to the FDA for PMA approval for the use of Infuse® device in spinal fusion surgery limited to only a single disc space in the lumbar spine (L4-S1) and accessed only via an anterior (frontal) approach.[57] This procedure is known as an Anterior Lumbar Interbody Fusion ("***ALIF***"). Accordingly, the FDA's premarket review focused exclusively on the safety and effectiveness of the Infuse® device *for that specific use and in that specific manner only*. *See*, 21 U.S.C. §§ 360c(a)(2), 360e(c)(1). The FDA's approval of the Infuse® device (in PMA No.P000058) was therefore expressly limited to that specific use as well.[58] The FDA *never* reviewed (and Medtronic did *not* seek approval for), the use of rhBMP-2 in spinal surgeries

[56] *See* FDA Approved Labeling for Infuse®, *see* Am. Pet. at ¶ 89.
[57] PMA Approval Letter, *see* Am. Pet. at ¶ 89.
[58] *See* FDA Approved Labeling for Infuse®, *see* Am. Pet. at ¶ 89.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

performed in any other manner using approaches through the back or side (called "posterior" or "posterolateral" approaches).[59]

The FDA approved the Infuse® device as a "combination" product on July 2, 2002. BMP *alone* is defined by the FDA as a "therapeutic biologic."[60] The Infuse® device is therefore technically a "Device-Biologic" "combination product." The individual separate components and parts of the Infuse® device have markedly different regulatory rules and possess no pre-market approval at all. The FDA in its PMA approval of the Infuse® device required that *all* of its three components be used together, as specifically stated in the FDA Approved Labeling:

> **"These components must be used as a system. The InFUSE™ Bone Graft [rhBMP-2] component must not be used without the LT-CAGE™ Lumbar Tapered Fusion Device component."**[61]

The FDA's approval for the design and use of the Infuse® device was limited because "[t]he safety and effectiveness of the Infuse® Bone Graft component [the rhBMP-2] with *other* spinal implants [other than the LT-Cage™], implanted at locations *other* than the lower lumbar spine, or used in surgical techniques *other* than anterior open or anterior laparoscopic approaches ***[had]. . . not been established***."[62] (emphasis added) The FDA approved only one specific lumbar procedure, the ALIF procedure. Medtronic did not even apply for approval of any procedure other than ***ALIF*** due to concerns about potential adverse events already reported at the time of the product's approval. A Medtronic-sponsored trial examining the application of rhBMP-2 in ***PLIF*** (Posterior Lumbar Interbody Fixation) procedures was *halted* in December 1999 when uncontrolled bone growth developed in a number of the patients. (Am. Pet. ¶ 183.) This clinical trial demonstrated that bone overgrowth complications from the Infuse® device resulted from the

---

59 *See* FDA Approved Labeling for Infuse®, *see* Am. Pet. at ¶ 89.
60 *See* "Guidance for Industry and FDA, Class II Special Controls Guidance Document: Intervertebral Body Fusion Device", *see* Am. Pet. at ¶ 221-224.
61 *See* FDA Approved Labeling for Infuse®, *see* Am. Pet. at ¶ 89. (Emphasis in the original.)
62 *Id. at* 4 (emphasis added).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

product's very own mechanism of action; *i.e.*, rhBMP-2 stimulates the growth of new bone. The FDA limited Infuse® to ***ALIF*** procedures only. *Id.* ¶ 89.

Defendants emphasize in their motion that, because the specific requirements of the Infuse® device PMA approval attach to the Infuse® "device," *any* causes of action under state law imposing requirements "different from, or in addition to" those imposed by the FDA's PMA approval are preempted. *See* Defs' Mot. at 3, *citing Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). However, the FDA Approval Letter stated: "Failure to comply with *the conditions of approval* ***invalidates this approval order***. Commercial distribution that is not in compliance with these conditions is a violation of the [FDCA]."[63] These "CONDITIONS FOR APPROVAL" were attached to the FDA Approval Letter and stated in part, as follows:

> PREMARKET APPROVAL APPLICATION (PMA) SUPPLEMENT. Before making any change ***affecting the safety or effectiveness of the device***, submit a PMA supplement for review and approval by FDA....
>
> A PMA supplement must be submitted ***if the device is to be modified*** and the modified device should be subjected to animal or laboratory or clinical testing designed to determine if the modified device remains safe and effective.

(Emphasis added.)

For the purposes of this motion, the Court must view each allegation in the Complaint as true. [64] This includes the allegation that Medtronic promoted the use of only one component of the Infuse® device (rhBMP-2/the collagen sponge) completing it with "other spinal implants" as opposed to the LT-Cage™ component of Infuse® that had been approved by the FDA and contrary to the safety limitations imposed by the PMA. The Court must further take as true that

[63] FDA Approval Letter, *see* Am. Pet. at ¶ 89.

[64] When a trial court is presented with a motion to dismiss pursuant to Rules 55.27(a)(2) and (6), the court must "accept as true all of plaintiff's averments and view the allegations in the light most favorable to the plaintiff." *Platonov v. The Barn, L.P.*, 226 S.W.3d 238 (Mo. App. E.D. 2007) (citing *Vogt v. Emmons,* 158 S.W.3d 243, 247 (Mo. App. E.D. 2005)).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic promoted this unauthorized, unapproved, and altered design to be "implanted at locations other than the lower lumbar spine, or used in surgical techniques other than anterior open or anterior laparoscopic approaches…," in further investigation of the safety limitations imposed by the PMA. Each of these changes in use and modifications in design obviously was a "change ***affecting the safety or effectiveness of the device…"*** and thus contrary to the CONDITIONS FOR APPROVAL. Yet, Medtronic failed to comply with the conditions of the FDA's approval when it failed to file a PMA Supplement requesting further approval for these changes, thus obviously impacting the safety of the Infuse® device. Medtronic specifically disregarded these safety requirements intended by the FDA to draw a protective boundary around only those uses and designs that had been found safe and effective. Such findings had not been made for surgeries using posterior approaches because Medtronic's ***PLIF*** study had been prematurely stopped, due to concern with excess bone growth occurring in those patients. Thus, the FDA Approval of the Infuse® device is meaningless and inapplicable, for as used by Plaintiffs here, its literal describe Medtronic's violation of the PMA's CONDITIONS FOR APPROVAL. The FDA Approval Letter specifically states that when Medtronic violates the boundaries of the PMA approved by the FDA, <u>the PMA is invalid and does not apply as to those violations.</u>

### B. Federal Prohibitions Against "Off-Label" Promotion

For purposes of this motion, this Court must assume[65] that Medtronic intended and did deliver to Plaintiffs only a *single* component of the Infuse® device, rhBMP-2, to be used in their respective surgeries via an *unapproved* surgical approach or knowing that it would likely *not* be used in combination with the equipment required by the FDA, namely, the LT-Cage™ or both.

[65] *See Platonov v. The Barn, L.P.*, 226 S.W.3d 238 (Mo. App. E.D. 2007)

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Either of these conditions made the use of rhBMP-2 in Plaintiffs "off-label;" that is, ***unapproved by the FDA***. Medtronic engaged in multiple wrongful and illegal acts for the purpose of promoting the distribution and use of rhBMP-2 "off-label." These wrongful acts included making false statements and fraudulently concealing safety and efficacy information regarding the off-label use.

The FDA "generally prohibits the manufacturer...from distributing a product...for any ***intended use*** that the FDA has not approved as safe and effective...."[66] "If a manufacturer knows, or has knowledge of facts that would give him notice that a device…is to be used for conditions, purposes, or uses other than the ones for which he offers it, the manufacturer is required to provide adequate labeling for such other uses."[67] FDA regulations prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[68]

The FDCA prohibits the introduction, or delivery for introduction into interstate commerce, of any device that is adulterated or misbranded.[69] A Class III device (like the Infuse® device) is "'adulterated' with respect to an intended use if it. . . has not received premarket approval. . . with respect to that intended use."[70] A device is "'misbranded' unless its labeling bears 'adequate directions' ***for the intended use*** of the device including indications, effects, relevant hazards. . .and precautions under which practitioners. . .can use the device safely and for the purposes for which it is intended."[71] Therefore, a device is "misbranded" if a manufacturer "intends" for the product to be used in any unapproved or "off- label" way, because that device

---

[66] 65 Fed. Reg. § 14286 (Mar. 16, 2000).
[67] 21 C.F.R. § 801.4.
[68] 21 C.F.R. §§ 201.100, 201.128; *see* 21 U.S.C. § 352(f)(1).
[69] 21 U.S.C. § 331(b).
[70] *Taylor v. Danek Med., Inc.*, No. 95-7232, 1998 U.S. Dist. LEXIS 20265, at *27–28 (E.D. Pa. Dec. 29, 1998) (citing 21 U.S.C. § 351(f)).
[71] *Id.* (citing 21 U.S.C. § 352(f) and 21 C.F.R. §§ 801.4, 801.109) (emphasis added); *see* 21 U.S.C. § 352(a).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

does not include directions, indications, and warnings on the product label for those unapproved uses.[72]

### C. There Is A Presumption Against Preemption

There is a well-established "basic presumption against pre-emption" because preemption upsets the balance of power between the federal government and the states as independent sovereigns. *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005).[73] Accordingly, "[w]hen faced with two equally plausible readings of statutory text, [courts] 'have a duty to accept the reading that disfavors preemption.'" *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 240 (3d Cir. 2009) (quoting *Altria Grp., Inc.*, 555 U.S. at 77). This presumption holds "even in the event of an express preemption clause," *id.* (citation omitted), and is particularly strong in tort cases like this one because the states have historically enjoyed broad powers to protect the "lives, limbs, health, comfort, and quiet of all persons." *Slaughter House Cases*, 16 Wall 36, 62 (1873); *see also Lohr*, 518 U.S. at 485 (applying the presumption against preemption in a medical device case). "That issues of health and safety have traditionally fallen within the province of state regulation is beyond refute." *Bruesewitz*, 561 F.3d at 240 (citing *Riegel*, 518 U.S. at 485); *Ard v. Jensen,* 996 S.W.2d 594, 600 (Mo. Ct. App. 1999) ("… [P]reemption is the exception rather than the rule.").

### D. Preemption Does not Apply When Medtronic Violates The Laws

Multiple FDA regulatory violations are alleged by Plaintiffs, not in an effort to enforce these provisions, but solely to show parallel claims in anticipation of Medtronic's preemption defense. Medtronic systematically violated federal law through a nationwide campaign of

---

[72] *See* 21 C.F.R. §§ 801.4

[73] *See also, Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) ("[W]hen addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'").

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

illegally and misleadingly promoting the rhBMP-2 component to be used contrary to the FDA's approval of the Infuse® device. For over a decade, Medtronic engaged in "carnival-like promotion" of the rhBMP-2 by, among other things, "misrepresent[ing]" the product's "effectiveness and harms through selective reporting, duplicate publication, and underreporting."[74] Once discovered, Medtronic's reckless scheme shocked Congress[75] and enraged the medical community.[76] More importantly, Medtronic's misconduct violated both Missouri and federal law, and caused Plaintiffs to suffer grievous personal injuries.

