Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

STATE OF MISSOURI )
) SS
CITY OF ST. LOUIS )

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| JIMMY HENDRICH AND LORETTA ANN HENDRICH; KAREN KLASEUS; VINCENT ADDERLY; YUKSEL AGAN; VICTOR BAEZ; FLOYD BARNETT; BARRY BLACK AND SABRINA BLACK; STEPHEN BOLDUC AND ARLENE BOLDUC; JULIA BOYNTON; DAVID BURROUGHS AND STEPHANIE CAMPBELL; VIVIAN CANNON AND JENNIFER COY-CANNON; WILBERT CARLTON; RAYMOND CHAMPAGNE; STEVEN CRENSHAW; DEBRA DEROSIER AND WESNER DEROSIER; MARYANN DEVES AND DAVID DEVES; RUTH FRALEY AND BORIS FRALEY; JOSEPH FREDERICK; KATHLEEN GRESSER; EDRIS HICKS; GORDON HIGH AND JENNIFER LYNN HIGH; MATTHEW HORSWILL AND JEWELEEN HORSWILL; CAROL JAMES; SHAUNTA KEMP; KARL KENT JR. AND CAROLINE BROWN KENT; DOUGLAS KIFFMEYER; CHARLES LEE AND LISA ANN LEE; ALONZO LEWIS AND BRENDA LEWIS; STEPHEN LINDSEY; DAWN MATLOCK; JOHANNA MAYNARD; DEBRA MCCLURKIN AND JOSEPH MCCLURKIN; ANDREA MILLER; WYNDI MILLER; FRANK MILLS AND LOLA MILLS; MICHAEL NEDO AND LENORE LOFARO; JOHN OCKLESTON; JAMES OLIVER; EDWARD SALSMAN; ALBERTO SANCHEZ AND IRIS SANCHEZ; JAMES SEVERIN AND JODI SEVERIN; MELISSA SHACKLEFORD AND RICKY SHACKLEFORD; MELANIE SHAW AND CHARLES SHAW; HEATHER SMITH; JUNE SPOMER; DEBRA STRICKLAND; TAMMY THOMAS AND MARK THOMAS; PATSY THOMPSON AND STEPHEN THOMPSON; MARTIN WILLIAMS AND ) | CASE NO.: 1422 – CC01224<br><br>DIVISION NO<br><br>JURY TRIAL DEMAND<br><br>AMENDED PETITION FOR DAMAGES |

Electronically Filed - City of St. Louis - September 15, 2014 - 10:46 AM

DONNA WILLIAMS; STEVE WILSON; LAURA WOLFE; GEORGE ATCHISON AND RUTH ANN ATCHISON; DOUGLAS BERGERON; SYLVIA BRYANT AND LESTER BRYANT; SAN JUANITA CANTU FLORES; BRYAN KEITH FREEMAN; STANLEY GROVE AND JACQUELINE GROVE; TED JAKOVEC AND MARIAN JAKOVEC; SHARON LITTLE; ROBBY MICHAEL ORGERON;TERALANDUR PARTHASARATHY AND GITA MALUR; KEITH SCHREMP; MARY ANN TILLMAN AND DAVID TILLMAN; CARLOS WEBSTER )

Plaintiffs )

-vs- )

MEDTRONIC, INC. )
(Serve: )
Registered Agent )
The Corporation Company )
120 South Central )
Clayton, Missouri 63105) )

and )

MEDTRONIC SOFAMOR DANEK USA, INC. )
(Serve: )
Registered Agent )
CT Corporation Systems )
120 South Central )
Clayton, Missouri 63105) )

and )

MEDTRONIC SOFAMOR DANEK, INC. )
(Serve: )
Registered Agent )
CT Corporation Systems )
120 South Central )
Clayton, Missouri 63105) )

and )

DOES 1 – 100 )
Defendants )

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

## TABLE OF CONTENTS


I. INTRODUCTION ........ 8

II. PARTIES ........ 11

III. JURISDICTION AND VENUE ........ 16

IV. SUMMARY OF THE "OFF-LABEL" ALLEGATIONS ........ 16

V. SUMMARY OF THE "UNAPPROVED DEVICE" ALLEGATIONS ........ 28

VI. FACTS ........ 47

A. THE INFUSE® BONE GRAFT DEVICE ........ 47

B. BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE® BONE GRAFT ........ 48

C. BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF INFUSE® ........ 48

D. REGULATORY FRAMEWORK ........ 50

1. The Premarket Approval (PMA) Application Process For Class III Medical Devices ........ 52

2. PMA Applications are Limited By The Claimed "Intended Use" ........ 54

3. The PMA Approval Process Includes The Device And Its Labeling ........ 55

4. FDA Regulations And PMA Process, Prohibit "Off-Label" Promotion ........ 57

5. FDA Regulations Prohibit Marketing Promotion And/or Distributions for "Off Label" Uses Other Than the "Intended Uses" Set Forth in the PMA or PMA Supplement ........ 62

6. FDA Requires Filing a Supplemental PMA for "Off-Label" Uses ........ 63

7. FDA Prohibits Misleading Or False Promotion And Marketing ........ 66

8. General Reporting to The FDA is Required After the PMA Process ........ 67

9. A Manufacturer Must Follow Good Manufacturing Practices ........ 69

10. Violations of Federal Statutes or FDA Regulations Void the Federal Preemption Defense ........ 71

E. THE HISTORY OF FDA'S APPROVAL OF INFUSE® ........ 77

1. The FDA Advisory Committee's Concerns Regarding "Off-Label" Uses Of Infuse® ........ 77

1. FDA Restricted Approved Use Due to Safety Concerns ........ 82

2. After PMA Approval, Medtronic Published a False "Fact Sheet" ........ 86

F. INFUSE® USES OTHER THAN PMA APPROVED ARE "OFF-LABEL" ........ 87

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM


1. Description Of "On-Label" and "Off-Label" Infuse® Uses......87

2. Medtronic's Breach of Its Duties To Seek a Supplemental PMA......91

3. Medtronic Failed To Satisfy Its Duties Imposed By The FDA Regulations And PMA Process, To Adequately Warn The FDA, Physicians, And Patients Of The Increased Risks, Dangers, And Adverse Events Associated With The "Off-Label" Use Of Infuse®......93

G. WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A DRUG – NOT A MEDICAL DEVICE -UNDER THE NAME INDUCTOS®), BUT MEDTRONIC FAILED TO TAKE SIMILAR ACTION IN THE UNITED STATES......93

H. IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL" USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE......95

I. "OFF-LABEL" SALES OF INFUSE® ARE VERY PROFITABLE FOR MEDTRONIC......96

J. MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE®......98

1. Despite the Corporate Integrity Agreement, Medtronic's Off-Label Promotion Continues......101

2. Medtronic Accused of Paying Doctors Illegal Kickbacks to Induce Them Into Using Medtronic Manufactured Medical Devices......106

3. Medtronic Accused Once Again of Paying Surgeons Illegal Kick-Backs to Induce Them Into Using Medtronic Manufactured Medical Devices......107

K. $85 MILLION TO SETTLE SHAREHOLDER SUIT RE: OFF-LABEL PROMOTION......107

1. Systematic "Off-Label" Over-Promotion Through Medtronic's Agent......110

a. Sponsoring "Off-Label" Over-Promotion Through Medtronic's Agents......110

b. Instructing its sales representatives to sell "off-label" dosages......110

c. Citing "studies" to "educate" surgeons in off-label surgical techniques......111

d. Referring surgeons to "off-label" users of Infuse® for clinical advice......112

e. "Informing" surgeons on off-label dosages in the cervical spine......113

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM


f. Showing surgeons how to roll the Infuse® Sponge "like a burrito"……….114

g. Infuse® sales (over 85-90%) were from "off-label" uses……………………115

h. Packaging the LT-Cage separately, knowing the rhBMP-2 component out-sold its Cage……………………………………………115

i. Quotas for Infuse® sales could not be achieved by "on-label" alone……….116

j. Providing step-by-step "off-label" surgical instructions …………………117

k. Medtronic agents training other surgeons "off-label"……………………118

2. Confidential Witnesses Prove "Off-Label" Promotion………………………119

L. "OFF-LABEL" USE IN THE LUMBAR SPINE IS NEITHER SAFE NOR EFFECTIVE……………………………………………………120

M. USE OF KEY OPINION LEADERS (KOLS) FOR PROMOTION………………122

N. MARKETING BMP ON MEDTRONIC'S WEB SITES……………………122

1. Misrepresenting BMP on Medtronic's Web Sites……………………122

2. Promotion on Back.com in Violation of FDA Regulation……………124

3. Promotion on Necksurgery.com Violates FDA Regulation……………127

O. LEADING SPINE EXPERTS REPUDIATE MEDTRONIC STUDIES……………127

1. *The Spine Journal* Reveals Medtronic's Agents……………………130

2. Exaggerating The Morbidity Of Traditional Auto-Graft Fusion……………131

3. Medtronic grossly underestimated the risks in its sponsored studies……………132

P. MEDTRONIC, IN VIOLATION OF FEDERAL LAW AND THE INFUSE® PMA, CONCEALED AND/OR FAILED TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS, DANGERS, AND INCREASED RISKS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE®…………………………………133

1. In Fact, A Subsequent Review Demonstrated The "Off-Label" Use Of Infuse® In Posterior Approaches Creates A 500% Increase In Inflammatory Reactions And At Least Three Times The Back And Leg Pain Compared To Iliac Crest Bone Graft (ICBG)……………………………………133

2. Medtronic-Sponsored Studies Failed To Report Catastrophic Ectopic Bone Growth, Reoperation, Radiculitis, Osteolysis, Resorption, And Loss Of Alignment Related To The Use Of Infuse®…………………………134

3. Medtronic-Sponsored Physicians Failed To Disclose Adverse Events Related To Osteolysis, Subsidence, And Reoperation Related To The Use Of Infuse®……………………………………………………136

4. Medtronic-Sponsored Physicians Failed To Disclose An Alarming Rate Of Retrograde Ejaculation Related To The Use Of Infuse®……………137

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

5. Medtronic-Sponsored Studies Failed To Report Urogenital Adverse Events Were Twice As Likely To Occur Using Infuse® Compared To ICBG..........138

6. Medtronic-Sponsored Physician/Authors Failed To Report Adverse Events That Occurred During A Clinical Trial For "Amplify™", A Higher Dosed rhBMP-2 (Infuse®) Product..........139

Q. UNITED STATES SENATORS QUESTION MEDTRONIC ABOUT UNREPORTED SIDE EFFECTS, FINANCIAL TIES TO CLINICAL INVESTIGATORS, AND "OFF-LABEL" PROMOTION AND MARKETING OF INFUSE®..........141

1. Medtronic's Payments To Doctors For The Promotion And Marketing Of Infuse® "Off-Label" Sales Prompts Individual Inquiries From United States Senators..........141

2. The U.S. Senate Committee On Finance Launches An Investigation, In June 2011, Into Medtronic's Influence Over Clinical Investigators' Failure To Disclose Adverse Events..........143

3. The U.S. Senate Also Inquires Into Medtronic's Practices Regarding Recalls And Post-Market Surveillance Of Infuse® And Clinical Investigators' Failure To Disclose Adverse Events..........144

R. UNITED STATES SENATORS BAUCUS AND GRASSLEY'S INVESTIGATION OF MEDTRONIC REVEALS IN A U.S. SENATE REPORT RELEASED OCTOBER 2012 THAT MEDTRONIC MANIPULATED SCIENTIFIC STUDIES RELATING TO INFUSE® AND DISCLOSED THE PAYMENTS OF HUNDREDS OF MILLIONS OF DOLLARS IN PAYMENTS TO THE "RESEARCHERS"..........145

1. High-Level Medtronic Employees Conspired With Medtronic's Secret Agent/Author J. Kenneth Burkus, M.D. To Intentionally Omit Serious Adverse Events From Medtronic-Funded Published "Studies"..........154

2. Medtronic's Vice-President Of Biologic Marketing Worked In Concert With Authoring Physicians To Over-Emphasize The Pain In Alternative Spinal Treatments From Medtronic-Funded Published "Studies"..........156

3. Medtronic Employees (Including Its Director Of Marketing) Covertly Participated As "Peer-Reviewers" On Behalf Of The Physician Authors Named On The Paper And Secretly Instructed The Author To Remove All References To Adverse Events From Medtronic-Funded Published "Studies"..........159

S. THE YALE STUDY, PUBLISHED IN JUNE 2013, FUNDED WITH MILLIONS OF DOLLARS FROM MEDTRONIC, CONFIRMS THE LACK OF SCIENTIFIC INTEGRITY OF PREVIOUS COMPANY SPONSORED "STUDIES" OF MEDTRONIC'S INFUSE®..........163

T. RECENT STUDIES, RELEASED SEPTEMBER 4, 2013, RECOGNIZED RHBMP-2 EXPOSURE LEADS TO A FIVE-FOLD INCREASE IN CANCER..........172

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM


U. ARTICLES FROM THE RECENT SEPTEMBER 2013 ISSUE OF THE SPINE JOURNAL DISCUSSES THE LACK OF EFFICACY, INCREASED RISKS, SAFETY CONCERNS, AND THE CORRUPTED INFUSE® STUDIES.....173

V. MEDTRONIC'S PARTICIPATION IN THE COVERING UP OF AND FAILURE TO ADEQUATELY WARN OF THE SERIOUS ADVERSE EVENTS AND INCREASED RISKS AND COMPLICATIONS ASSOCIATED WITH "OFF-LABEL" USE OF INFUSE® CAUSED PLAINTIFFS' INJURIES.....177

**VII. EQUITABLE TOLLING/FRAUDULENT CONCEALMENT**.....179

**VIII. GENERAL ALLEGATIONS**.....181

**IX. SPECIFIC PLAINTIFF ALLEGATIONS**.....184

**X. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES**.....248

**XI. CLAIMS FOR RELIEF**.....248

A. FIRST CAUSE OF ACTION – Negligence.....248

B. SECOND CAUSE OF ACTION - Negligence Per Se.....256

C. THIRD CAUSE OF ACTION - Negligence – Misrepresentation.....260

D. FOURTH CAUSE OF ACTION - Strict Liability – Failure to Warn.....262

E. FIFTH CAUSE OF ACTION - Strict Liability – Design Defect.....267

F. SIXTH CAUSE OF ACTION - Strict Liability – Manufacturing Defect.....273

G. SEVENTH CAUSE OF ACTION - Common Law Fraud.....280

H. EIGHTH CAUSE OF ACTION - Constructive Fraud.....284

I. NINTH CAUSE OF ACTION - Fraudulent Concealment.....286

J. TENTH CAUSE OF ACTION - Breach of Express Warranty.....288

K. ELEVENTH CAUSE OF ACTION - Breach of Implied Warranty.....291

L. TWELFTH CAUSE OF ACTION - Violation of Consumer Protection Laws.....294

M. THIRTEENTH CAUSE OF ACTION - Violation of Missouri Merchandising Practices Act.....299

N. FOURTEENTH CAUSE OF ACTION - Loss of Consortium.....301

O. FIFTEENTH CAUSE OF ACTION - Gross Negligence/Punitive Damages.....302

**PRAYER FOR RELIEF**.....306

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

## AMENDED PETITION FOR DAMAGES

COMES NOW, the above named Plaintiffs by and through their undersigned counsel, and states as their Amended Petition for Damages against MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK USA, INC., MEDTRONIC SOFAMOR DANEK, INC., and DOES 1-100 (collectively herein referred to as "Medtronic" or "Defendants") as follows:

## INTRODUCTION

1. This is an action for product liability and fraud against Medtronic Inc., and its wholly owned subsidiaries, Medtronic Sofamor Danek, USA, Inc., and Medtronic Sofamor Danek, Inc. In 2002, Medtronic applied for, and received, a very narrow and limited Food and Drug Administration (FDA) approval for permission to sell Medtronic Infuse® Bone Graft LT-Cage™ Lumbar Tapered Fusion Device System ("Infuse®") for a specific, intended use.

2. The Infuse® "device" is a "system" that combines two components, consisting of three parts. The three parts are: (1) the bone protein biologic (rhBMP-2); (2) the absorbable collagen sponge (ACS); and (3) a metallic spinal fusion cage, called an "LT-CAGE™". The bone protein biologic (rhBMP-2) is soaked into the absorbable collagen sponge (ACS) to create the first component. This first component is then placed into the second component, the "LT-CAGE™," which is specifically, designed, tested and approved to be used with the biologic, rhBMP-2.

3. If the product used does not contain all three parts (the bone protein biologic (rhBMP-2), the collagen sponge (ACS), and the LT-CAGE™, then it is not Infuse®, (i.e., not an approved Class III Medical Device).

4. If the product used is not Infuse®, but is rather a new, unapproved device that uses only selective parts taken from Infuse®, such as using the rhBMP-2 and the absorbable collagen sponge component, either on its own, without the LT-CAGE, or with another unapproved surgical cage, then it will be referred herein as an "Unapproved Device."

5. Infuse® was approved by the FDA to be used for only a single level of fusion, meaning it could only be placed once in the space in between two vertebrae. Further, its approval was limited to the space between specific vertebrae in the lumbar region (in 2002, it was limited to the L4-S1 and in 2004,

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

it was slightly expanded to the L2-S1 region). Finally, the approval of Infuse® was limited to use in a specific type of surgical approach, an Anterior Lumber Interbody Fusion (ALIF).

6. If the product is used to fuse more than a single level of vertebrae, outside of the L4-S1 region of the lumbar spine, or performed with a surgical technique other than an ALIF, then it is outside of FDA approval and described as "off-label".

7. Recognizing these strict limitations greatly reduced the potential market and ultimate sales of Infuse®, and instead of seeking an expanded FDA approval through a supplemental Pre-Market Approval (PMA) as is required by the Federal Food, Drug, and Cosmetic Act (FDCA), and the Infuse® PMA, Medtronic embarked on an illegal, false and deceptive marketing scheme to promote the sale of Infuse® for unapproved "off-label" uses and/or the use of an "Unapproved Device".

8. In 2002, in furtherance of this illegal promotional campaign, Medtronic published a "Fact Sheet" that summarized and promoted the results of scientific studies it sponsored, many of which were performed after the limited FDA approval of Infuse®.[1] However, it was only recently revealed, that in the "Fact Sheet" as well as in the scientific studies themselves, Medtronic intentionally concealed important and material safety information in violation of federal law, the Infuse® PMA, and parallel state law.

9. First of all, Medtronic hid the fact that the studies it was promoting as "outside objective reports" were, in fact, written or rewritten by their own secret agents who were paid hundreds of millions of dollars by Medtronic to write these studies. Second, Medtronic hid the fact that Medtronic itself was actively involved in the writing and editing of the articles, including making the ultimate decisions to include and/or exclude important health and safety information. Third, Medtronic hid the fact that, in these articles, Medtronic intentionally omitted and actively concealed material information about serious adverse events that were found in these studies. All of the above activities of Medtronic are in violation of federal law, the Infuse® PMA, and parallel state law.

10. Medtronic knew that the off-label uses of Infuse®, or the use of an "Unapproved Device", were unreasonably dangerous and exposed patients to serious risks of increased injury and harm. Medtronic's

[1] Medtronic, Fact Sheet (2002) *available at* *http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf* (also attached hereto as Exhibit "A").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

false and deceptive marketing scheme was so effective, however, that 85-90% of all Infuse® sales were from off-label uses, and/or the use of an "Unapproved Device". An "off-label" use rate of 85-90% can never be realized without significant "off-label" promotion, all in violation of federal law, the PMA, and parallel state laws. Medtronic received several billions of dollars of ill-gotten gains stemming from its false, deceptive, and illegal Infuse® marketing scheme.

11. As a result of Medtronic's fraudulent and wrongful actions, non-Medtronic paid physicians were deprived of material information known by Medtronic, Medtronic's clinic trial physicians, Medtronic's paid authors, and Medtronic's Key Opinion Leaders (KOLs), concerning not only the lack of efficacy, but the truth concerning the significant and serious adverse events posed by the off-label use of Infuse® or the use of an "Unapproved Device". This deception precluded the non-Medtronic paid physicians from being learned or informed of the lack of efficacy, or the significant dangerous risks and propensities, stemming from the "off-label" use of Infuse® and/or the use of an "Unapproved Device". Medtronic concealed and failed to warn of the increased risks of using Infuse® off-label and/or the use of an "Unapproved Device" by funding biased studies and articles by Key Opinion Leaders, published in key medical journals, that reported a lower incidence of adverse effects.

12. Medtronic concealed critical safety information, including adverse events and serious increased risks (estimated by the authors of a peer reviewed article published in *The Spine Journal* to be as high as 50 times more than Medtronic reported), from the use of Infuse®. Medtronic, via its illegal actions, clearly prevented the non-Medtronic paid Plaintiffs' physicians, from being adequately warned and informed about the serious dangers of off-label use of Infuse® and/or the use of an "Unapproved Device." Plaintiffs and Plaintiffs' physicians detrimentally relied on Medtronic for truthful and accurate information, which Medtronic failed to provide. By misleading the physicians, and restricting them from becoming learned intermediaries, Medtronic ultimately misled the patients to their detriment and damage.

13. Independent studies have only recently revealed that the allegedly "scientific studies", which Medtronic and its secret physician agents (who received undisclosed compensation, exceeding $210 million dollars, disguised as "royalties", but were actually illegal kickbacks) promoted to reliant

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

physicians and patients confirming the safety and efficacy of Infuse®, were in fact fraudulent and false. The original Medtronic sponsored studies, when analyzed by truly independent experts, including those who took part in the Medtronic funded YODA studies, *The Spine Journal*, and the U.S. Senate Report, confirmed that Infuse® provided no additional benefits to patients and, in fact, exposed patients to serious and undisclosed increased risks and complications.

14. Medtronic's fraudulent scheme was undertaken in conscious disregard of the health and safety of Infuse® patients, and in violation of federal law, the PMA, and parallel state law. Thousands of vulnerable and unsuspecting patients, including the Plaintiffs herein, have been seriously and permanently injured as a result of Medtronic's wrongful, illegal and immoral actions.

## II. PARTIES

### A. Plaintiffs

15. Below is a list of each Plaintiff who is bringing his or her own case against Defendants:

16. Plaintiffs Jimmy Hendrich and Loretta Ann Hendrich reside in St. Louis, Missouri.[2] Plaintiff Jimmy Hendrich was first injured in the city of St. Louis, Missouri as he was exposed to an "Unapproved Device" consisting of only select parts of Infuse® (i.e. the rhBMP-2 and collagen sponge without the mandatory approved LT-CAGE™) in a surgery he had at Barnes Jewish Hospital in St. Louis, Missouri.

17. Plaintiff Karen Klaseus resides in Minneapolis, Minnesota. Minnesota is the location of Defendant's corporate headquarters.

18. Plaintiff Vincent Adderly resides in Miami, Florida.

19. Plaintiff Yuksel Agan resides in Atlanta, Georgia.

20. Plaintiff Victor Baez resides in Miami, Florida.

21. Plaintiff Floyd Barnett resides in Whitesville, West Virginia.

22. Plaintiffs Barry Black and Sabrina Black reside in Barnwell, South Carolina.

23. Plaintiffs Stephen Bolduc and Arlene Bolduc reside in Southbridge, Massachusetts.

[2] Plaintiff Jimmy Hendrich was erroneously named James Hendrich in the original filing. In this Amended Petition, his official birth name has been properly substituted in.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

24. Plaintiff Julia Boynton resides in Sunrise, Florida.

25. Plaintiffs David Burroughs and Stephanie Campbell reside in Rochester, New York.

26. Plaintiffs Vivian Cannon and Jennifer Coy-Cannon reside in Jacksonville, Florida.

27. Plaintiff Wilbert Carlton resides in Boomer, North Carolina.

28. Plaintiff Raymond Champagne resides in Baton Rouge, Louisiana.

29. Plaintiff Steven Crenshaw resides in Ferguson, Missouri.

30. Plaintiffs Debra Derosier and Wesner Derosier reside in Orlando, Florida.

31. Plaintiffs Maryann Deves and David Deves resides in Ellisville, Missouri.

32. Plaintiffs Ruth Fraley and Boris Fraley reside in Vacaville, California.

33. Plaintiff Joseph Frederick resides in Pflugerville, Texas.

34. Plaintiffs Kathleen Gresser resides in Baldwin, New York.

35. Plaintiff Edris Hicks resides in Macclenny, Florida.

36. Plaintiffs Gordon High and Jennifer Lynn High reside in Niceville, Florida.

37. Plaintiffs Matthew Horswill and Jeweleen Horswill reside in Waukesha, Wisconsin.

38. Plaintiff Carol James resides in Duncan, Oklahoma.

39. Plaintiff Shaunta Kemp resides in Mount Olive, Mississippi.

40. Plaintiffs Karl Kent Jr. and Caroline Brown Kent reside in Oklahoma City, Oklahoma.

41. Plaintiff Douglas Kiffmeyer resides in Madison, Illinois.

42. Plaintiffs Charles Lee and Lisa Ann Lee reside in Nixa, Missouri.

43. Plaintiffs Alonzo Lewis and Brenda Lewis reside in Port Saint John, Florida.

44. Plaintiff Stephen Lindsey resides in Kansas City, Missouri.

45. Plaintiff Dawn Matlock resides in Sioux Falls, South Dakota.

46. Plaintiff Johanna Maynard resides in Lacey's Spring, Alabama.

47. Plaintiffs Debra McClurkin and Joseph McClurkin reside in Newberry, South Carolina.

48. Plaintiff Andrea Miller resides in Molino, Florida

49. Plaintiff Wyndi Miller resides in Cantonment, Florida.

50. Plaintiffs Frank Mills and Lola Mills reside in Hudson, Florida.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

51. Plaintiffs Michael Nedo and Lenore Lofaro reside in Rockaway, New Jersey.

52. Plaintiff John Ockleston resides in New Lynn, New Zealand.

53. Plaintiffs James Oliver resides in Florissant, Missouri.

54. Plaintiff Edward Salsman resides in Farmington, Missouri.

55. Plaintiffs Alberto Sanchez and Iris Sanchez reside in Orlando, Florida.

56. Plaintiffs James Severin and Jodi Severin reside in Steinhatchee, Florida.

57. Plaintiffs Melissa Shackleford and Ricky Shackleford reside in Mooreville, Mississippi.

58. Plaintiffs Melanie Shaw and Charles Shaw reside in Berkeley, Missouri.

59. Plaintiff Heather Smith resides in De Soto, Missouri.

60. Plaintiff June Spomer resides in Cody, Wyoming.

61. Plaintiff Debra Strickland resides in Mariposa, California.

62. Plaintiffs Tammy Thomas and Mark Thomas reside in Granada, Minnesota. Minnesota is the location of Defendant's corporate headquarters.