As previously stated, for purposes of this motion, all allegations in the Petition must be taken as true.[77] The question here, however, is whether Medtronic should be free of any civil liability to those hurt by their wrongful over the course of more than a decade? Despite having potential liability for violating these federal laws, which is not Plaintiffs' concern here, could imposition of civil liability under state law tort claims possibly be *inconsistent* with Medtronic's duties under those same federal laws, and thus be preempted?

Congress could have never intended to protect a manufacturer, like Medtronic, from liability when it boldly violates FDA regulations through false and misleading off-label promotion, *unapproved* by the FDA. This certainly was not the intent of the FDA, when it explicitly provided that its Premarket Approval ("PMA") for the Infuse® device be invalid in circumstances where Medtronic intentionally violates the CONDITIONS OF APPROVAL by altering the design and uses of the device in ways that tragically impact its "safety and effectiveness."

---

[74] Eugene Carragee, MD, *Response to Long-Awaited YODA Report on Controversial Spinal Fusion Product*, THE SPINE JOURNAL, June 17, 2013, *see* Am. Pet. at ¶ 759.
[75] Senate Report, *see* Am. Pet. at ¶ 668..
[76] Eugene J. Carragee, MD, *A Critical Review of Recombinant Human Bone Morphogenetic Protein-2 Trials in Spinal Surgery: Emerging Safety Concerns and Lessons Learned*, THE SPINE JOURNAL, April 27, 2011, *see* Am. Pet. at ¶ 559.
[77] *See Platonov*, 226 S.W.3d 238.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

In the past few months alone, no fewer than nine (9) state and federal courts across the country have rejected Medtronic's nearly identical preemption motions where the first component of the Infuse® device was "misbranded;" thus, violating the criminal prohibitions under the MDA and FDCA, due to Medtronic's "off-label" promotion.[78] "[T]he shield [of preemption] drops when the manufacturer violates federal law. 'Section 360k provides immunity for manufacturers of new Class III medical devices [like Infuse®] to the extent that they comply with federal law, but it does not protect them if they have violated federal law.'"[79] In an effort to circumvent this precedent, Medtronic grossly mischaracterizes Plaintiffs' claims and the relevant facts. Plaintiffs do not claim that Medtronic should have designed the Infuse® device differently or given different warnings applicable to FDA-***approved*** uses. Rather, Plaintiffs claim that Medtronic chose to violate federal law through intentionally misleading promotion of new designs and uses that were *never considered or approved by the FDA* for *the* Infuse® device.

**E. Plaintiffs' Claims Are Not Preempted By Riegel's Two-Step Test**

Medtronic argues that Plaintiffs' state law claims are preempted because "each is expressly preempted by the Medical Device Amendments of 1976 ("MDA") to the Federal Food,

[78] *See, Ramirez v. Medtronic, Inc.,* No. CV-13-00512-PHX-GMS, 2013 U.S. Dist. LEXIS 118822 (D. Ariz. Aug. 21, 2013) (holding plaintiff's state-law claims were not preempted because they arose from Medtronic's misleading off-label promotion of Infuse®, violating federal law against "misbranding" a device); *Alton v. Medtronic Sofamor Danek USA, Inc*., No. 3:13-CV-409-PK, 2013 U.S. Dist. LEXIS 127190 (D. Ore. Sep. 6, 2013) (same result reached through different reasoning); *Eidson v. Medtronic, Inc*., Nos. 3:13-CV-02049-LHK; 3:13-CV-01502-LHK, 2013 U.S. Dist. LEXIS 144179 (N.D. Cal. Oct. 3, 2013) (similar); *McDonald-Lerner v. Neurocare Assocs., P.A.*, No. 373859-V, 2013 Md. Cir. Ct. LEXIS 6, at *19–20 (Md. Cir. Ct. Aug. 29, 2013) (same); *Sanda v. Medtronic, Inc*., No. 13L000305, Hrg. Tr. 53:20-56:17 (Ill. Cir. Ct. Jul. 18, 2013) (Brewer, J.) (same); *Chambers (Brandt) v. Medtronic, Inc*., No. 12-2-07422-4 SEA (Wash. Super. Ct. Sept. 18, 2013) (same).

[79] *Ramirez v. Medtronic Inc*., 2013 U.S. Dist. LEXIS 118822 (D. Ariz. Aug. 21, 2013), quoting *Bausch v. Stryker Corp*., 630 F.3d 546, 553 (7th Cir. Ill. 2010). (emphasis added); Memorandum and Order, *Hornbeck, Donna et. Al. v. Medtronic, Inc. et al.*, 13 C7816 (U.S. Dis. Ct., Dist. Of Ill., East.Dist., 2014); Order, *Maretta Worrix v. Medtronic, Inc., et al.*, No. 13-CI-01016 (Ky. Pike Cir. Ct. March 6, 2014); Order, *Winston Dillion, Jr., Et ux. v.Medtronic, Inc.*, et al., No. 13-CI-00922 (Ky. Pike Cir. Ct. May 26, 2014), attached hereto as Ex. O.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Drug, and Cosmetic Act (FDCA), 21 U.S.C. §360k(a)."[80] But Medtronic admits that Plaintiffs may avoid preemption by successfully enunciating state-based causes of action consistent with federal duties imposed under the MDA. The Supreme Court in *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008) recognized that MDA §360k(a) enacted a ***two-step test*** in determining whether state law claim are expressly preempted.

- "[T]he Federal Government [must have] established requirements applicable to" a specific medical device. *Riegel*, 552 U.S. at 321. If no federal requirements exist, the inquiry ends—there can be no express preemption without an applicable federal requirement.

- The Court must next ask whether the Plaintiffs' claims impose requirements on the defendant that are "different from, or in addition to" the federal ones. *Id.* at 322. State-law requirements that do not differ from, or add to, the federal requirements applicable to a device are termed "parallel" requirements and are not preempted. *Id.* at 330.

Plaintiffs' claims are not preempted unless **both** of the MDA §360k(a) requirements are satisfied. But in this usage, *neither* step is met. There are no federal requirements applicable to the use of only the first component of the Infuse® device, rhBMP-2, **without** the second component, the LT-Cage™. The FDA never granted Medtronic permission to promote the rogue use of first component **alone**. Just as a glass of gin is not considered a Martini, the promotion and sale of *only* rhBMP-2 alone was simply not the Infuse® device.

The FDA Approval Letter[81] for the Infuse® device by its very terms invalidates the FDA PMA approval in cases where Medtronic fails to conform to the CONDITIONS OF APPROVAL, attached to the Approval Letter. The CONDITIONS OF APPROVAL required Medtronic to obtain a supplemental Premarket Approval ("PMA") from the FDA where

[80] Defs' Mot. at 2-3.
[81] *See* PMA Approval Letter for Infuse®, *see* Am. Pet. at ¶ 89.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic intended to change the design or the approved uses of its device; yet, Medtronic failed to do so in each of Plaintiffs' cases. Medtronic plainly understood this, as they obtained a new, *separate* PMA for their rhBMP-2 when intended to be used for repair of open tibia fractures and in some oral and sinus surgeries. Nonetheless, only if the Court finds that the PMA was somehow applicable to this rogue use of the rhBMP-2 component alone, the Plaintiffs' state-law claims are based only on parallel requirements that are neither different from, nor add to, the federal requirements and Plaintiffs' claims must survive.

### 1. No Specific FDA Requirement Applies Only to the rhBMP-2 Component (as Implanted in Plaintiffs) Because Medtronic Promoted a Different Design and Use than Approved by the FDA.

#### a. The Infuse® FDA Approval Letter invalidated all PMA requirements applicable to *unapproved* uses promoted contrary to the CONDITIONS OF APPROVAL.

At the point that Defendants violated the CONDITIONS OF APPROVAL of the FDA's Approval Letter, all PMA requirements applicable to the device were null and void for what remained was not the PMA device known as Infuse®, which was the only device the FDA had approved. Only when Defendants *complied* with the restrictions and conditions imposed by the FDA Approval Letter of Infuse®, would the device-specific requirements applicable to the Infuse® device preempt any state law causes of action that directly conflict with those requirements. When a manufacturer decides to violate the CONDITIONS OF APPROVAL the effect is predictable and absolute. The language of the FDA Approval Letter specifically states that: "Failure to comply with the conditions of approval **invalidates this approval order**."[82] Plaintiffs' state law causes of action cannot be inconsistent with a PMA that doesn't exist in cases where Medtronic chose not to comply with those conditions.

[82] *see* Am. Pet. at ¶ 89.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

When the manufacturer intends and promotes a new and unapproved use of a medical device, or markets a change in the design of a product unapproved by the original PMA, FDA regulations require the manufacturer to submit a new or supplemental PMA, ***precisely*** because there are then no specific requirements that attach to the new device to assure such uses or designs are safe and effective. This is one of the CONDITIONS OF APPROVAL explicitly imposed by the FDA's Approval Letter. *Id.* If a manufacturer, like Medtronic, fails to obtain a PMA or a PMA supplement, the new device is misbranded. "FDA has taken the position that '[a]n approved drug [or device] that is marketed for an unapproved use (whether in labeling or not) is misbranded because the labeling of such drug [or device] does not include 'adequate directions for use.'"[83]

The MDA makes it plain that it does not regulate the practice of medicine regarding "off-label" uses, but the MDA is equally clear that this is wholly separate from the criminal prohibitions against promoting an unapproved product by a manufacturer:

> Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient… **Further, this section shall not change any existing prohibition on the *promotion* of unapproved uses of legally marketed devices.**[84]

The MDA and FDA regulations prohibit a manufacturer from promoting a use of the product that is not the specified FDA approved use.[85] Should a manufacturer intend to market a device "for a new or different indication for use, the premarket notification submission must include appropriate supporting data to show that the manufacturer has considered what

[83] 1A-8B Drug Product Liability § 8B.06, *quoting,* 21 U.S.C.S. §321(m).
[84] 21 U.S.C. § 396 (emphasis added). *See also*, Am. Pet. ¶229.
[85] 21 U.S.C. § 331(a) (effective 2013); *see also*, 21 U.S.C. § 397 and 21 C.F.R. § 814.80 (providing that a device "may not be … advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device." *See* 21 C.F.R. § 807.87(g).

The FDA reviews the PMA only for the manufacturer's "***intended*** conditions of use." 21 CFR § 860.7(b)(2). The PMA must contain "Indications for use." 21 C.F.R. § 814.20(b)(3)(i). The FDA did not review the Infuse® device for safety and effectiveness uses which Medtronic represented as *unintended,* such as with posterior approach surgeries. Although the FDA certainly reviewed all the available data, this was with a view to approving uses for which Medtronic represented the Infuse® device would actually be marketed. Medtronic knew if it had advised the FDA that it intended to market the components of the Infuse® device for ***TLIF***s and other posterior approach surgeries, the FDA would not have approved the Infuse® device PMA because it had insufficient clinical evidence to support such uses.