63. Plaintiffs Patsy Thompson and Stephen Thompson reside in Saint George, South Carolina.

64. Plaintiffs Martin Williams and Donna Williams reside in Dolton, Illinois.

65. Plaintiff Steve Wilson resides in Pace, Florida.

66. Plaintiff Laura Wolfe resides in Jacksonville, Florida.

67. Plaintiffs George Atchison and Ruth Ann Atchison reside in Highland, Illinois.

68. Plaintiff Douglas Bergeron resides in Colorado Springs, Colorado.

69. Plaintiffs Slyvia Bryant and Lester Bryant reside in Milford, Pennsylvania.

70. Plaintiff San Juanita Cantu Flores resides in Seguin, Texas.

71. Plaintiff Bryan Keith Freeman resides in Rocklin, California.

72. Plaintiffs Stanley Grove and Jacqueline Grove reside in Berkeley Springs, West Virginia.

73. Plaintiffs Ted Jakovec and Marian Jakovec reside in Montgomery, Illinois.

74. Plaintiff Sharon Little resides in Centralia, Illinois.

75. Plaintiff Robby Michael Orgeron resides in Dripping Springs, Texas.

76. Plaintiff Teralandur Parthasarathy and Gita Malur reside in Glen Carbon, Illinois.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

77. Plaintiff Keith Schremp resides in Perryville, Missouri. Plaintiff Keith Shremp was injured in the city of St. Louis, Missouri as he was exposed to an "Unapproved Device" consisting only of select parts of Infuse® (i.e. the rhBMP-2 and collagen sponge without the mandatory approved LT-CAGE™) in a surgery he had at Barnes Jewish Hospital in St. Louis, Missouri.

78. Plaintiffs Mary Ann Tillman and David Tillman reside in Glenolden, Pennsylvania.

79. Plaintiff Carlos Webster resides in Lovejoy, Illinois.

**B. Defendants**

80. Defendant MEDTRONIC, INC. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.

81. Defendant MEDTRONIC SOFAMOR DANEK, INC. is an Indiana corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132. Defendant MEDTRONIC SOFAMOR DANEK, INC. is a wholly owned subsidiary of Defendant MEDTRONIC, INC.

82. Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132. Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a wholly-owned subsidiary of Defendant MEDTRONIC SOFAMOR DANEK, INC. which, in turn, is a wholly-owned subsidiary of MEDTRONIC, INC.

83. Defendants MEDTRONIC, INC., MEDTRONIC SOFAMOR DANEK, INC., MEDTRONIC SOFAMOR DANEK USA, INC., and DOES 1-100 (shall be collectively referred to herein as "Medtronic" and/or the "Medtronic Defendants").

84. At all relevant times herein mentioned, Medtronic authorized and directed and/or participated in the "off-label" promotion and sale of Infuse® and/or the promotion and sale of a unapproved FDA product, when they knew, or with the exercise of reasonable care should have known, of the increased risks, hazards and unreasonably dangerous propensities, and thereby actively participated in the tortious

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

conduct which resulted in the serious injuries to the Plaintiffs described herein.

85. There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between the certain Defendants and other Defendants such that any individuality and separateness between them has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and/or would promote injustice.

86. At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint-venturer of the Defendants named herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiffs.

87. At all times herein mentioned, Defendants were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

88. At all times herein mentioned, the Medtronic Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling an unapproved FDA product. These products were for use by the Plaintiffs and

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Plaintiffs physicians. As such, each of the Medtronic Defendants is individually, as well as jointly and severally, liable to the Plaintiffs for their damages.

89. The harm which has been caused to Plaintiffs resulted from the conduct of one or various combinations of the Defendants, and through no fault of Plaintiffs. There may be uncertainty as to which one or which combination of Defendants caused the harm. Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiffs injuries.

90. Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by the Plaintiffs.

91. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of DOES 1 through 100, inclusive, are unknown to Plaintiffs at this time, who therefore sue defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same is ascertained.

92. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the DOE Defendants were the agent, servant, employee and/or joint venturer of the other co-defendants and other DOE Defendants, and each of them, and at all said times, each Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

## III. JURISDICTION AND VENUE

93. The Court has personal jurisdiction pursuant to § 506.500 R.S. Mo., over the Defendants because, at all relevant times, they have engaged in substantial business activities in the State of Missouri. At all relevant times, the Defendants transacted, solicited, and conducted business in Missouri through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in Missouri. Jurisdiction in this court is also proper because the defendants committed torts in whole or in part against plaintiffs in Missouri. Further, there is no federal subject matter jurisdiction because no federal question is raised, and there is no diversity jurisdiction.

94. There is no federal diversity jurisdiction, because both Plaintiff Karen Klaseus and Defendant MEDTRONIC INC. are Minnesota residents.

95. Likewise, there is no federal diversity jurisdiction, because both Plaintiffs Tammy Thomas and Mark Thomas and Defendant MEDTRONIC INC. are Minnesota residents.

96. Venue is proper in this Court, pursuant to § 508.010(4) R.S. Mo., as the conduct which gave rise to plaintiffs Jimmy Hendrich and Loretta Ann Hendrich's action occurred in the city of St. Louis, Missouri.

97. Venue is also proper in this Court, pursuant to § 508.010(4) R.S. Mo., as the conduct which gave rise to plaintiff Keith Michael Schremp's action occurred in the city of St. Louis, Missouri.

98. The plaintiffs herein are all properly joined in this action pursuant to 507.040 R.S. Mo as they assert a right to relief under the same series of occurrences and questions of law and fact are common to all plaintiffs in this action.

## IV. SUMMARY OF THE "OFF-LABEL" ALLEGATIONS

99. This is an action for the serious and permanent injuries incurred by the Plaintiffs resulting from Medtronic's promotion, sale, and distribution of: (a) an unreasonably dangerous and defective combination medical device product known as Infuse® Bone Graft and LT Cage® Lumbar Tapered Fusion Device ("Infuse®") when used "off-label"; and/or (b) the use of an "Unapproved Device" that has selective parts taken from Infuse®.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

100. Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic.

101. The Infuse® "device" is a "system" that combines two components, consisting of three parts. The three parts are: (1) the bone protein biologic (rhBMP-2); (2) the absorbable collagen sponge (ACS); and (3) a metallic spinal fusion cage, called an "LT-CAGE™". The bone protein biologic (rhBMP-2) is soaked into the absorbable collagen sponge to create the first component. This first component is then placed into the second component, the "LT-CAGE™," which is specifically, designed, tested and approved to be used with the biologic, rhBMP-2.[3]

102. If the product used does not contain all three parts (the bone protein biologic (rhBMP-2), the collagen sponge, and the LT-CAGE™) then it is not Infuse®, (i.e. not an approved Class III Medical Device).

103. If the product used is not Infuse®, but is rather a new unapproved device that uses only selective parts taken from Infuse®, such as using the rhBMP-2 and the absorbable collagen sponge, either on their own, with another unapproved surgical cage or with another medical product then it will be referred herein as an "Unapproved Device."

104. Medtronic sold the two components of Infuse® separately. Therefore, Medtronic had direct actual knowledge that they were selling and distributing an "Unapproved Device" every time they sold rhBMP-2 and the absorbable collagen sponge and did not also sell the LT-CAGE™ to the same person.

105. The vast majority of the Plaintiffs in this complaint received "Unapproved Devices" intentionally promoted and knowingly distributed by Medtronic for use in their spinal fusion surgeries.

106. The FDA approved Infuse® on July 2, 2002 for a specific "intended use".

107. The "intended use" approved by the FDA in 2002 was a single-level anterior lumbar

---

[3] *See* Infuse® Label, "The InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device consists of two components containing three parts- a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein and a carrier/scaffold for the bone morphogenetic protein and resulting bone. The InFUSE™ Bone Graft component is inserted into the LT-CAGE™ Lumbar Tapered Fusion Device component to form the complete InFUSETM Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device. **These components must be used as a system. The Infuse® Bone Graft component must not be used without the LT-Cage Lumbar Tapered Fusion Device component.**" *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

interbody fusion ("ALIF") to be used in a portion of the lumbar spine, meaning:

a. Infuse® was approved to be used for only a single level of fusion. Basically, Infuse® was approved to be placed only in the space in between two vertebrae.

b. The approval of Infuse® was limited to only being used in a specific type of surgical approach called an Anterior Lumber Interbody Fusion (ALIF). ALIF spinal fusion surgeries are performed from a frontal (i.e. anterior) approach.

c. Infuse®'s approval was limited to which vertebrae it could be used for. Infuse® was approved in 2002 only for a small portion of the lumbar spine. The 2002 approval restricted the use of Infuse® for ALIF procedures to the spinal region from L4-S1.[4]

108. In 2004 the FDA approved a supplement expanding the "intended use" of Infuse® to L2-S1.

109. If the product is used other than to fuse a single level of vertebrae, not within the L2-S1 region of the lumbar spine, or performed with a surgical technique other than an ALIF, then it is outside of the "intended uses" of the PMA, not approved by the FDA, and therefore would be called "off-label".

110. To date, Infuse® has NOT been approved for posterior lumbar fusions.

111. To date, Infuse® has NOT been approved for lateral lumbar fusions.

112. To date, Infuse® has NOT been approved for use without an approved Cage.

113. To date, Infuse® has NOT been approved for use in regions of the spine other than L2-S1.

114. Uses other than those intended uses approved by the PMA are non-approved "off-label" uses.

115. Medtronic never applied to the FDA for approval of Infuse® for these off-label non-intended uses.

---

[4] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT -CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B");

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

116. Medtronic never asked the FDA to make a determination as to whether the off-label use of Infuse® via other surgical approaches, methods or involving other areas of the spine is safe and effective.

117. Medtronic never formulated adequate directions and warnings for such off-label non-intended uses of Infuse®.

118. Medtronic never provided adequate directions and warnings for such off-label non-intended uses of Infuse®.

119. Because the FDA never approved such off-label uses, there were no FDA-imposed requirements specific to the non-approved uses of Infuse® and therefore no FDA- approved labeling for such off-label uses.

120. Medtronic knew that the FDA did not approve such off-label non-intended uses.

121. Medtronic knew that the FDA did not approve rhBMP-2 for use with other non-approved surgical cages.

122. Medtronic knew that the FDA did not grant them permission to market rhBMP-2 for use with other non-approved surgical cages.

123. Medtronic knew that the FDA did not grant them permission to distribute rhBMP-2 for use with other non-approved surgical cages.

124. Medtronic knew that the FDA did not approve rhBMP-2 for use without an approved cage.

125. Medtronic knew that the FDA did not grant them permission to market rhBMP-2 for use without a cage.

126. Medtronic knew that the FDA did not grant them permission to distribute rhBMP-2 for use without an approved cage.

127. Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in their premarket application.

128. Medtronic knew that the FDA did not grant them permission to market Infuse® for uses other than the "intended use" set for in the PMA approval of Infuse®.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

129. Medtronic knew that they were prohibited by federal law and the PMA received from the FDA, from promoting unapproved "off-label" uses of Infuse®.

130. Medtronic knew it was and is illegal for Medtronic to promote Infuse® for uses other than "intended uses".

131. It is illegal for Medtronic to distribute Infuse® with knowledge and/or notice that Infuse® was going to be used in an "off-label" manner.

132. It is illegal for Medtronic to distribute rhBMP-2 for use with other non-approved surgical cages.

133. It is illegal for Medtronic to distribute rhBMP-2 for use without an approved cage.

134. Medtronic was aware that a PMA approved Class III medical device promoted for unapproved "off-label" use, is deemed a misbranded medical device in violation of 21 U.S.C. § 352(f) (2012).

135. Medtronic was aware that a PMA approved Class III medical device distribution of a misbranded medical device is prohibited pursuant to 21 U.S.C. §§ 331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

136. However, Medtronic recognized that the limited FDA approval obtained for Infuse® in 2002, severely restricted the potential market for Infuse® and consequently the ultimate sales volume and profit to be achieved.

137. Instead of submitting a PMA Supplement as required by the FDCA and the PMA, Medtronic devised a well-financed and extensive scheme to promote and market Infuse® for non-approved, off-label uses. This scheme included the promotion of using only select parts of Infuse®, such as only using rhBMP-2/collagen sponge or using rhBMP-2/collagen sponge with an unapproved cage, even though this makes the product used no longer Infuse®, no longer an approved Class III Medical Device, and no longer a product that was properly tested by the manufacturer or reviewed by the FDA.

138. Medtronic devised, and intended to devise, a scheme to defraud physicians, hospitals and patients, by means of false and fraudulent pretenses, representations and concealment of material facts.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

139. Medtronic knew its promotion of Infuse® for non-FDA approved uses was illegal.

140. Medtronic knew the unapproved "off-label" use of Infuse® exposed patients to serious dangers and greatly increased adverse risks.

141. Despite knowing the "off-label" promotion of Infuse® was not only illegal, but extremely dangerous to the health and safety of its consumers, Medtronic, in conscious disregard for the safety of the patients, including Plaintiffs, successfully carried out its false and unlawful marketing and promotional scheme.

142. These illegal promotional efforts proved to be highly effective; eventually, more than eighty-five to ninety percent (85-90%) of all Infuse® sales involved "off-label" uses, generating billions of dollars in ill-gotten sales revenue.

143. As alleged herein in detail, in order to unlawfully enhance Infuse® sales, Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities to encourage physicians to use Infuse® for dangerous and unapproved/"off-label" procedures.

144. While Medtronic engaged in substantial, widespread and systematic false, misleading and illegal promotional activities they violated their duty owed to the physician and patients, in concealing and failing to warn the physicians and patients of the known serious increased risks and complications stemming therefrom.

145. Medtronic's wrongful, illegal, and immoral conduct has become the subject of investigation, action and/or sharp rebuke, by the Department of Justice, the United States Senate, the authors of *The Spine Journal*, the authors of the two (2) independent papers constituting the YODA study, as well as many other respected physician and peer reviewed publications. Further, the media, such as the *Wall Street Journal*, *New York Times* and Medtronic's own home town *Star Tribune*, has published a significant number of in-depth, investigative articles concerning Medtronic's wrongful conduct causing the Infuse® catastrophe.

146. According to articles in the June 2011 issue of *The Spine Journal* (an internationally recognized medical journal that publishes peer-reviewed research articles related to evidence-based spine care), Medtronic-sponsored studies and articles failed to disclose, or inaccurately report, the safety

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

of Infuse® by concealing and/or underestimating its increased risks and dangers. *The Spine Journal* revealed that Medtronic-sponsored articles failed to disclose the life threatening and completely debilitating serious adverse effects seen in its earliest trials of Infuse®. *The Spine Journal* also revealed that the actual rate of incidence of these serious side effects is much greater than the rate disclosed by Medtronic and the Medtronic-sponsored studies to physicians and to the public. *The Spine Journal* reported that the actual rate of incidence of certain side effects of Infuse® was up to **FIFTY TIMES** more than what was reported by Medtronic. Finally, *The Spine Journal* found that all of the "researchers" who wrote the original articles touting the perfect safety profile of Infuse®, without disclosing the adverse events, were paid hundreds of millions of dollars by Medtronic and these payments were, at that point, never disclosed to the public.

147. *The Spine Journal* demonstrated how far Medtronic would go in its aggressive "off-label" campaign. Medtronic paid its secret agents outrageous amounts of compensation, so large in fact that one can only interpret the payments as kickbacks or, more appropriately, payoffs, to underreport the adverse effects of Infuse® in their studies. These highly paid secret agents acted as agents and were in fact agents for Medtronic. These secret agents wrote fraudulent studies about using Infuse® "off-label" while illegally and acting in concert with Medtronic to hide the adverse events from its consumers and surgeons. The fact that they were receiving extraordinary compensation from Medtronic, for their published "studies", all under the supervision and instruction of Medtronic, was concealed from physicians and patients.

148. Following *The Spine Journal*, the United States Senate Finance Committee began an investigation into Medtronic concerning Infuse®. After the completion of the extensive investigation, the United States Senate Finance Committee published an official report confirming the independent findings of *The Spine Journal*. The U.S. Senate Report officially found that Medtronic falsely manipulated the studies, under reported adverse events, paid their secret agents enormous sums of money, and directly participated in the writing of the false and misleading studies, without any indication in the articles that Medtronic had any role in writing or editing the published work. The U.S. Senate Report exposed Medtronic for their fraudulent activity.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

149. Not only did Medtronic illegally promote using Infuse® "off-label", but they knowingly promoted materially false information about the "off-label" use of Infuse®. Medtronic heavily used these Medtronic-sponsored studies that *The Spine Journal* criticized in the promotion of Infuse®. Following the limited FDA approval of Infuse® in 2002, Medtronic published a "Fact Sheet." The Medtronic Fact Sheet represented, in part, the following:

> **Fact Sheet**
>
> ***INFUSE® Bone Graft/LT-CAGE®*** Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures,** without the need for the additional surgery to harvest bone from the patient's hip. Scientists determined that rhBMP-2, with an absorbable collagen sponge as the carrier, (INFUSE® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative disc disease patients implanted with INFUSE® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy and therapeutic benefits of the new procedure as compared to traditional autograft procedures**… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complications** that would require follow-up visits…[5] (emphasis added).

150. Medtronic knew when they made these representations that these "facts" were materially false, and misleading and illegal, as they violated federal law and the PMA. Medtronic actively concealed the truth related to the study results and concealed material information related to the safety and efficacy of Infuse® from the physicians and patients. In the wake of the storm of controversy, discussed herein, related to the safety of Infuse, Medtronic was belatedly forced by the ever-mounting public pressure to disclose the underlying data from the Infuse® studies for independent YODA examination.

151. Medtronic subsequently commissioned a review of the prior Medtronic-sponsored Infuse® studies to be led by Yale University. Medtronic paid Yale University over 2 million dollars to

---

[5] Medtronic, Fact Sheet (2002) *available at* http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf. (also attached hereto as Exhibit "A").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

reanalyze and what Medtronic was hoping, would rebut *The Spine Journal* findings. Yale supervised the study, under their YODA program. It took over two years. The study was performed by 2 independent medical facilities, one in the United States and one in the United Kingdom, each reviewing the same data. However, at the end of the day, the YODA studies confirmed that *The Spine Journal* was right. The YODA findings questioned the scientific integrity of those prior Medtronic sponsored studies and also confirmed that Medtronic wrongfully hid known serious adverse events. The YODA reports pointed out that the Medtronic studies downplayed the adverse events actually observed with the use of Infuse® while improperly accentuating the adverse events when an autograft was used. In fact the authors of the YODA study found that evidence suggested that some of the data related to previous Medtronic-sponsored studies were intentionally omitted. The YODA study showed that not only did Infuse® lack <u>any</u> clinical benefit over alternative spine fusion procedures, but that Infuse® was associated with a greater prevalent risk of very serious injuries, including cancer.

152. The results of the YODA study, published in June of 2013, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were false, misleading and deceptive.

153. The results of the YODA study, confirmed that the Medtronic Fact Sheet (and the Medtronic sponsored studies) were therefore illegal and in violation of federal law, the PMA, and state common laws.

154. Physicians and their patients relied upon the honesty, integrity and truthfulness of Medtronic's (as well as Medtronic secret agents') representations regarding the safety of Infuse® to their detriment.

155. Hundreds of thousands of vulnerable and unsuspecting patients, including the Plaintiffs, have become victims of Medtronic's ongoing campaign of fraud, deceit, illegal, and immoral conduct.

156. The lead editorial of the July 6, 2013 edition of the Chicago Tribune accurately described this shocking debacle with their headline: "The Danger of Rigged Medical Research."[6]

157. Caught in the midst of this tangled web of wrongful conduct, fraud, and deceit are the

---

[6] Editorial: The danger of rigged medical research, Chicago Tribune, July 6, 2013, *available at* <u>http://articles.chicagotribune.com/2013-07-06/opinion/ct-edit-medtronic-20130706_1_bone-growth-research-infuse</u> (also attached hereto as Exhibit "D").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

unsuspecting and vulnerable victims —the patients. Tragically, the Plaintiffs are such victims.

158. When used "off-label" in spine surgery, Infuse® has often failed to function in a safe and effective manner, thereby causing serious medical problems and, in some patients, like Plaintiffs, serious, permanent, and/or catastrophic injuries.

159. The "off-label" use of Infuse® can cause serious physical injuries and/or death.

160. When Infuse® is used off-label in spinal surgery, it often causes "ectopic" or "exuberant" bone growth. This ectopic/exuberant bone growth results from Infuse®'s very mechanism of action. In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing – i.e. into or against the spinal cord or other spinal nerves.

161. Ectopic/exuberant bone growth can create nerve compression, which can cause the patient to experience any number of adverse effects, including intractable pain, paralysis, spasms, cramps in limbs, and in some cases even leads to death.

162. In "off-label" spine surgeries, Infuse® also can lead to many other serious and significant adverse events, including severe inflammatory reactions, fluid collections, bone resorption (bone destruction), osteolysis (active resorption of bone matrix), subsidence (sinking of the cage), implant displacement, radiculitis, retrograde ejaculation, urinary and/or bowel retention or incontinence, seroma, infections, sterility, cancer, and even death. These debilitating and life threatening adverse events, often result in poorer global outcomes often resulting in the patient being in a significantly worse physical condition than they were in prior to the surgery, as a result of the off-label use of Infuse®, as in Plaintiffs' cases.

163. Indeed, many adverse events associated with the use of Infuse® result from off-label use of the product by surgeons who did not fully understand the highly potent nature of rhBMP-2 as they were never fully informed by Medtronic of the increased risks and dangers stemming from its off-label use.

164. As discussed, *infra*, the learned intermediary doctrine provides that if the manufacturer fails to provide physicians with an adequate warning of the risks associated with its medical device, and

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

if the physician did not have independent knowledge of the risks, then the manufacturer's failure to adequately warn is the proximate cause of a patient's injuries.

165. It goes without saying, but yet we must, an intermediary cannot be "learned" if they are not warned of the serious dangers and increased risks that can arise out of the use of a medical device.

166. Plaintiffs' physicians were not adequately warned by Medtronic of the increased risks and serious dangers of using Infuse® "off-label" and/or an "Unapproved Device."

167. Plaintiffs' physicians could not have acquired independent knowledge of the increased risks and dangers because Medtronic intentionally concealed these increased risks and dangers to maximize their own financial gains.

168. Medtronic, by their actions, prevented Plaintiffs' physicians from fulfilling their role as a learned intermediaries.

169. A reasonably prudent physician would not select (nor would a patient consent to the use of) a product if they knew there were important, life-altering serious health risks being concealed by the manufacturer.

170. Likewise, a reasonably prudent physician (nor would a patient consent to the use of) would not select a product that has no additional benefits, but has increased risks of serious, life-altering, physical injuries.

171. The Plaintiffs do not complain herein of fraud on the FDA in the PMA process. Further, Plaintiffs are not seeking to enforce the Federal Regulations in this action, or are they suing merely because Medtronic's conduct violates these provisions. Rather, Plaintiffs are alleging Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws. Plaintiffs, individually, claim that they (and their treating physicians) were deceived, misled, defrauded, and, as a result, injured by Medtronic's and Medtronic's secret agents' deceptive, false, and illegal promotion and distribution of Infuse® for unapproved off-label uses and/or the use of an "Unapproved Device."

172. Medtronic's fraudulent conduct includes, but is not limited to:

a. Promoting Infuse® for unapproved "off-label" uses outside of the "intended uses" as

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

set forth in the premarket application and the PMA;

b. Utilizing highly paid consultants/agents to canvas the country in presentations illegally promoting and marketing unapproved off-label uses of Infuse® and/or an "Unapproved Device";

c. Ghostwriting and editing "scientific studies" to falsely tout that Infuse® had a perfect safety record, by intentionally deleting the adverse events when, in fact, Medtronic knew this was false and the underlying data failed to support this claim;

d. Publishing these "scientific studies" in leading medical journals, touting the success of Infuse®, which appear to be authored by neutral physicians when, in fact, they were written by Medtronic secret agents who received in excess of $200 million dollars in undisclosed compensation/kickbacks and/or disguised "royalties";

e. Summarizing and promoting the results of these fraudulent "scientific studies" on its direct to consumer "informational" websites, including, but not limited to, Medtronic's Fact Sheet referenced herein.

f. Failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted "off-label" unapproved uses of Infuse® and/or an "Unapproved Device", by requiring the physicians and others conducting the "studies" to publish accurate, truthful and undistorted results of those "studies";

g. Failing to prohibit its employees and agents from manipulating the published materials concerning the actual adverse events found in those "studies";

h. Failing to provide adequate warnings regarding the increased risks and dangers associated with the promoted off-label unapproved uses and/or an "Unapproved Device";

i. Failing to submit a PMA Supplement, as required by the FDCA and the PMA, for the "off-label" unapproved uses Medtronic and its agents were illegally promoting and/or marketing;

j. Failing to submit a PMA application and obtain FDA approval before marketing, promoting, distributing and selling an "Unapproved Device";

k. Creating and distributing false and misleading advertising regarding the safety of

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Infuse® and/or an "Unapproved Device";

l. Knowingly making misleading, false and deceptive statements regarding the safety of Infuse® and/or an "Unapproved Device";

m. Knowingly failing to provide/concealing material information regarding the increased risks and dangers of Infuse® and/or an "Unapproved Device";

n. Promoting and distributing an unreasonably dangerous and defective product;

o. Failing to report adverse events to the FDA, and failing to warn of increased adverse events related to Infuse® and/or an "Unapproved Device."

173. In doing the acts alleged herein, Medtronic (a) did not act reasonably with regard to the foreseeable harm to patients, including the Plaintiffs; (b) did not act as a responsible manufacturer of a Class III medical device; (c) acted unlawfully, in violation of the PMA; (d) acted unlawfully, in violation of the FDA regulations; and (e) violated state common law duties, all of which parallel FDA and federal requirements.

174. Plaintiffs bring this action for full redress for the injuries and damages they have proximately incurred and will incur as a result.

## V. SUMMARY OF THE "UNAPPROVED DEVICE" ALLEGATIONS:

### 1. The Definition of an "Unapproved Device" As Used Herein

175. The Infuse® "device" is a "system" that combines two components consisting of three parts. The three parts are: (1) the bone protein biologic (rhBMP-2), (2) the Absorbable Collagen Sponge (ACS), and (3) a metallic spinal fusion cage, called an "LT-CAGE™". The bone protein biologic (rhBMP-2) is soaked into the Absorbable Collagen Sponge to create the first component. This first component is then placed into the second component, the "LT-CAGE™," which is specifically, designed, tested and approved to be used with the biologic, rhRHBMP-2-2.[7]

[7] *See* Infuse® Label, "The Infuse™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device consists of two components containing three parts- a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein and a carrier/scaffold for the bone morphogenetic protein and resulting bone. The Infuse™ Bone Graft component is inserted into the LT-CAGE™ Lumbar Tapered Fusion Device component to form the complete Infuse™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device. **These components <u>must</u> be used as a system. The Infuse® Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component.**" *available at*

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

176. If the product used does not contain all three parts (the bone protein biologic (rhBMP-2), the Absorbable Collagen Sponge, and the LT-CAGE™) then it is not Infuse®, (i.e. not an approved Class III Medical Device).

177. If the product used is not Infuse®, but is rather a new unapproved device that uses only selective parts taken from Infuse®, such as using the rhBMP-2 and the Absorbable Collagen Sponge, either on their own or with another unapproved surgical cage then it will be referred herein as an "Unapproved Device."