Hence, the post-approval marketing ploy of hiding behind the Infuse device's PMA, but secretly promoting off label uses. Therefore, the PMA for the Infuse® device, by its own terms, conditions and limitations, is <u>not applicable</u> to uses for which Medtronic never sought FDA approval. Plaintiffs' surgeries establish that Defendants clearly intended to distribute rhBMP-2 alone, though it never revealed that rogue use to the FDA and never signaled its intent to disassemble the Infuse device and market individual components for unapproved uses.[86]

For these reasons, the first step of *Riegel*'s two step inquiry has not been satisfied. There are <u>no requirements</u> applicable to a single-component in a non-ALIF insertion for the Infuse® device when the FDA was never even given the opportunity to consider such uses; thus, <u>no FDA</u>

[86] *See, Ramirez*, 2013 U.S. Dist. LEXIS 118822, at *20–22 ("[T]he FDA reviewed Infuse®'s safety and effectiveness only for the uses Medtronic specified in its PMA application, and the regulations are premised on that review. . . . Thus, while the requirements applicable to the device are not explicitly use-specific, they are premised on the manufacturer's intended use."); *See also, McDonald-Lerner*, 2013 Md. Cir. Ct. LEXIS 6, at *19–20; *Purchase v. Advanced Bionics, LLC*, 896 F. Supp. 2d 694, 696 (W.D. Tenn. 2011).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

requirements exist regarding these uses when they were never even considered by FDA.

**b. PMA requirements do not attach to the singular components of the Infuse device.**

This case is vastly different from previous medical device cases where plaintiffs have alleged that PMA approval does not apply to the components of a device because in those cases, the *whole* device was considered in its entirety. For example, in *Gross v. Stryker Corp.*, plaintiff alleged that a single component of the Trident hip, the metal acetabular cup, did not have PMA approval because that particular component previously went through the 510(k) approval process. *See* 858 F. Supp. 2d 466 (W.D. Pa. 2012). The plaintiff's essential argument was that since the component was previously approved through the 510(k) process, that it could not receive subsequent PMA approval when incorporated into a new device. Regardless of whether that analysis is correct, this case is inapposite because the Trident hip had received PMA approval as a *whole* device, including the metal acetabular cup, and was appropriately used as a *whole* device. *See Id*. It is unlikely that PMA approval would have applied to the Trident hip's metal acetabular cup if it had been used by itself, absent the entire Trident hip, or if the metal cup was used in a hip approved through the 510(k) process. Another case, *Smith v. Depuy Orthopaedics Inc.*, is distinguishable because the artificial knee components relevant to the plaintiff's claims all received *supplemental* PMA approval. *See* 552 F. App'x 192 (3d Cir. 2014).[87] Here, isolated rhBMP-2 never received any supplemental PMA approval to be used alone or with a Class II cage in the spine.

This case is also distinguishable from *Gross* and *Smith* because Plaintiffs are claiming the

[87] Defendants may also cite to *Duggan v. Medtronic, Inc.*, but the facts of that case are ultimately inapposite to the case at bar. *See* 840 F. Supp. 2d 466 (D. Mass. 2012) (Defendants sought and acquired a supplemental PMA approval for the device at issue).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

PMA is inapplicable not based upon how the surgeon utilized the device but by how Defendants promoted it. *See* 858 F. Supp. 2d 466; *see also* 552 F. App'x 192. Plaintiffs understand and are not attempting to argue that the MDA curtails the practice of medicine. However, Plaintiffs do assert that were it not for the illegal promotion and the intentional misrepresentations of Defendants, Plaintiff's surgeons would never have used the rhBMP-2 alone, with a Class II cage, or in an unapproved manner.

Defendants ask the Court to give the one component they truly promoted, rhBMP-2, preemptive protection, but this position would not only drastically reduce the safety of medical devices, but disembowel the PMA process. Not only would this give manufacturers free reign to promote dangerous and deadly components, outside the PMA approval system, but it would also allow manufacturers to escape any civil liability for those clear violations of federal law. If Defendants are correct that rhBMP-2 alone is cloaked in preemptive protection, despite the fact that it was never put through the PMA process for use alone in the spine and was used in ways the FDA approval never authorized, then medical device manufacturers would be able to obtain PMA approval for combination devices, promote their individual components in any fashion they see fit, and escape all responsibility. A device manufacturer with a profitable, but unsafe, component would only need to combine it with safer components for the purposes of gaining PMA approval then simply ignore the FDA and put the singular component on the market with robust off-label promotion. The victims of this conduct would then have no civil recourse. For example, a manufacturer of PMA-approved artificial hips could promote the acetabular cup for use in a patient's shoulder or a manufacturer of insulin pumps could promote their tubing as a catheter. Such are obvious violations of federal law surely ensure the safety of patients using medical devices. These district courts whose decisions can be read to support this illogical

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

position must recognize that it is inconsistent with the legislative purpose behind the MDA.[88] Had Defendants been able to get PMA approval for rhBMP-2 alone for use in the spine, they would most likely have done so since it appears that economically, it was of the only component they were actually selling. However, as many studies have now shown, rhBMP-2 is unsafe on its own as a singular component and never would have received that PMA approval on its own.

**c. Cases Applying PMA Protection to rhBMP-2 Alone are Based Upon a Flawed Analysis**

Plaintiffs respectfully disagree with these few district courts that have misinterpreted *Riegel* and simultaneously hampered the purpose of the MDA with respect to device safety. Cases such as *Gavin* improperly expand the scope of *Riegel* to include the individual components of devices. *See* 2013 WL 3791612. In *Gavin*, the court stated that:

> Plaintiff's arguments undercut his position against preemption, because Plaintiff is essentially arguing that preemption is inapplicable here because using the INFUSE Bone Graft component alone was an off-label use of the Device. This argument is clearly inconsistent with *Riegel* which also involved the off-label use of a medical device. Moreover, the Plaintiff's complaint even states that '[t]he FDA has [ ] approved INFUSE Bone Graft.' Accordingly, because the INFUSE Bone Graft received premarket approval from the FDA through the PMA process as a component part of the medical device, the first condition under the *Riegel* two-step analysis is satisfied.

*Id.* (citing *Riegel*, 552 US at 321). This analysis is incorrect. In *Riegel* the surgeon was using an "Evergreen Balloon Catheter" and while the use was off-label, it is important to note that the surgeon was using the *whole device*. 552 U.S. at 320. Therefore, comparing *Riegel* to the facts of a case involving the use of rhBMP-2 alone or with an unapproved Class II case is

---

[88] *See Hawkins v. Medtronic, Inc.*, 2014 WL 346622 (E.D. Cal. 2014); *Ledet v. Medtronic, Inc.*, 2013 WL 6858858 (S.D. Miss. 2013); *Schouest v. Medtronic, Inc.*, 2014 WL 1213243 (S.D. Tex. 2014); *Houston v. Medtronic Inc.*, 957 F. Supp. 2d 1166 (C.D. Cal. 2013); *Gavin v. Medtronic, Inc.*, 2013 WL 3791612 (E.D. La. 2013).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

improper. That is not the Infuse device. The Supreme Court was never faced with the question of whether the components of a device have independent PMA protection. If the balloon in the Evergreen Balloon Catheter was put inside a patient's body alone or attached to a catheter with only 510(k) approval, logic dictates that it would not have received PMA protection. For it would have not been the "Evergreen Balloon Catheter" device Infuse have received approval.

In *Houston*, the court stated that the plaintiff's claims are "within the ambit of express preemption under *Riegel*" because they are "oriented 'with respect to' the off-label promotion and use of a device that is covered by federal requirements." *Houston*, 957 F. Supp. 2d at 1176. This was a misstatement of the law, as plaintiff's claims of off-label promotion do not automatically "orient" them within the realm of express preemption under *Riegel*. *See* 552 US 312. This standard cannot be found anywhere within the Supreme Court's decision, and suggests a "preemption by implication" rule analysis that exists nowhere else in any decision. While it is true that plaintiff's claims in *Riegel* dealt with an off-label use of the catheter, but the mere off label use does not obligate a court to use *Riegel's* preemption analysis.

Another case, *Ledet*, cited both *Gavin* and *Houston*, leads to an increasingly flawed analysis. That court also cited to *Riley v. Cordis Corp.*, a case involving the use of a Cypher stent. *See* 625 F. Supp. 2d 769 (D. Minn. 2012). While Plaintiffs disagree that off-label usage will still provide a PMA device preemptive protection, this case is irrelevant to the issue of whether singular components of a device have that protection because inherent, the surgeon used the complete stent and not only components of the device.

Later decisions, such as *Hawkins* and *Schouest,* rely upon *Bass v. Stryker Corp.,* to reach their conclusion that a PMA applies to each component of the device, but the facts in *Bass* are also completely inapposite to the facts of an Infuse device case. *See* 2014 WL 346622; 2014 WL

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

1213243; 669 F.3d 501 (5th Cir. 2012). *Bass* was a case involving an artificial hip. The entire artificial hip in question was approved through the PMA process and the complete device was used. *See* 669 F.3d 501. Therefore, both *Hawkins* and *Schouest* base their conclusions on factually different case law. Those facts would prevent the district courts from recognizing the unique situation presented that the component device at issue is technically a biologic, not a device. Unlike a stent or artificial hip, the components and parts of the Infuse® device have markedly different regulatory rules. As discussed above, the biologic component of Infuse®, rhBMP-2, is governed by the FDA's Center for Drug Evaluation or Research ("CDER").[89]

**d. The rhBMP-2 device implanted in Plaintiff is a new "biologic" or combination device, with no applicable PMA requirements.**

Here, Medtronic obviously intended that the rhBMP-2 component of the Infuse® device be used with cages other than the LT-Cage™, already approved by the FDA for use with rhBMP-2. FDA Regulations make it clear that combining the rhBMP-2 component with a cage other than the one specifically approved, required the manufacturer to file a new PMA (or a PMA supplement) in order to upgrade the cage (also known as a "spacer") to a Class III device.[90] The rhBMP-2 component implanted in Plaintiffs was either an "unapproved biologic" or "combination biologic/device", designed differently and requiring additional or new regulatory approval.[91] Medtronic was required to demonstrate "reasonable assurance" that the rhBMP-2 device it knew was implanted in Plaintiffs was "safe" and "effective" "*under the conditions of use prescribed*" in a Premarket Application for approval ("PMA").[92] Nevertheless, the

[89] *See generally,* definitions in 21 CFR § 3.2(b).
[90] *See* 21 CFR § 888.3080.
[91] For this very reason, the FDA required the Infuse® label to state that: "The safety and effectiveness of the Infuse® Bone Graft component with other spinal implants, implanted at locations other than the lower lumbar spine, or used in surgical techniques other than anterior open or anterior laparoscopic approaches have not been established." *See see* Am. Pet. at ¶ 89.
[92] 21 U.S.C. § 360e(d)(2) (emphasis added); *See also,* 21 U.S.C. § 360c(a)(2).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Medtronic Defendants never tendered a PMA for the use of rhBMP-2 alone or with a cage other than the LT-Cage, Inter Fix™, or Inter Fix™ RP Threaded Fusion Device. For these reasons, there are and can be no regulatory requirements specific to this unapproved combination biologic/device as *delivered to Plaintiffs*. That device is a rogue device and Plaintiffs' state law claims in the absence of regulatory requirements cannot be inconsistent with them.[93] The first step of the *Riegel* test cannot be met. Thus, the Court's preemption analysis must, stop here.[94] *Ramirez,* 2013 WL 4446913, at *37.[95]

**e. The approval of Infuse® remains in effect, but only within the boundaries intended by the FDA. FDA never intended its PMA to apply separately to the parts of the Infuse® device**

The approval for the Infuse® device only remains valid within the boundaries set for the device by the FDA. "Revocation" of the FDA's "pre-market approval" may not be automatic where the manufacturer, such as Medtronic, conforms to the conditions of the approval and the requirements of the FDCA and FDA's regulations. But the case at bar is ***not*** a situation where the FDA was "withdrawing approval of the application…" per 21 USCS § 360e. Plaintiffs do not consider whether the Infuse® device PMA is 100% invalid or that it should be withdrawn.