**2. The Majority of Plaintiffs' Underwent Spinal Fusion Surgery With Fusion Cages**

178. All Plaintiffs underwent some type of spinal fusion procedure between 2002 through 2013.[8] The surgeries were generally performed because of back pain.

179. In the majority of Plaintiffs' surgeries, a surgical intervertebral fusion cage was inserted between the vertebrae into one or more levels of the spine from a posterior or lateral approach (an incision in the back or side of the patient).

180. These fusion cages were used to spread the vertebrae apart, making the openings in the back of the spine larger and allowing more room for nerve roots, to decrease pinching and irritation on the nerves.

181. Also, these fusion cages are used to replace ruptured or deviated discs between the vertebrae, which may be impinging on the spine.

182. Generally, these cages increase stability between the two vertebrae by allowing bone to grow between them so that the vertebrae become "fused" together.

183. This increase in space between vertebrae and the resulting fusion between the vertebrae should eliminate mechanical movement between the vertebrae, thus relieving back pain by reducing irritation and impingement on nerves.

184. The vast majority of fusion cages used in Plaintiffs' surgeries were approved by the FDA for use with the patients' own bone (or bone from a cadaver) to create a bone graft bridge between

---

http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

[8] Specific facts related to each individual Plaintiff's procedure can be found below.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

vertebrae. The cages were not approved by the FDA to be used as part of the Medtronic's INFUSE® Bone Graft/LT-Cage™ Lumbar Tapered Fusion Device system or with rhBMP-2.

185. Usually, when a patient's own bone is used, it is obtained either from the surgical site or areas another area of the body, like the hip.

186. Bone placed in the fusion cage causes bone between vertebrae to grow and "fuse" together, thus eliminating mechanical movement between the vertebrae, increasing stability and decreasing pressure and irritation on the spinal cord and nerve roots.

**3. Plaintiffs' Cages Were Filled With The rhBMP-2 Soaked Absorbable Collagen Sponge, The 1st Component Of A Two Component Combination Biologic/Device Called "Infuse®." FDA Approved Infuse® To Be Used As A "Single Entity" System Consisting of Two Components and Three Parts**

187. Contrary to their design and FDA approvals, Plaintiffs' Cages were not filled solely with Plaintiffs' own bone (or bone from a cadaver).

188. Plaintiffs' Cages were packed with a bio-engineered and bio-manufactured bone-growth material known as Recombinant Human Bone Morphogenetic Protein ("rhBMP-2"), which is typically soaked into an Absorbable Collagen Sponge (rhBMP-2/Absorbable Collagen Sponge).

189. The rhBMP-2/Absorbable Collagen Sponge was approved for marketing by the FDA for use in spinal fusion procedures, but ***only*** as the 1st of a 2 component (3 part) medical device "system" called "INFUSE® Bone Graft/LT-Cage™ Lumbar Tapered Fusion Device" (Infuse®).

190. The rhBMP-2/Absorbable Collagen Sponge (parts 1 and 2 which form the first component) must be inserted into the "LT-CAGE™ (part 3 which forms the second component)[9], which is a hollow titanium cylinder.

---

[9] In February of 2004, the FDA approved Medtronic's PMA application for the use of certain sizes of the two other Medtronic Titanium cages called the Inter Fix™ and the Inter Fix™ RP Cages, to be used as the second component Infuse®. In this subsequent approval, the FDA reinforced that Infuse® "**must be** used as a system" with all three parts (i.e. the rhBMP-2, the absorbable collagen sponge, and one of these three particular approved Titanium cages). The FDA also did not expand the very limited uses that Infuse® was approved for (i.e. only a single level fusion surgery using the ALIF procedure in the L2-S1 region of the Lumbar Spine).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**4. A Short History of rhBMP-2 and MSD's Clinical Trials**

191. Sofamor Danek, Inc. first bought a license to use Bone Morphogenetic Protein ("rhBMP-2") from Genetics Institute, Inc. (now a subsidiary of Wyeth) on February 16, 1995.

192. The patent on rhBMP-2 describes it as a purified protein used for the treatment of bone and cartilage defects.[10]

193. In October 1996, Sofamor Danek, Inc. obtained an Investigational Device Exemption (IDE) to begin clinical studies of rhBMP-2 for the purpose of collecting safety and efficacy data relating to rhBMP-2 and growing bone between vertebrae to be used in spine fusion surgeries.

194. If successful, Sofamor Danek, Inc. hoped rhBMP-2 would eliminate the need to use the patient's own bone (usually taken from the hip) and/or cadaver bone to stimulate bone growth.

195. Subsequently, in 1999, Medtronic, Inc. acquired Sofamor Danek, Inc.

196. Sofamor Danek, Inc., now Medtronic Sofamor Danek, Inc., is a wholly owned subsidiary of Medtronic, Inc.

197. Medtronic Sofamor Danek, Inc. clearly anticipated rhBMP-2 would be used in all types of common spine fusion surgery, resulting in massive sales potential.

198. However, in 1999, one part of Medtronic Sofamor Danek, Inc,'s IDE clinical trial was halted when 75% of exposed patients undergoing "posterior" approach surgery (incisions from the back – an unapproved approach) grew excess bone into their spinal canal, potentially causing failed surgeries or increased disabilities and pain. The trial, which involved an off-label posterior surgical technique, and had planned to enroll hundreds of people, was stopped at 67 patients (34 received rhBMP-2 and 33 received a hipbone graft). The authors said the trial was stopped "out of abundant caution." Three of the paper's four authors worked as consultants to Medtronic and had financial relationships related to the research. Shockingly, it was not until 2004 that a paper on the trial was finally published in the *Spine Journal*.

199. Based on the results of its own clinical trials, Medtronic Sofamor Danek, Inc. was able prove to the FDA the rhBMP-2/Absorbable Collagen Sponge was safe and effective for ***only a very***

[10] http://www.patentstorm.us/patents/5618924.html (for a description of the patent, applied for on 3/19/91 and issued April 8, 1997.)

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

***limited*** type of surgery, known as an Anterior Lumbar Interbody Fusion (ALIF), and then, only when used as a complete system with a specific fusion cage, called the "LT-CAGE™.

200. According to the clinical studies submitted by Medtronic to the FDA, the rhBMP-2/Absorbable Collagen Sponge was safe and effective, only when it was inserted through an incision into the stomach, implanted in the anterior aspect of the spine, and at only one level of the spine, from L4-S1.

201. Medtronic Sofamor Danek, Inc.'s application to the FDA for a Premarket Approval ("PMA") of INFUSE® Bone Graft/LT-Cage™ Lumbar Tapered Fusion Device was therefore restricted to a very small subset of spine fusion surgeries, i.e., only using an anterior approach, at one level of the spine, from L4-S1.

### 5. The FDA Restricted INFUSE® Bone Graft/LT-Cage™ Lumbar Tapered Fusion Device Use and Route of Administration

202. On July 2, 2002, the FDA granted MSD a PMA for INFUSE® Bone Graft/LT-Cage™ Lumbar Tapered Fusion Device as a single Class III device.

203. As the initial FDA approved label indicates, "The InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device consists of two components containing three parts- a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein and a carrier/scaffold for the bone morphogenetic protein and resulting bone. The InFUSE™ Bone Graft component is inserted into the LT-CAGE™ Lumbar Tapered Fusion Device component to form the complete InFUSE™ Bone Graft LT-CAGE™ Lumbar Tapered Fusion Device. **These components <u>must</u> be used as a system. The InFUSE™ Bone Graft component <u>must not</u> be used without the LT-CAGE™ Lumbar Tapered Fusion Device component."** (Emphasis supplied in label).

204. The FDA separates medical devices into three classes, with Class III devices receiving the highest degree of scrutiny from the FDA because these devices may present the highest degree of risk.

205. In contrast to other combination medical devices, the rhBMP-2/Absorbable Collagen Sponge component of the Infuse® system (separate from the cage component of the Infuse® system) has

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

never been classified, tested, or reviewed by the FDA.

206. On January 10, 2002, during the FDA Advisory Committee Panel ("FDA Panel") hearing concerning potential FDA approval of Infuse®, panel members voiced concerns regarding use of the product.

207. They asked Medtronic to describe its efforts to self-guard against uses of rhBMP-2 and its components and parts, which were not proven safe and effective by the clinical studies submitted for marketing approval by Medtronic.

208. FDA Panel members, including Dr. John Kirkpatrick, cautioned Medtronic to guard against procedures other than ALIF procedures with an anterior approach, the only "intended use" Medtronic set forth in its premarket application to the FDA, and the only use shown to provide reasonable assurance of safety and efficacy, based upon the information Medtronic submitted including clinical studies using the rhBMP-2/Absorbable Collagen Sponge.

209. Dr. Kirkpatrick also emphasized the need to use the two components of the Infuse® system together, because the LT-CAGE™ had been specifically designed for ALIF surgeries (through the front of the patient) and would therefore discourage the use of rhBMP-2 in posterior approach surgeries (through the back of the patient).

210. The 2002 FDA approval restricted the use of Infuse® to ALIF spinal fusion procedures, at one level from L4-S1.[11]

211. The 2002 FDA approved label also made it clear that the PMA approved device "consists of two components containing three parts - a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein, and a carrier/scaffold for the bone morphogenetic protein and resulting bone" and that "**These components <u>must</u> be used as a system.**" (Emphasis supplied in label).

[11] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…INFUSE™ Bone Graft/LT - CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach." Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit B); *see also* Infuse® Label, "These components <u>must</u> be used as a system. The INFUSE® Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component." *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit C).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

212. In 2004, the FDA approved a supplement, expanding the "intended use" of Infuse® to include ALIF procedures, with an anterior approach to the spinal region from L2-S1.

213. As explained in its labeling, the FDA's approval for Infuse® was limited because "[t]he safety and effectiveness of…[the rhBMP-2/Absorbable Collagen Sponge] with other spinal implants [***other than*** the LT-Cage™], implanted at locations ***other than*** the lower lumbar spine, or used in surgical techniques ***other than*** anterior…approaches ***[had]. . .not been established***."[12]

**6. Infuse® Was Not Used In the Majority of Plaintiffs' Surgeries**

214. The rhBMP-2/Absorbable Collagen Sponge was designed to be inserted as "filler" into the second component of Infuse®, a fusion cage called the LT-Cage™.

215. The LT-Cage™ was designed and tested to be used only in surgeries utilizing an anterior approach (from an incision in the front of the patient).

216. Although the FDA approved The Infuse™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device as safe and effective, when used as a complete system, the rhBMP-2/Absorbable Collagen Sponge together with the LT-Cage™, the vast majority of the Plaintiffs' surgeons used the rhBMP-2/Absorbable Collage Sponge without the LT-Cage™. These surgeons only did so based upon the false, illegal, and wrongful conduct of Medtronic as described herein.

217. The FDA defined Infuse® as a single medical device made up of a ***system*** of two components: (1) rhBMP-2/Absorbable Collagen Sponge; and (2) LT-Cage™. Infuse® was designed and tested by Defendants to be used together, as a system, with the rhBMP-2/Absorbable Collagen Sponge inserted into the LT-Cage™.

218. In July 2002, the FDA only approved use of the rhBMP-2/Absorbable Collagen Sponge as part of the two-component "system" in Infuse®. No other clinical tests were performed to demonstrate the rhBMP-2/Absorbable Collagen Sponge was safe and effective used alone, or in combination with any other medical device. The FDA did not evaluate any other uses of the system.

219. In fact, the FDA made this very clear in the approved labeling, where it states: "The InFUSE™ Bone Graft component is inserted into the LT-CAGE™ Lumbar Tapered Fusion Device

[12] Exhibit C, FDA Approved Labeling.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

component to form the **complete** InFUSE™ Bone Graft LT-CAGE™ Lumbar Tapered Fusion Device." (Emphasis added).

220. Accordingly, a medical device consisting of the Infuse® Bone Graft component, without the LT-CAGE™ Lumbar Tapered Fusion Device component, is not the complete Infuse® Bone Graft LT-CAGE™ Lumbar Tapered Fusion Device and does **NOT** have PMA approval by the FDA to be marketed or sold in the United States.

221. Infuse® is a "Device-Biologic"[13] "combination product."[14]

222. Since 1991, FDA regulations have specifically defined a combination product. Per the literal terms of the FDA's regulations, Infuse® is a "biologic/device…mixed…as a ***single entity***…."[15] (Emphasis added.)

223. As a combination product, the PMA for Infuse® only applies to the device when all three parts (comprising the two components) are used as a single entity.

---

[13] *See "The Silver Sheet,"* Vol. 8, No. 11 (November 2004), a well-known industry newsletter, which described Infuse® as follows:

> The product consists of three main components: a metal spinal fusion cage; a genetically engineered human protein (rhBMP-2) in powder form; and a collagen sponge to carry the protein.
>
> The rhBMP-2 powder and collagen sponge are packaged together in a kit that also contains sterile water (used to mix the protein powder into a liquid solution) and a syringe. The metal cage device is packaged and sold separately.
>
> The **combination product** was approved via PMA in 2002 for the treatment of degenerative disc disease in the lower spine. Surgeons soak the sponge with the rhBMP-2 solution and place it inside the cage; the cage is then implanted between the patient's vertebrae, where the rhBMP-2 promotes new bone growth to fuse the spine.

(Emphasis added.) *available at* http://www.fda.gov/downloads/combinationproducts/meetingsconferencesworkshops/ucm116740.pdf

[14] *See*, PMA Approval for P000058 dated July 11, 2002 (INFUSE Bone Graft/LT-Cage Lumbar Tapered Fusion Device), specifically designating Infuse® as a "Combination Device", attached hereto as Exhibit B; *also available at* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=13698 .

[15] 21 CFR §3.2(e), quoted below:

> (e) Combination product includes:
>
> (1) A product comprised of two or more regulated components, i.e., drug/device, biologic/device, drug/biologic, or drug/device/biologic, that are physically, chemically, or otherwise combined or mixed and produced as a single entity;
>
> …
>
> (3) A drug, device, or biological product packaged separately that according to its investigational plan or proposed labeling is intended for use only with an approved individually specified drug, device, or biological product where both are required to achieve the intended use, indication, or effect and where upon approval of the proposed product the labeling of the approved product would need to be changed, e.g., to reflect a change in intended use, dosage form, strength, route of administration, or significant change in dose;

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

224. rhBMP-2 is defined by the FDA as a "therapeutic biologic."[16]

225. A "biologic" is defined by the Public Health Service Act.[17]

226. "Device" is defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq*. (2012) (the "FDCA"), which includes the Medical Device Amendments of 1976.[18]

227. Drugs, devices and biologics are markedly different for purposes of FDA regulatory mechanisms, with different aspects of the FDA orchestrating their regulations.

228. As a biologic, rhBMP-2 ordinarily would be governed by the FDA's Center for Drug Evaluation or Research ("CDER")[19] (if distributed separately from the Infuse® system).

229. In contrast, the Center for Devices and Radiological Health ("CDRH") orchestrates regulatory authority over all "devices" as defined in the FDCA.

230. As a biologic, rhBMP-2 would likely be FDA-approved for marketing, by itself, through the CDER via a New Drug Application ("NDA") or through a Biologics License Application ("BLA").[20]

231. The CDER has a Division of Therapeutic Protein (DRP) with regulatory responsibility for multiple biological therapeutics,[21] like rhBMP-2.[22]

232. Marketed separately, both the absorbable collagen Absorbable Collagen Sponge[23] and the LT-CAGE™[24] are "devices" falling clearly under the jurisdiction of the CDRH.

---

[16] *See* "Guidance for Industry and FDA, Class II Special Controls Guidance Document: Intervertebral Body Fusion Device," available online at: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm071408.htm

[17] The rhBMP-2 in Infuse® is a "biological product" and "has the meaning given the term in section 351(a) of the Public Health Service Act *(42 U.S.C. 262*(a))." 21 CFR §3.2(d).

[18] 21 U.S.C. § 321(g) defines "device" for the purpose of the FDCA and FDA Regulations. 21 U.S.C. § 321(g) defines "drug" for the purposes of the FDCA and FDA Regulations.

[19] *See generally,* definitions in 21 CFR §3.2(b).

[20] http://www.fda.gov/BiologicsBloodVaccines/DevelopmentApprovalProcess/BiologicsLicenseApplicationsBLAProcess .

[21] *See, e.g.*, FDA's website discussing the CDER and its Office of Biotechnology Products (OBP): http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/default.htm and http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm090470.htm

[22] *See* Division of Therapeutic Proteins line chart, attached hereto as Exhibit 6. *See also,* list of approved biologic products available online at: http://www.fda.gov/downloads/forindustry/userfees/prescriptiondruguserfee/ucm164641.pdf

[23] The collagen sponge in Infuse® is a Class II medical device and classified separately as a resorbable calcium salt bone void filler device. *See,* "Guidance for Industry and FDA Staff – Class II Special Controls Guidance Document: Resorbable Calcium Salt Bone Void Filler Device," availabe online at: http://www.fda.gov/ohrms/dockets/ac/03/briefing/3955b1_CALCIUM%20SALT.pdf

[24] The LT-CAGE™ is now defined as a Class II "Intervertebral body fusion device." *See* 21 CFR 888.3080,

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

233. The FDA's CDER never reviewed or approved rhBMP-2 to be marketed alone as a biologic.

234. For the purpose of the FDA's regulations, the components and parts of Infuse® (when used in spinal surgeries) cannot be treated separately because each such component and part is governed by a totally separate set of FDA regulations and as a combination product, must be treated as a "***single entity***…" and a "system".

235. Infuse®, as defined by the FDA PMA approval and the FDA approved labeling, was not used in the vast majority of the of Plaintiffs' fusion surgeries as a result of Medtronic's false, illegal, and wrongful conduct as described herein.

236. Medtronic intended to deliver, and did deliver, the rhBMP-2/Absorbable Collagen Sponge, separately, to each of the Plaintiffs, to be used apart from the LT-Cage™.

237. According to the Infuse® PMA and FDA regulations, Infuse® was approved as a "system" and therefore a "single entity…" The approved labeling for Infuse® reads in part, with bold and underlined formatting: **"These components <u>must</u> be used as a system. The INFUSE® Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component."**[25]

238. The separate components and parts of Infuse® are not Infuse®.[26] The Infuse® PMA requirements do not attach to these components when used separately, because these components, when used separately, are a different and distinct biologic, and different and distinct devices, each requiring their own PMA approval.

---

attached as Exhibit 9. However, such devices are elevated to Class III when they "include any therapeutic biologic (e.g., bone morphogenic protein)." *Id.* Intervertebral body fusion devices were Class III until June, 2007, when the FDA downgraded them to Class II devices when using "autologous" bone grafts. *See* FDA Website: "Guidance for Industry and FDA Staff -- Class II Special Controls Guidance Document: Intervertebral Body Fusion Device," issued June 12, 2007, available online at: http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm071410.pdf.

[25] Infuse® Label, attached hereto as Exhibit C (emphasis supplied in label).

[26] Even if the Infuse® PMA requirements somehow applied separately to its component parts (which they do not), Medtronic intended to and did violate the restrictions of the Infuse® PMA to the various combinations of these biologic/devices outlined above, by promoting rhBMP-2 use in posterior approach surgeries *without* the LT-Cage™.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**7. Defendants Recruited Key Opinion Leaders (KOLs) To Market rhBMP-2, Unapproved By The FDA, Alone and In Combinations With Various Devices**

239. The majority of spinal fusion surgeries are "posterior", as opposed to the "anterior" approach approved by the FDA for Infuse®.

240. The FDA severely limited the market for Infuse® by approving Infuse® as a "system" and by restricting Infuse® for use in surgeries utilizing an "anterior" approach. But, Medtronic's ambition for sales was not so limited.

241. From the very beginning, Medtronic endeavored to expand rhBMP-2's market.

242. Medtronic expanded the "off-label" use of Infuse® and the "Unapproved Device" sales by paying large amounts of money to "Key Opinion Leader" ("KOL") spine surgeons around the country. Many of these KOLs published articles, or appeared at special "dinners" or continuing education seminars, advocating the "off-label" use of Infuse® and the "Unapproved Device" use in posterior approach surgeries, without the LT-CAGE™. While emphasizing the problems of using autograft and allograft procedures, they minimized the risks or dangers of this experimental, new Class III Medical Device, which has not been approved by the FDA,

243. The U.S. Senate, in a special report, found that Medtronic paid approximately $210 million to these KOLs who, in turn, improperly influenced and promoted the sale of the "off-label" use of Infuse® and the "Unapproved Device."[27]

244. Medtronic also tied their sales representatives' compensation almost solely to sales quotas for the first component of Infuse® (the rhBMP-2/Absorbable Collagen Sponge), but had no incentives or bonuses related to the sales of the second component of Infuse® (the LT-CAGE™).

245. This compensation plan was purposeful and intended to increase sales of the rhBMP-2/Absorbable Collagen Sponge for uses and in manners not approved by the Infuse® PMA, and contrary to PMA restrictions on Infuse®'s design and use.

246. Medtronic's reimbursement strategy with insurance carriers was also designed to

[27] S. Comm. on Finance, 112th Cong., 2d Sess., *Staff Report on Medtronic's Influence on Infuse Clinical Studies* (Oct. 2012) ("Senate Report"). Available online at: http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&ved=0CCYQFjAA&url=http%3A%2F%2Fo2.aolcdn.com%2Fhss%2Fstorage%2Fpatch%2F6fca5987e2c44fd011690ea8164f8cfa&ei=-ihAU87NK8jNsQTlq4CgAg&usg=AFQjCNFoz9RkjF-8Idi6HwIXyRRyLZzSqw.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

promote, and did promote, the sale of Infuse for "Off-Label" uses and of its "Unapproved Device" into markets not approved for Infuse®.

247. The concerted efforts of Medtronic and its KOLs were in violation of the FDCA and the MDA, for marketing, distribution and promotion of rhBMP-2/Absorbable Collagen Sponge as a combination biologic/device, unapproved as such by the FDA.

248. Medtronic's and their KOLs' promotion and marketing of the rhBMP-2/Absorbable Collagen Sponge for use in spinal fusion surgeries created a combination medical device different and distinct from Infuse®.

249. The majority of cages used in Plaintiffs' surgeries ("Plaintiffs' Cages") were Class II medical devices and these devices had not been subjected to adequate pre-clinical or clinical testing or FDA review and approval as required by 21 CFR §888.3080 to be used with a biologic like rhBMP-2; thus, Plaintiffs' Cages implanted in Plaintiffs were experimental devices, and were for that reason and others, unreasonably dangerous.

250. This rhBMP-2/Absorbable Collagen Sponge/Plaintiffs' Cages device had not been subjected to adequate pre-clinical or clinical testing or FDA review and approval; thus, the rhBMP-2/Absorbable Collagen Sponges/Plaintiffs' Cages implanted in Plaintiffs was experimental "Unapproved Devices", and was for that reason and others, unreasonably dangerous.

251. In addition to the rhBMP-2/Absorbable Collagen Sponge, Medtronic and their KOLs also promoted and marketed the rhBMP-2/Absorbable Collagen Sponge with the Plaintiffs' Cages, and thus created a new unapproved combination Class III Medical Device different and distinct from Infuse®.

252. The rhBMP-2/Absorbable Collagen Sponges in combination with Plaintiffs' Cages had not been subjected to adequate pre-clinical or clinical testing or FDA review and approval; thus, the rhBMP-2/Absorbable Collagen Sponges/Plaintiffs' Cages combination devices implanted in Plaintiffs were experimental devices, and were for that reason and others, unreasonably dangerous.

253. Medtronic and their KOLs also promoted, marketed and/or knowingly distributed Plaintiffs' Cages for use with rhBMP-2, a biologic.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**8. Medtronic And Its KOLs Falsely Promoted And Marketed rhBMP-2**

254. Medtronic, and their KOLs, working as co-conspirators, understood that spine surgeons learned of spinal procedures through various sources of information including: (a) medical literature; (b) medical conferences and seminars; (c) sales representatives from medical device companies, like Medtronic; and, (d) consulting with peers in the spine surgery community.

255. Medtronic, with its KOLs, sales representatives and other agents, infiltrated each of the sources of information listed above.

256. Medtronic, and its KOLs so systematically corrupted and tainted these sources of information that any spine surgeon or patient seeking the true safety and efficacy of rhBMP-2 could only base his/her opinion on tainted and false information, either through explicit misrepresentations of fact or through the withholding of true safety and efficacy information when Medtronic, its KOLs, and its other agents had a duty to impart the true safety and efficacy information, but failed to do so.

257. The falsehoods discussed above were material and were designed by Medtronic to induce Plaintiffs to consent to, and their surgeons to use, the rhBMP-2/Absorbable Collagen Sponge with Plaintiffs' Cages.

258. Had the true risks and benefits not been falsely concealed from the Plaintiffs and their surgeons, and had the Plaintiffs and their surgeons known that the devices implanted in their surgery were unapproved Class III Medical Devices, essentially experimental devices, and unapproved for marketing and use by the FDA, the Plaintiffs and their surgeons would not have consented to use these devices in the manner and in the combination in which these devices were used in Plaintiffs' surgeries.

259. Medtronic paid its KOLs large sums of money during relevant time periods both before and after Medtronic sold the rhBMP-2/Absorbable Collagen Sponges and sold or recommended the use of Plaintiffs' Cages to Plaintiffs.

260. Both Medtronic and its KOLs knew and conspired to keep secret that its KOLs were simply highly paid salesmen of Medtronic products, distributing false and misleading safety and efficacy concerning rhBMP-2/Absorbable Collagen Sponges in combination with Plaintiffs' cages and were not, as they appeared, objective scientists and investigators giving opinions regarding the true safety and

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

efficacy of Medtronic's rhBMP-2/Absorbable Collagen Sponge, used either with its surgical fusion cages or similar cages produced by other companies designed for use in posterior approach surgeries.

261. In many cases, Medtronic sales representatives were present for the Plaintiffs' spinal fusion surgery.

262. For some of the Plaintiffs, Medtronic's KOLs were their surgeons; yet, these KOL surgeons failed to reveal their financial conflict of interest in using and/or marketing Medtronic products—whether rhBMP-2 and/or Plaintiffs' cages as well as the risks associated therewith—when both Medtronic and its KOLs had a duty to disclose them.

263. Regardless of whether Medtronic entered into an explicit fraudulent conspiracy with its KOLs, Medtronic and their KOLs withheld the fact that Medtronic paid its KOLs huge sums of money based on the sales of Medtronic products. Medtronic paid this money at the same time its KOLs made supposedly "unbiased," objective scientific statements regarding the risks and benefits of Medtronic's products, including Infuse®, the rhBMP-2/Absorbable Collagen Sponge single component of Infuse® without a mandatory approved cage or with another cage that is untested and unapproved for use with a biologic.

264. As described above, by withholding this financial conflict of interest, Medtronic and its KOLs corrupted the sources of information regarding the rhBMP-2/Absorbable Collagen Sponge otherwise available to the medical community and/or to patients.