---

[93] Throughout its memorandum, Medtronic ambiguously and misleadingly uses the term "Infuse," or "the Infuse device" to refer both to the Infuse® Combination Device approved by the FDA and also to rhBMP-2, which was the part of the product implanted into Plaintiffs. Medtronic's attempt to conflate two very different things – one, the FDA-approved Infuse® device, and the other, an unreviewed, unapproved component of Infuse® – is factually, logically and legally wrong based on FDA regulations.

[94] *See Ramirez,* 2013 U.S. Dist. LEXIS 118822, at *37; *McDonald-Lerner* 2013 Md. Cir. Ct. LEXIS 6, at *19-20; *Sanda v. Medtronic, Inc*., No. 13L000305, Hrg. Tr. 53:20-56:17 ("[*Riegel* has] required me to determine whether the FDA has imposed a device-specific requirements on this device. Certainly it has, but not for the off-label use.").

[95] Several cases Medtronic relies on have failed to recognize this critical point—that the manufacturer's misleading promotion of off-label uses effectively establishes a new, misbranded use, in circumvention of FDA requirements. The absence of FDA review or approval of that off-label use means there are no federal determinations regarding the safety or efficacy of that use with which a potential state jury verdict could conflict; therefore, there is no basis for preemption under § 360k and the first prong of *Riegel* is not met. *See, e.g., Wendt v. Bernstein,* No. 12 L 11479 (Ill. Cir. Ct. Jun. 24, 2013)*; Caplinger,* 921 F. Supp. 2d at 1218 n.4; *McCormick v. Medtronic, Inc.,* No. 368532-V (Md. Cir. Ct. Apr. 19, 2013) (currently on appeal to Court of Special Appeals); *Coleman v. Medtronic, Inc., et al.*, No. SC112290 (Super. Ct. of Cal. June 22, 2012); *Otis-Wisher*, 2013 U.S. Dist. LEXIS 88813; *Gavin*, 2013 U.S. Dist. LEXIS 101216; *Dawson v. Medtronic, Inc.*, No. 3:13-cv-663-JFA, 2013 U.S. Dist. LEXIS 112877 (D.S.C. Aug. 9, 2013); *Wolicki-Gables,* 634 F.3d at 1300.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Rather, it is that this PMA has no validity to a device which does not match what the PMA describes.

The FDA provided a specific regulation *requiring* a manufacturer desiring to use a biologic, like rhBMP-2, with a spacer cage, to obtain a new PMA for this now new device.[96] In light of this specific regulation, the FDA could not have intended, as that the Infuse® device PMA would apply separately to rhBMP-2 alone. The ***separate*** components and parts of Infuse® have markedly different regulatory rules, as opposed to the Device-Biologic Combination singularly defined as Infuse® device. The rhBMP-2 part of the Infuse® device is a biologic which (if the FDA had approved to be used separately or as a stand-alone product) would have been governed by the FDA's Center for Drug Evaluation or Research ("CDER").[97] If marketed separately, rhBMP-2 as a biologic likely would be approved for marketing, by itself, through the CDER via a New Drug Application ("NDA") or through a Biologics License Application ("BLA").[98] The CDER has a Division of Therapeutic Protein (DRP) with regulatory responsibility for multiple biologic proteins, like rhBMP-2. But this type of approval never happened. [99] In contrast, the Center for Devices and Radiological Health ("CDRH") orchestrates regulatory authority over all "devices" as defined in the FDCA. The CDER never approved the use of rhBMP-2 separately for use in the spine and the CDRH approved the use of rhBMP-2 only in combination with specific medical devices; namely, the LT-Cage™ and the collagen sponge

[96] *See* 21 CFR § 888.3080.
[97] *See generally,* definitions in 21 CFR § 3.2(b).
[98]http://www.fda.gov/BiologicsBloodVaccines/DevelopmentApprovalProcess/BiologicsLicenseApplicationsBLAProcess.
[99] Contrary to Medtronic's argument, *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.,* 592 F.Supp.2d 1147, 1155 (D.Minn. 2009), *aff'd sub nom*. *Bryant v. Medtronic, Inc.,* 623 F.3d 1200 (8th Cir. 2010) is inapplicable here. *Sprint Fidelis* was within the context of a recall of devices issued by the FDA. The Court held that Plaintiffs' causes of action in such a circumstance would be "second-guessing of the FDA's decision-making." 592 F. Supp. 2d at 1156. But here, there can be no recall where the device and its uses were never approved in the first place. There can be no "second-guessing" where the FDA never "guessed" in the first place.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

parts of the Infuse® device.

"In other words, preemption under MDA §360k is not even an issue because the PMA for 'the Infuse® Bone Graft/L-T Cage Device' does not establish device-specific requirements for the bone protein alone and without the LT-Cage, or the implantation of any or all of the device through a posterior approach." *McDonald-Lerner v. Neurocare Assocs.*, P.A., NO. RWT 14-cv-094, 2014 WL 1356602 (D. Md. Apr. 4, 2014).[100] *McDonald-Lerner* further explained that any other result would completely neutralize the FDA's regulatory scheme:

> It is unfathomable that Congress authorized the FDA to approve and limit the sale and distribution of drugs and medical devices for specific purposes, under specific conditions, and impose stringent premarket approval and subsequent labeling requirements, setting out those purposes and other conditions of approved use, but yet allow manufacturers and their representatives to ignore those same requirements with impunity by touting off-label uses to physicians. If that is true, the federal regulatory scheme and approval process established by Congress is a complete waste of time.[101]

**2. <u>Plaintiffs' State-Law Claims Are Based On Requirements That Merely Parallel Federal Requirements.</u>**

Even if PMA No. P000058 established federal requirements specifically applicable to the off-label use of the component parts of the Infuse® device (which it did not), there would still be no basis for express preemption. Plaintiffs' state-law claims are not based on requirements "different from, or in addition to" the requirements of federal law. Plaintiffs' state-law claims seek only to impose liability for misconduct that happens to violate federal law and FDA regulations (thus avoiding expressed preemption), while independently basing such claims on Missouri law (thus avoiding implied preemption). Such claims are deemed valid "parallel

[100] "There is no legitimate federal concern with state judges or state juries meddling with the decisions of the FDA when the state law claims, as alleged in this case, arise 'out of a use that has not been reviewed by the FDA but has been promoted by the manufacturer.'" *McDonald-Lerner,* at 19, *quoting Ramirez v. Medtronic Inc.*, 2013 U.S. Dist. LEXIS 118822 *9 (D. Ariz. Aug. 21, 2013).

[101] *Id.* at *23-4.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

claims," as explained by *Lohr*:

> Nothing in § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements. **Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement.** While such a narrower requirement might be "different from" the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule. **The presence of a damages remedy does not amount to the additional or different "requirement" that is necessary under the statute; rather, it merely *provides another reason* for manufacturers to comply with identical existing "requirements" under federal law.**

*Lohr*, 518 U.S. at 45 (emphasis added). Parallel claims need not be "identical," just as train tracks are "parallel" but never truly identical, although they arrive at the same destination.

**a. The FDCA and FDA Regulations prohibit off-label solicitation.**

Defendants cite to *United States v. Caronia* for the proposition that federal regulations do not prohibit off-label use but this case is clearly inapposite.[102] In *Caronia*, Alford Caronia, a pharmaceutical representative for a drug company, was convicted of promoting the drug, Xyrem, by arranging "speaker programs" and paying "speakers" to tout its off-label uses to physicians. Caronia himself did not answer questions regarding off-label use, but arranged to have others answer for him, including "Key Opinion Leaders", similar to those alleged in the Complaint here. The Second Circuit reversed Caronia's conviction based on his First Amendment rights. "We construe the misbranding provisions of the FDCA as not prohibiting and criminalizing ***the truthful off-label promotion*** of FDA-approved prescription drugs." *Id.* at 168 (emphasis added).

The holding in *Caronia* provides no safe harbor for the actions of Medtronic in this case

[102] *See* 703 F.3d 149 (2d Cir. 2012).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*Caronia* hinged on *truthful* promotion, while the off-label promotion here is alleged to be *false and misleading*. The *Caronia* court had no trouble concluding that false or misleading off-label promotions would have been prohibited:

> [O]ff-label promotion that is false or misleading is not entitled to First Amendment protection. [Citations omitted.] Under 21 U.S.C. § 331(a), a defendant may be prosecuted for ***untruthfully promoting*** …a drug.

*Id.* at FN10 (emphasis added).

The Eighth Circuit, in *Blankenship v. Medtronic Inc.*, took precisely the same position:

> … *Caronia* is distinguishable because it was an appeal of a criminal conviction… *Caronia* addressed the limited issue of whether the government "can *prosecute* pharmaceutical manufacturers and their representatives under the FDCA" for speech promoting off-label uses of an FDA-approved drug. In contrast here, the plaintiff is bringing a *civil* case against the manufacturer itself. *Caronia* does not apply in the instant case.

2014 WL 1226491, at *4 (8th Cir. 2014). Given that Plaintiffs bring a civil action and allege that Defendant's promotion of rhBMP-2 was false and misleading, *Caronia* is inapplicable here.