265. Medtronic and its KOLs had a legal and ethical duty to reveal this financial conflict of interest, and the true risks and benefits of the combination biologic/devices outlined above; yet, negligently and/or intentionally failed to do so.

266. Medtronic sold the rhBMP-2/Absorbable Collagen Sponge/Plaintiffs' Cages to each hospital where the surgery was performed, which in turn re-sold them to the Plaintiffs. These hospitals had no reason to know that these Class III Medical Devices were unapproved and experimental, and thus unreasonably dangerous products, in violation of federal law, the Infuse® PMA, and parallel state laws.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**9. Medtronic Falsely Marketed And/or Promoted Plaintiffs' Cages**

267. In addition to the tapered LT-CAGE™ for anterior surgeries, Medtronic also manufactured cages for use in posterior surgeries, which were approved by the FDA as Class II medical devices.

268. These posterior cages were designed cleared by the FDA to be used with cadaver bone or harvested bone graft and were never designed or approved by the FDA to be used with a biologic, such as rhBMP-2.

269. In an effort to capture the PLIF market for both its rhBMP-2/Absorbable Collagen Sponge and its Class II cages, Medtronic promoted combining the rhBMP-2/Absorbable Collagen Sponge with its Class II surgical cages.

270. Medtronic, its secret agents, and its KOLs negligently, recklessly and/or intentional represented that Class II cages (regardless of manufacturer) could safely and effectively be used with rhBMP-2/Absorbable Collagen Sponge, even though they were not approved for use with a biologic.

271. Neither of these devices (the rhBMP-2/Absorbable Collagen Sponge and the Class II surgical cages) were approved by the FDA for this intended use.

272. Thus, Medtronic promoted not only the use of its rhBMP-2/Absorbable Collagen Sponge into markets unapproved for Infuse® but also falsely reassured physicians and patients that Class II surgical cages, such as the Plaintiffs' Cages, could safely and effectively be used with a biologic; that is to say rhBMP-2.

273. These Class II surgical cages, like the Plaintiffs' Cages, were completely untested for use with a biologic. Thus, surgeons ended up essentially guessing at proper doses of rhBMP-2 to be used with no clinical trial to determine how use these Plaintiffs' Cages with rhBMP-2/Absorbable Collagen Sponge, either as to the surgical cage or the amount of rhBMP-2 to be used.

274. For instance, at the suggestion and encouragement of Medtronic's KOLs and its sales representatives, surgeons would cut-up the rhBMP-2/Absorbable Collagen Sponge to make it fit in surgical cages not designed to be used with the rhBMP-2/Absorbable Collagen Sponge device. Or, as explained below, Medtronic's sales representatives would suggest that surgeons roll the rhBMP-

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

2/Absorbable Collagen Sponge "like a taco," a "burrito," or a "cigar" in order to fit it into various aspects of the spine, without a cage.

275. The majority of Plaintiffs' Cages were made of polyetheretherketone (PEEK) and designed to be used only in a posterior surgical approach.

276. Plaintiffs' Cages varied, but a substantial quantity of Plaintiffs' Cages consisted of PEEK cages manufactured by Medtronic and were densely packed with rhBMP-2.

277. These PEEK cages had been approved for marketing by the FDA via a 510(k) procedure, which allowed for approval merely by showing that the cage was "substantially equivalent" to other products like it, already on the market.

278. These PEEK cages were approved via the 510(k) process and were not approved via the FDA's most stringent approval process for Class III devices via a PMA Process.

279. Although Medtronic, their sales representatives, and their KOLs were well-aware that Plaintiffs' Cages were being used for purposes for which they had not been tested or designed, Medtronic and its co-conspirators and agents encouraged to use of Plaintiffs' Cages with rhBMP-2, a biologic.

280. Under state law, Medtronic had a duty of due care in the design, testing, manufacturing, distribution and marketing of surgical cages it intended to be used with a biologic.

281. On June 12, 2007, the FDA promulgated 21 CFR §888.3080, requiring an "approved PMA" for surgical cages containing biologics, such as rhBMP-2.

282. Medtronic knew that the FDA promulgated 21 CFR §888.3080.

283. Despite having full knowledge of this regulation, Medtronic and its agents, including, but not limited to, its KOLs, continued to negligently and/or recklessly promote and distribute Class II cages, such as some of relevant Plaintiffs' Cages here, for use with a biologic, specifically the rhBMP-2/Absorbable Collagen Sponge.

284. The LT-CAGE™[28] for use as part of Infuse® was approved for use as a Class III device, which is the most rigorous form of approval possible by the FDA.

---

[28] *See*, Zdeblick, TA, Burkus, JK, "LT-CAGE™, Lumbar Tapered Fusion Device Surgical Technique," available online at: http://www.mtortho.com/public/LT-cage_st.pdf.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

285. The LT-CAGE™ is made of titanium and was specially designed to be implanted through the front of the spinal column.

286. Medtronic, their sales representatives, their KOLs (as well as other agents) advised Plaintiffs and/or Plaintiffs' surgeons that use of such Class II PEEK cages, including Plaintiffs' Cages, were safe and effective and they failed to inform Plaintiffs that Plaintiffs' Cages were unapproved Class III Medical Devices, essentially experimental medical devices, unfit and untested for use with a biologic, like rhBMP-2.

287. Medtronic, through their sales representatives, witnessed multiple surgeries involving the misuse of these Class II PEEK devices; yet, Medtronic took no measure to warn against the use of these devices, despite their knowledge that such use was dangerous to the patient.

288. Medtronic knew that these Class II PEEK cages should be re-designed and tested for safe and effective use with a biologic prior to implantation in a posterior approach spine surgery.

289. Despite having this knowledge, Medtronic continued to promote the use of the rhBMP-2/Absorbable Collagen Sponge in combination with Class II PEEK cages. In this way, Medtronic created, marketed, and promoted an unapproved Class III, experimental medical device, without FDA approval and without adequate testing, that was unreasonably dangerous.

290. For the vast majority of the Plaintiffs, the rhBMP-2/Absorbable Collagen Sponge was implanted using Plaintiffs' Cages without the LT-CAGE™. In some cases, no cage was used at all.

291. The majority of Plaintiffs' Cages, in contrast to the LT-CAGE™ which was approved as a component and part of the Infuse® device system, are differently designed, are for different surgical approaches, and are made of different materials. Different regulatory approvals from the FDA apply to the use of the Infuse® versus the Plaintiffs' Cages.

292. Medtronic promoted and marketed to Plaintiffs and their doctors cages other than the LT-CAGE™, which were distinct medical devices untested for the use recommended by these Defendants.

293. Such uses were never reviewed or approved by the FDA and such promotion and marketing was contrary to FDA regulations, the FDCA and the MDA.

294. Medtronic's highly paid KOLs and secret agents, on behalf of Medtronic, promoted these

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

types of devices, teaching surgeons to use them.

295. Such uses were never reviewed or approved by the FDA and such promotion and marketing was contrary to FDA regulations, the FDCA and the MDA.

296. Plaintiffs' Cages were not designed or tested to contain a biologic, like rhBMP-2.

**10. The Infuse® PMA Is Completely Inapplicable if The Medical Device Used was Not Infuse®**

297. Medtronic never applied to the FDA for approval for the medical devices it created for implantation into Plaintiffs.

298. The Infuse® Class III Medical Device "consists of two components containing three parts - a tapered metallic spinal fusion cage, a recombinant human bone morphogenetic protein and a carrier/scaffold for the bone morphogenetic protein and resulting bone" and that "**These components <u>must</u> be used as a system.**" (Emphasis supplied in label)

299. The "system" that received PMA approval and is referred to as Infuse® was not used in the vast majority of the plaintiffs set forth herein.

300. Medtronic never sought FDA-approval of the use of the rhBMP-2/Absorbable Collagen Sponge alone or in combination with Plaintiffs' Cages.

301. Medtronic never formulated any directions and warnings for Plaintiffs' Cages and/or the rhBMP-2/Absorbable Collagen Sponge, as they were used in Plaintiffs' fusion surgeries.

302. Therefore, there are <u>no</u> FDA-imposed requirements specific to the devices implanted into Plaintiffs because Medtronic never sought FDA approval for these medical devices prior to their marketing, sale, and eventual implantation into Plaintiffs.

303. As used in Plaintiffs, the use, application and safety and effectiveness of the rhBMP-2/Absorbable Collagen Sponge and Plaintiffs' Cages were wholly outside of the FDA's regulatory framework and the PMA for Medtronic's Infuse®.

304. Therefore the FDCA as amended in 1976 by the MDA and 21 U.S.C. § 360k is inapplicable.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**11. Medtronic Violated Federal Law as well as Parallel State Law**

305. However, if this court is of the opinion that the FDCA as amended in 1976 by the MDA and 21 U.S.C. § 360k is applicable, plaintiffs allege the following.

306. It was and is illegal for Medtronic or any of their sales representatives or agents to market and distribute the biologic/devices outlined above for use in Plaintiffs' fusion surgeries.

307. Medtronic was aware that their promotion, marketing and sales of the rhBMP-2/Absorbable Collagen Sponge would result in it becoming "misbranded" in violation of 21 U.S.C. § 352(f).

308. Medtronic was aware that their promotion of Plaintiffs' Cages (which these Defendants manufactured) for use with a biologic, like rhBMP-2, would result in Plaintiffs' Cages becoming "misbranded" in violation of 21 U.S.C. § 352(f).

309. Medtronic was aware that distribution by them of these "misbranded" medical devices is and was prohibited pursuant to 21 U.S.C. §§ 331(a), (k) and 21 U.S.C. § 352(f).

310. In doing the acts alleged herein, Medtronic: (a) did not act reasonably with regard to the foreseeable harm to patients, including Plaintiffs; (b) did not act as a responsible manufacturer of Class II or Class III Medical Devices; (c) acted unlawfully, in violation of the Infuse® PMA (to the extent applicable); (d) acted unlawfully, in violation of the federal statutes; (e) acted unlawfully, in violation of the FDA regulations; and/or (f) violated state common law duties, all of which parallel and are ***not*** in addition to or different from FDA and federal requirements.

311. Plaintiffs bring their causes of action solely under state law for full redress for the injuries and damages they have suffered and have proximately incurred and will incur as a result. Plaintiffs here do not seek any remedy under federal law, or assert any cause of action under such laws. Product liability claims asserted herein allege traditional state law causes of action embedded within an unlawful scheme of promoting unapproved medical products and/or "off-label" promotion. The facts supporting these common law theories of recovery are parallel to and consistent with repeated violations, by Medtronic, of the Medical Device Amendments of 1976 ("MDA") and FDA regulations. Facts relating to this scheme of off-label promotion are more specifically alleged below.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

## V. FACTS

### A. THE INFUSE® BONE GRAFT DEVICE

312. Medtronic manufactured, designed, marketed, promoted, and sold Infuse® for use in lumbar spine fusion surgeries.

313. Infuse® contains a bioengineered bone-protein known as recombinant bone morphogenetic protein-2 ("rhBMP-2"), and it is used as an alternative to bone grafting, which involves the transplantation of a piece of bone from the patient's own hip (or bone from a cadaver) to the spine to promote bone growth. The purported goal of Infuse® is to achieve the ultimate outcome of a bone transplantation by stimulating bone growth with the use of rhBMP-2 without producing the possible adverse side effects of a bone grafting procedure, which can be pain at the donor site.

314. As an alternative to traditional grafting/transplantation procedures, Infuse® uses a protein known as rhBMP-2 (extracted from genetically-engineered cells which originate from the ovaries of Chinese Hamsters) to facilitate the fusion of vertebrae.

315. The Infuse® "device" is a "system" that combines two components consisting of three parts. The three parts are: (1) the bone protein (rhBMP-2), (2) the absorbable collagen sponge (ACS), and (3) a metallic spinal fusion cage, called an "LT-CAGE™". The bone protenin, rhBMP-2 is soaked into the absorbable collagen sponge to create the first component. This first component is then placed into the second component, the "LT-CAGE™".




316. The LT fusion cage allegedly maintains the spacing between vertebrae and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, with the goal of permanent stabilization (fusion) of the spine.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

317. The absorbable collagen sponge is described as "scaffolding" and is used as a carrier for the bone protein. The absorbable collagen sponge is manufactured from bovine collagen.

318. During surgery, rhBMP-2 is soaked onto and binds with the absorbable collagen sponge that is designed to resorb, or disappear, over time. As the sponge dissolves, the rhBMP-2 is designed to stimulate the cells to produce new bone.

**B. BACKGROUND ON BONE MORPHOGENETIC PROTEIN IN THE INFUSE® BONE GRAFT**

319. Surgeons have for decades employed spinal fusion – a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them – to treat a number of spinal conditions and deformities.

320. For years, autologous bone graft has been considered the "gold standard" in spinal fusion surgery. In an autologous bone graft, or "autograft," the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest, and implants the bone graft in the site where fusion is desired.

321. Consequently, studies revealing the ability for biologically manufactured protein to generate bone growth in laboratory animals represented a potential to provide a third surgical option to traditional bone graft procedures. The theory was that, if fusion could be accomplished through the use of biologically manufactured proteins, patients could forego the harvest surgery required in an autograft, but could still benefit from the superior fusion rates associated with autograft procedures.

**C. BACKGROUND INFORMATION ON THE CORPORATE OWNERSHIP OF INFUSE®**

322. Genetics Institute, Inc. identified, isolated, purified and cloned the bone morphogenetic protein known as BMP-2.

323. Sofamor Danek Group, Inc., a Memphis, Tennessee based spinal device maker ("Sofamor Danek"), acquired the exclusive rights to the recombinant human bone morphogenic rhBMP-

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

2 for spinal applications in the United States from Genetics Institute in February 1995.

324. Under the agreement, Sofamor Danek acquired the exclusive right in North America to develop and commercialize these products for spinal applications. Sofamor Danek paid Genetics Institute, Inc. $12.5 million in license fees in 1995 and was obligated to pay up to $37.5 million starting in 1996 through 1998. Genetics Institute, Inc. retained the exclusive right to manufacture rhBMP-2 for supply to Sofamor Danek. Genetics Institute, Inc. and Sofamor Danek agreed to equally share revenues.[29]

325. Wyeth Pharmaceuticals, shortly after this agreement, acquired Genetic Institute, Inc. and the rights to rhBMP-2 in 1996.[30]

326. In October 1996, Sofamor Danek filed an application for an Investigational Device Exemption ("IDE") with the FDA to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to commercially market rhBMP-2.[31]

327. In January 1999, Medtronic purchased Sofamor Danek for $3.6 billion.[32]

328. Medtronic, Inc. acquired/merged with Sofamor Danek Group, Inc., and thereafter formed the business unit Defendant Medtronic Sofamor Danek, Inc. Medtronic Sofamor Danek, Inc. is a wholly-owned subsidiary of Medtronic, Inc. The business unit, Defendant Medtronic Sofamor Danek USA, Inc. (MSD) is a wholly-owned subsidiary of Defendant Medtronic Sofamor Danek, Inc. MSD is engaged in the development, design, manufacture, and marketing of InFuse™ Bone Graft/LT-CAGE™.

329. Defendant Medtronic, Inc., develops, designs, manufactures and markets medical devices through various business units, each of which Medtronic, Inc. exercises dominion over, owns, operates and otherwise controls.

330. According to the current Medtronic, Inc. web site under "Company History": "1999-

---

[29] Genetics Institute and Sofamor Danek to Collaborate on Spinal Indication for rhBMP-2, (Feb 16, 1995), *available at* http://www.thefreelibrary.com/GENETICS+INSTITUTE+AND+SOFAMOR+DANEK+TO+COLLABORATE+ON+SPINAL...-a016518853 (also attached hereto as Exhibit "E").

[30] Wyeth Quietly Turns Itself Into A Biotech Power (Nov 23, 2007), *available at* http://www.blnz.com/news/2008/02/19/Wyeth_Quietly_Turns_Itself_Into_7301.html (also attached hereto as Exhibit "F").

[31] Bone Morphogenic Proteins: Applications in Spinal Surgery (Sep 2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2504139/ (also attached hereto as Exhibit "G").

[32] Medtronic to Buy Maker of Spine Implants for $3.6 Billion, *LA Times*, (Nov 3, 1998), *available at* http://articles.latimes.com/1998/nov/03/business/fi-38827 (also attached hereto as Exhibit "H").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Sofamor Danek Group shareholders approve a merger with Medtronic, Inc., the world's leading medical technology company. The new company bears the name Medtronic Sofamor Danek. 2006-Company evolves away from Sofamor Danek name to Medtronic's Spinal and Biologic's business unit."[33]

331. The Infuse® Bone Graft/LT-CAGE™ is identified within Medtronic, Inc.'s current web site as being part of Medtronic's Spinal and Biologic's business unit.[34]

332. In 2009, Pfizer acquired Wyeth for $68 billion[35]

**D. REGULATORY FRAMEWORK**

333. To understand the full scope of the allegations contained in this Complaint, a brief general background regarding the applicable FDCA provisions is warranted, as well as an application of those laws to the present case.[36]

334. The United States Food and Drug Administration ("FDA") is the federal agency of the United States of America that is charged with safeguarding the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq*. (2012) (the "FDCA").[37]

335. The FDCA was passed in 1933 to protect patients. Congress realized that there were drug manufacturers selling drugs that were neither effective nor safe. Congress felt that regulations were necessary to protect patients by making the drug manufacturers go through an approval process before they would be legally permitted to promote their drugs for specific indications.

336. In 1976, there were the Dalkon Shield contraceptive tragedies where numerous patients were severely harmed by that medical device. Congress responded by enacting the Medical Device Amendments of 1976 ("MDA") to extend the coverage of the FDCA to medical devices. The MDA was passed to protect patients with the idea that medical devices should be subjected to a rigorous approval

---

[33] http://www.medtronic.com/about-us/company-profile/medtronic-history/index.htm
[34] http://www.medtronic.com/about-us/businesses/artificial-disc/index.htm.
[35] Wyeth was subsequently purchased by Pfizer in 2009 for $68 billion. *see* Aaron Smith, *Pfizer to buy Wyeth for $68 billion*, CNNMoney.com (Jan. 30, 2009) *available at* http://money.cnn.com/2009/01/26/news/companies/pfizer_wyeth/ (also attached hereto as Exhibit "I").
[36] Plaintiffs are not seeking to enforce these provisions in this action. Likewise, Plaintiffs are not suing merely because Medtronic's conduct violates these provisions. Rather Plaintiffs are alleging that Medtronic's conduct that violates these federal regulations, as well as the PMA obtained for Infuse®, also violates parallel state laws.
[37] The ultimate responsibility for the safety of a medical device, of course, rests with the Manufacturer.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

process *for specific indications* – *specific intended uses* – before medical device manufacturers are allowed to market them. Therefore, the FDA has authority over drugs and medical devices under the FDCA and the MDA.

337. The MDA established three regulatory classes for medical devices. The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective according to user risk. Class I Medical Devices pose the least risk, whereas Class III Medical Devices pose the greatest risk to the users.[38]

338. Class I Medical Devices are subject to "general controls" such as labeling requirements.[39] Class II Medical Devices are subject not only to "general controls," but also to "special controls" such as "performance standards, postmarket surveillance, [and] patient registries."[40] If a device cannot be determined to provide a reasonable assurance of safety and effectiveness under Class I or II controls and is either marketed as a life supporting device or may cause an unreasonable risk of illness or injury, then it rises to the level of a Class III Medical Device.[41]

339. Class III Medical Devices are the most regulated. The MDA defines a Class III Medical Device as one that supports or sustains human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury.[42]

340. Class III Medical Devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, and several types of implantable orthopedic devices for spine and hip surgery.

341. Medtronic's Infuse® is a class III Medical Device because it combines a surgical fusion cage designed to contain a biologic, like rhBMP-2.[43]

342. Many of the plaintiffs' cages are Class II Medical Devices, which are unapproved for use with a biologic. If the manufacturer intendeds to use such cages with a biologic (as Medtronic did here),

[38] 21 U.S.C. § 360c(a)(1) (2012).
[39] 21 U.S.C. § 360c(a)(1)(A) (2012).
[40] 21 U.S.C. § 360c(a)(1)(B) (2012).
[41] 21 U.S.C. § 360c(a)(1)(C) (2012).
[42] *Id.* Medtronic Infuse® is a Class III Medical Device.
[43] *See* "Guidance for Industry and FDA, Class II Special Controls Guidance Document: Intervertebral Body Fusion Device," available online at: http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm071408.htm

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

the manufacturer at that point is required to obtain PMA approval for use of the device with a biologic.[44]

343. FDA regulations prohibit biologics, such as the rhBMP-2 in Infuse®, to be used in a surgical cage that has not been vetted for that use by the FDA through it Pre-market Approval ("PMA") process as a Class III Medical Device, as further explained below.[45]

**1. Premarket Approval ("PMA") Process For Class III Medical Devices**

344. The MDA imposes detailed federal oversight on the introduction of new medical devices onto the market. The level of federal oversight varies depending on the risks the devices present. Class III Medical Devices are given the greatest oversight in the pre-market approval process ("PMA") by the FDA.[46]

345. Before a company can market a Class III Medical Device, the company is required to submit a premarket application to the FDA supported by data that provides the FDA with a reasonable assurance that the medical device is safe and effective for its ***intended use***.[47] In order to show safety and effectiveness, the applicant is required to submit evidence to the FDA, typically in the form of clinical trial results.

346. Without a premarket application, there is insufficient information about Class III Medical Devices and the FDA has already determined that the performance standards (Class II) or general controls (Class I) cannot provide reasonable assurance that the medical device is safe and effective for its specific intended use.

347. Under Section 515 of the FDCA, all medical devices placed into Class III are subject to premarket approval requirements. Premarket approval by FDA is the required process of scientific review in order to provide reasonable assuredness of the safety and effectiveness of Class III Medical Devices for their ***intended uses***.[48]

348. The applicant must provide, among other things: 1) "a detailed description of the

[44] *Id.*
[45] 21 C.F.R. § 888.3080.
[46] 21 U.S.C. § 360c(a)(1)(C) (2012).
[47] 21 U.S.C. §§§ 360e(a)(2), 360e(d)(1)(B)(iii)II, 360e(d)(2)(A) (2012).
[48] 21 U.S.C. § 360e (2012) (emphasis added).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

proposed conditions of use of the device,"[49] 2) a sample label, which must include the *intended uses* or conditions of use[50], and 3) "full reports of all information, published or known to or which should reasonably be known to the applicant, concerning investigations which have been made to show whether or not such device is safe and effective."[51]

349. The applicant is required to turn over information to the FDA that is complete, truthful, and accurate.[52]

350. To determine if a medical device is safe and effective, the FDA reviews the scientific evidence regarding the medical device submitted by the applicant, including "evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device *under its conditions of use*."[53]

351. "There is reasonable assurance that a device is safe when it can be determined, based upon valid scientific evidence, that the probable benefits to health from use of the device for its *intended uses* and conditions of use, when accompanied by *adequate directions and warnings against unsafe use*, outweigh any probable risks. The valid scientific evidence used to determine the safety of a device shall adequately demonstrate the absence of unreasonable risk of illness or injury associated with the use of the device for its intended uses and conditions of use."[54]

352. "[T]he safety and effectiveness of a device are to be determined (A) with respect to the persons for whose use the device is represented or intended, (B) with respect to *the conditions of use* prescribed, recommended, or suggested in the labeling of the device, and (C) weighing any probable benefit to health from the use of the device against any probable risk of injury or illness form such

[49] 21 U.S.C. § 360c(a)(3)(D)(i) (2012).
[50] 21 U.S.C. § 360e(c)(1)(F) (2012); see also 21 U.S.C. § 360c (2)(B) (2012).
[51] 21 U.S.C. § 360e(c)(1)(A) (2012).
[52] *Id.*
[53] 21 C.F.R. § 860.7(c)(2) (2012) (emphasis added).
[54] 21 C.F.R. § 860.7(d)(1) (2012) emphasis added).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

use."[55]

353. After the FDA finishes review of the premarket application, it then denies, approves, or approves with conditions on distribution, marketing, or sale.[56]

354. "In making the determination whether to approve or deny the application, the Secretary shall rely on the conditions of use included in the proposed labeling as the basis for determining whether or not there is a reasonable assurance of safety and effectiveness."[57]

355. After the FDA approves a Class III Medical Device through the premarket application process, the FDA essentially grants the applicant permission to market and sell a particular medical device for its *specific approved use* (i.e. its "*intended use*").