**b. <u>Plaintiffs' State-Law Claims Parallel Federal Law.</u>**

Even if PMA No. P000058 established federal requirements specifically applicable to the off-label use of the single rhBMP-2/collagen sponge component in Plaintiffs' surgeries (which it does not), there is still no basis for express preemption under § 360k(a) because the state-law claims are not based on requirements "different from, or in addition to" the requirements of federal law. To the contrary, the Plaintiffs' state-law claims seek to impose liability on Medtronic for misconduct that violates traditional Missouri tort law and, at the same time, also happens to violate federal law and FDA regulations as well. These are valid "parallel claims." *See Lohr*, 518 U.S. at 495; *Riegel,* 552 U.S. at 330.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

As explained above, several circuits have followed suit holding that state-law parallel claims like those of Plaintiffs' avoid preemption for precisely the same reason. For example, the Ninth Circuit, in an unanimous *en banc* decision held that § 360k of the MDA did not preempt plaintiffs' parallel state-law claim, noting that: "[o]ur sister circuits have uniformly held that, in cases dealing with **violations of the MDA outside the pre-market approval process**, the MDA does not preempt state-law causes of action for damages in which the state-law duty 'parallels' the federal-law duty under the MDA." *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1227-28 (9th Cir. 2013), *cert. denied*, *Medtronic, Inc. v. Stengel*, -- S. Ct. --, 2014 WL 2807193 (June 23, 2014) (emphasis added) (citing *Hughes*, 631 F.3d at 765 and *Bausch*, 630 F.3d at 549).[103]

*Bausch* was recently applied by the Northern District of Illinois in *Elmore v. Smith,* where that court rejected preemption arguments nearly identical to those raised by Medtronic here:

> Under Illinois law, violation of a statute designed to protect human life is prima facie evidence of negligence, [citation omitted]. In addition, Illinois "imposes strict liability on sellers of unreasonably dangerous products where the dangerous condition existed when it left the manufacturer's control." *Apperson v. E.I. du Pont de Nemours & Co.*, 41 F.3d 1103, 1106 (7th Cir.1994). Design or manufacturing defects may cause a product to become "unreasonably dangerous." *Id.* Because plaintiffs' common-law claims are based on alleged violations of federal law, they impose no requirement "different from, or in addition to" the requirements of the federal regulations, and are not expressly preempted.

2013 WL 1707956, at *3 (N.D. Ill. 2013). Accordingly, Plaintiffs here bring a state law tort claim against Medtronic to the extent that Medtronic has violated a similar federal law.

[103] *Hughes* held that the state-law claim was not preempted "to the extent that this claim is predicated on [the defendant's] failure to comply with the applicable federal statutes and regulations." 631 F.3d at 764. The Eleventh Circuit, too, has recognized that a plaintiff can allege a parallel claim by alleging that a manufacturer "violated a particular federal specification referring to the device at issue," and caused injury. *Wolicki-Gables*, 634 F.3d at 1301.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*First*, Plaintiffs allege Medtronic falsely and misleadingly promoted off-label, misbranded uses of the Infuse® device in violation of federal law and parallel state-law requirements.[104] As stated above, promotion by a manufacturer of off-label uses of a medical device violates federal law. While doctors are allowed to use devices off-label, the FDA prohibits device manufacturers from promoting any off-label uses of their products, especially if such promotion is false and misleading.[105] This is precisely because the FDA's premarket review of a device's safety and effectiveness is not unlimited; the FDA reviews only the intended use specified by the manufacturer in the PMA application. *See* 21 U.S.C. §§ 360c(a)(2), 360e(c)(1); *see also Ramirez*, 2013 WL 4446913, at *28. Medtronic's conduct in falsely and misleadingly promoting dangerous, misbranded uses of the Infuse® device violates state law requirements.[106] Those claims, based on fraudulent misrepresentation and concealment, do not impose any requirements different from, or in addition to the federal requirements outlined above. Not surprisingly, like federal law, Missouri law prohibits misbranding of a device. *See* Mo. R.S. § 196.015.[107] Missouri law prohibiting misbranding is nearly identical – and certainly parallel – to the federal law prohibiting such misbranding.

Furthermore, Medtronic's fraudulent promotion of misbranded uses of the Infuse® device also violates traditional Missouri laws regarding fraud, negligence, and strict liability, precisely the claims alleged here by the Plaintiffs.[108] *See, e.g., Hill v. Air Shields Inc.*, 721 S.W.2d 112

---

[104] Medtronic's reliance upon *Walker v. Medtronic, Inc.* is inapplicable since it does not concern injuries due to a manufacturer's promotion of an off-label, misbranded use of a device. *See* 670 F3d 569 (4th Cir. 2012).

[105] *See* 21 U.S.C. § 333(a); *Ramirez*, 2013 U.S. Dist. LEXIS 118822, at *28; *McDonald-Lerner*, 2013 Md. Cir. Ct. LEXIS 6, at *21-*24; *Caronia*, 703 F.3d at 166; *United States v. Stryker Biotech, LLC*, (D. Mass. 2012); *Cornett v. Johnson & Johnson*, 48 A.3d 1041, 1057 (N.J. 2012).

[106] *See* Mo. R.S. § 196.015

[107] "The following acts and the causing thereof within the state of Missouri are hereby prohibited… (1) The manufacture, sale, or delivery, holding or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded; (2) The adulteration or misbranding of any food, drug, device, or cosmetic…"

[108] Medtronic narrowly argues that the claims here are not parallel because there is no state law concept of "off-label use." The conduct at issue here is misleading promotion of a misbranded product. The illegality of this misconduct does not turn on the origin of the term "off-label."

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

(Mo. 1986) (finding a genuine issue of material fact with respect to the plaintiff's negligence and strict liability claims when a manufacturer of incubators knew of literature in the medical community disputing its warnings but continued to sell the unaltered product), 118 ("… there are issues as to material facts which should have been resolved at trial; namely, whether the machine as designed or the literature describing its use fostered a misuse of oxygen, with the result that the incubator was unnecessarily dangerous when it was sold without a warning… if defendant promoted a belief that oxygen concentrations of less than 40 percent were universally safe when it was aware of research results to the contrary, then it was negligent"). Here, Plaintiffs allege that Medtronic manipulated the medical literature to affirmatively misrepresent and conceal risks linked to off-label use of the bone protein component. That same reprehensible conduct constituting off-label promotion and misbranding that violates federal law also serves as the predicate misrepresentation to prove fraud. The claims based on Medtronic's misleading promotion of misbranded uses of the Infuse® device are parallel and escape preemption under § 360k.

*Second,* the Plaintiffs allege Medtronic failed to submit to the FDA reports of adverse events in violation of both federal and state law. (Am. Pet. ¶ 1619(n).) Manufacturers are required to maintain and submit information to the FDA, including adverse event reports, 21 C.F.R. § 803.50, and to establish internal procedures for reviewing complaints and event reports. 21 C.F.R. § 820.198(a). More specifically, a manufacturer must update the FDA when it learns of investigations or scientific studies concerning its device, 21 C.F.R. § 814.84(b)(2), or incidents where the device—used in any manner, including off-label, unapproved uses—"[m]ay

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

have caused or contributed to a death or serious injury," either due to malfunction or normal operation, *id.* § 803.50(a).

*Stengel* is an instructive example. There, the plaintiff was rendered a paraplegic by an implanted Medtronic Class III medical device and claimed that Medtronic had violated a state-law duty of care by failing to report to the FDA risks discovered after the date of the FDA's premarket approval of the device. *See Stengel*, 704 F.3d at 1226. The Ninth Circuit found that not only did Medtronic's failure to inform the FDA of known risks violate the MDA's requirements but parallel Arizona state law requirements to warn and to sell products with appropriate warnings. *Id.* at 1233. Specifically, Arizona law contemplates that a warning to a third party, such as the FDA, can satisfy a manufacturer's duty "if, given the nature of the warning and the relationship of the third party, there is 'reasonable assurance that the information will reach those whose safety depends on their having it." *Id.* at 1233 (*quoting* Restatement (Second) of Torts § 388 cmt. n.

Missouri law is no different and recognizes Comment "n" to § 388 of the Restatement *i.e.*, that a defendant may have a duty to warn a third party, such as the FDA, although the extent of that duty is a question of fact for the jury to decide. *See, e.g., Donahue v. Phillips Petroleum*, 866 F.2d 1008 (8th Cir. 1984) (citing *Morris v. Shell Oil Co.*, 467 S.W.2d 39, 42 (Mo. 1971)). Here, as in *Stengel*, the Plaintiffs allege that after the FDA's approval of the Device in 2002, Medtronic knew of, but failed to report adverse events involving Infuse®. (Am. Pet. ¶ 1619(n).) That failure violated both federal law and state law. Thus, the Plaintiffs' claims based on Medtronic's failure to report adverse events to the FDA are parallel claims that escape preemption under § 360k.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

In sum, Medtronic's alleged misconduct – *i.e.* unlawfully and misleadingly promoting dangerous misbranded uses of the Infuse® device while, at the same time, concealing and failing to report adverse events caused by these misbranded uses – violates federal law prohibiting misbranding and requiring reporting of adverse events, as well as parallel Missouri state-law prohibitions against misbranding, misrepresentation, and failing to warn. Thus, § 360k does not preempt these state law claims.

The Plaintiffs' design defect claim also escapes preemption. Contrary to Medtronic's contention, the Plaintiffs do not claim that Medtronic should have designed the Infuse® Combination Device differently from what the FDA approved. The Plaintiffs' design defect claim alleges that the use of the Infuse® Bone Protein alone for use in non-anterior approach spine surgeries, a design which was never reviewed or approved by the FDA was defective. "[T]he fact that Medtronic is alleged to have actively promoted the use of Infuse® outside of the prescribed federal approval process has opened up state law claims premised on the new, unapproved use of Infuse®. Infuse® may indeed be defectively designed for the off-label uses that Medtronic may have actively promoted. Certainly the FDA has not made a finding one way or the other. Because there are no applicable federal regulations that govern the product for this new use, there is no conflict for preemption purposes." *Ramirez*, 2013 WL 4446913, at *17. The purpose of § 360k's express preemption provision is to avoid having another entity (*e.g.* state legislators or a state jury) come to a conclusion about a device's safety that conflicts with the determination made by the FDA during the PMA process. *See, e.g.*, 21 C.F.R. § 808.1(d). But where, as here, a claim arises out of an improperly promoted and misbranded use that has never been reviewed by the FDA, let alone approved, there is no FDA determination with which to conflict. And where, as here, Plaintiffs' claims arise out of misconduct by the manufacturer with

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

respect to its marketing of a medical device, there is no law or policy basis for preempting the application of state laws designed to protect consumers against such behavior. *See Bausch*, 630 F.3d at 553, *Ramirez*, 2013 WL 4446913, at *10. Another recent decision denying Medtronic's motion to dismiss based on preemption, stated:

> "In short, the the FDA considered a specific use and issued specific warnings for that use. It does not follow that the FDA's oversight with respect to that specific use protects all other uses. Accordingly, the FDCA does not preempt the Plaintiffs' claims premised on the duty to warn others about risks associated with unapproved uses of the InFUSE® Bone Graft component the Medtronic Defendants marketed and promoted…
>
> A medical device manufacturer receives no protection where a plaintiff can prove that the manufacturer's violation of federal law caused his or her injury compensable under statelaw. Here, the Plaintiffs have alleged that the Medtronic Defendants' have violated several federal requirements and those violations serve as the bases of the Plaintiffs state-law claims. Therefore, this Court denies the Medtronic Defendants' preemption motion."