356. "*A device may not be manufactured, packaged, stored, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device*."[58]

**2. PMA Applications Are Limited by the Claimed "*Intended Use*"**

357. The PMA is based on the manufacturer disclosing all of the pertinent information about the medical device for the FDA to review. One of the most significant parts of the premarket application is the medical device's claimed "*intended uses*" as these are the only uses that are evaluated by the FDA in their premarket approval process for efficacy and safety.[59] The Code of Federal Regulations (C.F.R.), Title 21, Chapter I, Subchapter H—Medical Devices, § 801.4 (2012) (Meaning of intended uses.), defines "intended use" in terms of "objective intent" of the manufacturer in a medical device approval setting:

> The words intended uses or words of similar import in 801.5, 801.119, and 801.122 refer to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons'

---

[55] 21 U.S.C. § 360(a)(2)(A-B-C) (2012) (emphasis added).
[56] 21 U.S.C. § 360e(d) (2012); 21 C.F.R. § 814.82 (2012).
[57] 21 U.S.C. § 360e (d)(1)(A) (2012).
[58] 21 C.F.R. § 814.80 (2012) (emphasis added).
[59] 21 U.S.C.§ 360e(c)(2)(A)(iv) (2012); *see* also 21 U.S.C. § 360c(a)(2)(A-B) (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

> expressions or may be shown by the circumstances surrounding the distribution of the article. **This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives.** It may be shown by the circumstances that the article is, **with the knowledge** of such persons or their representatives, **offered and used for a purpose for which it is neither labeled nor advertised**. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer…But **if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses** to which the article is to be put.[60]

358. The FDCA requires Class III Medical Devices to be demonstrated to be safe and effective for each *intended use*.[61]

359. The FDA ensures that medical devices intended for use in humans are demonstrated by the manufacturer to be safe and effective for each of their *intended uses* and that the labeling of such medical devices bore true and accurate information concerning their intended use.[62]

360. The FDA determines what is on label on the basis of a product's "intended use."[63]

361. The "intended use" of a medical device is defined at 21 C.F.R. § 801.4 (2012) as "the objective intent of the persons legally responsible for the labeling of devices…" "The intended use or uses of a medical drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source."[64] Manufacturers must obtain FDA approval for each intended use.[65]

### 3. The PMA Approval Process Includes the Device And Its Labeling

362. Not only is the medical device itself part of the PMA process, but the labeling and packaging that comes with it is as well. Each premarket submission must also include all proposed

[60] 21 C.F.R. § 801.4 (2012) ("Meaning of 'Intended Uses" Under the "General Labeling Provisions" for the "Labeling" section.) (Emphasis added).
[61] *See* 21 U.S.C. § 360c(2)(B) (2012).
[62] *Id.*
[63] *Id.*
[64] 65 Fed. Reg. § 14286 (Mar. 16, 2000).
[65] 21 U.S.C. § 360c(2)(B) (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

"labeling" for the medical device and *__its intended use__*.[66]

363. The FDCA requires that a submission for approval of a device include proposed labeling for the proposed *__intended uses__* of the medical device that includes, among other things, the conditions for therapeutic use.[67]

364. In order to be approved by the FDA, an applicant for premarket approval of a Class III Medical Device must demonstrate its safety and effectiveness for "the persons for whose use the device is represented or __intended__" and "with respect to the conditions of use prescribed, recommended, or suggested in the label…"[68]

365. The FDA performs a risk-benefit assessment of the medical device and then determines the adequacy of the manufacturer's proposed label. When the FDA approves a premarket application, the FDA finds that based on the information supplied by the manufacturer, a device is safe and effective under the __specific and limited conditions of use included on the label__ and that the label is not false or misleading.[69]

366. A manufacturer is required to give adequate directions for the use of a medical device such that a "layman can use a device safely and for the purposes for which it is intended"[70], and conform to section 801.15 requirements governing the appearance of the label.[71]

> **__Adequate directions for use means directions under which the layman can use a device safely and for the purposes for which it is intended.__** Section 801.4 defines intended use. Directions for use may be inadequate because, among other reasons, of omission, in whole or in part, or incorrect specification of:
>
> (a) **__Statements of all conditions, purposes, or uses for which such device is intended, including conditions, purposes, or uses for which it is prescribed, recommended, or suggested in its oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the device is commonly used__**…
> (b) Quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions…

---

[66] *Id.*
[67] *Id.*
[68] 21 U.S.C. § 360c(a)(2)(A)-(B) (2012).
[69] 21 U.S.C. § 360e(d)(1)(A), (d)(2) (A-B-C-D) (2012).
[70] 21 C.F.R. § 801.5 (2012).
[71] 21 C.F.R. § 801.15 (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

(f) Route or method of administration or application.[72]

367. "Labeling" encompasses all written, printed or graphic material accompanying the drug or device[73], and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.[74]

368. Labeling includes the intended purpose as well as any advertised or promoted purposes.

> Labeling on or within the package from which the device is to be dispensed bears **information for use, including indications**, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and **for the purpose for which it is intended, including all purposes for which it is advertised or represented**: Provided, however, That such information may be omitted from the dispensing package if, but only if, the article is a device for which directions, hazards, warnings, and other information are commonly known to practitioners licensed by law to use the device. Upon written request, stating reasonable grounds therefor, the Commissioner will offer an opinion on a proposal to omit such information from the dispensing package under this proviso."[75]

369. "Most, if not all, labeling is advertising. The term "labeling" is defined in the Act [FDCA] as including all printed matter accompanying any article. Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[76]

#### 4. FDA Regulations and PMA Process, Prohibit "Off-Label" Promotion

370. When the FDA approves a medical device, the agency approves the device for the specific intended use set out in the product's approved labeling. A use approved by the FDA is usually referred to as an "approved", "labeled" or "intended use". A use that does not appear in the labeling is not approved as safe and effective as it never went through the FDA's PMA review. It is known as an "unapproved," "off-label," or "new use." For the sake of consistency, in this complaint, Plaintiffs refer to such unapproved uses as "off-label".

---

[72] 21 C.F.R. § 801.5 (2012).
[73] *Id.* 65 Fed. Reg. 14286 (March 16, 2000).
[74] 21 C.F.R. § 801.109(c) (2012).
[75] 21 C.F.R. §801.109 (c) (2012).
[76] *U.S. v. Research Labs.*, 126 F.2d 42, 45 (9th Cir. 1942).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

371. A medical device manufacturer is not permitted to promote and/or market a new medical device submitted to the FDA under the premarket approval process until it has an approval for its intended use, including approval for the proposed labeling. Moreover, if approved, the medical device manufacturer is permitted to promote the medical device only for the medical conditions or *indicated uses* specified in the approved labeling. Therefore, a medical device manufacturer is not permitted to promote a medical device in an "off-label" manner, since the FDA did not approve the medical device for that medical condition or use.

372. A central feature of the FDCA is that it prohibits medical device companies from promoting their devices for "off-label" uses.[77]

> The Federal Food, Drug, and Cosmetic Act of 1938 (FDCA), as amended, **generally prohibits the manufacturer of a new drug or medical device from distributing a product in interstate commerce for any intended commerce for any intended use that FDA has not approved as safe and effective.** The intended use or uses of a drug or device may be set forth in, among other things, its label or "labeling," which includes written, printed, or graphic matter affixed to or "accompanying" the product. See 21 U.S.C. 321(m); 21 C.F.R. 202.1(1)(2); see also 21 C.F.R. 201.128, 801.4. The intended use or uses of a drug or device may also be determined from advertisements, promotional material, oral statements by the product's manufacturer or its representatives, and any other relevant source. *Action on Smoking and Health v. Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980); see also 21 C.F.R. 201.128 and 801.4.
>
> **When FDA approves a drug or medical device, the agency approves the product for each use set out in the product's approved labeling.** A use that FDA approves is thus sometimes referred to as an "approved" or "labeled" use. A use that does not appear in the labeling is not approved as safe and effective by FDA and is known as an "unapproved" or "off-label" use.
>
> A central feature of the FDCA is that it generally prohibits interstate commerce in

[77] Congress created a very limited "safe harbor" for certain "off-label" promotion between 1997 and 2006. The "safe harbor" allowed manufacturers to provide copies of peer reviewed scientific articles to physicians. See 21 U.S.C. §§ 360aaa, 360aaa-1 (2012) (these regulations had a sunset clause of September 30, 2006 and were never renewed, see 21 C.F.R. §§ 99.101 (2012) (current FDA regulations on this issue). As further discussed herein, Plaintiffs, however, allege that Medtronic's "off-label" promotional efforts far exceeded these "safe harbor" activities (i.e. redistribution of peer reviewed articles) and included other impermissible acts, including but not limited to, using paid consultants, key opinion leaders, seminars, presentations, in-house corporate paid doctors operating phone banks to instruct outside surgeons over the phone when they call Medtronic headquarters on how to perform "off label" procedures, as well as drafting, editing and ghostwriting the so-called "peer reviewed articles" while paying the listed "authors" (who are acting as agents for the company) millions of dollars without disclosing these efforts or payments within the contents of the articles or anywhere publically, all to actively and consciously over promote the "off-label" uses of Infuse®.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

new drugs and devices for "new uses"... **Similarly, a medical device that is distributed for a "new use" is "adulterated," see 21 U.S.C. 351 (f), and "misbranded," see 21 U.S.C. 352(f). An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. 331(a), (k))**...[78]

373. "[O]ne of the [FDCA's] core objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use."[79]

374. A medical device that is promoted for non-intended "off-label" uses is deemed "misbranded" in violation of 21 U.S.C. § 352(f) (2012) (misbranding).

375. "**Among representations in the labeling of a device which render such device misbranded is a false or misleading representation with respect to another device or a drug or food or cosmetic.**"[80]

376. Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label; otherwise the medical device is misbranded.[81]

377. A product is "misbranded" when the directions and indications for the unapproved uses that the manufacturer "intends" the product to be used for have not been included on the label.[82]

378. The FDCA's accompanying regulations require that medical devices sold by manufacturers have adequate directions for use[83], and failure to have adequate instructions for use is considered "misbranding,"[84] which is prohibited.[85]

379. The FDCA requires medical device manufacturers to disclose all material facts in advertising and labeling[86], and false or misleading labeling is considered "misbranded"[87], which is prohibited.[88]

380. The distribution of a "misbranded" medical device is prohibited pursuant to 21 U.S.C. §

---

[78] 65 Fed. Reg. § 14286 (March 16, 2000). (Emphasis added).
[79] *United States v Caronia*, 703 F3d 149, 166 (2nd Cir. 2012) quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, (2000).
[80] 21 C.F.R. §801.6 (2012).
[81] 21 C.F.R. § 801.4 (2012).
[82] 21 C.F.R. § 801.4 (2012).
[83] 21 C.F.R. § 801.5 (2012).
[84] 21 U.S.C. § 352 (f) (2012).
[85] 21 U.S.C. § 331(b).
[86] 21 U.S.C. § 321 (n) (2012).
[87] 21 U.S.C. § 352 (a),(q)(1) (2012).
[88] 21 U.S.C. § 331(b).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

331(a), (k) (2012) and 21 U.S.C. § 352(f) (2012).

381. The FDCA provides that a medical device is misbranded if, among other things, the labeling did not contain adequate directions for use.[89] Adequate directions for use could not be written for medical indications or uses for which the medical device has not been approved, and accordingly, directions for "off-label" use cannot be included in the approved labeling.

382. "Similarly, a medical device that is distributed for a 'new use' is 'adulterated,' see 21 U.S.C. 351(f), and 'misbranded,' see 21 U.S.C. § 352(f). An adulterated or misbranded product is prohibited from distribution in interstate commerce (21 U.S.C. § 331(a), (k))…"[90] The reason a medical device that is distributed for an unapproved new use is considered 'misbranded' is that the device fails to include adequate directions and warnings.

383. "Off-label" use of a medical device is a use that was not approved by the FDA, including different applications or surgical approaches, different dosages, different patient populations, or different conditions from those stated in the label.

384. The FDA prohibits medical device manufacturers from promoting any "off-label" uses through advertisement, recommendations, or suggestions.

385. A manufacturer is prohibited from promoting a use of the product that is not the specified use in the PMA or the label.[91]

386. A manufacturer who wishes to modify the labeling, packaging, design, or indications for use of its device has to comply with a supplemental PMA process.[92]

387. The FDA strictly regulates manufacturers based on the intended use of the device, and manufacturers cannot deviate from those specifications without permission. If a manufacturer wants to change the intended use for a device, it must follow the FDA's established procedure.[93]

388. Federal law requires a manufacturer to ensure that any warranty statements it voluntary

---

[89] 21 U.S.C. § 352(f)(1) (2012); *See also* 21 C.F.R. § 801.5 (2012).
[90] Fed. Reg. § 14286 (Mar. 16, 2000).
[91] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a "device may not be… advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order to the device.")
[92] 21 C.F.R. § 814.39(a) (2012).
[93] *See* 21 C.F.R. § 814.39(a) (2012) (specifying how a manufacturer can add new indications for use through the supplemental PMA process); 21 U.S.C. § 360e(d)(6) (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

makes are truthful, accurate, not misleading, and consistent with applicable federal and state law.[94]

389. Under the FDCA and its accompanying regulations, a medical device manufacturer must include all intended uses in the label otherwise the device is misbranded.[95]

390. Under the FDCA, medical device manufacturers are prohibited from introducing the adulteration or misbranding of any medical device into interstate commerce.[96]

391. A Class III device that fails to meet and/or comply with the requirements of the PMA is considered to be adulterated under Section 501(f) of the FDCA and cannot be marketed. A device may also be adulterated or misbranded because it lacks requisite FDA clearance or approval.[97] Furthermore, "[l]isting of unapproved uses in the... advertising... results in an adulterated medical device."[98] Marketing the device for an unapproved intended use thus makes the device both misbranded and adulterated.

392. The FDCA prohibits the introduction into interstate commerce of any medical device that is misbranded[99], and also prohibits the alteration of any part of the labeling, advertising, or promotional material for a medical device while the device is held for sale after shipment in interstate commerce that results in the device being misbranded.[100]

393. A medical device manufacturer may not tell the FDA that its device should or will be used only in certain procedures, and then actively encourage physicians to use the device in other procedures. By promoting and/or advertising the medical device to physicians for a new unapproved use the medical device manufacturer has shown that the intended use of the device has changed. Off-label promotion violates federal law, the PMA and may carry criminal penalties, as well as violating state common law.[101]

---

[94] 21 U.S.C. § 331(b) (effective 2013). It should be noted that the FDA approval letter for Infuse® specifically states that the FDA "...does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws." *See* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

[95] 21 C.F.R. § 801.4 (2012).

[96] 21 U.S.C. § 331(b) (effective 2013).

[97] FDCA §§ 501(f), 502(o), 21 U.S.C. §§ 351(f), 352(o).

[98] 59 Fed. Reg. 59821 (Nov. 18, 1994).

[99] 21 U.S.C. § 331(a) (effective 2013).

[100] 21 U.S.C. § 331(k) (effective 2013).

[101] *See* 21 U.S.C. § 333(a) (2012). This conduct also violates State parallel common laws. The Second Circuit held that "off-label promotion that is false or misleading is not entitled to First Amendment protection." *United States v. Caronia*, 703 F.3d

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**5. FDA Regulations Prohibit Marketing, Promotion And/or Distribution for "Off-Label" Uses Other Than The "Intended Uses" Set Forth In The PMA Or PMA Supplement**

394. The FDA "generally prohibits the manufacturer... from distributing a product... for any intended use that the FDA has not approved as safe and effective..."[102]

395. "If a manufacturer knows, or has knowledge of facts that would give him notice that a device… is to be used for conditions, purposes, or uses other than the ones for which he offers it, the manufacturer is required to provide adequate labeling for such other uses."[103]

396. FDA regulations prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[104]

397. Thus, a manufacturer that knows a device is being used for "off-label" uses is required to notify the FDA and obtain approval for labeling modifications consistent with the alternate use. Failure to do so renders the device adulterated and misbranded.

398. The FDCA prohibits the introduction, or delivery for introduction, into interstate commerce of any device that is adulterated or misbranded.[105]

399. FDA regulations also prohibit a manufacturer from "express[ing]" an "intent" or merely "know[ing]" or having "notice" that its product "is to be used" "off-label".[106] Any manufacturer's statement, whether true or not–and even mere knowledge of use–can create a new "intended use," and thus a misbranded or adulterated product.

400. The FDA regulations make it plain that it does not regulate the practice of medicine. However the FDA regulations have also made it crystal clear that this is wholly separate and apart from

149, 160-69 (2d Cir. 2012). Further, the Ninth Circuit has assumed that "off-label" promotion violates federal law. *Carson v. Depuy Spine, Inc.*, 365 Fed. App'x 812, 815 (9th Cir. 2010).

[102] 65 Fed. Reg. § 14286 (Mar. 16, 2000).

[103] 21 C.F.R. § 801.4 (2012). An example of direct knowledge would be when the manufacturer has a sales representative in the operating room. An example of notice would be when the manufacturer has a majority of sales for non-approved off-label uses.

[104] 21 C.F.R. §§ 201.100, 201.128 (2012); *see* 21 U.S.C. § 352(f)(1) (2012).

[105] 21 U.S.C. § 331(b) (2012).

[106] *See* 21 C.F.R. §§ 201.100, 201.128; *see also* 21 U.S.C. § 352(f)(1). Medtronic routinely had Corporate Sales Representatives directly in the operating room during "off-label" surgeries. As further discussed herein, Medtronic's sales of Infuse® were over 85-90% "off-label". This staggering high statistic is sufficient evidence to not only put Medtronic on notice of the "off-label" use, but it also highlights how successful Medtronic were with their illegal over promotional campaign for "off-label" uses. *See Minneapolis Firefighters*, 278 F.R.D. 454, at 456 (D. Minn. 2011) discussed further herein. (also attached hereto as Exhibit "J").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

the restrictions the FDA has placed on a manufacturer for promoting or distributing an unapproved product.

> Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient… **Further, this section shall not change any existing prohibition on the promotion of unapproved uses of legally marketed devices.**[107]

401. Therefore, although the FDA does not regulate the practice of medicine,[108] the FDCA does prohibit a manufacturer from promoting a use of the product that is not the specified approved use.[109]

402. Should a manufacturer wish to market a device "for a new or different indication for use, the premarket notification submission must include appropriate supporting data to show that the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[110]

**6. FDA Requires Filing a Supplemental PMA for "Off-Label" Uses**

403. In addition to limiting premarket approval to only those devices and uses demonstrated to be safe **and** effective, the actual stated purpose of premarket approval is "[t]o ensure the disapproval of PMA's for devices that have not been shown to be safe **and** effective or that do not otherwise meet the statutory criteria for approval."[111]

404. This prohibition in the FDCA is intended to protect patients and consumers by ensuring that manufacturers do not promote devices that are unsafe or ineffective based on the FDA's standards and review.

405. The terms of 21 C.F.R. § 801.4 render any device "adulterated" or "misbranded" when the manufacturer knew or should have known ("knowledge of facts that would give him notice") that the

---

[107] 21 U.S.C. § 396 (emphasis added).
[108] 21 U.S.C. § 396.
[109] 21 U.S.C. § 331(a) (effective 2013); see also 21 C.F.R. § 814.80 (2012) (providing that a device "may not be … advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.")
[110] 21 C.F.R. § 807.87(g) (2012).
[111] 21 C.F.R. § 814.2 (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

doctor/hospital/etc. to which the device was sold was going to use it in an "off-label" manner.

406. Under 21 C.F.R. § 801.4, the FDA regulations state that "if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put."

407. Consequently, federal law requires that a medical device manufacturer, who has knowledge or even notice of "off-label" use, to provide adequate labeling.

408. The manufacturer must seek "adequate labeling for such a device which accords with such uses to which the article is to be put."

409. If such a device does not have the required "adequate labeling" the medical device is "adulterated" and "misbranded."

410. "Off-label" use is not approved by the FDA as "safe and effective," which approval is a prerequisite to placing any material on the labeling concerning any use. A manufacturer must seek a PMA supplement for the new, unapproved, "off-label" use.

411. 21 C.F.R. § 814. 39(a) (2012) requires a manufacturer to file a PMA Supplement for changes that affect the safety or effectiveness of a device. This section expressly requires that a manufacturer file a PMA for any "new indications for use of the device." This is not a permissive choice, but rather a federally mandated requirement, as shown by the use of the term "**shall**" in the federal regulation.

412. "After FDA's approval of a PMA, an applicant **shall** submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA … While the burden for determining whether a supplement is required is primarily on the PMA holder, **changes for which an applicant shall submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device**:

(1) **New indications for use of the device**

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

(2) **Labeling changes**…"[112]

413. A manufacturer must submit a PMA Supplement to the FDA for review/approval changes affecting safety and effectiveness of a device (specifically including new indications)[113]; a manufacturer who desires to market or distribute a device "for a new or different indication for use, the premarket notification must include appropriate data to show the manufacturer has considered what consequences and effects the change, modification, or new use might have on the safety and effectiveness of the device."[114]

414. If a manufacturer wishes to obtain approval for a new or different intended use, the manufacturer must go through a lengthy and expensive process to obtain FDA approval for the new use, either by filing a PMA Supplement application pursuant to § 814.39, or by filing a new PMA application.

415. Any changes the manufacturer believes could affect the safety and effectiveness of the device, including any intention to promote the device for new, unlabeled uses, must be submitted, via a "PMA Supplement," to the FDA for approval. "After FDA's approval of the PMA, an applicant shall submit a PMA supplement for review and approval by FDA before making a change affecting the safety and effectiveness of the device for which the applicant has an approved PMA… While the burden for determining whether a supplement is required is primarily on the PMA holder, changes for which an applicant *shall* submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety or effectiveness of the device: (1) *New indications for use of the device…*"[115]

416. Most changes to the labeling of a device after premarket approval require prior FDA approval but a manufacturer may place into effect "labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction," "that add or strengthen an instruction that is intended to enhance the safe use of the device," or that deleted misleading, false or unsupported indications."[116]

---

[112] *See* 21 C.F.R. § 814.39(a) (2012) "PMA Supplements" (emphasis added).
[113] 21 U.S.C. § 814.39(a) (2012).
[114] 21 C.F.R. § 807.87(g) (2012).
[115] 21 C.F.R. § 814.39(a) (2012) (emphasis added).
[116] *See* 21 C.F.R. 814.39(a)(2); 21 C.F.R. 814.39(d)(1); 21 C.F.R. 814.39(d)(2)(i)-(iii).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

417. Under those regulations, the manufacturer is required to notify the FDA of "Changes Being Effected" (CBE) to a device's labeling.

**7. FDA Prohibits Misleading Or False Promotion And Marketing**

418. Under the FDCA and FDA's implementing regulations, labeling, promotional advertisements, and making claims about medical devices are deemed misleading if they fail to disclose certain information about the product's risks.[117]

419. Generally, to comply with the FDCA and FDA's implementing regulations, and therefore the PMA, such promotional pieces: (a) Cannot be false or misleading in any particular;[118] (b) Must reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in the promotional piece;[119] and (c) Must be about only approved intended uses.[120]

420. The FDA regulates the manufacture, sale, and distribution of medical devices in the United States under the authority of the FDCA. This authority includes oversight of labeling and advertising for all medical devices.[121]

421. A medical device shall be deemed to be misbranded if its labeling is false or misleading in any particular.[122] Labeling or advertising may be considered misleading if it fails to reveal material facts about the product being promoted, including facts about the consequences that can result from use of the product as suggested in a promotional piece.[123]

422. "In the case of any restricted device distributed or offered for sale in any State, if (1) its advertising is false or misleading in any particular, or (2) it is sold, distributed, or used in violation of regulations prescribed under section 360j(e)," the device may be deemed "misbranded."[124]

[117] Infuse® was initially approved as a combination medical product which contained a device (the LT-Cage) and a collagen sponge soaked with rhBMP-2 (a Biologic/Device). The FDA classified this combination product as a medical device. Medtronic often sold the collagen sponge soaked with rhBMP-2 (Biologic drug) separately from the LT-Cage (the device).
[118] Drugs and devices are misbranded under the Act if their labeling is false or misleading in any particular. 21 U.S.C. § 352(a) (2012).
[119] 21 U.S.C. § 321(n) (2012); 21 C.F.R. § 1.21(2012).
[120] 21 C.F.R. § 801.4 (2012).
[121] *See* 21 U.S.C. § 352(a), (n), (q), & (r) (2012).
[122] 21 U.S.C. § 352(a) (2012).
[123] *See* 21 U.S.C. § 321(n) (2012).
[124] 21 C.F.R. § 502 (q) (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

423. Advertisements for restricted devices must include "a brief statement of the intended uses of the device and relevant warnings, precautions, side effects, and contraindications…"[125]

424. Restricted device advertisements must not be false or misleading[126] and must reveal facts that are material about the product being advertised, including facts about the consequences that can result from use of the product as suggested in an ad.[127]

**8. General Reporting to The FDA is Required After the PMA Process**

425. A Medical device manufacturer's obligations do not end with the FDA's Premarket Approval ("PMA") process.

426. Even after premarket approval issues, manufacturers are required to report to the FDA "no later than 30 calendar days after the day: the manufacturer receive[s] or otherwise become[s] aware of information, from any source, that reasonably suggests that a device" marketed by the manufacturer:

(a) May have caused or contributed to death or serious injury; or

(b) Has malfunctioned and this device or a similar device [likewise marketed by the manufacturer] would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.[128]

427. In addition, manufacturers are required to make periodic reports to the FDA regarding approved devices, such reports to include summaries of:

(a) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant; and

(b) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant.[129]

428. Once the FDA has approved a medical device through the PMA application process (such

---

[125] *See* 21 U.S.C. § 352(r)(2) (2012).
[126] 21 U.S.C. § 352(q)(1) (2012).
[127] 21 U.S.C. § 321(n) (2012).
[128] 21 C.F.R. § 803.50(a); *see also* 21 U.S.C. § 360i(a) (further detailing the post approval reporting requirements applicable to device manufacturers).
[129] 21 C.F.R. § 814.84(b)(2).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

as Infuse®), the manufacturer/applicant is required to comply with the standards set forth in the PMA approval letter. "A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device."[130]

429. Under federal law, a medical device manufacturer has a continuing duty to monitor the product after premarket approval and to discover and report to the FDA any complaints about the product's performance and any adverse health consequences of which it became aware and that are or may be attributable to the product.

430. Following approval, a medical device manufacturer is required to report adverse events associated with the use of the product, *i.e.* those that may have caused serious injury or death or has malfunctioned and would likely cause or contribute to death or serious injury if recurred.[131]

431. The medical device manufacturer is required to report any incidents or information that reasonably suggests that the device: (a) "[m]ay have caused or contributed to a death or serious injury;" or, (b) "[h]as malfunctioned" in a manner that would likely "cause or contribute to a death or serious injury" if it recurred.[132]

432. "*Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary.* When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate."[133]

433. "*Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated*, unless such investigation has already been performed for a similar complaint and another investigation is not necessary."[134]

434. "Any complaint that represents *an event which must be reported to FDA* under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s)

[130] 21 C.F.R. § 814.80 (2012).
[131] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[132] 21 C.F.R. § 803.50(a) (2012); 21 U.S.C. § 360i(a) (2012).
[133] 21 C.F.R. § 820.198(b) (2012) (Emphasis added).
[134] 21 C.F.R. §820.198(C) (2012) (Emphasis added).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (a) Whether the device failed to meet specifications; (b) Whether the device was being used for treatment or diagnosis; and, (c) *The relationship, if any, of the device to the reported incident or adverse event.*"[135]

435. Another general reporting requirement for Class III Medical Devices after PMA approval is that the manufacturer is obligated to inform the FDA of new clinical investigations or scientific studies concerning the device about which the manufacturer knows or reasonably should know.[136]

436. Further, the FDCA subjects approved devices to reporting requirements.[137] For example, the manufacturer must update the FDA when it learns of investigations or scientific studies concerning its device[138], or incidents where the device used in any manner "[m]ay have caused or contributed to a death or serious injury," either due to malfunction or normal operation.[139] The FDA can revoke its approval based on these post-approval reports.[140] The manufacturer must establish internal procedures for reviewing complaints and event reports.[141]

437. Medical device manufacturers are required by federal regulation to "establish and maintain" an adverse event database.[142]

### 9. A Manufacturer Must Follow Current Good Manufacturing Practices

438. Under 21 C.F.R. § 820.1(a) (2012) of the Quality System (QS) Regulation for Medical Devices, current good manufacturing practice (cGMP) requirements are set forth in this quality system regulation. The requirements in this part govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use. The requirements in this part are intended to ensure that

---

[135] 21 C.F.R. §820.198(d) (2012) (Emphasis added).
[136] 21 C.F.R. § 814.84(b)(2) (2012).
[137] 21 U.S.C. § 360i (2012).
[138] 21 C.F.R. § 814.84(b)(2) (2012).
[139] *Id.* § 803.50(a) (2012).
[140] 21 U.S.C. §§ 360e(e)(1), 360h(e) (2012).
[141] 21 C.F.R. § 820.198(a) (2012).
[142] *See* 21 C.F.R. § 803.1(a) (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

finished devices will be safe and effective and otherwise in compliance with the FDCA. This part establishes basic requirements applicable to manufacturers of finished medical devices.

439. 21 C.F.R. § 820.5 (2012) "Quality Systems", the FDA regulations state, "Each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part."

440. 21 C.F.R. § 820.30(i) (2012): "Design controls" states (i) *Design changes.* Each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

441. 21 C.F.R. § 820.30(g) (2012): *Design validation* means establishing by objective evidence that device specifications conform with user needs and intended use(s) and "shall include testing of production units under actual or simulated use conditions."