Memorandum and Order at 6-9, *Hornbeck, Donna et. Al. v. Medtronic, Inc. et al.*, 13 C7816 (U.S. Dis. Ct., Dist. Of Ill., East.Dist., 2014).

Medtronic seeks to use the very federal regulations it has violated as a shield against state-law liability for Plaintiffs' injuries arising from those violations. But § 360k only provides immunity for device manufacturers to the extent that they comply with federal law – there is no prize for violating federal law. *See Bausch*, 630 F.3d at 553. No federal requirements apply to the off-label use of Infuse® Bone Protein. Thus, § 360k(a) preemption does not apply.

### c. Plaintiffs' Claims Against Defendants are Not Impliedly Preempted

Ostensibly recognizing that Plaintiffs have pled a viable parallel claims based upon Medtronic's off-label promotion, Medtronic alternatively argues that such parallel claims are "impliedly preempted" under the Supreme Court's ruling in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001). This is a curious proposition. Namely, Medtronic argues on one

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

hand that to survive preemption under the 2008 *Riegel* decision, a plaintiff must show a "parallel" claim, and then, on the other hand, argues that any attempt to show a parallel claim would be preempted by the 2001 *Buckman* decision.[109] The practical effect of this *non sequitur* argument, of course, is to immunize Medtronic against any possible civil liability for violating either federal or state law.

A review of the applicable authority confirms that *Buckman,* which concerned a "fraud on the FDA" claim, is not at all applicable to this case. In *Buckman,* patients claimed they suffered injuries from implantation of orthopedic bone screws into their spines. 531 U.S. at 343. The patients settled their claims against the device manufacturer and proceeded on a suit solely against a *regulatory consultant* they alleged made fraudulent representations to the FDA in the course of the FDA approval process. *Id.* The Supreme Court held that the FDCA as amended by the MDA impliedly preempted the patients' sole cause of action for "fraud on the FDA." *Buckman,* 531 U.S. at 348. But, *Buckman* specifically distinguished such "fraud-on-the-agency" claims, *i.e.*, claims not related to a field of law that states traditionally occupied, from claims based on state law tort principles such as those in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) (state tort action against federally licensed nuclear plant), and *Lohr,* 518 U.S. 470 (state tort action against device manufacturer). *Buckman,* 531 U.S. at 352-53.

Plaintiffs' claims here, like those in *Lohr,* but unlike those in *Buckman,* are traditional state tort law claims based on warning defects, not fraud on a federal agency. Plaintiffs do not complain of fraud on the FDA, rather, that they and their treating physicians were deceived and

[109] Moreover, Medtronic's argument fails to explain why the Court, in 2008, would go through the trouble of creating the parallel claim exception in *Riegel,* which was, according to Medtronic, prohibited by its *earlier* 2001 *Buckman* decision.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

injured by: (a) Medtronic's actions in illegally promoting the Infuse® device for off-label/unapproved uses; (b) utilizing paid consultants to market the off-label use of the Infuse® device; and (c) failing to provide adequate warning regarding the risks and dangers associated with the promoted off-label uses. Multiple courts, including courts on whose decisions Medtronic relies, have held that such claims are not preempted by *Buckman. Riley,* 625 F.Supp.2d at 784 (neither *Riegel* nor *Buckman* would preempt a properly pled claim based on off-label promotion); *Cornett,* 414 N.J. Super. at 402 (claims that device manufacturer illegally promoted its device for off-label uses and failed to provide adequate warnings would not be preempted by *Riegel* or *Buckman); In re Medtronic, Inc., Implantable Defibrillators Litig.*, 465 F. Supp. 2d 886, 899 (D. Minn. 2006) *(Buckman* did not preempt plaintiff's state tort law claims against Medtronic and further holding: "States may not be concerned about protecting federal agencies, but states have a strong interest in protecting their citizens from fraud and personal injuries."); *Bausch,* 630 F.3d at 557 *(Buckman* did not preempt plaintiffs' claims against manufacturer that failed to comply with FDA regulations); *Knipe v. SmithKline Beecham,* 583 F.Supp.2d 553, 583, 597-98 (E.D. Pa. 2008) *(Buckman* does not preempt plaintiff's state tort law claims that pharmaceutical manufacturer failed to issue adequate warnings of risks associated with off-label uses); *Phillips v. Stryker Corp.*, 2010 WL 2270683 (E.D. Tenn. June 3, 2010) *(Buckman* did not preempt plaintiff's ability to establish a "parallel claim" as mandated by *Riegel); Elmore v. Smith & Nephew, Inc.*, 2013 WL 1707956, at *4 (N.D. IL 2013) (Plaintiffs' claims were not impliedly preempted because they were based on common-law duties of care that exist independently of the FDA regulations).

Here, Plaintiff has likewise alleged that Medtronic's illegal off-label promotion of the Infuse® device for unapproved procedures violated both federal law *and* Missouri state tort law.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

*See* Mo. R.S. § 196.015. Accordingly, although Plaintiffs' claims are premised on alleged violations of federal law, they nonetheless exist independently as state law causes of action. They are not impliedly preempted by *Buckman*.

#### d. Plaintiffs' Warranty Claims Are Not Preempted

The breach of express and implied warranty claims are not subject to express 360k(a) preemption; they do not create requirements different from or in addition to federal law. Nor are they impliedly preempted under § 337(a), as warranty claims are independent of federal law.

***First***, warranty claims are not common-law tort actions, but exist by virtue of positive legislative enactments of state law. *See* Mo. R.S. §§ 400.2-313 – 315. A warranty is a promise voluntarily made – the "requirement[s] imposed by an express warranty claim are not imposed under State law, but rather imposed by the warrantor." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 525 (1992). Because warranty claims do not concern the breach of a promise pertaining to safety or effectiveness required by the FDA, but rather a voluntary contractual promise made by the defendant, separate and apart from any FDA requirements, determination of warranty claims do not "require a finder of fact to challenge or usurp the FDA's conclusions of safety and effectiveness." *Cline v. Advanced Neuromodulation Sys.*, 914 F. Supp. 2d 1290, 1298 (N.D. Ga. 2012).[110] FDA federal regulations themselves make clear that warranty claims are not preempted

[110] *See also Mitchell*, 126 F. 3d at 915 ("A state judgment based on the breach of an express representation by one of the parties does not necessarily interfere with the operation of the [premarket approval], and therefore we cannot say that such a cause of action is preempted"); *Alton*, 2013 U.S. Dist. LEXIS 127190, at *93-*94 (warranty claim premised solely on Medtronic's voluntary statements to public and medical community regarding the safety and efficacy of off-label uses of Infuse, which statements are not subject to FDA regulation and thus not preempted); *Duvall* v. *Bristol Myers-Squibb Co.*, 103 F.3d 324, 330, n.5 (4th Cir. 1996) ("Although the [Supreme] Court did not address a claim for breach of implied warranty in [*Lohr*], we nevertheless determine that the reasoning of that decision requires a conclusion that state-law claims for breach of implied warranties are not preempted by §360k(a)."); *Riley*, 625 F. Supp. 2d at 788 (§ 360k does not preempt a warranty claim based on voluntary statements and "Any other result would turn FDA approval of [FDA-required] statements into a free pass to deceive consumers . . .").

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

because they are state laws of general applicability, not specifically developed with respect to medical devices. *See* 21 C.F.R. § 808.1(d)(1) (such claims are "not 'requirements applicable to a device' within the meaning of section [360k(a)]"). Thus, express preemption does not apply.

***Second,*** because warranty claims concern voluntary promises--not imposed by federal law-- they exist independent of federal law and present no risk of interference with the federal regulatory scheme.[111] Thus, are not impliedly preempted by § 337(a).[112] The Plaintiffs do not assert warranty claims alleging that Medtronic defrauded the FDA.

It should also be noted that the 2002 Approval Letter excludes warranties: "CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws."[113]

In sum, the Plaintiffs' warranty claims are premised on Medtronic's misconduct that both (1) happens to violate the FDCA and (2) would give rise to a recovery under state law even in the absence of the FDCA. Thus, they are not expressly or impliedly preempted.

### F. The Solicitor General's Amicus Brief On Preemption Sheds Light on the Position of the Supreme Court

Recently, the Supreme Court denied certiorari in *Stengel*, a case decided in the 9th Circuit Court of Appeals *en banc*, which unanimously held that the MDA did not preempt consumers' state law failure-to-warn claim. Upon invitation of the Supreme Court, the Solicitor General submitted an amicus brief that outlined the government's (and also, the FDA's position) that

---

[111] *See Alton v. Medtronic, Inc.*, 2013 WL 478631, at *30 (D. Or. 2013) (recognizing plaintiff's breach of express warranty claim because it was based solely on Medtronic's voluntary statements to the public regarding the safety and efficacy of off-label promotion and such statements "are not subject to FDA regulation." The court concluded that "recognition of [plaintiff's] breach of express warranty claim presents no risk of interference with the federal medical device regulatory scheme.")
[112] *See Id.*
[113] *See* page 3 of the July 2, 2002 Approval Letter, *see* Am. Pet. at ¶ 89.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

only **device-specific** federal requirements have any preemptive force and "by contrast FDA's general manufacturing and labeling regulations do not have preemptive force."[114] As recommended by the Solicitor General, the petition was then denied. *See Stengel v. Medtronic, Inc.*, 704 F.3d 1224 (9th Cir. en banc 2013), *cert. denied* (U.S. June 23, 2014) (No. 12-1351). In light of that recent denial, *Stengel* is now the standing authority on preemption and the views of the Solicitor General are a guidepost to courts facing this complex issue. In a unique situation, this Court has the distinct advantage of knowing the position of the government and particularly the FDA, with respect to this complex issue.

As stated above, the first step to *Riegel's* two-part test is whether "[T]he Federal Government has established requirements applicable to" a particular medical device. *Riegel*, 552 U.S. at 321. The Solicitor General's opinion was that most circuits are making the mistake of simply skipping over this first step by concluding *that any* federal device-specific requirement, regardless of whether a plaintiff's state-based claim impinges on it, imposes across-the-board preemption:

> The courts of appeals, in every case since *Riegel* involving a device subject to premarket approval, have tacitly dispensed with the first step of a proper Section 360k(a) preemption analysis—i.e., asking whether FDA has established device-specific requirements on the same subject as the relevant state requirement. That practice in the circuits may reflect an erroneous assumption that the existence of *any* device-specific federal requirement has across-the-board preemptive effect, even on a state requirement addressed to a different subject.

U.S. Amicus Br. at 15, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013). (emphasis in original). In addition, "[t]o have preemptive force under Section 360k(a), a federal requirement ordinarily must be not only device specific, but also relevant to the asserted state claim." *Id.* Based on the above analysis, this Court must ask whether the FDA

[114] U.S. Amicus Br. at 9, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013), attached hereto as Ex. P.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

has established device-specific requirements, on the same subject as Plaintiffs' state tort claims, and whether those state claims actually conflict with the federal law. *Id.* It is vital to note that such federal requirements must be something other than requirements or regulations that only *generally* apply to all devices.