442. 21 C.F.R. § 820.22 (2012): "Quality Audit" states: "Each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system."

443. 21 C.F.R. § 820.160(a) (2012): "Distribution" states: "**Each manufacturer shall establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed**" (Emphasis added). In other words, a manufacturer is only permitted to distribute a medical device that is approved. Therefore, if a medical device is going to be used for a use outside of the approved intended uses, then the manufacturer is not permitted to distribute it.

444. 21 C.F.R. § 820.170(a) (2012): "Installation" states: Each manufacturer of a device requiring installation shall establish and maintain adequate installation and inspection instructions, and where appropriate test procedures. Instructions and procedures shall include directions for ensuring proper installation so that the device will perform as intended after installation. The manufacturer shall distribute the instructions and procedures with the device or otherwise make them available to the person(s) installing the device.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

445. 21 C.F.R. § 803 (2012), states: Manufacturers must include information that is reasonably known to the manufacturer, timely make Medical Device Reporting ("MDR") submissions, define the procedures for implementing corrective and preventative actions, and review sampling methods for adequacy of their intended use.

446. 21 C.F.R. § 820.100 (2012) "Corrective and Preventive Action" states: (a) [e]ach manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

2) Investigating the cause of nonconformities relating to product, processes, and the quality system;

3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device; and

5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems.

**10. Violations of Federal Statutes or FDA Regulations Void the Federal Preemption Defense**

447. If a manufacturer markets a medical device for off-label uses that have not been approved by the FDA, then the manufacturer does not get the protection afforded to FDA approved medical devices by the medical advice amendment (MDA) (i.e. If it's not approved, its not protected).

448. To the extent, if any, the Infuse® PMA applies to its component parts, manufacturers that promote or distribute their products for "off-label" uses not only are not granted authority to do so by the FDA, but also are not afforded any of the protections or privileges of the FDCA or the MDA, including

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

preemption of any kind or immunity from liability.

449. In light of Medtronic's failure to disclose to the FDA all of the true, honest, valid scientific information concerning Infuse® and all of the components and parts, the warning approved by the FDA for "on-label", indicated uses was inadequate and harmful to Plaintiffs.

450. In light of Medtronic's promotion of "off-label" uses – the uses not set forth in the PMA as "intended uses" - the warning approved by the FDA for "on-label", indicated uses, was inadequate and harmful to Plaintiffs when they underwent an "off-label" use promoted by Medtronic. 21 U.S.C. § 352 (2012), 21 U.S.C. §§ 352(q), (r) (2012).

451. In the absence of federal approval of the new intended use(s), there is nothing to preempt state law requirements as the FDA has not reviewed, approved, or passed on those uses not set forth in the premarket application.

452. Medtronic's aggressive promotion of Infuse® for "off-label" non-approved uses and obfuscation of the true facts and increased risks and dangers of Infuse®, has led to widespread acceptance among spinal surgeons of such uses as these surgeons mistakenly relied on Medtronic to tell them the truth and/or not corrupt the science being published in peer-reviewed medical journals. Medtronic's promotion of Infuse® for "off-label" use substantially contributed to Plaintiffs' physicians' use of Infuse® because of these defendants' active promotion of that "off-label" use and corruption of the published literature. Plaintiff seeks to hold Medtronic liable for injuries that trace back to its illegal conduct.

453. The FDA has not approved the way in which Infuse® was used in the Plaintiffs as it was not set forth in the PMA and therefore it is not an "intended use" and therefore, there were no applicable federal regulations or need to establish a parallel claim.[143]

454. There is a presumption against federal preemption of state laws that operate in traditional state domains. "In all preemption cases, and particularly those in which Congress has 'legislated... in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest

[143] Plaintiffs' claims are premised, in part, on Medtronic's "off-label" promotion of Infuse® and the resulting injury. "Off-label" promotion violates federal law. 21 U.S.C. § 331(a) (effective 2013); 21 C.F.R. § 814.80 (2012).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

purpose of Congress.'"[144] Parties seeking to invalidate a state law based on preemption "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'"[145] "[T]he historic police powers of the State include the regulation of health and safety."[146] "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, and historically, ... matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'"[147]

455. "Nothing in § 360k denies [the states] the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements."[148]

456. As the Supreme Court held in *Riegel v. Medtronic, Inc.*, "State requirements are pre-empted under the MDA only to the extent that they are "different from, or in addition to" the requirements imposed by federal law. § 360k(a)(1). Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case "parallel," rather than add to, federal requirements."[149]

457. "The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of federal law that hurt patients is, to say the least, counter-intuitive."[150]

458. "Medical device manufacturers who subject their Class III devices to the rigorous premarket approval process are protected by federal law from civil liability so long as they *comply* with federal law. That protection does not apply where the patient can prove that she was hurt by the manufacturer's *violation* of federal law."[151]

459. Claims for failure to warn are not preempted. "Failure to warn claim is neither expressly

---

[144] *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).
[145] *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814, (1997).
[146] *Id.*
[147] *Medtronic v. Lohr*, 518 U.S. at 475.
[148] *Id.* at 495.
[149] *Riegel v. Medtronic*, 552 U.S. 312, 330 (2008).
[150] *Bausch v. Stryker Corp.*, 630 F.3d 546, 549-550 (7th Cir. 2010). See also *Bausch* quoted with approval by the 9th Circuit in *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013) (*en banc*).
[151] *Id.* at 550 (italicized emphasis original).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

nor impliedly preempted by the MDA to the extent that this claim is premised on [the defendant manufacturer]'s violation of FDA regulations with respect to reporting [adverse outcomes] caused by the device."[152]

460. "A claim that promotion of off-label use beyond the safe harbor was coupled with a failure to warn would not be preempted."[153]

461. "But we do hold, under *Lohr*, *Buckman*, and *Riegel*, that this claim is not preempted, either expressly or impliedly, by the MDA. It is a state-law claim that is independent of the FDA's pre-market approval process that was at issue in *Buckman*. The claim rests on a state-law duty that parallels a federal-law duty under the MDA, as in *Lohr*… [W]e conclude that the MDA does not preempt… state-law failure-to-warn claim[s]…"[154]

462. Likewise, claims for fraud are not preempted either. "… [T]he *Cipollone* Plaintiff's fraud claim… fell outside of the Labeling Act's pre-emptive reach…." Preemption "does not include the more general duty not to make fraudulent statements… We conclude, as we did in *Cipollone*, that the Labeling Act does not pre-empt state-law claims like respondents' that are predicated on the duty not to deceive."[155]

463. In a recent Federal District Court case regarding Infuse®, the court held that claims based on general state law duties are not preempted either. "*Lohr* and its progeny contemplate two types of "parallel" state-law claims that escape express FDCA/MDA preemption: (i) state-law claims that are premised on conduct that both violates the FDCA and is independently actionable under state law… and (ii) state-law claims that are premised on conduct that contravenes state-law duties of such generality as not to present any risk of interference with the federal medical-device regulatory scheme."[156]

464. The generality of state-law duty to warn claims was an important distinction in the Supreme Court's analysis in *Lohr v. Medtronic*. The Court wrote: "[T]he predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks

[152] *Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 776 (5th Cir. 2011)
[153] *Cornett v. Johnson & Johnson*, 998 A.2d 543 (N.J. App.Div. 2010).
[154] *Stengel v. Medtronic, Inc.*, 704 F.3d at 1226-27.
[155] *Altria Group, Inc., et al., v. Good Et al.*, 555 U.S. 70 (2008).
[156] *Alton v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 3:13-CV-409-PK at 42.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

involved in their use. Th[is] general obligation[ ][is] no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force.[157] The state-law duties upon which the Lohrs relied escape preemption "because their generality leaves them outside the category of requirements that § 360k envisioned to be 'with respect to' specific devices such as pacemakers."[158]

465. In another recent federal district court case regarding Infuse®, the court stated that if the manufacturer remained in compliance with the federal scheme and promoted only the uses anticipated by the PMA, the manufacturer has, to some extent, shielded itself from such state law claims. But the shield totally drops when the manufacturer violates federal law.[159] The court went on to say, "In the absence of federal approval of the new use, there is nothing to preempt state law requirements. And in light of the limited breadth courts afford a preemption defense, §360k should not be read as a broad assertion of exclusive federal power over all things having to do with medical devices. Section 360k does not foreclose [Plaintiff]'s state law theory."[160]

466. In *Stengel v. Medtronic, Inc.*, the Supreme Court issued an Order inviting the Solicitor General to submit an Amicus Brief expressing the views of the United States. According to the Solicitor General, only device-specific federal requirements have preemptive force while "by contrast FDA's general manufacturing and labeling regulations do not have preemptive force."[161]

467. Citing *Lohr*, the Solicitor General stated that "federal requirement[s] are applicable to the device within the meaning of Section 360k(a)(1) only when they are applicable to the device in question… and, in accordance with FDA regulations, only when they are specific counterpart regulations or specific to a particular device."[162]

468. This reasoning led the Solicitor General to the conclusion that "[i]f a state requirement were preempted absent a specific federal requirement that reflects FDA's weighing of competing considerations on the same subject and specific to the device (or type of device), the MDA would have

157 *Lohr v. Medtronic, Inc.*, at 501–02.
158 *Id.* at 502.
159 *Ramirez v. Medtronic, Inc.*, 2013 U.S. Dist. LEXIS 118822 at 36-38.
160 *Id.* at 38.
161 U.S. Amicus Br. at 9, *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1226 (9th Cir. 2013).
162 Id at 8-9 (internal citations omitted).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

the ironic effect of providing less public protection from unsafe and ineffective medical devices that pre-MDA law.[163]

469. In *Stengel,* and similarly in this complaint, the alleged conduct of the petitioner was governed by *general manufacturing and labeling regulations* applicable to all medical devices and *not the device's pre-market approval*.

470. It is the opinion of the Solicitor General that respondents' failure to warn claims escaped express preemption because "such a claim implicates no preemptive device-specific federal requirement."[164]

471. The Solicitor General reasoned that Petitioner had a duty, post PMA approval, to update their label pursuant to 21 C.F.R. 814.39(d)(2)(i)-(iii), which requires a manufacturer to strengthen the warnings on their label to reflect newly acquired safety information.[165]

472. This line of reasoning also led to the conclusion that respondent's failure to warn claim did not implicate *Buckman* as there was no indication that such a claim would be impliedly preempted.

473. In summary, while manufacturers who *comply* with federal law may be entitled to certain protections, those who *violate* federal law are not entitled to preemption of state laws/immunity for their tortuous conduct and in fact are liable for their conduct that violates federal law. The idea that Congress would have granted civil immunity to medical device manufacturers for their violations of Federal law that hurt patients is to say the least, counter-intuitive.

474. Essentially, if a manufacturer does not abide by the federal requirements, it is not protected by them.[166]

## E. THE HISTORY OF FDA'S APPROVAL OF INFUSE®

### 1. The FDA Advisory Committee's Concerns Regarding Off-Label Uses

475. The FDA Advisory Committee hearing involving the initial Pre-Market Approval of

---

[163] Id at 11 (internal citations omitted).
[164] Id. at 7.
[165] *See Id.*
[166] The promotion of Infuse® for unapproved uses is akin to promoting a device that has never been approved by the FDA and therefore those unapproved uses cannot be protected by the FDA regulations since they have not received FDA approval.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Infuse® took place on January 10, 2002.

476. The transcript of the hearing makes it clear that the principal concern of the Committee members was that Infuse® *should not be* used in a manner or for uses contrary to the application made by Medtronic for its PMA.

477. Several Committee members expressed profound concern that the use of Infuse® through an approach other than anterior would potentially cause exuberant growth of bone into the spinal canal, thus ossifying the neural elements of the spine and injuring the patient in a significant number of cases. Additionally, Committee members expressed concern regarding the potential cancer risk associated with Infuse®.

478. According to the FDA official transcript of the Committee meeting leading to the initial approval of Infuse® for ALIF procedures only, Committee Member Stephen Li, Ph.D., remarked that nine (9) clinical investigators with a financial interest in the product had reported success with Infuse® more often than investigators without financial interest "almost by a factor of two." The identity of these investigators is not apparent from the transcript.[167]

479. Medtronic's secret agents, Thomas A. Zdeblick, M.D., Hallett Matthews, M.D.,[168] and Scott Boden, M.D., three of Medtronic's most highly paid consultants and royalty recipients, were present and testified on behalf of Medtronic at the hearing.

480. Agents Zdeblick, Matthews and Boden assured the Committee (particularly through Medtronic's secret agent Scott Boden, M.D.) that the only approval sought, *i.e.*, use of Infuse® for the single level lumbar anterior approach, would prevent leakage of the BMP into the neural elements of the spine.[169]

---

[167]Orthopedics and Rehabilitation Devices Advisory Panel, at page 306, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http%3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=YaDuUfXnM5DhiwLaroCgCw&usg=AFQjCNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gwh4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").

[168] John Fauber, *Medtronic Helped Write, Edit Positive 'Infuse' Spine Studies*, Milwaukee Journal Sentinel/MedPage Today (October 2012), *available at* http://www.medpagetoday.com/PainManagement/BackPain/35551 (also attached hereto as Exhibit "L").

[169] Orthopedics and Rehabilitation Devices Advisory Panel, at page 78, (Jan 10, 2002), *available at* http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDQQFjAB&url=http%3A%2F%2Fwww.fda.gov%2Fohrms%2Fdockets%2Fac%2F02%2Ftranscripts%2F3828t1.doc&ei=YaDuUfXnM5DhiwLaroCgCw&usg=AFQj

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

481. During the hearing, panel member Dr. Hanley questioned the sponsored physicians regarding "off-label" use and asked, *"[w]e have one question and that relates to one of those letters that was read earlier about putting the BMP adjacent to the nerve for a posterior approach. It doesn't relate to the indication being sought for here but any comments from people on that?"* [170]

482. Medtronic's secret agent Scott Boden, M.D., dismissed this concern by responding:

> *[o]bviously, the risks and complications of the device are that of the surgery, the insertion of the cage and what's inside the cage, and this specific application before the panel today is through an anterior approach, either an open or a laparoscopic and to talk about safety issues that are related to a different surgical approach seems to me to be outside the scope of what we ought to be focusing on today.*[171]

483. At the time of this hearing, Medtronic's secret agent Thomas A. Zdeblick, M.D. was a consultant for Medtronic, making $400,000 per year for eight (8) days of consulting (not including "royalties" he received from Medtronic).

484. At the time of this hearing, Medtronic's secret agent Scott Boden, M.D. was receiving at least $100,000 per year in consulting fees from Medtronic (not including "royalties" he received from Medtronic).

485. At the time of this hearing, Medtronic's secret agent Hallett Mathews, M.D. was making an average of at least $250,000 per year in consulting fees from Medtronic.

486. At the time of this hearing, Medtronic's secret agents Dr. David Polly, J. Kenneth Burkus, M.D., and Charles Branch, M.D. were all listed by Medtronic as *resources* for this hearing, and were presumably present, but did not speak (all received significant consulting and/or royalty payments from Medtronic) as discussed herein supra.

487. Six months following the initial hearing, the Committee on July 2, 2002, voted to approve Infuse®, *but only with the tapered LT-Cage in a single level lumbar anterior approach.* Any surgical approach other than the anterior requires the posterior barrier to the spinal canal to be intentionally compromised and such was not approved.

---

CNFVP4BHeX9LJOkYgyQCMXcnz8EuMQ&sig2=QLM5gwh4Z9143xAkeCxgcw&bvm=bv.49478099,d.cGE (also attached hereto as Exhibit "K").

[170] *Id.* at 255-56.

[171] *Id.*

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

488. Following obtaining the FDA approval of Infuse® for a specific intended use, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. actively worked to promote "off-label" uses of Infuse® as well as worked to promote the use of rhBMP-2/collagen sponge single component of Infuse® without the second component in a manner contrary to the restrictions in the Infuse® PMA.

489. During such period of time, Medtronic's secret agents Scott Boden, M.D., Thomas A. Zdeblick, M.D. and J. Kenneth Burkus, M.D. failed to make adequate, if any, disclosures of their relationship with Medtronic or compensation they received from Medtronic.

490. During such period of time, the FDA approved use of Infuse® only had an extremely small share of the fusion market.

491. Medtronic's secret agent Scott Boden, M.D. received compensation from Medtronic between 1996 and 2010 of $28,796,034.00.

492. During such period of time, Medtronic's secret agent Scott Boden, M.D. wrote extensively on the use of Infuse® in "off-label" procedures, including the use of rhBMP-2/collagen sponge single component of Infuse® combined with Class II surgical cages, even though these Class II surgical cages have never been tested or approved for use with a biologic.

493. By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. wrote that when Infuse® is used "off-label", including the use of rhBMP-2 without the LT-Cage™, it is likely to be effective, even for uses and in a manner contrary to the Infuse® PMA. His article in *Orthopedic Nursing*, also praises the benefits of the product, noting that while rhBMP-2 "is quite expensive, [its] potential to lessen morbidity, accelerate healing and provide more consistent results undoubtedly justify these costs in appropriately selected patients."[172]

494. By way of example and not limitation, Medtronic's secret agent Scott Boden, M.D. along with Drs. Paul A. Anderson, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in the *Journal of Bone and Joint Surgery* article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of rhBMP-2/sponge in an "off-label" Posterolateral

[172] Scott Boden, *The ABC's of BMPs*, 24 Ortho. Nursing, 49-52 (2005) (attached hereto as Exhibit "M").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Fusion procedure, contrary to the ALIF approach approved by the Infuse® PMA. According to the authors, the study reported that rhBMP-2 improved fusion rates when used in combination with iliac crest bone graft in an unapproved procedure in which the rhBMP-2 was wrapped around local bone as a bulking agent. According to the authors, the study's findings suggested that "the current [Infuse] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft."[173]

495. During such period of time, Medtronic's secret agent Thomas A. Zdeblick, M.D., the Chairman of the Department of Orthopedics and Rehabilitation at the University of Wisconsin, failed to properly disclose his financial relationship with Medtronic.

496. The only disclosure made by Medtronic's secret agent Thomas A. Zdeblick, M.D. were annual payments exceeding $20,000 in University conflict of interest forms when, in truth and in fact, he actually received between $2.6 and $4.6 million <u>per year</u>.

497. Medtronic paid their secret agent Thomas A. Zdeblick, M.D. an annual salary of $400,000 under a contract that only required him to work eight (8) days per year.[174]

498. Medtronic's secret agent Thomas A. Zdeblick, M.D. received $34,168,739.81 from Medtronic between 1996 and 2010.[175]

499. Medtronic's secret agent Thomas A. Zdeblick, M.D. also has been a significant contributor to Medtronic's promotion of Infuse® and/or "Unapproved Device", authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of "off-label" uses of Infuse®, as well as BMP, the BMP/Sponge and/or use in combination with Class II medical devices, untested FDA-approved for such purposes.

500. Only a few months after Infuse® was approved, Medtronic's secret agent Thomas Zdeblick, M.D. authored a 2003 paper where he declared that BMP could become "the new gold

---

[173] Scott Boden et al., *What's New in Spine Surgery*, J Bone Joint Surg Am. 92(10):2017-28 (2010) (also attached hereto as Exhibit "N").

[174] *Medtronic Paid Researcher More than $20,000 – Much More,* The Wall Street Journal (Jan 16, 2009), *available at* http://online.wsj.com/article/SB123206035479087601.html (also attached hereto as Exhibit "O").

[175] U.S. Senate, Committee on Finance, *Staff Report on Medtronic's Influence on Infuse Clinical Studies,* at 5, S. Prt. 112-38 Washington: U.S. Government Printing Office (October 2013), *available at* http://www.finance.senate.gov/newsroom/chairman/release/?id=b1d112cb-230f-4c2e-ae55-13550074fe86 (also attached hereto as Exhibit "P").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

standard" in spine surgery and added that it was being used "exclusively" at his institution. The paper was published in the *Journal of Spinal Disorders & Techniques*, where Zdeblick is the editor-in-chief, but failed to mention that Dr. Zdeblick received significant royalties on the Medtronic LT-Cage, which is the second component of Infuse®.

501. On the website, www.Back.com, which is owned and operated by Medtronic, Medtronic's secret agent Thomas A. Zdeblick, M.D. describes the advantages of BMP and appears in an online video discussing the benefits of BMP which he claims includes no adverse events. Conspicuously, the video only discusses spinal surgery from the *posterior* approach of the spine, a procedure contrary to the restrictions in the Infuse® PMA, and fails to discuss or provide any merit to the approved approach. In this video, Medtronic's secret agent Thomas A. Zdeblick states, " we looked at the safety concerns with Infuse® very carefully and did not find any adverse events, it's a naturally occurring protein and well accepted by patients." (Emphasis added)

502. Medtronic's secret agent J. Kenneth Burkus, M.D., is an orthopedic surgeon and a self-described "consultant" for Medtronic.

503. Medtronic's secret agent J. Kenneth Burkus, M.D. received $6,380,336.83 from Medtronic between 1996 and 2010.[176]

504. During such period of time, Medtronic's secret agent J. Kenneth Burkus, M.D. was the lead author of four of the original thirteen studies of Infuse® sponsored by Medtronic.[177]

505. All of the studies by Medtronic's secret agent J. Kenneth Burkus, M.D. failed to report any of the observed adverse events that were subsequently revealed by a recent independent review of his data and the publication of the misleading and false results discussed hereinafter.

---

[176] *Id.*

[177] Burkus JK, Gornet, MF, Dickman CA, Zdeblick TA, *Anterior lumbar interbody fusion using rhBMP-2 with tapered interbody cages,* J. Spinal Disord. Tech, 2002; 15:337-49; Burkus JK, Transfedlt EE, Kitchel SH, et al. *Clinical and radiographic outcomes of anterior lumbar interbody fusion using recombinant human bone morphogenetic protein-2*, Spine 2002; 27:1219-24; Burkus JK, Sandhu HS, Gornet MF, Longely MC, *Use of rhBMP-2in Combination with Structural Cortical allografts surgery: clinical and radiographic outcomes in anterior lumbar spinal fusion,* J. Bone Joint Surg. Am. 2005;87:1205-12; and Burkus JK, Heim SE, Gornet MF, Zdeblick TA, *Is INFUSE bone graft superior to autograft bone? An integrated analysis of clinical trials using the LT-CAGE lumbar tapered fusion device,* J. Spinal Tech. 2003;16:113-22. (also attached hereto as Exhibit "Q").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

### 2. FDA Restricted the Approved Use Due to Safety Concerns

506. The FDA reviewed Infuse®'s safety and effectiveness only for the uses Medtronic specified in its PMA application, and the regulations are premised on that specific review.[178]

507. As presented in Medtronic's original PMA application, which was eventually approved by the FDA on July 2, 2002, Infuse® consists of two components: (1) the tapered LT-CAGE Lumbar Tapered Fusion Device Component, a thimble-sized hollow metal cylinder that keeps the vertebrae in place and provides a frame that contains and directs the development of new bone growth; and (2) The Infuse® Bone Graft Component, which includes an Absorbable Collagen Sponge ("ACS") that acts as a carrier and scaffold for the active ingredient in Infuse®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the ACS.

508. Although these two components are sold separately, the initial approved labeling for the product indicates that Infuse® requires both components.

509. The approved labeling for the product reads in part with bold and underlined formatting: **"These components <u>must</u> be used as a system. The Infuse® Bone Graft component <u>must not</u> be used without the LT-Cage Lumbar Tapered Fusion Device component."**[179] (Emphasis added).

510. The labeling also directs the specific manner in which both components are to be used in a fusion procedure.

511. Infuse® was initially approved by the FDA for exclusive use in the lower lumbar region of the spine (at levels L4 through S1), via an anterior approach (where the spine is approached by going in through the patient's abdomen), and only at one level per surgery.[180]

512. Infuse® was **NOT** approved for any other surgical approach or for use in any other

---

[178] 21 U.S.C. § 360c(a)(2) (stating that the FDA measures the "safety and effectiveness of a device… with respect to the conditions of use prescribed, recommended, or suggested in the labeling of the device, and weighing any probable benefit to health from the use of the device against any probable risk of injury or illness from such use."); id. § 360e(c)(1) (2012).

[179] Infuse® Label, *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058c.pdf (also attached hereto as Exhibit "C").

[180] The FDA approval letter specifically states, "[t]his device is indicated for spinal fusion procedures in skeletally mature patients with degenerative disc disease (DDD) at one level from L4-S1…InFUSE™ Bone Graft/LT-CAGE™ devices are to be implanted via an anterior open or an anterior laparoscopic approach," Approval Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), Exhibit 1 *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

region of the spine.[181]

513. The original PMA Approval Letter, dated July 2, 2002, from the FDA to Richard Treharne, Ph.D., Senior Vice President of Regulatory Affairs, provides in part that the approval of Infuse® is strictly limited as follows:

> The sale, distribution, and use of this device are restricted to prescription use in accordance with 21 C.F.R 801.109 within the meaning of section 520(e) of the Federal Food, Drug, and Cosmetic Act (the act) under the authority of section 515(d)(1)(B)(ii) of the act. FDA has also determined that, to ensure the safe and effective use of the device, **the device is further restricted within the meaning of section 520(e)** under the authority of section 515(d)(1)(B)(ii), (1) insofar as the labeling specify the requirements that apply to the training of a practitioners who may use the device as approved in this order and (2) **insofar as the sale, distribution, and use must not violate sections 502(q) and (r) of the act**.[182] (Emphasis added).

514. The PMA Approval Letter also provides, in part, as follows:

> [i]n addition to the post-approval requirements outlined in the enclosure, you have agreed to provide the following data in a post approval report: 1. In order to assess the long-term performance of the InFUSE™ Bone Graft/LT-CAGE™ Lumbar tapered Fusion Device, please conduct a post-approval study to obtain a total of 6 years of postoperative data from a statistically-justified number of patients implanted with this device…2. Because of unknown long-term device performance, particularly the resulting bony fusion characteristics, the post approval study should also contain retrieval analyses of any InFUSE™ Bone Graft/LT-CAGE™ Lumbar Tapered Fusion Device that is implanted and subsequently removed. This section is not limited to the patient population as described in item 1 above…3. Perform post-approval studies, which assess the effects of rh-BMP-2 on tumor promotion…4. Perform post-approval studies to investigate the potential for an immune response to rhBMP-2 to interfere in embryonic development in rabbits. Observation from this investigation may indicate a necessity to create a pregnancy monitoring database and/or modify your labeling.

515. The PMA was accompanied by an attachment setting forth the general "Conditions of Approval."

[181] Although the Infuse® label remains substantially the same as that approved by the FDA in 2002, the FDA did make minor adjustments to the label through post-approval supplements and the granting of additional PMAs. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-Sl to L2-Sl. The BMP/Sponge combination device Infuse® was also approved by the FDA to be used in maxillofacial dental procedures on March 9th, 2007 and in April of 2004 for repair of tibial fractures (See Exhibits 11 and 12). These uses represent a relatively minor percentage of the product's overall sales.