In the context of PMA approved devices, only the initial PMA would have preemptive force as it alone is specific to any particular device.[115] Thus, any claim alleging state tort claims despite compliance with the PMA would be preempted under *Riegel*. Plaintiffs' cannot and have not brought any claim alleging that the approved PMA was deficient or required alteration, since this would put Defendants in an unfair situation where they were abiding by federal law, but violating state tort law. The Plaintiffs in this case, similar to plaintiff in *Stengel*, are attacking the conduct of the manufacturer *after* PMA approval and therefore, bringing traditional state tort claims that cannot conflict with the device-specific regulations set forth by the PMA.

Medtronic's position that all claims against PMA approved devices should be either preempted or impliedly preempted is illogical, as stated by the Solicitor General:

> [I]f a state requirement were preempted absent a specific federal requirement that reflects FDA's weighing of competing considerations on the same subject and specific to the device (or type of device), the MDA would have the ironic effect of providing less public protection from unsafe and ineffective medical devices that pre-MDA law.

U.S. Amicus Br. at 11, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013). Medtronic has engaged in the worst type of federal violations by its conspiracy to commit off-label promotion; and yet, still blithely claims preemption from civil liability. That some courts have actually embraced this contradiction is founded exclusively on the misunderstandings that

[115] *See Riegel*, 552 U.S. at 322-323.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

the Solicitor General discusses at length.

When viewed in comparison to the ruling in *Stengel*, Defendants' position that the "federal law specifically *forbids* manufacturers from issuing additional warnings…" cannot be correct, as the Supreme Court and the government established that a manufacturer can always provide additional warnings to protect the public against newly recognized dangers. *See* Defs' Mot. at 44. The Solicitor General recognized that a device manufacturer requires FDA approval for label changes, prior to receiving that approval but stressed that a "manufacturer may place into effect '[l]abeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction,' 'that add or strengthen an instruction that is intended to enhance he safe use of the device,' or 'that delete misleading, false, or unsupported indications.'"[116] Defendants had the ability and were required to notify the FDA of "changes being effected" (CBE) to their device's labeling. *See* 21 C.F.R. 314.70(c)(6)(iii)(A) and (C). Their changes would have alerted Plaintiffs' physicians to the dangers of the Infuse® device. Due to the fact that enacting a CBE falls under a device manufacturer's general duties, Plaintiffs' claims based on that manufacturer's failure to do so does <u>not</u> implicate any <u>device-specific</u> federal regulation and thus, <u>cannot be preempted</u>.

Similar to *Stengel*, Plaintiffs raise the same issues surrounding Defendants' conduct *after* Defendants gained PMA approval for the Infuse® device as well. Plaintiffs are not bringing a claim with respect to the approved indications of the Infuse® device, as <u>none of the Plaintiffs in this case had surgeries that were approved under the PMA</u>. Instead, Plaintiffs claims are only based upon Defendants' violations of *general* manufacturing regulations that *all* device

[116] U.S. Amicus Br. at 2, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013) (citing 21 C.F.R. 814.39(d)(2)(i)-(iii)).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

manufacturers must adhere to.[117] Simply because a device manufacturer has their device approved under the PMA process, rather than the 510(k) process or another method, does not allow that manufacturer to violate blanket manufacturing regulations without any possibility of recourse for the public. It was certainly not the intent of Congress in enacting the Medical Device Amendments to eliminate the public's protection from unsafe devices and it is clear that the Supreme Court will recognize this fact.

**1. Despite the Guidance Provided in the Solicitor General's Amicus Brief, Some Courts Continue to Take an Incorrect Approach with Respect to Preemption**

Despite the Solicitor General's instructive amicus brief, providing much needed guidance on how to interpret the MDA, some courts still hold a position that ironically make medical devices less safe. For example, view the preemption analysis in *Blankenship v. Medtronic, Inc., et al.* Case No. 4:13-CV-1087 (CEJ), 2014 WL 1226491 (E.D. Mo. March 25, 2014). At the start of its analysis, the court states that "Step one of the preemption inquiry is to determine whether the federal government has established requirements applicable to the Infuse device." *See Id* at *7.[118] This is immediately incorrect as there are numerous federal requirements applicable to medical devices. Instead, the court must determine whether there are *device specific* requirements applicable to *this* device. *See* 21 C.F.R. 808.1(d). Otherwise a broad application of 360(k) would provide immunity from state claims on every possible front, completely dismiss the possibility of a "parallel claim", and improperly give general manufacturing requirements preemptive effect. *See Riegel,* 552 U.S. 312. Since Defendants must also shoulder the "heavy burden" of showing that federal preemption applies in this case

[117] *See* Am. Pet. at ¶¶ 1619(a)-(x).
[118] This same language was utilized in the preemption analysis in *Zaccarello v. Medtronic, Inc.,* No. 3:13-CV-01161-BCW (W.D. Mo. August 6, 2014).

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

(*King v. Collagen Corp.*, 983 F.2d 1130, 1137 (1st Cir. 1993)) they must also establish that rhBMP-2 is the device that actually has these *device specific* regulations. Here, Defendants cannot conclusively establish this point because rhBMP-2 never went through the PMA process as a singular component. Without PMA approval of the specific device there is no § 360(k) preemption possible and the Court's, the preemption analysis must come to an end.

By this same token, the court in *Zaccarello v. Medtronic, Inc.*, is manifestly incorrect in its dismissal of ten (10) out of the eleven (11) claims[119] brought by plaintiff. No. 3:13-CV-01161-BCW, 2014 WL 3866607 (W.D. Mo. August 6, 2014). While Plaintiffs disagree with the reasoning behind that court's decision, they also distinguish their claims from those asserted in *Zaccarello*. In *Zaccarello,* plaintiff alleged that "Infuse as implanted into [p]laintiff was defective as used, as evidenced by defendants' failure to comply with manufacturing specifications required by Infuse's [premarket approval]." *Zaccarello* at *5. The court then determined that plaintiff had failed to allege specific manufacturing requirement that Defendants violated. *See Id.* at *6. However, in the case at bar, Plaintiffs have done exactly that. *See* (Am. Pet. ¶¶ 1619(a)-(u).) In addition, the requirements that Plaintiffs' allege to have been violated are general manufacturing requirements that have no preemptive effect. Plaintiffs cannot and do not claim that there was a defect in the PMA-approved design of the Infuse® device. Plaintiffs allege that Defendants, through their off-label promotion, showed their intent to use this product off-label and thus, rendered this product "misbranded" after PMA approval. *See* (Am. Pet. ¶ 1619(f)). A device is "misbranded" if a manufacturer "intends" for the product to be used in any unapproved or "off- label" way, because that device does not include directions, indications, and

[119] This section will discuss only the claims dismissed through the court's preemption analysis in *Jimmy Zaccarello v. Medtronic, Inc.*, which included the plaintiff's manufacturing defect claim, design defect claim, failure to warn claim, negligence claim, strict liability claim, and negligence per se claim.

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

warnings on the product label for those unapproved uses.[120]

Next, the *Zaccarello* court dismisses plaintiff's design defect claim since plaintiff does not allege the design of the Infuse® device deviates from the design approved by the FDA. However, Plaintiffs' in this case *do* allege that Defendants deviated from the design approved by the FDA by greatly expanding the use of the device without requesting supplemental PMA approval. *See* (Am. Pet. Petition ¶ 1619(a)-(w).) Defendants never sought supplemental PMA approval for rhBMP-2, use with a Class II cage, or for any of the off-label applications Infuse was promoted for. Not only are there no specific federal requirements applicable to rhBMP-2's, use with a Class II cage, or are there any off-label uses with which it was applied in each Plaintiff's surgery, but Plaintiffs have claimed violations of general manufacturing duties that do not have preemptive effect. *See* (Am. Pet. ¶¶ 1619(a)-(w).)

Third, the *Zaccarello* court dismissed plaintiff's failure to warn claim because plaintiff sought to "impose on Defendants labeling or warning requirements that go beyond what federal law requires." *See Zaccarello* at *7. Plaintiff's here have not made any claim that seeks to impose requirements different from or in addition to the PMA. Instead, Plaintiffs have asserted that Defendants failed to make a Changes Being Effected (CBE) revision to the device's labeling *post PMA approval*. *See* 21 C.F.R. 314.70(c)(6)(iii)(A) and (C). This does not concern the initial PMA approval and would fit squarely within general manufacturing regulations that can have no preemptive effect. Any claim that the initial FDA approved labeling is deficient would be expressly preempted, but Plaintiffs' allegation that Defendants had a continuing duty to seek a CBE revision of their labeling in light of new adverse event data falls *outside* the PMA, under general manufacturing regulations. *See Id.* The FDA would not have prevented Defendants from

[120] *See* 21 C.F.R. § 801.4

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

making such a revision to their label.

Fourth, the *Zaccarello* court dismissed plaintiff's negligence claim, which was based upon four separate theories:

> (1) improper promotion and marketing of Infuse for off-label uses, (2) failure to warn [p]laintiff and [p]laintiff's physician of the dangers associated with off-label uses of Infuse, (3) failure to exercise reasonable care in complying with federal law and regulations applicable to the sale and marketing of Infuse, and (4) failure to exercise reasonable care to prevent Infuse from creating an unreasonable risk of harm to Plaintiff and other consumers when used in a reasonably foreseeable manner.

*Zaccarello,* 2014 WL 3866607 at * 7. The court found that the first theory was not expressly preempted since a claim based upon off-label promotion runs parallel to the MDA. However, it was *impliedly* preempted because the duty to refrain from off-label promotion "exist[s] solely by virtue" of the MDA. *See Zaccarello* at *7. While the court finds that this theory is preempted, it openly admits that off-label promotion is <u>barred</u> by MDA as misbranding, under the *general* manufacturing requirement 21 U.S.C. §§ 331(a), 333, and 321(n). *See Id.* at *8. *Every* manufacturer must abide by the ban on off-label promotion and thus, these are <u>not device requirements specific to the Infuse® device with preemptive effect</u>. The court also dismisses the plaintiff's second and fourth negligence theories because they sought to "impose requirements that are different from, or in addition to, the federal requirements." *See Zaccarello* at *9. The requirement that Defendants provide adequate warnings falls under 21 C.F.R. § 801.4, which is a general manufacturing duty. *See* (Am. Pet. at ¶¶ 1619(a)-(x)). Also federal law generally requires that "a device may not be… advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device." 21 U.S.C. § 331(a). These are both not <u>device specific requirements</u> that would have preemptive effect. Plaintiffs are not alleging that any change should have been made to the initial PMA in order to

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

satisfy these claims. A jury could easily find that the Defendants violated general manufacturing duties by promoting the device off-label *after* their initial PMA approval. The court dismissed plaintiff's third negligence theory because plaintiff failed to allege facts regarding a particular violation of federal law. With respect to this case, that is clearly not an issue as Plaintiffs have given an intensely detailed account of which federal laws were violated with respect to their negligence claim. *See* (Am. Pet. ¶¶ 1619(a)-(x)).