[182] Letter from the FDA to Medtronic Vice President Richard Treharne, Ph.D. regarding PMA Approval (July 2, 2002), *available at* http://www.accessdata.fda.gov/cdrh_docs/pdf/P000058a.pdf (also attached hereto as Exhibit "B"); It should be noted that Infuse® was approved as a "restricted device" within the meaning of the ACT.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

516. These general conditions (applicable to all Class III approved devices during 2002) require that Medtronic submit a PMA supplement for increased or unanticipated adverse events. "A PMA supplement must be submitted when unanticipated adverse effects, increases in the incidence of anticipated adverse effects, or device failures necessitate a labeling, manufacturing, or device modification."[183]

517. These general conditions also require that Medtronic submit a PMA supplement if the device is modified, including expanding its intended uses. "A PMA supplement must be submitted if the device is to be modified and the modified device should be subjected to animal or laboratory or clinical testing designed to determine if the modified device remains safe and effective."

518. These general conditions require Medtronic to provide a 'Special PMA Supplement – Changes Being Effected.'

519. These general conditions specify that such supplement "is limited to the labeling, quality control and manufacturing process changes specified under 21 C.F.R. 814.39(d)(2) (2012). It allows for the addition of, but not the replacement of previously approved, quality control specification and test methods. These changes may be implemented before FDA approval upon acknowledgment by the FDA that the submission is being processed as a 'Special PMA Supplement – Changes Being Effected.' This procedure is not applicable to changes in device design, composition, specifications, circuitry, software or energy source." [184]

520. The general "Conditions of Approval" section of the PMA also sets forth in part that "[c]ontinued approval of this PMA is contingent upon submission of post-approval reports required under 21 C.F.R. 814.84 (2012) at intervals of 1 year from the date of approval of the original PMA." [185]

521. Such post-approval reports must include "a. unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices ("related" devices includes devices which are the same or substantially similar to the applicant's device); and b. reports in the scientific literature concerning the device." [186]

---

[183] Approval Letter, Exhibit B.
[184] *Id.*
[185] *Id.*
[186] *Id.*

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

522. Additionally, the FDA PMA contains requirements concerning Medtronic's reporting of adverse reactions and device defect.

523. Medtronic, pursuant to the general conditions of approval, is required to provide the FDA within 10 days of receiving or having knowledge of information concerning: "[a]ny adverse reaction, side effect, injury, toxicity, or sensitivity reaction that is attributable to the device and; a. has not been addressed by the device's labeling; and b. has been addressed by the device's labeling but is occurring with unexpected severity or frequency."[187]

524. The general "Conditions of Approval" section of the PMA provided, in part that Medtronic must comply with The Medical Devices Reporting Regulation and "report to the FDA whenever they receive or otherwise become aware of information, from any source, that reasonably suggests that a device marketed by the manufacturer or importer: 1. May have caused or contributed to a death or serious injury; or 2. Has malfunctioned and such device or similar device marked by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."

525. The PMA for Infuse® was expressly conditioned upon Medtronic's compliance with and satisfaction of the above general conditions and requirements.

526. The FDA made clear in the PMA that "**[f]ailure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act**." (Emphasis added).

527. Neither Infuse®, nor any of its component parts, has ever been approved by the FDA for use in other parts of the spine, or for use in any other type of spinal procedure.[188] Therefore, all other uses are "off-label" and unapproved uses.

---

[187] *Id.*

[188] As further discussed herein, the FDA, in March of 2011, rejected Medtronic's application for Amplify, which is another rhBMP-2 bone growth protein used in Infuse® *see* Russolillo, Steven, *FDA Rejects Medtronic Spine Device,* Wall Street Journal (March 2012) http://online.wsj.com/article/SB10001424052748704823004576192593075897446.html; (also attached hereto as Exhibit "R")(emphasis added); Amplify contained three times the amount of rhBMP-2 found in Infuse®. The FDA reviewers stated "[t]he primary safety concern is the increased numbers of cancer events in patients treated with Amplify compared to the control group." Richwine, Lisa, *FDA staff: Cancer a concern with Medtronic device*, Reuters (July 2010), attached hereto s Exhibit 29, also *available at* http://mobile.reuters.com/article/healthNews/idUKTRE66M2U820100723 (also attached hereto as Exhibit "S").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

528. Physicians may use FDA-approved medical devices in any way they see fit, but the manufacturer is not permitted to promote in any way a medical device for uses other than the "intended uses" as set forth in the PMA application.

529. The promotion by a medical device manufacturer for any "off-label" or unapproved uses for its devices, or payment to doctors as inducements or kickbacks for promotion of "off-label" uses, is strictly unlawful and in violation of the PMA and federal regulations.

530. Medtronic has aggressively over-promoted, as well as induced, uses other than "indicated uses" of the component parts of Infuse®.

531. Such over-promotion for uses other than "indicated uses" was a violation of the "CONDITIONS OF APPROVAL."

**3. <u>After</u> PMA Approval, Medtronic Published a False "Fact Sheet"**

532. <u>Following</u> the FDA approval of Infuse® restricting its use, Medtronic published a "Fact Sheet". The Fact Sheet falsely represented, in part, the following:

> **Fact Sheet**
>
> ***Infuse® Bone Graft/LT-CAGE®*** Lumbar Tapered Fusion Device… Spinal fusion surgery with INFUSE® Bone Graft and the LT-CAGE® Device **is essentially the same as traditional autograft procedures**, without the need for the additional surgery to harvest bone from the patient's hip. **Scientists determined** that rhBMP-2, with an absorbable collagen sponge as the carrier, (Infuse® Bone Graft) **is an effective replacement for autograft bone in spinal fusion surgery**. This conclusion is **based on data resulting from a large-scale, multi-center, prospective, randomized, two-year study** involving 279 degenerative disc disease patients implanted with Infuse® Bone Graft and the LT-CAGE® Lumbar Tapered Fusion Device. The **study assessed the safety, efficacy** and therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complications** that would require follow-up visits…[189] (emphasis added).

533. In the "Fact Sheet" Medtronic made representations that Infuse® is essentially the same as autograft procedures.

534. In the "Fact Sheet", Medtronic states: "The **study assessed the safety, efficacy** and

[189] Medtronic, Fact Sheet (2002) *available at* <u>*http://www.medtronic.com/downloadablefiles/InFuse - InFuse Therapy Fact Sheet.pdf*</u> (also attached hereto as Exhibit "A")(Emphasis added).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

therapeutic benefits of the new procedure as compared to traditional autograft procedures… The data showed that the study met all of its primary endpoints… Long-term cost offsets (within two years of surgery): **Significantly fewer complications** that would require follow-up visits…"[190].

535. Medtronic does not reveal that its employees significantly altered the printed/reported results of those "studies" to reflect better outcomes for the BMP/Sponge, and worse outcomes for the alternative procedures, than what was in truth observed.

536. Nor did Medtronic disclose that **these "scientists" were extremely highly compensated** by Medtronic to the tune of millions and, in some cases, tens of millions of dollars, or that Medtronic employees actively edited, participated in the creation of, and/or **ghostwrote the text used in the published study**.

## F. INFUSE® USES OTHER THAN PMA APPROVED ARE "OFF-LABEL"

### 1. Description of "On-label" and "Off-Label" Infuse® Uses

537. To be considered an on-label use, Infuse® must be applied as follows: (a) BMP is impregnated on a supplied absorbable collagen sponge that is inserted inside an FDA approved Medtronic cage – THE L-T CAGE[191]; (b) This cage is placed via anterior approach; (c) Only a single level is fused; and (d) The fusion is performed between the L2 and S1 levels of the spine.

538. If any one of these criteria is violated, the FDA has not approved the use of Infuse® or any of its components.

539. The off-label use of Infuse® is outside the scope of the FDA's approval.

540. There are many ways in which the components of Infuse® may be used for a use or in a manner unapproved by the FDA.

541. Generally speaking, BMP can be placed in three locations: inside an interbody cage,

---

[190] *Id.*

[191] The FDA has only approved the LT-CAGE Lumbar Tapered Fusion Device (LT-Cage) and the Inter Fix Threaded Fusion Device for use with Infuse® in Spinal Fusions, *see* http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=2344 (also attached hereto as Exhibit "T"); The FDA also approved Mastergraft with the use of Infuse® for a humanitarian exception which was later withdrawn at the request of Medtronic in 2010, *available at* http://www.fda.gov/medicaldevices/productsandmedicalprocedures/deviceapprovalsandclearances/hdeapprovals/ucm161827.htm (also attached hereto as Exhibit "U")(Emphasis added).

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

surrounding the cage within the disc space, and along the posterior elements of the spine.

542. Only the approved LT-Cage can be used; therefore, the use of any other cage constitutes an FDA-unapproved use of Infuse® and its components.

543. There are numerous models of cages manufactured by a variety of companies. An incomplete list of the most noted "off-label" models includes cages manufactured by Medtronic, DePuy Lordotic Cages, Stryker Interbody Fusion Cages, NuVasive Spine Cages, and Zimmer Interbody Fusion PEEK Cages.[192] These are all Class II devices that have not been approved for use with the BMP component of Infuse®.

544. If Infuse® is directly placed in the space between two vertebrae, the surgeon's operative report will commonly refer to placing BMP in the anterior disc space prior to inserting a cage. Similarly, BMP can be applied laterally or posteriorly to the cage after insertion of the cage.

545. The surgeon has a number of choices when selecting a surgical approach for cage insertion in an interbody fusion. The most common of these are the anterior approach, the posterior approach, the transforaminal approach, and the extreme lateral approach.

546. When adopting an anterior approach, the surgeon makes an incision in the abdomen with

[192] Per Counsels' investigation, additional cages including but not limited to the following cages: Allograft Strut; Alphatec; Alphatec Novel; Alphatec PEEK; Alphatec Spine; Alphatec Zodiak; Altiva ArcTec LT; AVS Interbody; Axial Cage; AxiaLIF Cage; BAK; Bak Titanium Cage; Banana; Bengal Cage; Biomechanical Cage; Biomet PEEK; Biomet Solitaire PEEK; Blackstone; Blackstone PEEK Cage; Boomerang; Brantigan Carbon Fiber Cages; Bullet; Carbon Bullet Cage; Clydesdale Cage; Concord; Cornerstone; CoRoent; Crescent; Crosslink Medium; Custom Machine Biomechanical Femoral Allograft Prosthetic Space; Depuy; Depuy Acromed; DePuy Acromed Cage; DePuy Allograft Spacers; DePuy Anterior Lordotic Carbon Fiber Cages; DePuy Carbon Fiber Cage; Depuy Concode Bullet Cage; DePuy Cougar; DePuy Leopard; DePuy Lordotic Cage; Depuy Saber – PEEK; Femoral Ring Allograft; Geo; Global; Globus; Graftech Anterior Ramp; Harms Cage; Hollywood Interbody Fusion Device; HSR Graft; Hydrasorb Type Spacer; IC Graft Chamber; Implex; Infinity; InFix Innovasis X Box Cages; Innovasive; Innovation PEEK; Ionic; Ladotic; LANX Cage; Laris-Is Anteliys GX PEEK; LDR ROA Cage; Leftnet; Legacy; Life Spine Spacer & Biomet Biologics Spacer; LifePlan Health VG2P; Linxx Peek; Long Vuc-Pod Cages Loop TLIF Cage AMT Loop Interbody Cages; Mesh Cage; Mobis PEEK Spacer; Novel; Nutech; NuVasive; Nuvasive Spine Wave; Nuvasive STD; Synthes CCALIF Biomechanical Device; Ocelot Cage; ODC Implant; Perimeter Cage; Pioneer Bullet; Pyramesh; Rabea 5 Peek; Rattlesnake-Eminent; Ray Cage; Redmed PEEK; Regeneration Tech Threaded Bone Dowel; RTI Biologics Cage; Scientx; Sea Spine PEEK Spacers Seaspine Hollywood; Shadow Mesh; Signature Peak; Signus Tetrus; SinMesh Interbody Cage; Sofamar Boomerang II; Sonoma; Sovereign Cage; Spinal USA Titanium; Spine Frontier; Synthes CCALIF; Spine Metrics PEEK Spacer; Spine Wave Expandable Cage; Spine Wave XD Cartridge; Spinefrontier S-LIFT PEEK Cage; Spineology; Spinewave Staxx XD Cartridge; StaXx - D PEEK Expandable Cage; Stryker; Synfix; Synthes OPAL; Synthes PEEK; T Lift; Tangent; Telemon; Tetris; Theken Interbody Cage; Theken Spine Non-Tapered Cage; Thekenspine Nontapered Cage; Thekon PEEK Spacer; Threaded Bone Dowell; Titan; Titan Endoskeleton; USA Cage System; Ventura;Versa Trac P Cage; Verte Stack; VG2C Lifenet Health; Vitoss; X Core Expandable XLIF Cage – Nuvasive; X2 Crescent PEEK; Zero-P Synthes Spacer; Zimmer Parallel Slotted; Zimmer Ardis P; Zimmer BAK; Zimmer Lucent; and Zimmer PEEK.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

the patient in a supine (face-up) position. He or she proceeds to insert the cage through the retroperitoneal space to the front face of the spine. Spinal fusions that use a cage and adopt an anterior approach are called "anterior lumbar interbody fusions" or "ALIFs." When combined with the three other criteria, this is the **only** approach that will constitute an **on-label** procedure.




547. A cage (other than the LT-Cage) can be inserted via a posterior approach when an incision is made in the back with the patient in the prone position (faced down). The cage is then implanted into the interbody space from the back face of the spine. This kind of fusion is called a "posterior lumbar interbody fusion" or "PLIF." This is an "off-label" use of Infuse®.




548. A cage (other than the LT-Cage) can be inserted from either the right or left face of the spine by modifying the PLIF. These fusions are called "transforaminal lumbar interbody fusions" or "TLIFs." A TLIF is accomplished by creating an incision in the back, reaching around the side of the spine, and inserting the cage from either the left or the right. This is "off-label" use of Infuse®.

549. An additional procedure is also considered to be "off-label" when Infuse® is applied

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

along the posterior or posterolateral elements of the spine, including the facet joints, posterolateral gutters, and transverse processes. When Infuse® is placed in any of these posterior elements the surgery is called a "posterior" or "posterolateral" fusion (PLF), and no cage is used.




550. In fact, any use of Infuse®, or any use of its components, separately, not set forth in the premarket application as the "intended uses" and thereafter approved by the FDA in any of the PMAs, or PMA Supplements, is an "off-label" use or is simply use of a medical device never reviewed or approved by the FDA.

551. The spine consists of four general regions, cervical (neck), thoracic (chest), lumbar (low back), and sacral (lowest portion of the spine). Each region consists of individual vertebra which are described as "levels." These levels are numbered, with lower values corresponding to the vertebra that lay higher on the spine.

552. The cervical spine consists of seven levels, designated C1-C7. The thoracic spine consists of twelve levels, ranging from T1-T12. The lumbar spine usually consists of five vertebras, ranging from L1-L5. The sacrum is a structure immediately below the lumbar spine and consists of two levels, S1 and S2.

553. To be considered an on-label use, Infuse® must be applied at only one level, from L2-S1 in the lumbar or lumbosacral spine.

554. If Infuse® is used in more than one level, or outside L2-S1, then the FDA considers the procedure to be "off-label" and/or used with a medical device never reviewed or approved by the FDA.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

**2. Medtronic's Breach of its Duty Seek a Supplemental PMA**

555. Medtronic did not seek a post-approval supplement to its PMA or a new PMA to add additional intended uses or have additional components approved for use with the BMP.

556. Medtronic did not seek such a post-approval supplement or new PMA because it wanted to avoid the lengthy and time-consuming process.

557. Medtronic did not seek such a post-approval supplement because it knew the science would not support its application.

558. Medtronic knew or had reason to know, based upon the results of prior Medtronic-sponsored clinical studies of "off-label" uses (which were abruptly terminated as a result of observed complications), that "off-label" uses would be neither safe, nor effective.

559. Medtronic knew or had reason to know, for that reason, a supplemental PMA or new PMA would be rejected.

560. Instead, Medtronic engaged in very active and concerted efforts to market, promote, and sell the components of Infuse® "off-label" and/or marketed, promoted, and sold the components of Infuse® in combinations which were medical devices separate and distinct from Infuse® which had never been approved.

561. In undertaking such effort, Medtronic totally disregarded the increased risks, dangers, and complications that Medtronic knew or should have known were associated with "off-label" and/or unapproved uses of the components of Infuse®**.**

562. Medtronic did not notify the FDA of the "off-label" and unapproved uses, as required by federal law.

563. Medtronic did not track and report the adverse events associated with the "off-label" and unapproved uses, as required by federal law.

564. Medtronic did not seek to strengthen or increase the labeling to warn of the known and/or knowable dangers associated with "off-label" and/or unapproved uses of Infuse®**'s parts and components,** as required by federal law.

565. Medtronic did not file a PMA Supplement to seek approval for these unapproved devices

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

and their use.

566. Medtronic did not file a new PMA application for such uses, as required by federal law.

567. Medtronic did not discontinue sales of devices when it knew, or had reason to know, such devices were intended for purposes unreviewed and unapproved by the FDA.

568. Contrary to federal law, Medtronic did not report the unapproved uses and/or unapproved medical devices to the FDA when Medtronic knew the components of Infuse® were being so utilized.

569. Medtronic did not act as a reasonably prudent manufacturer of Class III medical devices in the promotion, sale, and distribution of Infuse® and its components.

570. Medtronic continued to illegally promote, market, and sell the components of Infuse® for unapproved uses, on hundreds of thousands of unsuspecting and vulnerable patients, some of whom would later suffer irreparable, debilitating and life-altering injuries, in order to reap enormous profits from those sales.

571. Medtronic prioritized market share and profit above the health and safety of patents and consumers, above FDA rules and regulations and above state common law duties.

572. Medtronic has violated federal law, FDA regulations, its PMA, and state common law duties, and breached the trust of physicians and patients who relied on Medtronic to act as reasonably prudent manufacturers. Medtronic acted in concert with its secret agents, and with other Defendants, as set forth herein, and acted in conscious and willful disregard of the health and safety of Infuse® patients, including the Plaintiffs herein.

**3. Medtronic Failed to Satisfy its Duties Imposed by the FDA Regulations and PMA Process, to Adequately Warn the FDA, Physicians, and Patients of the Increased Risks, Dangers, and Adverse Events Associated with the "Off-Label" Use of Infuse®**

573. Medtronic failed to fully and adequately warn physicians and patients of the increased risks and dangers associated with the "off-label" uses of Infuse®.

574. Medtronic had a duty to warn physicians of the possible increased risks and dangers associated with the "off-label" uses of Infuse® so that physicians could properly weigh the risks and benefits of the treatment and obtain proper informed consent from patients.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

575. Medtronic knew of additional risks and serious adverse events that they did not report to the FDA in violation of its federally mandated duties.

576. By continuing to illegally promote, market, and sell Infuse® for "off-label" use, as well as failing to warn of and report increased dangers and adverse events associated with such off-label use, and failing to seek approval for such off-label use, Medtronic breached its duty to physicians, and their patients, and wholly failed to act as a reasonably prudent medical device manufacturer, all in violation of federal law, the PMA and state common law duties.

### G. WYETH WARNED OF SERIOUS ADVERSE EVENTS RELATED TO INDUCTOS® IN EUROPE (INFUSE® IS MARKETED IN EUROPE AS A DRUG – NOT A MEDICAL DEVICE - UNDER THE NAME INDUCTOS®), BUT MEDTRONIC FAILED TO TAKE SIMILAR ACTION IN THE UNITED STATES

577. Wyeth Pharmaceuticals, in co-ownership with Medtronic, gained authorization to market Infuse® under the name InductOs® in Europe, in September of 2002.[193]

578. InductOs® first received approval for use in the treatment of acute tibia fractures in adults to increase the probability that tibial fractures will heal faster and reduce the need for additional surgeries.[194]

579. Subsequently, the European Commission expanded the approval of InductOs® in March of 2005 for use with the LT-Cage® Device for "single-level anterior (from the front) lumbar spinal fusion in adults with degenerative disc disease who had at least six months of non-operative treatment for this condition" at the L4 - S1 levels only.

580. This is still a limitation in Europe today.[195]

581. On March 23, 2007, less than two years after approval for use in the spine, Wyeth sent a letter to physicians in Europe warning that "[t]he unapproved use of InductOs® in posterior lumbar spine surgery or inappropriate use (e.g. overfilling of the implant/cage) has resulted in limited number of cases of localized fluid collection (e.g. pseudocysts, localized edema, implant suite effusion) some times

---

[193] Medtronic Announces European Commission Approval of New Indication for InductOs® for Spinal Surgery (April, 19, 2005), *available at* http://thefreelibrary.com/_/print/printarticle.aspx?id=131684515 (also attached hereto as Exhibit "V").
[194] *Id.; see also* FDA news Device Daily Bulletin (April 21, 2005), *available at* http://www.fdanews.com/newsletter/article?issueId=7469&articleId=71339 (also attached hereto as Exhibit "W").
[195] *Id.*

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

encapsulated, regularly requiring intervention."[196]

582. According to the letter, the majority of the reports of fluid collection occurred in surgeries where InductOs® was used in the "posterior lumbar approaches and/or in a manner inconsistent with the instruction for use, such as placing the sponge in places outside the cage and/or in overfilling of the implant/cage."

583. The letter also specified that fluid collection could occur within days or months after the spinal fusion, and that in more than half of the reported cases, the fluid collection encapsulated, and "resulted in nerve compression, neurological deficit or pain." In cases where the fluid collection persisted, clinical aspiration or surgical removal of the fluid was required.

584. The letter also explicitly recommended to surgeons that they use InductOs® exclusively in accordance with the instructions "paying attention to correct dosage and proper placement of the product within the LT-Cage."

585. Finally, the letter heralds the benefits of InductOs® stating, "InductOs® is approved for use in anterior spine fusion surgery as an alternative to autologous bone graft, resulting in non-inferior rates of radiographic fusion and clinical improvement. This potential post-operative adverse events needs to be placed in the context of reducing the need for autologous bone graft harvest."

586. The Committee for Medicinal Products for Human Use ("CHMP"), a division of the European Medicines Agency, also approved and released a Summary of Product Characteristics for InductOs® in 2007.

587. In Sections 4.2, 4.4, and 4.9 of this document, Wyeth directs surgeons to follow the instructions for InductOs®, exactly as provided ("Failure to follow the product preparation instructions for rhBMP-2/ACS may compromise its safety and effectiveness. Care and caution should be used to prevent overfilling of the construct and/or intervertebral space.").

588. In Sections 4.4, 4.8, and the Package Leaflet, Wyeth once again warns surgeons in detail of the formation of fluid collections, nerve compression, and pain when InductOs® is used in unapproved applications, where InductOs® is indicated exclusively for single-level (L4-S1) anterior

---

[196] Important Safety Information, Wyeth (March 23, 2007), *available at* http://www.cbg-meb.nl/NR/rdonlyres/F0155F2D-4488-49AF-A224-0B0498CFB201/0/DHPCL_InductosMar2007.pdf (also attached hereto as Exhibit "X").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

lumbar spine fusion coupled with an LT-CAGE® in adults, or for acute tibia fractures.

589. Conspicuously, neither the 2007 letter distributed to physicians in Europe regarding the dangerous effects of InductOs® when used in an "off-label" manner, nor the Summary of Product Characteristics approved by the CHMP, was provided to physicians in the United States.

### H. IN JULY 2008 THE FDA SENT A "DEAR DOCTOR" LETTER WARNING OF LIFE-THREATENING RISKS ASSOCIATED WITH THE "OFF-LABEL" USE OF INFUSE® WHEN USED IN THE CERVICAL SPINE

590. On July 1, 2008, the FDA sent out a public health notification "Dear Doctor" letter regarding the life-threatening complications associated with using Infuse® in cervical spine fusions.

591. In the letter, the FDA stated, "[t]his is to alert you to reports of life-threatening complications associated with recombinant human Bone Morphogenetic Protein (rhBMP) when used in the cervical spine. Note that the safety and effectiveness of rhBMP in the cervical spine have not been demonstrated and these products are not approved by FDA for this use."[197]

592. The FDA further stated, "complications were associated with swelling of the neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck. Anatomical proximity of the cervical spine to airway structures in the body has contributed to the seriousness of the events reported and the need for emergency medical intervention."[198]

593. With respect to unknown risks, the FDA stated, "[t]he mechanism of action is unknown, and characteristics of patients at increased risk have not been identified."[199]

594. The FDA warned BMP was only approved by the FDA for fusions of the lumbar spine, in skeletally mature patients with degenerative disc disease (DDD), at one level, from L2-S1.

595. The FDA emphasized BMP use outside the Infuse® system approved by the FDA is dangerous and, "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions

[197] FDA Public Health Notification: Life-Threatening Complications Associated with Recombinant Human Bone Morphogenic Protein in Cervical Fusion (July 1, 2008), *available at* http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm (also attached hereto as Exhibit "Y").
[198] *Id.*
[199] *Id.*

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

has not been demonstrated, and in light of the serious adverse events described above, the FDA recommended practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."[200]

596. Medtronic has resolved at least one wrongful death civil case filed related to the use of BMP in the cervical spine.[201] On August 21, 2008, Shirley Nisbet, a resident of Vista, California, underwent a cervical fusion procedure in which a Medtronic sales representative allegedly encouraged and recommended to her surgeon, prior to and during the surgery, that the surgeon use BMP in Ms. Nisbet's cervical spine. Following the operation, Ms. Nisbet had difficulty breathing and swallowing, and experienced severe pain and swelling in her neck. In the following days, her symptoms became progressively worse until her breathing became so compromised due to neck swelling and compression of her airway that she stopped breathing and fell into a coma on August 23, 2008. She remained in a vegetative state but was kept alive by artificial means for several days, until she died on August 30, 2008.[202] It has been reported that Medtronic subsequently settled this wrongful death action.

## I. "OFF-LABEL" SALES ARE VERY PROFITABLE FOR MEDTRONIC

597. Infuse® has become a blockbuster product for Medtronic.

598. Infuse® sales alone were nearly $900 million for the fiscal year of 2011.[203]

599. Medtronic has depended heavily on the sales of Infuse®, since its sales in other market areas, such as cardiac defibrillators, have significantly slowed due to numerous product recalls of a wide-variety of defective Medtronic products.

600. Medtronic's reliance on Infuse® for sales is exhibited by SEC filings and statements to analysts as well as the investing public, where Medtronic urged that Infuse® was a rapidly growing product and expected to greatly increase its market presence in the upcoming years.