The *Zaccarello* court also dismissed plaintiff's strict liability claim that "Infuse was defective due to inadequate warning or labeling" and "was also defective, unsafe, and ineffective for off-label uses that Defendants promoted Infuse be used for… and Defendants knew or should have known that Infuse was defective, unsafe, and ineffective for such off-label uses…" *See Zaccarello* at *10. Once again, Plaintiffs' in this case bring a similar claim but in no way intend to allege that the initial PMA was inadequate, as such a claim would be preempted. Plaintiffs' argue instead that Defendants had a duty to submit a (CBE) revision to the device's labeling *post PMA approval*. *See* 21 C.F.R. 314.70(c)(6)(iii)(A) and (C). To the extent the failure to warn stems from off-label promotion, such claims are based on violations of federal law and not violations of device specific requirements. *See* (Am. Pet. ¶¶ 1619(a)-(x)).

As to the, *Zaccarello* court's dismissal of plaintiff's negligence per se claim based upon implied preemption (*See Zaccarello* at *13) the court found that since the negligence per se claim is based upon violations of the MDA they must be parallel claims, but since they exist solely by virtue of the MDA, they must be impliedly preempted. *Id.* This is exactly the same faulty analysis referenced by the Solicitor General. The negligence per se claim alleged by Plaintiffs in this case is based upon violations of <u>general</u> manufacturing duties applicable <u>to all</u> medical devices. To the extent any negligence per se claim was based solely upon the PMA, it

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

could be found to be impliedly preempted but this is not the claim made in the case at bar.

## G. MEDTRONIC CANNOT ESCAPE RESPONSIBILITY FOR ITS OWN VIOLATIONS AND ACTIONS

Medtronic likes to try to skirt responsibility for their wrongful actions and to blame the doctors. Medtronic conveniently ignores the operative clause in the regulation: "Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient… **Further, this section shall not change any existing prohibition on the *promotion* of unapproved uses of legally marketed devices."** 21 U.S.C. §397 (emphasis added). True, the FDA does not regulate the practice of medicine but this is separate from the restrictions the FDA has placed on a manufacturer's promotion of unapproved uses and unapproved devices.

Here, Plaintiffs have alleged in great particularity and detail, which must be accepted as true, that Medtronic engaged in "carnival-like promotion" of the rhBMP-2 component outside the boundaries set forth in the PMA.

Thus, Medtronic's promotion of **unapproved uses** of its legally marketed device is still prohibited, regardless of the doctors' actions that were influenced by and acted in reliance upon Medtronic's false and deceptive marketing campaign.

Medtronic's promotion of the unapproved and off-label uses was so pervasive that it permeated every avenue of information available to doctors trying to determine the best, safest and most effective way to use this product. Medtronic via its concerted actions corrupted the science upon which doctors rely. The Lead Editorial of the July 6, 2013 edition of the Chicago Tribune accurately describes this debacle with the headline: "The Danger of Rigged Medical

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

Research."[121] Because of this inescapable illegal promotion being spearheaded by Medtronic, no doctor searching for the true risks and benefits of rhBMP-2 was able to avoid Medtronic's misrepresentations and omissions. Thus, Medtronic's assertion that manufacturers have "no control" over doctors' treatment decisions is directly contradicted by the allegations of Plaintiffs' Petition including the findings of the Senate Report and the Spine Journal, not to mention the YODA study itself, which Medtronic was compelled to commission in the face of the outcry over their actions.

This is not a case where the doctors were acting as rogue surgeons, combining various products and components together on their own whim. Rather, this is case of a rogue medical device manufacturer who maliciously disregarded and evaded the rules and regulations, which were designed to safeguard patients such as the Plaintiffs. Plaintiffs' surgeons were acting as instructed by Medtronic, through its sales representatives, Secret Agents and Key Opinion Leaders who acted as Medtronic's agents.

Michael Heggeness and Charles Mick, president and first vice president of the North American Spine Society, directly debunked Medtronic's blame the doctor defense: "If surgeons had known that the lead authors of the 13 original studies on InFuse had received payments ranging from $1.7 million to $64 million from Medtronic and that its marketing employees were co-authors and co-editors, would they have been so eager to use InFuse on their patients?"[122]

In a press release following the release of the YODA study results, *The Spine Journal* announced, ***"[i]n a triumph of understatement, the YODA group informs us that ten years***

[121] Am. Pet. at ¶ 156.
[122] McCarthy, Michael, *US firm accused of manipulating journal articles and paying millions to authors,* (Oct 2012), BMJ 2012, *available at* http://www.bmj.com/content/345/bmj.e7299, attached to the Am. Pet. as Exhibit "UUU").

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

***after its development 'it is difficult to identify a clear indication for BMP-2 use in spinal fusion.'"***

Dr. Carragee, Chief Editor of *The Spine Journal* further explained in part:

> *To put the YODA finding in perspective, one must understand the carnival-like promotion that preceded BMP-2's fall from grace.* ***Market boosters advertised*** *that BMP-2 went beyond all other medical innovations. Perhaps confusing Infuse® with penicillin or the polio vaccine, one zealot proclaimed: '****Infuse, the single most successful biologic product ever launched in orthopedics and possibly ever in medicine****.'*
>
> *It is astonishing to recall the lavish praise for BMP-2 use by some Medtronic-associated surgeons just a few years ago. . .****Dr. Scott Boden declared, '[t]he age of BMP has arrived.'*** *Then within three months of FDA approval in July of 2002,* ***Dr. Thomas Zdeblich and Dr. J. Kenneth Burkus reported that Infuse had become their exclusive bone grafting method for anterior lumbar fusions:*** *"With it superiority,* ***InFuse Bone Graft may now become the new gold standard*** *for replacing autograft bone.* ***[A]n extraordinary merry-go-round of comprehensively conflicted faces are found where independent checks should have provided critical review.*** *In some instances, it seems the principal investigator with strong financial ties helped design a trial, and then acted as surgeons who monitored their own complications. To complete the circuit the same surgeon/investigator would co-author the paper and then submit the manuscript for review to…well…himself as chief or section editor of the journal. In some cases the editor in chief of the journal approving his own paper was also the developer and the royalty holder on products being investigated. And now the [Yale Open Data Access Project] group – echoing The Spine Journal's critical review from 2 years ago – tells us that important concerns about BMP-2 complications were 'underreported' or just missing. As YODA project director Harlan Krumholz, MD, SM, delicately puts it, '****Evidence suggests that some data are not missing at random****.' Annals editors are more blunt: '****Early journal publications misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting.' Ouch****.*

Dr. Carragee concludes:

> ***[i]t's ultimately disappointing that after 15 years of largely self-congratulatory research, we have only indirectly discovered BMP-2' many potential complications…The suggested gap in our understanding if true, is simply appalling: these complications were systematically, 'misrepresented,' 'underreported' or just 'missing' from the first decade of publications.***

***379*** (emphasis added).

Plaintiffs and their physicians reasonably relied on Medtronic's representations and would not have consented to the off-label use of Infuse® had Medtronic fully and adequately

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

informed them of the true risks and serious dangers associated with the off-label unapproved use of Infuse®. Medtronic actively misrepresented the risks and dangers to the Plaintiffs and Plaintiffs' physicians. Medtronic's off-label promotion and marketing of Infuse® caused Plaintiffs' surgeons to decide to implant Infuse® in Plaintiffs using it in off-label unapproved uses. Plaintiffs have suffered serious personal injuries as a direct and proximate result of Medtronic's misconduct. Each of these allegations and the numerous other allegations of fact set forth in Petition must be accepted as true for the purposes of this motion.

Medtronic's blame the doctor defense is simply disingenuous, false, and unavailing. Medtronic is responsible for their own actions and must be held accountable for the destruction of patient lives they have so recklessly and callously caused.

## CONCLUSION

Medtronic has brought the instant motions in a desperate attempt to deny Plaintiffs access to justice and to escape responsibility for their wrongful actions. The motions are without merit. Plaintiffs are deserving of a trial on the merits of their claims. Medtronic should he held to account and to reap what they so wrongfully sowed. Wherefore, Plaintiffs' respectfully request that Medtronic's motions be denied in their entirety.

DATED: August 22, 2014

Respectfully submitted,

/s/ Eric D. Holland
Eric D. Holland *(Mo. Bar # 39935)*
R. Seth Crompton (Mo. Bar # 57448)
**HOLLAND, GROVES,**
**SCHNELLER & STOLZE, LLC**
300 N Tucker, Suite 801
St. Louis, Missouri 63101

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

TEL: (314) 241-8111
FAX: (314) 241-5554

Nicholas J. Drakulich, Esq. *(Pro Hac Vice)*
**THE DRAKULICH FIRM, APLC**
2727 Camino Del Rio South, Suite 322
San Diego, CA 92108
TEL: (858) 755-5887
FAX: (858) 755-6456
njd@draklaw.com

Richard J. Arsenault, Esq. *(Pro Hac Vice)*
**NEBLETT, BEARD & ARSENAULT**
2220 Bonaventure Court
Alexandria, Louisiana 71309
TEL: (800) 256-1050
FAX: (318) 561-2592
rarsenault@nbalawfirm.com

Jerrold S. Parker, Esq. *(Pro Hac Vice)*
**PARKER WAICHMAN LLP**
3301 Bonita Beach Road
Bonita Springs, Florida 34134
TEL: (239) 390-8610
FAX: (239) 390-0055
jerry@yourlawyer.com

W. Mark Lanier *(Pro Hac Vice)*
**LANIER LAW FIRM**
6810 FM 1960 West
Houston, Texas
TEL: (713) 659-5200
FAX: (713) 659-2204
wml@lanierlawfirm.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

Electronically Filed - City of St. Louis - August 22, 2014 - 11:02 AM

I hereby certify that, on August 22, 2014, the foregoing was electronically filed with the Clerk of the Court using the court's electronic filing.

(1) A true and accurate copy of the foregoing document was served via First Class Mail upon the following counsel:

Martin J. Buckley
BUCKLEY & BUCKLEY LLC
1139 Olive Street, Suite 800
St. Louis, MO 63101

*Attorney for Defendants Medtronic Inc. and Medtronic Sofamor Danek USA, Inc.*

(2) Additionally, a true and accurate copy of the foregoing document was served via electronic mail upon the following counsel:

Martin J. Buckley
mbuckley@buckleylawllc.com

Andrew E. Tauber
atauber@mayerbrown.com

Murray S. Levin
levinm@pepperlaw.com

Sean Fahey
faheys@pepperlaw.com

Daniel L. Ring
dring@mayerbrown.com

*Attorneys for Defendants Medtronic Inc. and Medtronic Sofamor Danek USA, Inc.*

Dated: August 22, 2014

/s/ Eric D. Holland
Eric D. Holland