---

[200] *Id.*
[201] *Nisbet v. Medtronic,* Case No. 8:08-cv-01361-JVS-RNB (C.D. Calif. [Southern Div.-Santa Ana]) was filed on 12/2/2008 and terminated on 2/27/09 by the filling of a Notice of Voluntary Dismissal w/o Prejudice by plaintiffs on 2/27/09.
[202] Medtronic Is Sued Over Bone Product (Dec 3, 2008), *available at* http://online.wsj.com/article/SB122827750515975273.html (also attached hereto as Exhibit "Z").
[203] "Critique could put bigger drag on Infuse sales" (Oct 25, 2012), *available at* http://www.startribune.com/business/175896771.html (also attached hereto as Exhibit "AA").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

601. In the 2007 fiscal year alone, according to Medtronic's Second Quarter press release filed with the SEC in November of 2006, "Worldwide Infuse® Bone Graft revenue grew 36 percent, driven by expanded surgeon adoption."[204]

602. In February of 2007, Arthur D. Collins, Jr., Medtronic Chairman of the board, responded to Citigroup analyst, Matthew Dodds, about the performance of Infuse®, stating that "Infuse® still grew 15%...**one of the biggest opportunities we have is continuing to expand the indication**." (Emphasis added).[205]

603. During the Goldman Sachs 28th Annual Global Health Care Conference, June 13, 2007, Medtronic's CFO, Gary Ellis stated, "Infuse is…one of our big growth platforms over the next several years."[206]

604. Additionally, Medtronic's Spinal Divisions Vice President for Clinical Affairs explained at an Investor and Analyst Meeting on June 20, 2007 that the company was sponsoring several clinical trials to obtain additional FDA approvals for Infuse®, including an ongoing Investigational Device Exemption ("IDE") trial examining its use in Posterolateral Fusion and other studies using it in the cervical spine.

605. FDA approval for these uses was never procured.[207]

606. In 2002, Infuse® was used in less than 1% of all spinal fusions.

607. By 2006, the product was used in 25% of all spinal fusions.

608. By 2007, as a result of Medtronic's over-aggressive promotion and concealment of dangers associated with use of its components without the Infuse® system, over 40% of PLIF procedures employed components of Infuse® contrary to FDA regulations.

609. The majority of growth stemmed from sales of components outside the Infuse® system, which comprised 85-90% of the total annual revenue from Infuse®.[208]

---

[204] Medtronic Reports Second Quarter Revenue Growth of 11 Percent (Nov 11, 2011), *available at* http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1164113830755&lang=fr_CH

[205] Complaint, as alleged in the shareholder action at Paragraph 195, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al, 08-06324, U.S. District Court, District of Minnesota* (also attached hereto as Exhibit "J").

[206] *Id.* at 207 as alleged in the shareholder action.

[207] *Id.* at 208 as alleged in the shareholder action.

[208] *See also* Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events Reported to the Manufacture and User Facility Device Experience Database,"* The Spine Journal, 12 (10): 894-899, October 2012 (also

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

### J. MEDTRONIC PAYS THE UNITED STATES GOVERNMENT $40 MILLION TO SETTLE WHISTLEBLOWER SUITS REGARDING ILLEGAL KICKBACKS TO DOCTORS TO INDUCE THE "OFF-LABEL" USE OF INFUSE®

610. Medtronic has also been named as a defendant in two prior *qui tam*[209] actions related to Infuse®, *United States ex rel. (UNDER SEAL)* v. *Medtronic. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn.) (commenced by a former Medtronic employee working as in-house counsel), and *United States ex rel. Poteet* v. *Medtronic, Inc., et al.*, Civil Action No. 03-2979 (W. D. Tenn.)[210] (Collectively, the "*qui tam* lawsuits").

611. The Plaintiffs in both cases alleged violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (2012), by paying illegal kickbacks to physicians in order to promote the use of the components and parts of Infuse® outside the approved system, and by inducing the submission of false and fraudulent claims to federal health care programs like Medicare and Medicaid.

612. In July 2006, Medtronic agreed to pay $40 million[211] to the federal government as part of its agreement to settle two *qui tam* actions under the False Claims Act, 31 U.S.C. §§ 3729-3733 (2012), the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a (2012), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12 (2012).[212]

613. In these lawsuits, the United States Department of Justice ("DOJ") contended that between January 1, 1998 and April 30, 2003, Medtronic made payments to physicians and entities in connection with its spinal products, in the form of: (a) payments and other remuneration for physicians' attendance and expenses at medical education events, "think tanks", VIP/Key Opinion Leader events, and meetings at resort locations (b) access for physicians to Medtronic's Healthcare Economic Services

---

attached hereto as Exhibit "CC"); *see also* John Carreyrou and Tom McGinity, *Medtronic Surgeons Held Back, Study Says*, Wall St. J. June, 29, 2011, *available at* http://online.wsj.com/article/SB10001424052702303627104576413663395567784.html (also attached hereto as Exhibit "DD").

[209] *United States ex rei. (UNDER SEAL) v. Medtronic. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn.)(also attached hereto as Exhibit "EE").

[210] *United States ex rei. Poteet v. Medtronic, Inc., et al.*, Civil Action No. 03-2979 (W. D. Tenn.)(also attached hereto as Exhibit "FF").

[211] Press Release, Department of Justice (July 18, 2006), *available at* http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").

[212] Medtronic also recently paid $23.5 million to settle allegations regarding Doctor kickbacks related to the sales of pacemakers. *See* Minnesota-Based Medtronic Inc. Pays U.S. $23.5 Million to Settle Claims That Company Paid Kickbacks to Physicians (Dec. 12, 2011), *available at* http://www.justice.gov/opa/pr/2011/December/11-civ-1623.html (also attached hereto as Exhibit "HH").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

and eBusiness Departments; and (c) payments made to various physicians and entities, pursuant to consulting, royalties, fellowships, and research agreements associated with Medtronic products.

614. Peter Keisler, Assistant Attorney General for the Department's Civil Division stated in response to the settlement that "*kickbacks to physicians are incompatible with a properly functioning health care system…They corrupt physicians' medical judgment and they cause overutilization and misallocation of vital health care resources.*"[213]

615. Specifically, the *qui tam* lawsuit brought forth by the former Medtronic counsel disclosed payments in the form of sham seminars and think tanks.

616. Seminars included free travel and lodging for physicians and their families, and were alleged to be without adequate training benefit. The locations ranged from Cancun at the Ritz Carlton, Hawaii, Malaysia and Los Cabos.

617. Additionally, Medtronic held all expenses-paid think tanks and study/discussion groups in Alaska, Amelia Island, Arnold Palmer Champions for Children Golf Tournament, New Orleans Mardi Gras (including up to a $25,000 payment to allow physicians to ride on a float and $15,000 spent on Mardi Gras beads), Idaho, Teton Valley and New York comprising at least 30 think-tanks and groups.[214]

618. Medtronic also entertained physicians at strip clubs in Memphis, Tennessee, home to defendant MSD.[215]

619. These trips were extravagant and the Medtronic funded visits to strip clubs inappropriate. As revealed hereinafter, the payments disclosed in these actions represented only the tip of the iceberg.

620. Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper, and thus resulted in the submission of false or fraudulent claims.

621. Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent

[213] Press Release, Department of Justice (July 18, 2006), *available at* http://www.justice.gov/opa/pr/2006/July/06_civ_445.html (also attached hereto as Exhibit "GG").

[214] See *United States ex rel. (UNDER SEAL) v. Medtronic, Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn.) (also attached hereto as Exhibit "EE").

[215] Lawsuit Says Medtronic Gave Doctors Array of Perks, (Sept 25, 2008), *The Wall Street Journal, available at* http://online.wsj.com/article/SB122230535985873827.html (also attached hereto as Exhibit "II").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

claims in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), *et seq.* (2012), which prohibits individuals from offering, soliciting or making any payment or remuneration to induce business reimbursed under a federal or state health care program, and the False Claim Act, 31 U.S.C. § 3729, *et seq.* (2012), which provides penalties for the submission of false claims to the federal government.

622. Under the settlement, the Medtronic Defendants also agreed to enter into a five-year Corporate Integrity Agreement ("CIA") with the U.S. Department of Health and Human Services' Office of Inspector General.[216]

623. Medtronic explained in its July 18, 2006 press release that this agreement implemented substantial oversight structures and procedures meant to ensure "***top-level attention to corporate compliance measures.***"[217] (Emphasis added.)

624. Among other items, the Corporate Integrity Agreement required the Medtronic Defendants to establish an electronic database to capture and manage all non-sales related transactions between its corporate spinal subdivision and its physicians or customers, with all transaction subject to an established set of internal controls and review processes, including monitoring by their senior management and Chief Compliance Officer.

625. The settlement also provided for negotiations between these defendants and representatives of the National Association of Medicaid Fraud Control Units for the purposes of distributing certain sums to several states which had been adversely affected by Medtronic's conduct.

### 1. Despite the Corporate Integrity Agreement, Medtronic's Off-Label Promotion Continues

626. Medtronic's secret agent Timothy Kuklo, M.D., a physician who was a former Army Colonel, retired from the military as Chief of Orthopaedic Surgery at Walter Reed Army Medical

[216] Corporate Integrity Agreement, *available at* http://oig.hhs.gov/fraud/cia/agreements/Medtronic_and_MSD_CIA.pdf also attached hereto as Exhibit "JJ")
[217] Press Release, Medtronic Resolves Qui Tam Suits (July 18, 2006), *available at* http://www.sec.gov/Archives/edgar/data/64670/000095013406013343/c06802exv99w1.htm (also attached hereto as Exhibit "KK").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

Center, the nation's premier military research hospital, in December 2006.

627. Timothy Kuklo, M.D. received hundreds of thousands of dollars per year in fees from the Medtronic Defendants following the DOJ settlement.

628. While still on active duty, Medtronic's secret agent Col. Kuklo was handsomely compensated by these defendants. From 2001 to 2005, Timothy Kuklo, M.D. received a total of $42,295 from Medtronic.

629. In 2006, his payments from the Medtronic Defendants went up to $42,627 for the single year.

630. Thereafter, Dr. Kuklo's payments skyrocketed. *The Wall Street Journal* revealed a substantial and dramatic increase in payments from the Medtronic Defendants of $356,242 in 2007, $249,772 in 2008, and $132,453 in the first few months of 2009.[218]

631. Medtronic's secret agent Timothy Kuklo, M.D. worked closely with these defendants as an active promoter of the "off-label" uses of Infuse®.

632. A U.S. Army investigation uncovered shocking misconduct by the former Army Colonel identifying a falsified study touting the benefits of using the components of Infuse® to treat wounded soldiers in Iraq, despite the fact that this use of Infuse® in the manner used in the study, was considered experimental.

633. The experimental nature of the study was never disclosed to the soldiers who were operated on and in which components of Infuse® were used in this experimental fashion.

634. The U.S. Army never approved the "study".

635. The U.S. Army never received the funds that the Medtronic Defendants paid to fund the "study".

636. Colonel J. Edwin Atwood, an Army physician who led the Army's inquiry described Kuklo's conduct as "the ultimate tragedy and catastrophe in academic medicine."[219]

---

[218] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").
[219] *Doctor Falsified Study on Injured G.I.'s, Army Says, The New York Times,* (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit "MM").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

637. Dr. Kuklo's "study" purported to compare fusion results of 67 patients who received autogenous bone graft versus 62 that were treated with the BMP/Sponge to treat certain tibial (shin bone) fractures in injured soldiers (including "off-label" uses). The "study" reported that employing the BMP/Sponge resulted in "strikingly" better outcomes than a traditional (autogenous) bone graft.

638. Medtronic's secret agent Timothy Kuklo, M.D. reported that those receiving autogenous bone grafts had successful fusion in 76% of procedures, while the union rate for the BMP/Sponge group was significantly better at 92%; he claimed that this was a "striking finding."[220]

639. Not only were Medtronic's secret agent Timothy Kuklo, M.D.'s reported union rates claimed better with the BMP/Sponge than with an autograft, but, according to this falsified study, patients who received the BMP/Sponge also reportedly experienced favorable outcomes in other clinical measures.

640. The study concluded that "the primary outcomes measures of union, rate of infection, and reoperation were all improved with rhBMP-2: and that those treated with the BMP/Sponge had a "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."[221]

641. Dr. Kuklo's Medtronic-sponsored study was false, the falsity only uncovered when one of the study's supposed "co-authors," Lt. Col. Romney C. Andersen, was congratulated on its publication by a colleague. After his discovery, Lt. Col. Andersen alerted Army investigators to the false claims.

642. Dr. Kuklo had listed four other Army surgeons as "co-authors" without their knowledge, when these four physicians had neither participated in nor reviewed the article's preparation or submission for publication.

643. The signatures of the four physicians listed as co-authors on the copyright release forms submitted to *The Journal of Bone and Joint Surgery* were forged by Dr. Kuklo.

644. The number of cases cited by Dr. Kuklo in the article differed from the number of cases contained in the Wartime casualty database, with no explanation for the discrepancies in the articles.

---

[220]Recombinant human bone morphogenetic protein-2 for grade III open segmental tibial fractures from combat injuries in Iraq, 1071, 1068-1072, *available at* http://graphics8.nytimes.com/packages/pdf/business/20090513kuklo-journal-article.pdf (also attached hereto as Exhibit "NN").
[221] *Id.* at 1068 and 1071-72.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

645. Contrary to Army policy, Dr. Kuklo did not obtain publication review or clearance from Walter Reed prior to submitting the article for publication.

646. The published results of the article suggested a much higher efficacy rate for BMP/Sponge than was supported by the experience of the purported co-authors.[222]

647. One of the Army's investigators, Col. Norvell V. Coots, cited a higher number of patients and injuries in Dr. Kulko's study than the hospital could account for. Coots stated "It's like a ghost population that were reported in the article as having been treated that we have no record of ever having existed…this really was all falsified information."[223]

648. After receiving correspondence from Walter Reed dated November 6, 2008 stating that Medtronic's secret agent Timothy Kuklo, M.D. did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co-authors had questioned the study findings, *The Journal of Bone and Joint Surgery* formally retracted the article and banned Dr. Kuklo from submitting further papers to the Journal.[224]

649. As noted in a May 19, 2009 follow-up article in *The New York Times,* when questioned about its ties to Medtronic's secret agent Timothy Kuklo, M.D., the Medtronic Defendants repeatedly declined to disclose when it began its financial relationship with the former Army surgeon or the extent of funding it provided.[225]

650. The funding for the study, which the Army never received, is, to date, unaccounted for.

651. Medtronic's secret agent Timothy Kuklo, M.D. appeared as a "distinguished guest surgeon" at Medtronic's Spine Division Business Overview Conference Call on September 28, 2006, alongside another Medtronic consultant, Dr. Rick Sasso—who received $150,000 in consulting fees in 2006—as well as Gary L. Ellis, Medtronic Vice President, Corporate Controller and Treasure and Peter Wehrly ("Wehrly"), Medtronic Spinal Division Senior Vice President.

[222] *Doctor Falsified Study on Injured G.I.'s, Army Says,* The New York Times, (May 13, 2009), *available at* http://www.nytimes.com/2009/05/13/business/13surgeon.html?pagewanted=all&_r=0 (also attached hereto as Exhibit "MM").
[223] *Id.*
[224] Withdrawal of a paper, J. Scott, J Bone Joint Surg. Br. March 2009 91-B:285-286, *available at* http://www.bjj.boneandjoint.org.uk/content/91-B/3/285.extract (also attached hereto as Exhibit "OO").
[225] Senator Seeks Data on Doctor Accused by Army of Falsifying a Product Study, (May 18, 2009), *available at* http://www.nytimes.com/2009/05/19/business/19surgeon.html?_r=0 (also attached hereto as Exhibit "PP").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

652. During the call, a Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side effects with using Infuse® in the cervical region," and whether such FDA-unapproved use was a concern for surgeons.

653. Dr. Sasso responded by referring to a "Level 1, controlled randomized study which was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the appropriate dosage of Infuse®, you did not get problems with esophageal obstruction and problems swallowing."

654. Medtronic's secret agent Timothy Kuklo, M.D. responded that the question "was well answered as far as appropriate dosage. I think it's really the bottom line."[226]

655. Medtronic's secret agent Timothy Kuklo, M.D.'s and Dr. Sasso's rendition of the medical literature was not accurate.

656. Drs. Kuklo and Sasso intentionally and with the full knowledge of Medtronic misrepresented the seriousness of the adverse events that Medtronic knew were occurring in the cervical spine – their misrepresentations only hinted at the significant influence of Medtronic's payments had on its consultants' medical judgment.

657. Additionally, Senator Grassley discovered that Medtronic's secret agent Timothy Kuklo, M.D.'s name did not appear on a list of paid consultants for Infuse® provided by the Medtronic Defemdants to Senator Grassley that the Senator had requested in a September 30, 2008 letter to the Medtronic Defendants. Senator Grassley disclosed the list Medtronic provided – which included 22 physicians who were paid a total of $943,000 from 2005 to 2008 – in a May 18, 2009 letter to these defendants that was published in the *Congressional Record* the following day. According to the May 18, 2009 letter, Senator Grassley was "concerned" that these defendants did not provide their secret agent Timothy Kuklo, M.D.'s name in response to his inquiry that specifically requested information regarding consultants whose work involves Infuse®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named in *The New York Times* as a consultant for these defendants in regards to Infuse®.[227]

[226] *Minneapolis Firefighters' Relief Association v. Medtronic, INC.*, et.al, 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[227]

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

658. By this time, Medtronic's secret agent Timothy Kuklo, M.D. had given countless presentations promoting the use of the BMP/Sponge component of Infuse® on behalf of the Medtronic Defendants, not to mention his fraudulent "studies."

659. On June 18, 2009, the Medtronic Defendants disclosed to *The Wall Street Journal* that Medtronic's secret agent Timothy Kuklo, M.D. had received almost $850,000 in payments from these defendants over the past ten (10) years, the majority of which – nearly - $800,000 – were made in the preceding three (3) years when Dr. Kuklo was shopping his study to medical journals.

660. The Medtronic Defendants paid their secret agent Timothy Kuklo, M.D. $356,242 in 2007, the year their secret agent Timothy Kuklo, M.D. sought publication of the study in two medical journals.

661. The Medtronic Defendants paid Dr. Kuklo $249,772 in 2008, the year the study was published.[228]

662. The Medtronic Defendants made both of these payments after it announced its settlement with the DOJ in July of 2006.

663. Medtronic only placed their secret agent Timothy Kuklo, M.D. on "inactive status" only ***after*** reports that he falsified the study's data were published in *The New York Times*.

**2. Medtronic Accused of Paying Doctors Illegal Kickbacks to Induce Them Into Using Medtronic Manufactured Medical Devices**

664. On December 12, 2011, it was announced that Medtronic Inc. had agreed to pay the United States $23.5 million to settle allegations that it paid illegal kickbacks to doctors for using their medical devices.[229]

665. The U.S. Department of Justice claimed that Medtronic violated the False Claim Act by providing payments to physicians to induce doctors to implant the company's medical devices and further that Medtronic had instructed its sales representative how to promote their products for "off-

[228] Medtronic Paid the Surgeon Accused Of Falsifying Study Nearly $800,000, (June 18, 2009), *available at* http://online.wsj.com/article/SB124527830694724953.html (also attached hereto as Exhibit "LL").

[229] See The U.S. Department of Justice Press Release dated December 12, 2011, entitled "*Minnesota-Based Medtronic Inc. Pays US $23.5 Million to Settle Claims That Company Paid Kickbacks to Physicians*" attached hereto as Exhibit HH and also available at: http://www.justice.gov/opa/pr/2011/December/11-civ-1623.html.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

label" uses.

666. The U.S. Department of Justice further contended that Medtronic caused false claims to be submitted to Medicare and Medicaid by using two post-market studies and two device registries as vehicles to pay participating physicians illegal kickbacks to induce them to implant Medtronic medical devices.

667. Medtronic paid physicians who participated in the post-market studies and registries an extra fee ranging from approximately $1,000 to $2,000 per patient.

668. The United States Department of Justice contended that Medtronic solicited physicians for the studies and registries in order to convert their business from a competitor's product or persuade the physicians to continue using Medtronic products.

669. "Patients who rely on their healthcare providers to implant vital medical devices expect that those decisions will be made with the patients' best interests in mind," said Tony West, Assistant Attorney General for the Civil Division. "Kickbacks, like those alleged here, distort sound medical judgments with financial incentives paid for by the taxpayers."

670. "Medicare and Medicaid beneficiaries depend on their physicians to make decisions based on sound medical judgment," said B. Todd Jones, U.S. Attorney for the District of Minnesota. "Medical device manufacturers must not be permitted to use improper payments to cloud that judgment."

671. "Today's settlement highlights one of the key purposes of the Anti-Kickback law – to ensure that the judgment exercised by health care providers in treating Medicare and Medicaid patients is not influenced by unlawful payments," said Benjamin Wagner, U.S. Attorney for Eastern District of California.

672. "Patients trust that decisions to implant certain pacemakers or other medical devices are based on their own health interests and not influenced by kickbacks," said Daniel R. Levinson, Inspector General of the Department of Health and Human Services.

**3. Medtronic Accused Once Again of Paying Surgeons Illegal Kick-Backs to Induce Them Into Using Medtronic Mannfactured Medical Devices**

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

673. Medtronic's schemes of illegal kickbacks are not an apparition, but rather appear to be the standard course of conduct for one of the world's largest medical device manufacturers.

674. On May 28, 2014, it was announced that Medtronic will pay the U.S. Justice Department $9.9 million to settle allegations that it paid illegal kickbacks to doctors for using its medical devices.[230] Medtronic was accused by a former high ranking employee that the company knowing and consciously provided financial and other inducements to physicians who implanted its devices.

675. Adolfo Schroeder, the former Business Development Manager at Medtronic, originally brought this case as a whistleblower lawsuit, until the U.S. Department of Justice, believing in Shroeder's claims, took over the litigation.[231] Shroeder had first hand knowledge of the internal workings of Medtronic because he joined the company in May of 2006. Being at the company, Shroeder had the opportunity to personally observe Medtronic's custom and practice of paying illegal kickbacks.

676. The U.S. Department of Justice had accused Medtronic of inducing doctors to use its products by paying them to speak at conferences, developing marketing and business plans at no cost, and providing tickets to sports events.

677. The U.S. Department of Justice also had charged that Medtronic violated the federal False Claims Act with their egregious behavior.

678. Describing Medtronic's course of conduct of using improper financial relationships to influence physician decision-making, Stuart F. Delery, the Assistant Attorney General for the U.S. Department of Justice Civil Division said, "Improper financial incentives have the potential to compromise physician medical judgment."

---

[230] *See* Rueters Top News Article dated May 28, 2014, entitled "*Medtronic settles U.S. kickbacks case over pacemakers*" available at: http://mobile.reuters.com/article/idUSL1N0OE1TB20140528?irpc=932. See also Star Tribune's news article date May 28, 2014, entitled "*Medtronic to pay $9.9 million in kickback settlement with feds*," available at: http://m.startribune.com/?id=260978651.

[231] *See U.S. ex rel Schroeder v. Medtronic Inc.*, U.S. District Court, Eastern District of California, No. 09-00279.

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

679. Additionally, U.S. Attorney Benjamin Wagner said, "These sorts of improper financial incentives not only undermine the integrity of medical decisions, they also waste taxpayer funds and are unfair to competitors who are trying to play by the rules".

680. Medtronic settled these claims before the court system, the United States Government, as well as the concerned public would have truly discovered the depths of Medtronic's illegal conduct.

## K. $85 MILLION TO SETTLE SHAREHOLDER SUIT RE: OFF-LABEL PROMOTION

681. *Minneapolis Firefighters' Relief Association v Medtronic, INC, et.al,* 08-06324, U.S. District Court, District of Minnesota (Minneapolis)[232] was brought on behalf of institutional shareholders and arose from allegations of the Medtronic Defendant's materially false, misleading, and incomplete public statements concerning Infuse®, notably including over-aggressive promotion of its components outside the FDA approved system.[233]

682. Judge Magnuson in the United States District Court for the District of Minnesota described the shareholder action, in part, in his Memorandum and Order on December 12, 2011 as follows:

a. "Infuse® is a surgically-implanted medical device containing a genetically engineered protein designed to stimulate bone growth." (Am. Compl. (Docket No. 68) ¶ 1.) Medtronic received approval from the Food and Drug Administration ("FDA") for certain specific uses on Infuse®: treatment of degenerative discs in the lower lumbar region of the spine, fractures of the tibia, and certain facial/oral surgeries." *See Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc. 278 F.R.D. 454, 456 (D. Minn. 2011)*

b. "Plaintiffs' claims arise from what they characterize as Medtronic's intentional promotion of off-label use for Infuse®. A physician's use of a device in a manner not specifically approved by the FDA is not illegal. It is illegal, however, for a manufacturer to promote device's off-label use. Plaintiffs contend that Medtronic engaged in such promotion,

---

[232] *See* Complaint *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "J").

[233] Jonathan Stempel, *Medtronic to pay $85 million to settle Infuse lawsuit*, Reuters, (March 31, 2012), *available at* http://206.132.6.104/article/2012/03/30/us-medtronic-settlement-idINBRE82T1A920120330 (also attached hereto as Exhibit "RR").

Electronically Filed - City of St. Louis - September 15, 2014 - 10:49 AM

and that eventually more than 85% of Infuse® sales involved off-label use. (*Id.* ¶ 3)…[t]he Infuse product generated approximately $800 million annually or 6% of Medtronic's total corporate revenue. (*Id.* ¶ 40.) In the summer of 2008, the FDA issued a warning about a particular off-label use of Infuse® and several months later, Medtronic disclosed that it was the target of an investigation by the Department of Justice ("DOJ") regarding off-label use of Infuse®." *Id.*

c. "Specifically, Plaintiffs allege that Medtronic both implicitly and explicitly encouraged its sales force to promote the off-label use of Infuse®. Plaintiffs rely on the testimony of 15 confidential witnesses to support this allegation." *Id.*

d. According to the Amended Complaint, the information provided by the confidential witnesses either established or implies that Medtronic actively promoted off-label uses for Infuse by, among other things, **hosting physician meetings at which a Medtronic-paid consulting physician would give a presentation on off-label uses** (Am. Compl. ¶ 93), **instructing its sales force in the off-label use of Infuse®** *(Id.* ¶ 94), **giving physicians literature about off-label uses for Infuse®** *(Id.* ¶ 96) **or directing physicians to other surgeons who used Infuse® for off-label procedures** (*Id.* ¶ 102), **and advising physicians regarding the appropriated dosage of Infuse for off-label uses** (*Id.* ¶ 105). Plaintiffs also claim that Medtronic set high sales targets for Infuse and knew or should have known that such high targets could be reached only through illegal promotion of off-label uses of Infuse." (e.g., *Id.* ¶ 107).[234] *Id.* (Emphasis added).

**I. Systematic "Off-Label" Over-Promotion Through Medtronic's Agents**

683. As noted by Judge Magnuson, according to former employees in the shareholder action against the Medtronic Defendants, these defendants engaged in systematic "off-label" promotion.

684. Some of the techniques alleged in the shareholder action used by these defendants include: sponsoring "off-label" presentations by "opinion leaders;" providing sales representatives specific, step-

[234] Memorandum and Order at 2-3, *Minneapolis Firefighters' Relief Association v Medtronic, INC., et.al,* 08-06324, U.S. District Court, District of Minnesota (also attached hereto as Exhibit "SS").